1  DAVID M. POITRAS P.C. (CA Bar No. 141309)
   ALEXIS M. McGINNESS (CA Bar No. 241449)
2  JEFFER MANGELS BUTLER & MITCHELL LLP
   1900 Avenue of the Stars, Seventh Floor
3  Los Angeles, California 90067-4308
   Telephone:   (310) 203-8080
4  Facsimile:   (310) 712-8571
   Email:      dpoitras@jmbm.com
5
   Counsel for Westrim, Inc.,
6  Debtor and Debtor-in-Possession

7
               UNITED STATES BANKRUPTCY COURT
8               CENTRAL DISTRICT OF CALIFORNIA
                SAN FERNANDO VALLEY DIVISION
9

10 In re                          | CASE NO.   1:11-bk-15313-GM

11 WESTRIM, INC. dba WESTRIM CRAFTS,   | Chapter 11
   a Delaware corporation.
12
                 Debtor.
13                                 NOTICE OF EMERGENCY MOTION AND
                                   EMERGENCY MOTION TO ESTABLISH
14                                 PROCEDURES FOR THE SALE OF A
                                   SUBSTANTIAL PORTION OF THE
15                                 ESTATE'S ASSETS; MEMORANDUM OF
                                   POINTS AND AUTHORITIES;
16                                 DECLARATION OF RONALD B. COOPER
                                   IN SUPPORT THEREOF
17
                                   [11 U.S.C. §§ 105 and 363]
18
                                   **Hearing:**
19
                                   Date:       May 3, 2011
20                                 Time:       10:00 a.m.
                                   Ctrm:       Ctrm. 303
21                                             21041 Burbank Blvd.
                                               Woodland Hills, CA 91367
22
                                   Judge:      Hon. Geraldine Mund
23

24

25

26

27 **TO THE HONORABLE JUDGE GERALDINE MUND, UNITED STATES BANKRUPTCY**

28 **JUDGE, AND INTERESTED PARTIES:**

1    **PLEASE TAKE NOTICE** that on the 3rd day of May 2011, at the hour of 10 a.m., or as

2    soon thereafter as counsel can be heard, in the courtroom of the Honorable Judge Geraldine Mund,

3    United States Bankruptcy Judge, which is located in Courtroom 303, 21041 Burbank Boulevard,

4    Woodland Hills, CA 91367, Westrim, Inc. dba Westrim Crafts, a Delaware corporation, debtor and

5    debtor-in-possession in this chapter 11 case (hereinafter "Debtor"), will and does hereby move the

6    Court, pursuant to sections 105(a) and 363(b) of chapter 11 of title 11 of the United States Code, 11

7    U.S.C. § § 101, et seq. (the "Bankruptcy Code"), to establish procedures for the sale of a substantial

8    portion of the estate's assets (hereinafter the "Motion" or "Sale Procedures Motion").

9        Subject to Bankruptcy Court approval, Debtor has entered into an agreement to sell a

10    substantial portion of the assets consisting of inventory, intellectual property, general intangibles,

11    goodwill, customer lists and certain other defined assets of the bankruptcy estate (the "Sale" or

12    "Sale Agreement") and to assume and assign specified executory contracts and unexpired leases to

13    Blue Moon Beads Acquisition Corp. (hereinafter "Purchaser" or "Acquisition Corp.") pursuant to

14    that certain proposed Asset Sale and Purchase Agreement (the "Sale Agreement") between Debtor

15    and Acquisition Corp. As of the Petition Date, the parties have not executed the Sale Agreement

16    but they do anticipate executing the Sale Agreement prior to the hearing on this Motion. If the

17    proposed sale is approved, Acquisition Corp. (or the "Successful Bidder" as defined below) will

18    acquire a substantial portion of Debtor's assets, consisting of inventory, intellectual property,

19    general intangibles, goodwill, customer lists and certain other defined assets (hereinafter the

20    "Assets"), excepting, without limitation, cash, accounts receivable, certain furniture, fixtures and

21    equipment, Debtor's corporate minute books, contracts and leases that are not designated for

22    assumption and assignment, bankruptcy avoidance claims (excepting only avoidance actions against

23    suppliers, vendors and customers of Debtor which have or will have the same relationships with

24    Purchaser on and after the Closing) and certain designated inventory (hereinafter the "Excluded

25    Assets"). The proposed sale to Acquisition Corp. is subject to overbid at the hearing on Debtor's

26    Motion to Approve the Sale Agreement (the "Sale Hearing" or the "Sale Motion" as applicable).

27        As set forth in the Sale Agreement, Debtor proposes to sell the Assets to Acquisition Corp.

28    (or an overbidder) for $2.5 million cash at Closing (subject to adjustment), plus an additional

1  payment of $250,000 in March 2012, plus earnout payments, if earned, of up to $12,500,000 based

2  on the achievement of certain net product margins by Acquisition Corp. following the closing (as

3  described in the proposed Sale Agreement) (the "Earn Out") (collectively, the "Purchase Price").

4  As set forth in the Cooper declaration filed in support of the Sale Motion, Debtor believes that the

5  proposed purchase price for the Assets is fair and reasonable under the circumstances presented.  In

6  the absence of new capital or a sale (such as that proposed by the Sale Motion), Debtor's business

7  will be forced to close, permanently.  In such event, material going concern value, in addition to

8  approximately 70 jobs will be lost, unnecessarily.  Debtor's board of directors has determined that

9  the sale proposed herein is beneficial to Debtor and this bankruptcy estate.  Based upon information

10  and belief, Debtor believes that there may be overbidding at the Sale Hearing.  Through this

11  process, the Court and interested parties will be assured that the Assets will be sold for the highest

12  and best price possible.

13       Pursuant to the contemplated purchase offer Debtor has received, the sale must be close by

14  June 3, 2011.  Accordingly,  (i) a Sale Order must be entered on or before May 27, 2011, (ii) the

15  sale motion needs to be filed immediately after the bid procedures may be approved, and (iii) bid

16  procedures need to be approved as soon as possible.

17       Debtor is serving a copy of this Motion upon all creditors who assert a general security

18  interest in the Assets, the twenty largest creditors holding unsecured claims, parties requesting

19  special notice, the Office of the United States Trustee and counsel for the proposed purchaser

20  Acquisition Corp., by either messenger, overnight mail, facsimile or email, as reflected in the

21  attached proof of service.  Debtor believes and alleges that this notice is appropriate within the

22  meaning of § 102 of the Bankruptcy Code.

23       The Motion is based upon this notice of motion, the Motion itself, the attached declaration,

24  the pleadings and records on file in this case, and upon such other evidentiary matters as may be

25  presented to the Court regarding the Motion.

26       **PLEASE TAKE FURTHER NOTICE** that this Motion is being presented to the

27  Court on shortened notice.  Pursuant to General Order 02-02, any response, written or oral,

28  including any opposition or objection to the motion may be presented before or at the time of the

PRINTED ON
RECYCLED PAPER
748553v3

1    hearing on the Motion. Any opposition filed and served prior to the hearing on the Motion (i)

2    should be served by e-mail, fax or personal delivery and (ii) a filed copy of the opposition should be

3    delivered directly to Judge's Chambers.

4          **PLEASE TAKE FURTHER NOTICE** that failure to respond or to appear at the hearing

5    on the Motion may result in the Court granting the relief requested by the Motion. For further

6    information concerning the Motion, please contact the attorneys for Debtor listed on the first page

7    of this notice.

8

9    DATED: April 29, 2011                    JEFFER MANGELS BUTLER & MITCHELL LLP

10

11                                    By:    /s/ *David M. Poitras*
                                           DAVID M. POITRAS, P.C.
12                                         Counsel for Westrim, Inc.,
                                           Debtor and Debtor-in-Possession

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PRINTED ON
RECYCLED PAPER
748553v3

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

Subject to overbids, Debtor seeks to sell the Assets free and clear of all liens, claims, interests and encumbrances and assume and assign various leases and executory contracts related to the Assets, to Acquisition Corp. as set forth in the Sale Motion. By consummating the Sale, Debtor will preserve its going concern value and approximately 50 jobs may be saved.

## II.

## STATEMENT OF FACTS

### A.        Description Of Debtor

Westrim is a Delaware corporation and a wholly owned subsidiary of Creativity Crafts, Inc., a Delaware corporation ("Creativity"), and is based in Van Nuys, California. Westrim currently employs approximately 70 people. Creativity is a privately held Delaware corporation and is also based in Van Nuys, California. Other than its stock interest in Debtor, Creativity does not have any material assets, including none of the Assets to be acquired by Acquisition Corp. Similarly, other than various guaranty/surety obligations for which Debtor is the primary obligor, Creativity does not have any significant debt.

Debtor had its beginnings in Los Angeles during the early 1950's as Western Trimmings, when Albert Deitsch started a costumes and props design and supply business catering to the movie industry. Westrim, headed by Gary Deitsch, evolved into a basic crafts business in the 1960's wholesaling product to hobby stores and sewing retailers. Design of product was done in Southern California but virtually all production has been done in Asia since the 1970's, with the product being distributed nationwide from Westrim's Southern California distribution facility. By the early 2000's, the independent hobby and sewing stores had been replaced by the national chains of hobby and mass merchandise stores such as Michaels, JoAnn Stores, A.C Moore, Wal-Mart and Target. The Company grew to meet the needs of these large chains with evolving consumer trends and increasing volume. Scrapbooking became very popular and Debtor moved its focus toward that sector, retaining the basic crafts business. The costume jewelry making business became

JMBM | Jeffer Mangels Butler & Mitchell LLP

1   increasingly popular and in 2002, Westrim acquired Blue Moon Beads.  As the popularity of

2   scrapbooking declined, Debtor sold off its various units and the Blue Moon Beads unit is left as the

3   most popular national "premium" brand for high quality beads and fashion-conscious jewelry

4   making components.

5          **B.**          **The Main Assets of the Estate**

6          Debtor's principal assets are accounts receivable, inventory and equipment, most or

7   all of which appear to be subject to the security interests described above.

8          **1.**     **Receivables**

9          As of April 22, 2011, the face amount of Debtor's outstanding accounts receivable

10  was approximately $2,207,000.00.  Based upon past history, Debtor believes that as part of a going

11  concern, the current receivables are collectible with a reserve of approximately  $432,000.00.

12         **2.**     **Inventory**

13         Debtor's inventory consists of finished goods, raw materials and packaging materials.  As of

14  April 22, 2011, the value of Debtor's inventory subject to the pending sale, calculated as the value

15  of Debtor's cost of such inventory, was approximately $3,000,000.00.  As of April 22, 2011, the

16  value of Debtor's inventory not subject to the pending sale, again calculated at Debtor's cost of such

17  inventory, was approximately $2,000,0000.00.

18         **3.**     **Equipment**

19         Debtor owns certain furniture, fixtures and equipment, the non-depreciated book value of

20  which was approximately $2.5 million as of December 31, 2010.  Approximately 10% of these

21  assets are subject to the pending sale and the remainder will remain with the Debtor and will be

22  liquidated separately.

23         **4.**     **Summary**

24         In sum, the market value of Debtor's personal property assets as of the Petition Date

25  (including intellectual property and intangibles) was approximately $5,000,000 - $17,500,000.

26         **C.**          **Need For Bankruptcy Relief – The Proposed Sale**

27         Westrim acquired several craft companies between 2000 and 2006, with the intent of

28  leveraging a common "back office" infrastructure (warehousing, accounting, IT, HR) to provide

JMBM | Jeffer Mangels
Butler & Mitchell LLP

1    cost leverage and strengthen its relationships with key retail customers, including Michaels, JoAnn's

2    and Wal-Mart.  Significant losses in product placement due to changes in retailer strategy and

3    increased competition resulted in a decline in revenue from approximately $125 million in 2005 to

4    $30 million in 2010.  Westrim's current revenue and margins are not sufficient to pay its

5    infrastructure costs on an ongoing basis.  In May 2010, Westrim sold the assets of its scrapbooking,

6    paper crafting, wall décor, craft storage and general crafts business to ANW Crestwook.  In June

7    2010, Westrim engaged investment banker Stifel Nicolaus to market the assets of the Blue Moon

8    Beads unit, with the intent of paying all debts and returning any remaining capital to the

9    shareholders once the sale was complete.

10          Stifel Nicolaus assisted in preparation of a Confidential Memorandum regarding a proposed

11    sale of the Blue Moon Beads unit.  After contacting over 100 potential purchasers, identified by

12    Stifel Nicolaus and Debtor as the most likely candidates to acquire the Blue Moon Beads unit, the

13    Confidential Memorandum was sent in August 2010 to over 40 parties who had requested the

14    material.  Subsequent discussions were had with each of these parties, and eventually 6 parties

15    attended on-site presentations in September and October 2010.  Eventual negotiations with the 6

16    parties resulted in the receipt of 3 proposals in November and December 2010.  After discussions

17    with the investment banker, the proposal received from Acquisition Corp. was determined to be the

18    most viable proposal.

19          On or about April 8, 2011, Debtor and Acquisition Corp's parent company (the "Licensee")

20    entered into an Exclusive License Agreement (the "Exclusive License") pursuant to which Debtor

21    granted to the Licensee an exclusive license to make and sell to Michaels certain products under the

22    "Blue Moon" brand (the "Licensed Products").  The Exclusive License is attached as Exhibit 2 to

23    the Cooper Declaration.  The Licensee is required to pay to Debtor a royalty equal to 7% of the

24    gross sales to Michaels of the Licensed Products.  The Exclusive License was entered into in good

25    faith and on an arm's length basis (with substantial give and take between the parties) in order to

26    ensure that Michaels will continue to purchase the Licensed Products.  Pursuant to the Sale

27    Agreement, Debtor and Acquisition Corp. have agreed that Acquisition Corp. on behalf of the

28    Licensee, can offset any payments due to Debtor under the Exclusive License against any of the

JMBM | Jeffer Mangels Butler & Mitchell LLP

PRINTED ON
RECYCLED PAPER
748553v3

1    Breakup Fee (as defined below) due from the Seller.

2         Faced with the imminent prospect of a forced liquidation, in the exercise of its fiduciary

3    duty, Debtor's board of directors determined to file this chapter 11 case to preserve and protect

4    Debtor's assets for the benefit of all creditors, Debtor's employees, and to preserve the business as

5    close to a going concern as possible under the circumstances presented, to allow for a sale of

6    Debtor's assets for the benefit of all concerned, under the protection of the Bankruptcy Court.

7    **III.**

8    **PROPOSED SALE PROCEDURES AND OVERBID REQUIREMENTS**

9         Debtor's management has met to discuss the proposed Acquisition Corp. offer and in the

10   exercise of Debtor's reasonable business judgment, Debtor has decided it intends to accept the

11   Acquisition Corp. offer, subject to Bankruptcy Court approval and overbid pursuant to the

12   procedures set forth below and as ordered by the Court. A true and complete copy of the proposed

13   bidding procedures are attached to this Motion as Exhibit 1 (the "Bidding Procedures"). The

14   Bidding Procedures for which approval is sought by this Motion are summarized as follows:

15        a.    If the Acquisition Corp. is not the prevailing bidder in an auction for the

16   Assets and the sale to the prevailing bidder closes, Acquisition Corp. shall be entitled to (i) an

17   $82,500 termination fee and reimbursement for up to $100,000 for out-of-pocket expenses

18   (collectively, the "Breakup Fee") or (ii) up to $100,000 for out of pocket expenses if Acquisition

19   Corp. terminates the proposed Sale Agreement pursuant to Sections 15.1(e)(i) or Section 15.1(f);

20        b.    Under the Bidding Procedures, only Qualified Overbidders may participate in

21   the sale process. Qualified Overbidders are those prospective bidders who deliver to Debtor (i) an

22   executed confidentiality agreement in form and substance satisfactory to Debtor; (ii) current

23   financial statements or other financial information of the bidder or its equity holder(s)

24   demonstrating the bidder's financial capability to consummate the proposed sale, as determined by

25   Debtor in its sole discretion, and (iii) a preliminary, non-binding proposal identifying the nature and

26   extent of any due diligence it wishes to conduct, and financial information demonstrating its ability

27   to consummate the sale;

28        c.    The Bidding Procedures further provide that in order for a bid to be a

1  Qualified Overbid, such bid must be (i) by way of an executed copy of an asset purchase agreement:

2  (a) acceptable in form to Seller (the "Overbid Sale Agreement"), (b) clearly marked to show any

3  changes from the terms of the Acquisition Corp. Sale Agreement, or (c) on the same or more

4  favorable terms as the Acquisition Corp. Sale Agreement; provided, however, the purchase price in

5  such proposed Overbid Sale Agreement must be at least $307,500.00 more than the Acquisition

6  Corp. bid; (ii) accompanied by a non-refundable good faith deposit in the amount of $250,000; (iii)

7  accompanied by a binding financing commitment or other evidence of ability to consummate the

8  transaction; and (iv) received by Debtor prior to the Bid Deadline of May __, 2011.  By making a

9  bid, a bidder shall be deemed to have agreed to keep its offer open until the earlier of (x) two

10 business days after the Assets have been disposed of pursuant to the Bidding Procedures, or (y)

11 thirty days after the Sale Hearing;

12        d.        Debtor will consider a bid only if the bid is on terms that are not conditioned on

13 obtaining financing, due diligence or other conditions less favorable to the Debtor than those set

14 forth in the contemplated Sale Agreement.

15        e.        If Qualified Bids are received, Debtor will conduct an auction (the "Auction") for

16 some or all of the Assets as to which a Qualified Bid has been received.  Such Auction shall take

17 place at the Bankruptcy Court on a date to be scheduled by the Court at the hearing on this Motion.

18 Only a Qualified Overbidder who has submitted a Qualified Bid will be eligible to participate at the

19 Auction.  At such Auction, Acquisition Corp. and Qualified Overbidders will be permitted to

20 increase their bids and Acquisition Corp. will be permitted to bid the Breakup Fee.  Based upon the

21 terms of the Qualified Bids received, the level of interest expressed as to the Assets and such other

22 information as Debtor determines is relevant, Debtor in its reasonable discretion will conduct an

23 Auction in the manner it determines will result in the highest or otherwise best offer for the Assets

24 including, but not limited to, (i) offering the Assets for bidding as an entire package, in groups of

25 less than all of the Assets, and/or individually, (ii) offering the Assets for bidding in such successive

26 rounds as Debtor determines to be appropriate, and (iii) any such additional procedural rules that it

27 determines to be reasonable under the circumstances for conducting the Auction that are not

28 inconsistent with any of the provisions of the Bankruptcy Code, any Bankruptcy Court order, or the

1    Bidding Procedures.  Initially, incremental overbids will be set at $125,000;

2        f.        Upon conclusion of an Auction, Debtor shall (i) review each Qualified Bid on the

3    basis of financial and contractual terms and the factors relevant to the sale process, including those

4    factors affecting the speed and certainty of consummating the Sale and (ii) identify the highest and

5    otherwise best offer (the "Successful Bid").  At the Sale Hearing, Debtor shall present to the

6    Bankruptcy Court for approval the Successful Bid and any backup bids.  Debtor may adopt rules for

7    the bidding process that are not inconsistent with any of the provisions of the Bankruptcy Code, any

8    Bankruptcy Court order, or the Bidding Procedures; and

9        g.        Following a hearing approving the sale of one or more Assets to a Successful Bidder,

10   if such Successful Bidder fails to consummate an approved sale because of a breach or failure to

11   perform on the part of such Successful Bidder, (a) it will forfeit its Good Faith Deposit to Debtor

12   and Debtor may pursue any and all of its options at law and in equity with respect to such breach

13   (except as otherwise set forth in the Sale Agreement) and (b) the next highest or otherwise best

14   Qualified Bid, as disclosed at the Sale Hearing, shall be deemed to be the Successful Bid and

15   Debtor shall be authorized to effectuate such sale without further order of the Bankruptcy Court or

16   (c) Seller may reschedule the Auction to a later date and time convenient to the Court for any of the

17   Assets.

18                                            **IV.**

19                                        **ARGUMENT**

20   **A.        The Bidding Procedures Can Be Approved Under The Business Judgment**

21             **Standard**

22        A proposed use, sale or lease of property under Section 363(b) is appropriate if some

23   "articulated business justification" exists for the transaction.  See, Institutional Creditors of

24   Continental Air Lines, Inc. v. Continental Air Lines, Inc. (In re Continental Air Lines, Inc.), 780

25   F.2d 1223, 1226 (5th Cir. 1986); Stephens Indus., Inc. v. McClung (In re McClung), 789 F.2d 386,

26   390 (6th Cir. 1986); In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983); Walter v. Sunwest

27   Bank (In re Walter), 83 B.R. 14, 19-20 (Bankr. 9th Cir. 1988).

28        Applying § 363 of the Bankruptcy Code, numerous courts have approved overbid

1    procedures and break-up fees in advance of a debtor's sale motion.  See, Doehring v. Crown Corp.,

2    (In re Crown Corp.), 679 F.2d 774, 775 (9th Cir. 1982) (noting that district court required specified

3    minimum overbid amounts, deposits, and the form of purchase agreement to be used by bidders); In

4    re Crowthers McCall Pattern, Inc., 114 B.R. 877, 879 (Bankr. S.D.N.Y. 1990) (noting that the

5    bankruptcy court had entered an order approving potential break-up fees and requiring that overbids

6    be made in specified minimum increments with deposits); In re Table Talk, Inc., 53 B.R. 937, 939

7    (Bankr D. Mass. 1985) (noting that § 363 requires notice and a hearing prior to the establishment of

8    bidding procedures).

9            Courts have made clear that a debtor's business judgment is entitled to great deference with

10   respect to the procedures to be used in selling assets of the estate.  See, In re Integrated Resources,

11   Inc., 147 B.R. 650, 656-57 (Bankr. S.D.N.Y. 1992) (noting that overbid procedures and break-up

12   fee arrangements that have been negotiated by a debtor-in-possession are to be reviewed according

13   to the deferential "business judgment" standard, under which such procedures and arrangements are

14   "presumptively valid"), appeal dismissed, 3 F.3d 49 (2d Cir. 1993); In re 995 Fifth Ave. Assocs.

15   L.P., 96 B.R. 24, 28 (Bankr.  S.D.N.Y. 1989) (same).

16           In the present case, as discussed below, sound business justifications support the

17   proposed Bidding Procedures.

18       **B.**   **The Proposed Sale Procedures Will Maximize The Likelihood of High Values**

19           **For The Subject Assets**

20           Generally, to obtain approval of a proposed sale of assets, a debtor must demonstrate that the

21   "proffered purchase price is the highest and best offer."  In re Integrated Resource Inc., 135 B.R.

22   746, 750 (Bankr. S.D.N.Y.) aff'd, 147 B.R. 650 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d

23   Cir. 1993); In re Atlanta Packaging Products, Inc., 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988).

24           To that end, courts recognize that procedures intended to enhance competitive bidding are

25   consistent with the goal of maximizing the value received by the estate and are appropriate in the

26   context of bankruptcy sales.  See, Integrated Resources, 147 B.R. at 659 (such procedures should

27   "encourage bidding and maximize the value of the debtors assets"); In re Financial News Network,

28   Inc., 126 B.R. 152, 156 (S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . .

JMBM | Jeffer Mangels Butler & Mitchell LLP

1   [should] provide an adequate basis for comparison of offers, and provide for a fair and efficient

2   resolution of bankrupt estates"), appeal dismissed, 931 F. 2d 217, 2d Cir. 1991).

3          The proposed Bidding Procedures are intended to increase the likelihood that Debtor will

4   receive the best offer for the assets at issue.  First, pre-approval of the bidding procedures will

5   provide interested parties with notice of the specific bidding procedures authorized by this Court,

6   and the opportunity to competitively bid for the Assets.  Second, pre-approval of the rules of the

7   proposed sale will ensure fair comparability of competing bids.  Third, by open solicitation of

8   higher bids, Debtor is making every effort to maximize the value of the Assets to the estate and its

9   creditors.

10         As discussed in detail below, each provision of the proposed Sale Procedures is supported

11  by sound business judgment:

12         1.     The Bidding Procedures require that prospective purchasers submit to Debtor

13  by 5:00 p.m. (PDT) on May__, 2011 satisfactory evidence of such purchaser's financial ability to

14  perform and a $250,000 deposit in good funds, which will be non-refundable if such bidder is the

15  successful bidder at the Sale Hearing and the sale does not close due to purchaser's default.  These

16  provisions give Debtor time in advance of the hearing to evaluate whether a bidder is financially

17  capable of promptly closing a proposed transaction.  Also, such provisions will give potential

18  bidders the comfort that they will not be engaging in a bidding war with parties who are not bona

19  fide competitive bidders.

20         2.     The Sale Procedures provide that any party seeking to overbid the

21  Acquisition Corp. bid must bid an amount not less than $ 307,500 above the Acquisition Corp offer,

22  which is a total overbid of approximately 12% of the total purchase price set forth in the

23  contemplated Acquisition Corp. offer.  In order for the estate to benefit in any material away from

24  an overbid, it is necessary to fix a minimum overbid in excess of the additional costs associated

25  therewith, such as the Breakup Fee, legal fees, interest and other costs.

26         3.     The Bidding Procedures entitle Qualified Bidders to make further bids at the

27  Sale Hearing.  Affording parties the opportunity to increase their bids at the Sale Hearing

28  undoubtedly gives all Qualified Bidders a fair and final opportunity to make a higher and better bid.

JMBM | Jeffer Mangels
Butler & Mitchell LLP

C.              **The BreakUp Fee**

Break-up fees for purchasers of chapter 11 debtors or their assets provide appropriate compensation for the risk involved in preparing and proposing a bid. They thereby enhance the value of the debtor's estate by attracting initial bids and establishing a minimum standard for competing bids. *See* In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (break-up fees are "important tools to encourage bidding and to maximize the value of the debtor's assets"); In re Crowthers McCall Pattern, Inc., 114 B.R. 877 (Bankr. S.D.N.Y. 1990) (break-up fee justified by need to prevent bidder from withdrawing from transaction).

Courts have generally adopted one of two standards for analyzing bankruptcy-related break-up fees. The first utilizes the "business judgment rule," which "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was taken in the best interests of the company." In re Integrated Resources, Inc., 147 B.R. at 656. The Integrated Resources court considered the following three questions:

> (1) is the relationship of the parties who negotiated the break-up
> fee tainted by self-dealing or manipulation; (2) does the fee
> hamper, rather than encourage, bidding; (3) is the amount of the
> fee unreasonable relative to the proposed purchase price?

Initially, the court determined that a bankruptcy court could approve a break-up fee if it was not "tainted by self-dealing and was the product of arms-length negotiations." *Id.* at 658. With respect to the second question, the court reasoned that "if break-up fees encourage bidding, they are enforceable; if they stifle bidding they are not enforceable." *Id.* at 659. Regarding the third question, the court should "determine whether the amount of the fee is so substantial that it has a 'chilling effect' on other prospective bidders." *Id.* at 660.

In re America West represents an alternative approach to analyzing break-up fees. The America West court articulated the appropriate standard as whether the transaction will "further the diverse interests of the debtor, creditors and equity security holders alike," *id.* at 912, and concluded that it was required to determine if the break-up fee made economic sense for all concerned parties.

1    The proposed Break-Up Fee in this case satisfies the standards in both Integrated Resources

2  and America West.  The Break-Up Free represents a valid exercise of the Debtor's business

3  judgment because if another party makes a proposal that is superior to the Acquisition Corp. offer,

4  Debtor will have Acquisition Corp. to thank for this benefit.  Acquisition Corp.'s due diligence

5  efforts and financial capacity to provide the Purchase Price will have made any such better proposal

6  possible and available to the estate.  Thus, the Breakup Fee furthers the interests of the Debtor and

7  its creditors alike.  Further, the Breakup Fee has helped to preserve the value of the estate by

8  inducing Acquisition Corp. to serve as Stalking Horse and exposing Acquisition Corp.'s offer to

9  overbid.  Therefore, the Breakup Fee should be entitled to administrative expense claim status under

10  Section 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code and should not be subordinate to any

11  other administrative expense against Debtor, including under any debtor-in-possession financing or

12  cash collateral order.

13    Acquisition Corp.'s Breakup Fee is not tainted by self-dealing.  The Acquisition Corp. offer

14  is the result of arms-length negotiations over a long period.  Debtor's agreement to pay the Break-

15  Up Fee was intended to induce Acquisition Corp. to serve as the Stalking Horse and to expose

16  Acquisition Corp.'s proposal to overbid, not to chill the bidding.  Acquisition Corp. requested the

17  Breakup Fee to compensate it for the time, cost, and expenses incurred in connection with its due

18  diligence, the negotiation and preparation of the Acquisition Corp. offer and asset purchase

19  agreement, and activities contemplated to prepare for and participate in Debtor's chapter 11 case.

20    The amount of the proposed Break-Up Fee is reasonable given the size of the transaction.

21  Debtor estimates that the proceeds from the sale to Acquisition Corp. if Acquisition is not the

22  successful bidder will be approximately $2,807,500.  The proposed Break-Up Fee is only 6% of that

23  amount.  The Breakup Fee is appropriate under the circumstances and is less than the amount of

24  break-up fees typically approved by courts.  See, e.g., In re Montgomery Ward, et al., Case No. 97-

25  1409 (PJW) (Bankr. D. Del., June 15, 1998) (approving 2.7% break-up fee); In re Medlab, Inc.,

26  Case No. 97-1893 (PJW) (Bankr. D. Del., April 28, 1998) (break-up fee of 3.12% approved); In re

27  US One Communications Corp., Case No. 97-1196 (PJW) (Bankr. D. Del., Oct. 17, 1997)

28

JMBM    Jeffer Mangels Butler & Mitchell LLP

1   (approving break-up fee of 3%); <u>In re Edison Brothers Stores, Inc., et al.</u>, Case No. 95-1354 (PJW)

2   (Bankr. D. Del., Dec. 29,1995) (approving break-up fee of 3.5%).

3                                     **V.**

4                              **<u>CONCLUSION</u>**

5         For the reasons and based upon the arguments and authorities set forth above, Debtor

6   respectfully requests that the Court enter its order approving the Bidding Procedures and for such

7   other and further relief as the Court may deem just and proper.

8                                        Respectfully submitted,

9   DATED:  April 29, 2011            JEFFER MANGELS BUTLER & MITCHELL LLP

10

11                                 By:    _/s/ David M. Poitras_
                                          DAVID M. POITRAS, P.C.
12                                        Counsel for Westrim, Inc.,
                                          Debtor and Debtor-in-Possession
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PRINTED ON
RECYCLED PAPER
748553v3

## DECLARATION OF RONALD B. COOPER

I, Ronald B. Cooper, declare:

1.　　I am the President and Chief Executive Officer of Westrim, Inc. dba Westrim Crafts, a Delaware corporation, the debtor and debtor in possession in this chapter 11 case (the "Debtor"). I am authorized to make this declaration on behalf of Debtor.

2.　　I am familiar with each of the facts stated herein, and they are stated of my own personal knowledge. If called as a witness, I could and would competently testify with respect to the matters set forth herein.

3.　　I have read and assisted in preparation of the Motion to which this declaration is attached. Capitalized terms used in this declaration have the same meaning as such terms are given in the Motion.

4.　　Each of the facts set forth in the Motion are true and correct, to the best of my actual knowledge, information and belief.

5.　　Certain of the facts set forth in this declaration are based upon Debtor's business records. The documents and papers which comprise the business records of Debtor are maintained by persons whose duty it is to keep such records accurately and correctly. Said records are created by employees of Debtor by making a written record of each transaction or occurrence which relates to such events at or shortly after the time of such transaction or occurrence. I have reviewed certain of Debtor's records prior to making this declaration.

6.　　The proposed Bidding Procedures are intended to increase the likelihood that Debtor will receive the best offer for the assets at issue.

7.　　First, pre-approval of the bidding procedures will provide interested parties with notice of the specific bidding procedures authorized by this Court, and the opportunity to competitively bid for the Assets.

8.　　Second, pre-approval of the rules of the proposed sale will ensure fair comparability of competing bids.

9.　　Third, by open solicitation of higher bids, Debtor is making every effort to maximize the value of the Assets to the estate and its creditors.

PRINTED ON
RECYCLED PAPER
748553v3

10.    The Sale Procedures require that prospective purchasers submit to Debtor by 5:00 p.m. (PDT) on May __, 2011 satisfactory evidence of such purchaser's financial ability to perform and a $250,000 deposit in good funds, which will be non-refundable if such bidder is the successful bidder at the Sale Hearing and the sale does not close due to purchaser's default. These provisions give Debtor time in advance of the hearing to evaluate whether a bidder is financially capable of promptly closing a proposed transaction. Also, such provisions will give potential bidders the comfort that they will not be engaging in a bidding war with parties who are not bona fide competitive bidders.

11.    The Sale Procedures provide that any party seeking to overbid the Acquisition Corp. bid must bid an amount not less than $ 307,500 above the Acquisition Corp. offer, which is a total overbid of approximately 12% of the total purchase price set forth in the Acquisition Corp. offer. In order for the estate to benefit in any material away from an overbid, it is necessary to fix a minimum overbid in excess of the additional costs associated therewith, such as the Breakup Fee, legal fees, interest and other costs.

12.    The Bidding Procedures entitle Qualified Bidders to make further bids at the Sale Hearing. Affording parties the opportunity to increase their bids at the Sale Hearing undoubtedly gives all Qualified Bidders a fair and final opportunity to make a higher and better bid.

13.    Acquisition Corp.'s Break-up Fee is not tainted by self-dealing. The Acquisition Corp. offer is the result of arms-length negotiations over a long period. Debtor's agreement to pay the Breakup Fee was intended to induce Acquisition Corp. to serve as the Stalking Horse and to expose Acquisition Corp.'s proposal to overbid, not to chill the bidding. Acquisition Corp. requested the Breakup Fee to compensate it for the time, cost, and expenses incurred in connection with its due diligence, the negotiation and preparation of the Acquisition Corp. offer and asset purchase agreement, and activities contemplated to prepare for and participate in Debtor's chapter 11 case.

14.    The proposed Bidding Procedures are accurately described in detail in the Motion and Exhibit 1 attached hereto.

15.    On or about April 8, 2011, Debtor and Acquisition Corp's parent company (the

JMBM | Jeffer Mangels
Butler & Mitchell LLP

PRINTED ON
RECYCLED PAPER
748553v3

1    "Licensee") entered into an Exclusive License Agreement (the "Exclusive License") pursuant to

2    which Debtor granted to the Licensee an exclusive license to make and sell to Michaels certain

3    products under the "Blue Moon" brand (the "Licensed Products"). The Licensee is required to pay

4    to Debtor a royalty equal to 7% of the gross sales to Michaels of the Licensed Products. The

5    Exclusive License was entered into in good faith and on an arm's length basis (with substantial give

6    and take between the parties) in order to ensure that Michaels will continue to purchase the

7    Licensed Products. Pursuant to the Sale Agreement, Debtor and Acquisition Corp. have agreed that

8    Acquisition Corp. on behalf of the Licensee, can offset any payments due to Debtor under the

9    Exclusive License against any of the Breakup Fee due from the Seller. A true and correct copy of

10   the Exclusive License is attached hereto as Exhibit 2.

11         I declare under penalty of perjury under the laws of the United States of America that the

12   foregoing is true and correct, and that this declaration was executed this 29th day of April  2011, at

13   Windsor, California.

14

15                                         /s/ Ronald B. Cooper
                                           RONALD B. COOPER
16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

**Bidding Procedures**

Set forth below are the bidding procedures (the "Bidding Procedures") to be employed with respect to the prospective sale (the "Sale") of the following personal property of Westrim, Inc. ("Seller"):

(a)    Seller's legal and beneficial right, title and interest in and to the following to the extent used in, or related to, the Business:

(i)    all Inventory, the skus for which are set forth on Exhibit A;

(ii)    all executory Contracts (other than Rejected Contracts) identified by the parties for assignment to Purchaser on Schedule 2.1(a)(ii) (collectively, the "Assumed Contracts"), which may include if related to the Business: (A) the License Agreement and other license agreements to which Seller is a party and that provide Seller with rights to technology, products and/or trademarks, or by which Seller grants rights to third parties for Intellectual Property, (B) all purchase orders, Contracts or other commitments of Seller to suppliers and vendors of goods and services for materials, supplies or other items, specifically excluding the Vendor Terms Agreement and the Supplier Terms Agreement, and any side letters related thereto, (C) all sales orders, Contracts or other similar commitments of Seller, (D) all confidentiality agreements, non-competition, assignment of inventions and similar agreements to which Seller is a party, (E) all rights of Seller to the rebates, indemnities, warranties and licenses received from lessors, manufacturers and sellers of the Purchased Assets and (F) other executory Contracts and unexpired leases and each other Contract or arrangement designated as an Assumed Contract by Purchaser; provided that the Purchaser shall acquire all assets, deposits and prepaid expenses relating to any Assumed Contract;

(iii)    copies of all financial books, accounting records, files, lists, publications, and other records and data of Seller related to the Business, regardless of the medium on which such information is stored or maintained (the "Records");

(iv)    all goodwill of Seller relating to the Business;

(v)    all customer lists used by the Business;

(vi)    as used in the Business, all registered trademarks or service marks and all trademark and service mark applications, all common law trademarks, trade names, trade dress and logos, all copyrights (including copyrighted content on internet sites to the extent related to the Business), all domain names, websites, and extensions thereof, all know-how, trade secrets and other confidential information, inventions, ideas, discoveries, patent applications and granted patents (including any and all continuations, continuations-in-part, additions and divisions thereof, and any and all patents issuing from the patent applications, and any reissues, reexaminations, renewals, extensions, and substitutions of any of the

7748144v2

Exhibit 1 - 19

patents), and all industrial designs, owned by Seller or any Affiliate of Seller in the Business (the "**Intellectual Property**"), and any registrations and applications therefor, and all databases, design databases, schematics and data collections and all rights therein owned by Seller or any Affiliate of Seller;

(vii)    all claims, rights and causes of action relating to the Purchased Assets; and

(viii)    after completion of the services under the Transition Services Agreement, the telephone and facsimile numbers currently used in connection with the Business.

(b)    The Purchased Assets shall not include any of Seller's right, title or interest in or to any of the other assets of the Seller, including, without limitation, the following assets (collectively, the "**Excluded Assets**"):

(i)    any of Seller's Cash on hand, and all bank accounts and lockbox arrangements benefiting the Business;

(ii)    any Rejected Contracts and all Contracts and agreements that are rejected or are subject to a motion to reject by Seller in Bankruptcy Court;

(iii)    any corporate minute books, organizational documents, stock ledgers and other corporate books and records, any original accounting records relating to the Business or any other business of Seller or its Affiliates;

(iv)    all of Seller's deposits with carriers, lessors and other vendors (except with respect to any Assumed Contracts);

(v)    all claims and causes of action under Sections 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code, and any other claims or causes of action belonging to Seller or its estate (collectively, "**Avoidance Actions**"), other than those relating to the Purchased Assets;

(vi)    all Seller Plans (except to the extent set forth on <u>Schedule 2.1(a)(iii)</u>);

(vii)    any refunds and claims for refunds of Taxes accrued or accruing as of the Closing Date;

(viii)    all accounts receivable, whether or not relating to the Business, and all notes and other receivables;

(ix)    all insurance contracts and any rights or claims thereunder, whether or not pertaining to the Business; and

(x)    Seller's rights under this Agreement and the Ancillary Agreements.

2

(collectively, the "Assets").

Seller will seek entry of an order, among other things, authorizing and approving the Sale to Blue Moon Beads Acquisition Corp. ("Acquisition Corp.") or to a Qualified Overbidder (as hereinafter defined) as Seller, in the exercise of its reasonable business judgment may determine to have made the highest or otherwise best offer to purchase the respective Assets (the "Successful Bidder").

## The Bidding Process

Seller shall (i) determine whether any person is a Qualified Overbidder, (ii) coordinate the efforts of Qualified Overbidders in conducting their respective due diligence investigations regarding the Assets, (iii) receive offers from Qualified Overbidders, and (iv) negotiate any offer made to purchase the Assets (collectively, the "Bidding Process"). Any person who wishes to participate in the Bidding Process must be a Qualified Overbidder. Neither Seller nor its representatives shall be obligated to furnish any information of any kind whatsoever related to the Assets to any person who is not a Qualified Overbidder. Seller shall have the right to adopt such other rules for the Bidding Process which, in its reasonable judgment, will better promote the goals of the Bidding Process and which are not inconsistent with any of the other provisions hereof or of any Bankruptcy Court order.

## Participation-Bid Requirements

Unless otherwise ordered by the Bankruptcy Court for cause shown, to participate in the Bidding Process, each person (a "Potential Bidder") must deliver (unless previously delivered) to Seller the following documents (the "Required Bid Documents"), unless Seller waives in writing any/all of these requirements:

(a)    An executed confidentiality agreement in form and substance satisfactory to Seller;

(b)    Current financial statements or other financial information of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, current financial statements or other financial information of the equity holder(s) of the Potential Bidder, or such other form of financial disclosure acceptable to Seller and its advisors, demonstrating such Potential Bidder's ability to close the proposed transaction;

(c)    A letter stating that any offer put forth by such bidder shall be irrevocable until the earlier of (x) two (2) business days after the Assets have been disposed of pursuant to these Bidding Procedures, and (y) thirty (30) days after the Sale Hearing;

(d)    An executed copy of an asset purchase agreement: (i) acceptable in form to Seller (the "Overbid Sale Agreement"), (ii) clearly marked to show any changes from the terms of the proposed Asset Sale and Purchase Agreement by and among Debtor and Blue Moon Beads Acquisition Corp., as purchaser, dated April 29, 2011 (the "Acquisition Corp. Sale Agreement"). Objections to the Sale Motion must be served on Acquisition Corp. (iii) on the same or more favorable terms as the Acquisition Corp. Sale Agreement; provided, however, the

Exhibit 1 - 21

purchase price in such proposed Overbid Sale Agreement must be at least $307,500 (the Breakup Fee plus $125,000);

(e)     A good faith deposit (the "Good Faith Deposit") in the form of a certified check (or other form acceptable to Seller in its sole discretion) payable to the order of Seller (or such other party as Seller may determine to hold such funds in escrow) in an amount equal to $250,000; and

(f)     Written evidence of a binding commitment for financing or other evidence of ability to consummate the proposed transaction satisfactory to Seller in its sole discretion.

Seller will consider a bid only if the bid is on terms that are not conditioned on obtaining financing, due diligence or other conditions less favorable to the Seller than those set forth in the Acquisition Sale Agreement.

A Qualified Overbidder is a Potential Bidder that delivers the documents described in subparagraphs (a), (b), (c), (d), (e) and (f) above, whose financial information demonstrates the financial capability of the Potential Bidder to consummate the Sale, and that Seller determines is reasonably likely (based on the availability of financing, experience and other considerations) to consummate the Sale if selected as the Successful Bidder.

Within three (3) business days after a Potential Bidder delivers all of the materials required by subparagraphs (a), (b), (c), (d), (e) and (f) above, Seller shall determine, and shall notify the Potential Bidder in writing, whether the Potential Bidder is a Qualified Overbidder.

The Acquisition Corp. offer set forth in the Acquisition Corp. Sale Agreement is also a "Qualified Bid" herein.  Seller will deliver to Acquisition Corp. a copy of any materials described in subparagraphs (d) and (f) above that it receives from a Potential Bidder within 24 hours of its receipt.

## **Bid Protection**

Acquisition Corp. shall be entitled to be paid (i) a $82,500 termination fee and be reimbursed for up to $100,000 for out-of-pocket expenses (collectively, the "Breakup Fee") if a higher or otherwise better offer from another bidder is accepted or the Seller materially breaches the Acquisition Corp. Sale Agreement and (ii) up to $100,000 for out-of-pocket expenses if Acquisition Corp. terminates the Acquisition Corp. Sale Agreement pursuant to Section 15(e)(i) or Section 15.1(f) of the Acquisition Corp. Sale Agreement.   The Debtor's obligations set forth in this section shall be entitled to administrative expense claim status under Sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code and shall not be subordinate to any other administrative expense claim against Debtor, including under any debtor-in-possession financing or cash collateral order.

4

### Due Diligence

Seller may afford each Potential Bidder or Qualified Overbidder due diligence access to the Assets sought to be acquired. Seller will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access for such bidders. Seller shall not be obligated to furnish any due diligence information after the Bid Deadline (as defined herein). Neither Seller nor any of its affiliates (or any of their respective representatives) are obligated to furnish any information relating to the Assets to any person except to a Potential Bidder or Qualified Overbidder who makes an acceptable preliminary proposal. Bidders are advised to exercise their own discretion before relying on any information regarding the Assets provided by anyone other than Seller or its representatives.

### Bid Deadline

A Qualified Overbidder that desires to make a bid shall deliver a written copy of its bid to Jeffer Mangels Butler & Mitchell LLP, 1900 Avenue of the Stars, 7th Floor, Los Angeles, California 90067, to the attention of David M. Poitras P.C., Facsimile: (310) 712-8571; Email: dpoitras@jmbm.com, **on or before 5:00 p.m. Pacific Time on May __, 2011.** Seller may extend such deadline in its sole discretion (such deadline, including such extension, the "Bid Deadline"). In addition to the above-referenced extension, Seller may extend the Bid Deadline once or successively, but it is not obligated to do so. Notwithstanding the foregoing, Seller shall not extend the deadline to any date that is later than _____, 2011.

### "As Is, Where Is"

The sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by Seller, its agents or its bankruptcy estate except to the extent set forth in the Overbid Sale Agreement of the Successful Bidder as accepted by Seller. Except as otherwise provided in the Acquisition Corp. Sale Agreement or an Overbid Sale Agreement acceptable to Seller, all Seller's right, title and interest in and to the Assets shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon and there against (collectively, the "Interests") in accordance with Sections 363 and 365 of the Bankruptcy Code, with such Interests to attach to the net proceeds of the Sale of the Assets.

Each bidder shall be deemed to acknowledge and represent it has had an opportunity to inspect and examine the Assets and to conduct any and all due diligence regarding the Assets prior to making its offer; that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or assets in making its bid; and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in these Bidding Procedures or, as to the Successful Bidder, the Acquisition Corp. Sale Agreement or the Overbid Sale Agreement.

## Auction

After the Bid Deadline, Seller may conduct an auction (the "Auction") for some or all of the Assets as to which a Qualified Bid has been received. Such Auction shall take place at the United States Bankruptcy Court for the Central District of California, San Fernando Valley Division, 21041 Burbank Boulevard, Woodland Hills, California, Courtroom _____ (the "Bankruptcy Court") on May __, 2011, commencing at ___:___ __.m. Only a Qualified Overbidder who has submitted a Qualified Bid will be eligible to participate at the Auction. At such Auction, Acquisition Corp. and Qualified Overbidders (and Acquisition Corp.) will be permitted to increase their bids and Acquisition Corp. shall be entitled to bid the Breakup Fee. Based upon the terms of the Qualified Bids received, the level of interest expressed as to the Assets and such other information as Seller determines is relevant, Seller, after reasonable efforts to consult with interested parties, in its reasonable discretion, may conduct an Auction in the manner it determines will result in the highest or otherwise best offer for the Assets including, but not limited to, (i) offering the Assets for bidding as an entire package, in groups of less than all of the Assets, and/or individually, (ii) offering the Assets for bidding in such successive rounds as Seller determines to be appropriate, and (iii) any such additional procedural rules that it determines to be reasonable under the circumstances for conducting the Auction that are not inconsistent with any of the provisions of the Bankruptcy Code, any Bankruptcy Court Order, or these Bidding Procedures.

Upon conclusion of an Auction or, if Seller determines not to hold an Auction, then promptly following the Bid Deadline, Seller shall (i) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Sale and (ii) identify the highest and otherwise best offer (the "Successful Bid"). At the Sale Hearing, Seller shall present to the Bankruptcy Court for approval the Successful Bid and any backup bids. Seller may adopt rules for the bidding process that are not inconsistent with any of the provisions of the Bankruptcy Code, any Bankruptcy Court Order, or these Bidding Procedures.

## Acceptance of Qualified Bids

Seller presently intends to sell the Assets to Acquisition Corp. or the highest or otherwise best Qualified Overbidder. Seller's presentation to the Bankruptcy Court for approval of a particular Qualified Bid does not constitute Sellers' acceptance of such bid. Seller will be deemed to have accepted a bid only when the bid has been approved by an order of the Bankruptcy Court.

## Sale Hearing

The Sale Hearing, if required, shall take place at the Bankruptcy Court immediately following the Auction. The Sale Hearing may be adjourned or rescheduled without notice by an announcement of the adjourned date of a Sale Hearing. At such Sale Hearing, Seller shall present the Successful Bid to the Bankruptcy Court for approval.

6

Following a Sale Hearing approving the sale of one or more Assets to a Successful Bidder, if such Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, (a) it will forfeit its Good Faith Deposit to Seller and Seller may pursue any and all of its options at law and in equity with respect to such breach and (b) the next highest or otherwise best Qualified Bid, as disclosed at the Sale Hearing, shall be deemed to be the Successful Bid and Seller shall be authorized to effectuate such sale without further order of the Bankruptcy Court or (c) Seller shall reschedule at a later date and time another auction for any or both properties or assets.

**Return of Good Faith Deposit**

Good Faith Deposits of all Qualified Overbidders shall be held in escrow until the earlier of (x) three (3) business days after all Assets upon which the bidder is bidding have been disposed of pursuant to these Bidding Procedures or (y) thirty-one (31) days after the Sale Hearing.

**Modifications**

Seller may (a) determine, in its business judgment, which Qualified Bid, if any, is the highest or otherwise best offer; and (b) reject at any time before the entry of an order of the Bankruptcy Court approving a Qualified Bid, any bid (other than the Acquisition Corp offer set forth in the Acquisition Corp. Sale Agreement) that, in Seller's reasonable discretion is (i) inadequate or insufficient, (ii) not in conformity with the conditions of sale, or (iii) contrary to the best interests of Seller, its estate and/or its creditors.  At or before the Sale Hearing, Seller may impose such other terms and conditions as it may determine to be in the best interest of Seller's bankruptcy estate, its creditors and/or other parties in interest that are not inconsistent with any of the provisions of the Bankruptcy Code, any Bankruptcy Court Order, or these Bidding Procedures.

7748144v2

Exhibit 1 - 25

# EXHIBIT 2

Apr 29 11 02:04p       Aimee Cooper                              17078384436                    p.1

4/8/11

## EXCLUSIVE LICENSE AGREEMENT

THIS EXCLUSIVE LICENSE AGREEMENT ("Agreement") is entered into this 8th day of April, 2011, by and between WESTRIM, INC., a Delaware corporation (the "Licensor") and DCWV Acquisition Corporation, a Delaware corporation ("Licensee").

### RECITALS

Michaels Stores, Inc. ("Michaels") has or will request to purchase the skus of existing Blue Moon products set forth on Schedule A (attached hereto) and has agreed to purchase a program of new skus as set forth on Schedule A (attached hereto) of Licensor's products for a new program setting in Summer 2011 and running at least until Summer 2012 ("Michaels Bead Landing Summer 2011 Program") but requires assurance that the products will be available as planned through Licensee, and Licensor is willing to grant this exclusive license for this Program in exchange for the royalties agreed to herein.

### AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.    **Grant of License.**  Upon the terms and conditions hereinafter set forth, Licensor hereby grants to Licensee the exclusive, irrevocable (except as provided in Section 7 hereof), worldwide, transferable and sublicensable (as provided in Section 10 hereof) license and right to make and have made the products set forth on Schedule A (collectively, the "Licensed Products") for sale to Michaels, and to sell the Licensed Products to Michaels under the "Blue Moon" brand and intellectual property, trademarks, trade names, and related logos and symbols (collectively, the "Licensed Marks"). Licensee may also sell the Licensed Products to Michaels under the "Bead Landing" brand with permission from Michaels (and the Licensor grants to the Licensee the required intellectual property to do so). Licensed Marks does not include intellectual property owned by Michaels, Licensee or their affiliates. This license does not allow the Licensee to sell other products to Michaels under the Licensed Marks or any other customer under the Licensed Marks; it also does not allow the Licensee to sell the Licensed Products to customers other than Michaels and its affiliates provided Licensee shall have the right to liquidate inventory of any sku of the Licensed Products consistent with past custom and practice to discount retailers and suppliers thereto but not full retail stores (e.g. Jo-Ann Fabrics and Craft Stores, Meijer or Wal-Mart) for a period of up to ninety (90) days from the date that sku is discontinued at Michaels.

2.    **Sale of Inventory.**  Licensor shall sell, convey, transfer, assign and deliver to Licensee, and Licensee shall purchase from Licensor six (6) months of supply of inventory with respect to the Licensed Products to the extent currently on-hand at or in transit to Licensor's warehouse (the "Inventory"). Such Inventory shall be sold at Licensor's verifiable standard cost (which includes invoice, freight and duty costs) and shall be only of good and merchantable quality and fit for resale. The Inventory shall be sold, transferred, assigned and delivered free and clear of any liens and encumbrances. In addition to the six (6) month supply of Inventory referenced above, the Licensor and Licensee may agree to supply and purchase additional inventory in excess of the six (6) month supply and at a price as mutually agreed to by the parties.

3.    **Term.**  The term of the license hereby granted shall be effective on the date hereof and continue until the earlier of the tenth anniversary of the date hereof unless sooner terminated in accordance with the provisions hereof.

1

*uc  4/8/2011*

Exhibit 2 - 26

Apr 29 11 02:04p        Aimee Cooper                    17078384436                    p.2

4.    **Consideration.** The consideration to be paid Licensor by Licensee shall be a royalty equal to seven percent (7%) of gross sales (net of product returns) to Michaels of the Licensed Products (and substantially similar products) made by Licensee during the term of the Agreement. Sales shall be calculated based on invoices for Licensed Products that are shipped to Michaels or its designee. The royalty shall be calculated and payment shall be made no later than seventy-five (75) days following shipment and invoicing to Michaels. Licensee shall provide a calculation summary with each such payment of royalties showing in reasonable detail the methodology in calculating the royalties due. No license or any other fees shall be payable by Licensee in consideration for the license granted hereunder. Licensee shall have the right to offset any payments due to Licensor under this Agreement from obligations of Licensor to Licensee under this Agreement.

5.    **Covenants of Licensee.** Licensee hereby agrees that:

(a)    Licensee shall not use the Licensed Marks in any unlawful or commercially unreasonable manner; nor shall Licensee use the Licensed Marks in any manner which could be construed to constitute a declaration, assertion, testimonial, avowal, representation, warranty, commitment, assurance, guaranty, sponsorship or other statement or obligation of any kind on the part of Licensor without the prior written consent of Licensor.

(b)    Licensee shall use the Licensed Marks in accordance with all applicable Federal, State and local laws.

(c)    Nothing contained in this Agreement shall be construed as an assignment or grant to the Licensee of any right, title or interest in or to the Licensed Marks, it being understood that all rights relating thereto are reserved by Licensor, except for the license hereunder to Licensee of the right to use and utilize the Licensed Marks only as specifically and expressly provided in this Agreement.

(d)    Licensee's use of the Licensed Marks shall inure to the benefit of Licensor; and Licensee shall not at any time acquire any rights in such Licensed Marks by virtue of any use it may make of such Licensed Marks. At the termination or expiration of this Agreement, Licensee will be deemed to have assigned, transferred and conveyed to Licensor any trade rights, equities, goodwill, titles or other rights in and to the Licensed Marks which may have been obtained by Licensee or which may have vested in Licensee in pursuance of any endeavors covered hereby; and Licensee will execute any instruments reasonably requested by Licensor to accomplish or confirm that foregoing. Any such assignment, transfer or conveyance shall be without consideration other than the mutual covenants and consideration of this Agreement.

6.    **Warranties and Indemnification.**

(a)    Licensor represents and warrants that (i) Licensor's performance under this Agreement shall not violate any agreement between Licensor and any third party; (ii) the Licensed Marks and the use of the Licensed Marks as contemplated herein, to the best of Licensor's knowledge, do not and shall not violate any applicable law or regulation or infringe any copyright, trademark, trade secret or patent; (iii) Licensor has all right, power and authority necessary to enter into this Agreement and grant the license to the Licensed Marks hereunder; (iv) Licensor shall not use nor grant any other Person any license to use the Licensed Marks during the term of this Agreement in connection with the sale, marketing or distribution of the Licensed Products to Michaels and (v) Licensor has good and valid title to the Inventory and shall deliver such Inventory to the Licensee free and clear of all liens and encumbrances.

2

*uc  4/9/2011*

Exhibit 2 - 27

(b)     Licensee represents and warrants that (i) Licensee's performance under this Agreement shall not violate any agreement between Licensee and any third party or any obligation owed by Licensee to any third party; (ii) Licensee's intended use of the Licensed Marks, to the best of Licensee's knowledge, shall not violate any applicable law or regulation; (iii) Licensee has all right, power and authority necessary to enter into this Agreement; and (iv) Licensee shall not use the Licensed Marks in any unlawful or commercially unreasonable manner, and shall not use the Licensed Marks except as specifically allowed in this Agreement.

(c)     Licensor hereby agrees to indemnify and hold harmless Licensee, and its directors, officers, employees, licensees, agents, attorneys and independent contractors, from and against any adverse consequences, arising out of or in connection with Licensor's breach of and/or failure to comply with any of its representations, warranties, duties or obligations hereunder and/or any claim of infringement related to the Licensed Marks.

(d)     Licensee hereby agree to indemnify and hold harmless Licensor and its directors, officers, employees, licensees, agents, attorneys and independent contractors, from and against any adverse consequences, arising out of or in connection with Licensee's use of the Licensed Marks as described herein, or Licensee's breach of and/or failure to comply with any of its representations, warranties, duties or obligations hereunder.

7.    **Termination.**

(a)     If either party shall violate any of its obligations under the terms of this Agreement, then the non-breaching party shall have the right to terminate this Agreement upon thirty (30) days prior written notice to the breaching party with respect to any such default, and such notice of termination shall become effective unless the breaching party shall cure the violations within thirty-day period, but if such default is not susceptible to cure within such thirty-day period, the breaching party shall not be in default if the breaching party promptly commences the cure within such thirty-day period and diligently and continuously pursues the cure to completion; provided, however that in no event shall such cure period be extended by more than thirty (30) days.

(b)     Termination of the license under the provisions of this paragraph 6 shall be without prejudice to any rights which either party may otherwise have against other.

8.    **Effect of Termination or Expiration.** Upon and after the expiration or termination of this license, all rights granted to Licensee hereunder shall forthwith revert to Licensor and Licensee shall refrain from further use of the Licensed Marks, including without limitation any reference to the Licensed Marks in connection with the purchase, sale or distribution of the Licensed Products; provided that Licensee shall have the right to liquidate any inventory on-hand or on order with use of the Licensed Marks. Subject to the preceding sentence, Licensee acknowledges that its failure to cease all use of the Licensed Marks at the termination or expiration of this Agreement will result in immediate damage to Licensor. Licensee acknowledges and admits that there is no adequate remedy at law for such failure to use of the Licensed Marks, and Licensee agrees that in the event of such failure Licensor shall be entitled to equitable relief by way of temporary and permanent injunctions and such other further relief as any court with jurisdiction may deem just and proper. Resort to any remedies referred to herein shall not be construed as waiver of any other rights and remedies to which Licensor is entitled under this Agreement or otherwise.

9.    **Notices.** All notices and statements to be given, and all payments to be made hereunder, shall be given or made at the respective addresses of the parties as set forth below unless notification of a change of address is given in writing, and the date of mailing shall be deemed the date the notice or statement is given.

3

*uc  4/8/2011*

Exhibit 2 - 28

10.    **Relationship of Parties.** It is understood and agreed by the parties hereto that this Agreement does not establish a fiduciary relationship between them, each party shall be an independent contractor, and that nothing in this Agreement is intended to constitute either party an agent, franchisor, franchisee, legal representative, subsidiary, joint venturer, partner, employee, or servant of the other for any purpose whatsoever. During the term of this Agreement, Licensee shall hold itself out to the public as an independent company using the Licensed Marks pursuant to a license from Licensor, and neither party shall have any power to obligate or bind or commit the other party in any manner whatsoever. Licensee shall be solely responsible for its performance under the license, including product sourcing (other than as set forth in Section 2 above), testing, shipping, warehousing, delivery to Michaels, billing, collections and customer/consumer service; provided that (i) Licensor shall be responsible for all Inventory sold under Section 2 and (ii) Licensor shall provide all requested transition services to allow Licensee to sell Licensed Product to Michaels pursuant to the license hereunder (including Licensor shall fulfill purchase orders directly to Michaels upon request by Licensee (at Licensee's cost) through May 31, 2011.)

11.    **Assignment/Sublicense.** Licensee shall have the right to assign all or any part of its rights or delegate all or any part of its obligations hereunder without the prior written consent of the Licensor; provided, however that no such sublicense or assignment shall relieve Licensee of any of its obligations hereunder and assignee shall be subject to the obligations hereunder. Licensor shall have the right to assign all or any part of its rights or delegate all or any part of its obligations hereunder without the prior written consent of the Licensee to a successor-in-interest to the Licensed Marks or Licensed Products; provided, however that no such assignment shall relieve Licensor of any of its obligations hereunder and assignee shall be subject to the obligations hereunder.

12.    **Counterparts.** This Agreement may be executed in any number of counterparts (including via facsimile or email PDF) and all counterparts shall be deemed to constitute a single agreement. The execution of one counterpart by any party shall have the same force and effect as if that party had signed all other counterparts. Any signature page hereof may be detached from any counterpart hereof without impairing the legal effect of any signatures thereon and may be attached to another counterpart hereof identical in form hereto but having attached to it one or more additional signature pages.

13.    **Miscellaneous.** None of the terms of this Agreement can be waived or modified except by an express agreement in writing signed by both parties. The failure of either party hereto to enforce, or the delay by either party in enforcing, any of its rights under this Agreement shall not be deemed a continuing waiver or a modification thereof. This Agreement constitutes the entire agreement between the parties with respect to the subject thereof and all prior negotiations, understandings and commitments are superseded hereby and thereby. This Agreement may be amended only by an instrument in writing by both parties. This Agreement shall be governed by and construed in accordance with the laws of the State of California.

*    *    *    *    *

4

uc 4/8/2011

Exhibit 2 - 29

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be duly executed as of the day and year first above written.

LICENSOR:                         WESTRIM, INC.

                                  By: _____
                                      Ronald B. Cooper, President
                                  7855 Hayvenhurst Ave.
                                  Van Nuys, CA 91406

LICENSEE:                         DCWV ACQUISITION CORPORATION

                                  By: _____
                                      Michael Hill, President
                                  Address: 751 South 170 East
                                  Provo, UT 84601

5

uc  4/9/2014

Exhibit 2 - 30

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I.
Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
1900 Avenue of the Stars, 7th Floor, Los Angeles, CA 90067

A true and correct copy of the foregoing document described as *NOTICE OF EMERGENCY MOTION AND EMERGENCY MOTION TO ESTABLISH PROCEDURES FOR THE SALE OF A SUBSTANTIAL PORTION OF THE ESTATE'S ASSETS; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF RONALD B. COOPER IN SUPPORT THEREOF [11 U.S.C. §§ 105 and 363]* will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On *April 29, 2011,* I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒  Service information continued on attached page

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL** (indicate method for each person or entity served)**:**
On *April 29, 2011,* I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒  Service information continued on attached page

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on *April 29, 2011,* I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

☒  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| April 29, 2011 | Billie Terry | |
|---|---|---|
| Date | Type Name | Signature |

*ADDITIONAL SERVICE INFORMATION:*

I. **TO BE SERVED BY THE COURT VIA NOTICE OF
ELECTRONIC FILING ("NEF")** –

- David M Poitras    dpoitras@jmbm.com
- United States Trustee (SV)
  ustpregion16.wh.ecf@usdoj.gov

II. **SERVED BY OVERNIGHT MAIL**

Honorable Geraldine Mund
United States Bankruptcy Court - Central District of California
21041 Burbank Boulevard, Suite 342
Woodland Hills, CA 91367

WESTRIM , INC., dba WESTRIM CRAFTS,          LIST OF 20 LARGEST UNSECURED CREDITORS
a Delaware corporation

American Express-CPC/091678                   Grant Thornton, LLP
CPC Remittance Processing                     PO Box 51552
PO Box 329000                                 Los Angeles, CA 90051-5852
Weston, FL 33332-9000                         Attn: Daryl Ohland

VIF Valencia Gateway, LLC
c/o CB Richard Ellis
500 Citadel Drive
Commerce, CA 90040
Attn: Dee Eckman

                                             Agent for Bridge Lenders
                                             Ron Cooper
                                             11222 Brooks Road
SECURED CREDITORS                            Windsor, CA 95492

***ADDITIONAL SERVICE INFORMATION:***

III. **SERVED BY EMAIL**

WESTRIM , INC., dba WESTRIM CRAFTS,
a Delaware corporation

LIST OF 20 LARGEST UNSECURED CREDITORS

AMB Property Corp.
PRJT# PVANNUY03/Leade ID LWESTCR01
PO Box 6156
Hicksville, NY 11802-6156
Attn: Kari Hughes
Email: khughes@amb.com -

Anthem Blue Cross
PO Box 5812
Los Angeles, CA 90074-5812
Attn: Ruth Estrada
Email: Ruth.Estrada@anthem.com

Asian Craft Inc.
8th Fl, No 97 Sec 2, Nan King E Rd
Taipei, Taiwan
Attn: Donald Chen
Email: Donald@asiancraft.com.tw

Aurient International Corp.
8F-3 105 Chang An West Road
Taipei, Taiwan
Attn: Edmund Wu / Melody Hsiao
Email: Edmund@aurient.com.tw; Hsiao@aurient.com.tw

Banaras Beads Limited
A-1 Industrial Estate
Varanasi-221 106 India
Attn: Siddarth Gupta
Email: siddarth@banarasbeads.com

Bureau Veritas
Consumer Products Services, Inc.
14624 Collection Center Drive
Chicago, IL 60693
Attn: Teresa Keller
Email: teresa.keller@us.bureauveritas.com

Bureau Veritas Hong Kong Ltd
14630 Collection Center Drive
Chicago, IL 60693
Attn: Effie Lu
Email: effie.lu@cn.bureauveritas.com

CSA Canadian Sales Agency Inc.
#1 Valleybrook Drive
Toronto, ON M3B 2S7
Attn: Michelle Callahan
Email: michelle@csatransportation.com

Dumont Promotional Images Inc.
12947 Chadron Avenue
Hawthorne, CA 90250
Attn: Lisa Machado
Email: lisa@cssales.com

Edwards Properties
PO Box 1549
Springdale, AR 72765
Attn: Joe Edwards
Email: peggy@edcspringdale.com

7768454v1

## *ADDITIONAL SERVICE INFORMATION:*

### III. **SERVED BY EMAIL**

Kelly Lowry & Kelley LLP
6320 Canoga Ave #1650
Woodland Hills, CA 91367
Attn: John Kelly
Email: johnk@KLKPatentLaw.com

Miller Starr & Regalia
Dept 05115 POB 39000
San Francisco, CA 94139-5115
Attn: Lance Anderson
Email: LHA@msrlega.com

Silverwings Unique, Inc.
451 North Oak Street
Inglewood, CA 90302
Attn: Albert Chen
Email: albertc@suilax.com

Tru-Blu Industries LLC
PO Box 793
Niles, MI 49120
Attn: Bob Demmet
Email: trublu@qtm.net

Kwan Hing Fareast Prod Fty Ltd
Stg2 Blk A 6thF
Wah Fung Id Bldg Ct
Kwai Chung, Hong Kong
Attn: Michelle-Kwan Hing
Email: michelle@kwanhing.net

Nord Race Paper Intl Ltd
Unit 12 15/F Wah Wai Centre
38-40 Au Pui Wan St
New Territories, Hong Kong
Attn: Peter Pang
Email: peterpang@nordrace.com

Tin Hung Products Factory HK
223 G/F, Yu Chau Street
Sham Shui Po, Hong Kong
Attn: Tin Fu-Lap Yeung Yuk
Email: lap@tinfultd.com

Miller Starr & Regalia
300 Hamilton Avenue, Third Floor
Palo Alto, CA 94301
Attn: Lance Anderson
Email: LHA@msrlega.com

Attorneys For Acquisition Corp.
Paul Hastings Janofsky & Walker LLP
Amit Mehta
191 North Wacker Drive, 30th Fl
Chicago, IL 60606
Email: amitmehta@paulhastings.com

## SECURED CREDITORS

Attorneys For Acquisition Corp.
Paul Hastings Janofsky & Walker LLP
Jennifer B. Hildebrandt
515 South Flower St, 25th Fl
Los Angeles, CA 90071
Email: jenniferhildebrandt@paulhastings.com

Attorneys For Newstar Business Cred
Hunton & Williams LLP
Gregory G. Hesse
1445 Ross Avenue, Ste 3700
Dallas, TX 75202
Email: ghesse@hunton.com