DAVID M. POITRAS P.C. (CA Bar No. 141309)
ALEXIS M. McGINNESS (CA Bar No. 241449)
JEFFER MANGELS BUTLER & MITCHELL LLP
1900 Avenue of the Stars, Seventh Floor
Los Angeles, California 90067-4308
Telephone:     (310) 203-8080
Facsimile:     (310) 712-8571
Email:         dpoitras@jmbm.com

Counsel for Westrim, Inc.,
Debtor and Debtor-in-Possession

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
### SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re | CASE NO.    1:11-bk-15313-GM |
| WESTRIM, INC. dba WESTRIM CRAFTS, a Delaware corporation. | Chapter 11 |
| Debtor. | **NOTICE OF DEBTOR'S EMERGENCY MOTION AND DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (A) AUTHORIZING POSTPETITION FINANCING AND GRANTING SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT TO 11 U.S.C. §§ 361, 362, AND 364; (B) AUTHORIZING USE OF CASH COLLATERAL; (C) MODIFYING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362; (D) GRANTING ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§ 361, 362, 363, AND 364; AND (E) SCHEDULING INTERIM AND FINAL HEARINGS PURSUANT TO BANKRUPTCY RULE 4001; DECLARATION OF RONALD B. COOPER IN SUPPORT THEREOF** |
| | **Interim Hearing:** |
| | Date:        May 3, 2011<br>Time:        10:00 a.m.<br>Ctrm:        303<br>              21041 Burbank Blvd.<br>              Woodland Hills, CA 91367 |

Jeffer Mangels
Butler & Mitchell LLP

JMBM

# TABLE OF CONTENTS

Page

I.    JURISDICTION AND VENUE ................................................................5

II.   BACKGROUND ....................................................................................5

      A.    Description Of Debtor ................................................................5

      B.    Debtor's Principal Indebtedness.................................................6

      C.    The Main Assets of the Estate. ..................................................7

      D.    Need For Bankruptcy Relief – The Proposed Sale ....................8

      E.    Need for Financing ...................................................................10

III.  REQUESTED RELIEF ........................................................................10

IV.   SUMMARY OF PROPOSED DIP FINANCING.................................11

V.    SPECIFIC RELIEF REQUESTED .......................................................15

VI.   BASIS FOR RELIEF REQUESTED .....................................................16

      A.    The DIP Financing Should Be Approved..................................16

      B.    Debtor Is Unable To Obtain Credit On More Favorable Terms............................18

      C.    The Prepetition Lenders Will Be Adequately Protected..........................19

      D.    Debtor Has Met Its Burden For Use of Cash Collateral.........................20

      E.    Interim Approval Should Be Granted........................................21

VII.  NOTICE...............................................................................................21

VIII. NOTICE OF INTERIM ORDER AND HEARING ON FINAL ORDER.........................22

IX.   CONCLUSION.....................................................................................23

DECLARATION OF RONALD B. COOPER.....................................................24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JMBM | Jeffer Mangels Butler & Mitchell LLP

PRINTED ON

RECYCLED PAPER

7747793v3

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*In re Alyucan Interstate Corp.*,
    12 B.R. 803 ................................................................................................................20

*In re Ames Department Stores*,
    115 B.R. 34 .........................................................................................................16, 18

*In re Aqua Associates*,
    123 B.R. 192 ..............................................................................................................20

*General Electric Mortgage Corp. v. South Village,*
    *Inc.*, 25 B.R. 987 .......................................................................................................19

*In re Grant Broadcasting*, 71 B.R. 376 (Bankr. E.D. Pa.)
    aff'd, 75 B.R. 819 ......................................................................................................20

*In re Kain*,
    86 B.R. 506 ...............................................................................................................19

*In re Simasko Production Co.*,
    47 B.R. 444 ...............................................................................................................16

*In re Snowshoe Co.*,
    789 F.2d 1085 ...........................................................................................................18

*United Savings Association of Texas v. Timbers of Inwood Forest Associates,*
    *Ltd.*, 484 U.S. 365, 108 S.Ct. 626, [98 L.Ed.2d 740] ..........................................19

**CODES AND STATUTES**

11 U.S.C.
    § 102… .........................................................................................................................3
    § 361… .......................................................................................................................19
    § 361, 363(e) .............................................................................................................19
    § 363(c)(2) ............................................................................................................20, 28
    § 364… .......................................................................................................................18
    § 364(c) ......................................................................................................................17
    § 364(d)(1) .................................................................................................................17

28 U.S.C. §
    § 1408… .......................................................................................................................5
    § 157… .........................................................................................................................5

PRINTED ON

RECYCLED PAPER

7747793v3

**TABLE OF AUTHORITIES**
**(Cont'd)**

Page(s)

§ 157(b)(2) ................................................................................................5

Federal Rule of Bankruptcy Procedure
Rule 2002 ...............................................................................................22
Rule 4001 ......................................................................... 10,16, 21-22, 34
Rule 4001-2 ..............................................................................................5
Rule 4001(c)(2) .........................................................................................4

PRINTED ON

RECYCLED PAPER

**TO THE HONORABLE GERALDINE MUND, UNITED STATES BANKRUPTCY JUDGE, AND INTERESTED PARTIES:**

**PLEASE TAKE NOTICE** that on the 3rd day of May, 2011, at the hour of 10:00 a.m., or as soon thereafter as counsel can be heard, in the courtroom of the Honorable Geraldine Mund, United States Bankruptcy Judge, which is located in Courtroom 303, 21041 Burbank Boulevard, Woodland Hills, California 91367, Westrim, Inc. dba Westrim Crafts, a Delaware corporation, debtor and debtor-in-possession in this chapter 11 case ("Debtor"), will and does hereby, move the Court, on an emergency basis, for entry of interim and final orders (1) authorizing Debtor to incur postpetition secured indebtedness; (2) granting postpetition security interests and superpriority administrative expense status; (3) authorizing use of cash collateral; (4) modifying the automatic stay; (5) granting adequate protection; and (6) scheduling interim and final hearings hereon (the "Motion").

As set forth in detail in the Motion, Debtor needs financing and use of cash collateral, totaling approximately $1,472,000 over the two week period ending May 13, 2011 and $1,963,000 (in the aggregate) during the four week period ending May 27, 2011 to, among other things, pay: (a) payroll, (b) utilities, (c) rent, and (d) for raw materials.  Over this same period Debtor projects collections of $1,743,000.  As set forth herein,  Debtor anticipates using cash collateral collections to pay amounts owed to its prepetition senior secured lender Newstar Business Credit, LLC ("NEWSTAR") in order that NEWSTAR will advance new funds under the DIP Credit Documents to fund the Debtor's remaining cash needs during the periods identified above.  A detailed cash flow budget setting forth Debtor's projected income and expenses for the eight week period postpetition is attached to the Motion as Exhibit 1 (the "Budget").

It is imperative that Debtor obtain bankruptcy court approval of the Motion as soon as possible in order for Debtor to continue to operate.  If the Motion is not heard and approved by May 3, 2011, Debtor will most likely lose several valuable orders and customers and it is likely that the business operations will cease permanently.  In such event, material going concern value, in addition to approximately 70 jobs and will be lost, unnecessarily.  Debtor has no source of cash to operate its business other than cash collateral and the financing proposed in the Motion.

Jeffer Mangels
Butler & Mitchell LLP
JMBM

1    In accordance with Federal Rule of Bankruptcy Procedure 4001(d) and Local Bankruptcy

2    Rule 9075-1, Debtor served Notice of the Motion and the Motion itself on the twenty largest

3    creditors holding unsecured claims, all creditors who assert a general security interest in Debtor's

4    assets, and the Office of the United States Trustee, by either overnight courier, messenger, facsimile

5    or email, as reflected in the attached proof of service. Debtor believes and alleges that this notice is

6    appropriate within the meaning of 11 U.S.C. § 102 and FRBP 4001.

7    **PLEASE TAKE FURTHER NOTICE** that the Motion is being presented to the Court on

8    an emergency basis. Pursuant to the provisions of Local Bankruptcy Rules 2081-1, 9013-1 and

9    9075-1(a), any party opposing the relief sought by the Motion or the adequacy of the notice given of

10    the Motion may object at the hearing on the Motion and seek a continuance for good cause shown.

11    **PLEASE TAKE FURTHER NOTICE** that a failure to respond or to appear at the hearing

12    may result in the Court granting the relief requested by the Motion. For further information

13    concerning the Motion, you may contact the attorneys for Debtor listed on the first page of this

14    notice.

15    DATED: April 29, 2011             JEFFER MANGELS BUTLER & MITCHELL LLP

16

17                                       By:    */s/ David M. Poitras*
18                                              DAVID M. POITRAS
                                                Counsel for Westrim, Inc.
19                                              Debtor and Debtor in Possession

20

21

22

23

24

25

26

27

28

PRINTED ON

RECYCLED PAPER
7747793v3

- 3 -

**MOTION**

Debtor hereby submits this expedited Motion seeking, <u>inter alia</u>, entry of interim and final orders (1) authorizing Debtor to incur postpetition secured indebtedness; (2) granting postpetition security interests and superpriority administrative expense status; (3) authorizing use of cash collateral; (4) modifying the automatic stay; (5) granting adequate protection; and (6) scheduling interim and final hearings hereon.

Debtor proposes to incur postpetition secured indebtedness from NEWSTAR, as lender, in an aggregate amount not to exceed certain amounts set forth in the Budget, exclusive of certain fees, charges, and Carve-Out reserves (defined below)(the "<u>DIP Financing</u>").  The DIP Financing shall be issued pursuant to (1) the terms of the Newstar Loan Agreement attached hereto as <u>Exhibit 2</u>, (2) the form of interim order attached hereto as <u>Exhibit 3</u> (the "<u>Interim Order</u>"), and (3) the form of final order in substantially the same form as the Interim Order (the "<u>Final Order</u>," and together with the Interim Order, the "<u>Financing Orders</u>"), together with any related documents required to be delivered by or in connection with the DIP Financing (collectively, the "<u>DIP Credit Documents</u>").[1] Pursuant to the DIP Credit Documents, Debtor proposes to grant security interests, liens and superpriority claims to NEWSTAR, including a superpriority claim pursuant to section 364(c)(1) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and liens pursuant to sections 364(c) and (d) of the Bankruptcy Code, to secure Debtor's obligations in connection with the DIP Financing.

Debtor further requests that the Court (i) modify the automatic stay imposed pursuant to section 362 of the Bankruptcy Code to the extent reasonably necessary to permit NEWSTAR and Debtor to implement the terms of the Financing Orders, (ii) schedule an immediate emergency hearing (the "<u>Interim Hearing</u>") to consider the relief requested in the Interim Order, and (iii) schedule a final hearing ("<u>Final Hearing</u>") regarding the Motion within approximately 15 days after the Interim Hearing and approve notice procedures in connection therewith pursuant to Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure (collectively, the "<u>Bankruptcy Rules</u>").

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the DIP Credit Documents or in the Interim Order.

PRINTED ON
RECYCLED PAPER
7747793v3

In further support of this Motion, Debtor represents as follows:[2]

## I.

## JURISDICTION AND VENUE

This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

The statutory predicates for the relief requested herein are sections 105, 361, 362, 363, and 364 of the Bankruptcy Code, Bankruptcy Rule 4001, and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Central District of California.

## II.

## BACKGROUND

On April 29, 2011 (the "Petition Date"), Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

As of the date of this Motion, no trustee or creditors' committee has been appointed in this case.  Debtor remains in possession and control of its assets as a debtor-in-possession.

### A.    Description Of Debtor

Westrim is a Delaware corporation and a wholly owned subsidiary of Creativity Crafts, Inc., a Delaware corporation ("Creativity"), and is based in Van Nuys, California.  Westrim currently employs approximately 70 people.  Creativity is a privately held Delaware corporation and is also based in Van Nuys, California.  Other than its stock interest in Debtor, Creativity does not have any material assets.  Similarly, other than various guaranty/surety obligations for which Debtor is the primary obligor, Creativity does not have any significant debt.

---

[2]   The facts and circumstances supporting this Motion are set forth in the *Declaration of Ronald B. Cooper* attached hereto.

Jeffer Mangels
Butler & Mitchell LLP

JMBM

Debtor had its beginnings in Los Angeles during the early 1950's as Western Trimmings, when Albert Deitsch started a costumes and props design and supply business catering to the movie industry. Westrim, headed by Gary Deitsch, evolved into a basic crafts business in the 1960's wholesaling product to hobby stores and sewing retailers. Design of product was done in Southern California but virtually all production has been done in Asia since the 1970's, with the product being distributed nationwide from Westrim's Southern California distribution facility. By the early 2000's, the independent hobby and sewing stores had been replaced by the national chains of hobby and mass merchandise stores such as Michaels, JoAnn Stores, A.C Moore, Wal-Mart and Target. The Company grew to meet the needs of these large chains with evolving consumer trends and increasing volume. Scrapbooking became very popular and Debtor moved its focus toward that sector, retaining the basic crafts business. The costume jewelry making business became increasingly popular and in 2002, Westrim acquired Blue Moon Beads. As the popularity of scrapbooking declined, Debtor sold off its various units and the Blue Moon Beads unit is left as the most popular national "premium" brand for high quality beads and fashion-conscious jewelry making components.

**B.**     **Debtor's Principal Indebtedness**

Prior to the Petition Date, NEWSTAR provided financial accommodations to Debtor pursuant to that certain Loan and Security Agreement (the "Newstar Loan Agreement"), dated as of September 3, 2008, as amended from time to time. As of the Petition Date, Debtor owed NEWSTAR approximately $5.7 million, which debt is secured by a senior perfected security interest in substantially all of Debtor's assets. Debtor has investigated and believes that NEWSTAR has a perfected and unavoidable security interest in substantially all of Debtor's assets. The debt owed to NEWSTAR is secured by all assets of both Debtor and Creativity. NEWSTAR asserts that it is oversecured. Debtor is hopeful that the NEWSTAR debt will be paid in full through a combination of the cash to be paid at the closing of a proposed sale of Debtor's assets in connection with the Blue Moon Beads unit (described below) and a further guaranteed payment in March 2012, the collection of Debtor's remaining accounts receivable (which are not part of the assets being sold under the transaction described in the Sale Motion described below), proceeds from sale of other

Jeffer Mangels
Butler & Mitchell LLP

JMBM

1    assets not included in the transaction described in the Sale Motion, such as inventory and

2    intellectual property not related to the Blue Moons Bead unit, furniture, fixtures and equipment, and

3    the Earn Out.

4        As of the Petition Date, a group of fourteen individuals/entities (the "Bridge Lenders")

5    assert a claim against Debtor in the amount of approximately $1,025,000 plus accrued interest and

6    costs (the "Bridge Loan").    The Bridge Lenders are comprised of a group of shareholders of

7    Creativity, including most of the members of Creativity's Board of Directors.  The Bridge Lenders

8    provided the Bridge Loan to Debtor in June 2010 to fund certain operating shortfalls and to

9    otherwise get Debtor to the "finish line" to complete an out-of-court going concern sale of Debtor's

10   then (and still) remaining assets.  At that point in time, Debtor and the Bridge Lenders reasonably

11   believed that the value of the company in a sale would be sufficient to pay creditors in full and

12   provide a return to equity.  The Bridge Lenders' debt is secured by a junior security interest in

13   substantially all of Debtor's assets.  The Bridge Loan is subordinate to the NEWSTAR loan.

14       NEWSTAR and the Bridge Lenders are the only parties that Debtor is aware of that assert a

15   perfected blanket security interest in the Debtor's assets.

16

17   **C.    The Main Assets of the Estate.**

18       Debtor's principal assets are accounts receivable, inventory and equipment, intellectual

19   property and intangibles, most or all of which appear to be subject to the security interests described

20   above.

21            **1.    Receivables**

22       As of April 22, 2011, the face amount of Debtor's outstanding accounts receivable

23   was approximately $2,207,000.00.  Based upon past history, Debtor believes that as part of a going

24   concern, the current receivables are collectible with a reserve of approximately  $432,000.00.

25            **2.    Inventory**

26       Debtor's inventory consists of finished goods, raw materials and packaging materials.  As of

27   April 22, 2011, the value of Debtor's inventory subject to the pending sale, calculated as the value

28   of Debtor's cost of such inventory, was approximately $3,000,000.00.  As of April 22, 2011, the

PRINTED ON

RECYCLED PAPER
7747793v3

value of Debtor's inventory not subject to the pending sale, again calculated at Debtor's cost of such inventory, was approximately $2,000,000.00.

### 3. **Equipment**

Debtor owns certain furniture, fixtures and equipment, the non-depreciated book value of which was approximately $2.5 million as of December 31, 2010. Approximately 10% of these assets are subject to the pending sale and the remainder will remain with the Debtor and will be liquidated separately.

If the Motion is denied and Debtor is forced to liquidate, there will be a deficiency on NEWSTAR's prepetition debt and the Bridge Lenders and unsecured creditors will receive nothing.

### D. **Need For Bankruptcy Relief – The Proposed Sale**

Westrim acquired several craft companies between 2000 and 2006, with the intent of leveraging a common "back office" infrastructure (warehousing, accounting, IT, HR) to provide cost leverage and strengthen its relationships with key retail customers, including Michaels, JoAnn's and Wal-Mart. Significant losses in product placement due to changes in retailer strategy and increased competition resulted in a decline in revenue from approximately $125 million in 2005 to $30 million in 2010. Westrim's current revenue and margins are not sufficient to pay its infrastructure costs on an ongoing basis. In May, 2010 Westrim sold the assets of its scrapbooking, paper crafting, wall décor, craft storage and general crafts business to ANW Crestwook. In June 2010, Westrim engaged investment banker Stifel Nicolaus to market the assets of the Blue Moon Beads unit, with the intent of paying all debts and returning any remaining capital to the shareholders once the sale was complete.

Stifel Nicolaus assisted in preparation of a Confidential Memorandum regarding a proposed sale of the Blue Moon Beads unit. After contacting over 100 potential purchasers, identified by Stifel Nicolaus and Debtor as the most likely candidates to acquire the Blue Moon Beads unit, the Confidential Memorandum was sent in August 2010 to over 40 parties who had requested the material. Subsequent discussions were had with each of these parties, and eventually 6 parties attended on-site presentations in September and October 2010. Eventual negotiations with the 6 parties resulted in the receipt of 3 proposals in November and December 2010. After discussions

JMBM Jeffer Mangels Butler & Mitchell LLP

PRINTED ON
RECYCLED PAPER
7747793v3

with the investment banker, the proposal received from Acquisition Corp. was determined to be the most viable proposal.

Faced with the imminent prospect of a forced liquidation, in the exercise of its fiduciary duty, Debtor's board of directors determined to file this chapter 11 case to preserve and protect Debtor's assets for the benefit of all creditors, Debtor's employees, and to preserve the business as close to a going concern as possible under the circumstances presented, to allow for a sale of Debtor's assets for the benefit of all concerned, under the protection of the Bankruptcy Court. Substantially contemporaneous with the filing of this Motion, Debtor intends to file a Motion for Order Authorizing: (A) Sale of Certain Assets of the Estate Free and Clear of All Liens, Claims, Interests and Encumbrances; (B) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (C) Related Relief (the "Sale Motion").[3]  As set forth in the Sale Agreement to be attached to a sale motion, Debtor proposes to sell the assets associated with its Blue Moon Beads unit to Acquisition Corp. (or an overbidder) for $2.5 million cash at Closing (subject to adjustment), plus an additional $250,000 to be paid in March 2012, plus "earn out" payments, if earned, of up to $12,500,000 based on the achievement of certain future sales and net product margins by Acquisition Corp. following the closing (as described in the proposed Sale Agreement) (the "Earn Out") (collectively, the "Purchase Price"). Debtor believes that the proposed purchase price for the assets is fair and reasonable under the circumstances presented.  In the absence of new capital or a sale (such as that proposed by the proposed sale), Debtor's business will be forced to close, permanently.  In such event, material going concern value, in addition to approximately 70 jobs will be lost, unnecessarily.  Debtor's board of directors has determined that the sale proposed herein is beneficial to Debtor and this bankruptcy estate.  Based upon information and belief, Debtor believes that there may be overbidding at any hearing on the proposed sale.  Through this process, the Court and interested parties will be assured that the assets will be sold for the highest and best price possible.

---

[3]     As of the Petition Date, the Sale Agreement has not been finalized.  In the event that the Sale Agreement is not finalized in a manner acceptable to NEWSTAR prior to the hearing on this Motion, NEWSTAR reserves the right to withdraw its agreement to provide the DIP Financing.

PRINTED ON

RECYCLED PAPER
7747793v3

- 9 -

**E.**    **Need for Financing**

Debtor has an urgent and immediate need for cash (in the form of DIP Financing) to sustain its business and attempt to consummate the proposed going concern sale of Debtor's assets. Without immediate (and ongoing) access to the cash, Debtor will be unable to pay its obligations under the NEWSTAR Loan Agreement and thus unable to obtain the DIP Financing necessary to provide cash flow to purchase product, pay employees, or continue to operate its business. Consequently, Debtor will suffer irreparable harm, thereby jeopardizing any prospect for maximizing value in this bankruptcy case. Without DIP Financing, Debtor's effort to sell its assets as a going concern will also be completely derailed. Debtor will be liquidated for far less than the value that would be produced by a sale.

As indicated, if the DIP Financing is approved, Debtor will have sufficient cash to maintain its going concern value pending a sale, which should ultimately generate value in excess of amounts necessary to repay the DIP Financing.

Debtor believes that the proposed DIP Financing is fair and reasonable under the circumstances and according to ordinary and appropriate business terms. The DIP Financing has been negotiated in good faith and at arms' length by and between the parties. Debtor has been unable to obtain credit to finance its ongoing operations on an unsecured basis or subject to a junior lien on Debtor's assets.

**III.**

**REQUESTED RELIEF**

By this Motion, Debtor requests: (a) authority to obtain postpetition secured financing pursuant to section 364 of the Bankruptcy Code by entering into the DIP Financing Agreement; (b) authority to grant NEWSTAR, pursuant to sections 364(c) and (d) of the Bankruptcy Code, security interests and a superpriority administrative expense claims as set forth in the DIP Financing Agreement; (c) authority to use cash collateral to pay prepetition debt to NEWSTAR; (d) authority to modify the automatic stay in certain respects in connection with the DIP Financing; and (e) setting a Final Hearing on this Motion pursuant to Rule 4001(c) of the Federal Rules of Bankruptcy Procedure.

PRINTED ON

RECYCLED PAPER
7747793v3

JMBM | Jeffer Mangels
Butler & Mitchell LLP

# IV.

## <u>SUMMARY OF PROPOSED DIP FINANCING</u>

Pursuant to the DIP Financing Agreement, the principal terms of the DIP Financing generally are as follows:[4]

<u>Borrower</u>:  Debtor.

<u>Lender</u>:  NEWSTAR.

<u>Commitment</u>:  Per the Budget.

<u>Term</u>:  The Debtor's right to use Cash Collateral hereunder and the DIP Credit Facility shall terminate without further order of this Court (i) if there is an Event of a Default under the DIP Credit Facility, or (ii) if a trustee under chapter 7 or 11 of the Bankruptcy Code, a responsible officer, or an examiner with enlarged powers relating to the operations of the business (powers beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) Code shall be appointed in the chapter 11 case, or (iii) at maturity on June 3, 2011.

<u>Priority and Liens</u>:  All obligations of Debtor to NEWSTAR under the DIP Financing would have superpriority administrative expense status subject to the Carve-Out (as defined below and in the Financing Orders).  NEWSTAR will receive security interests in and liens upon (the "<u>DIP Liens</u>") all prepetition and postpetition assets of Debtors, whether now existing or hereafter acquired or arising, or any proceeds thereof (collectively, the "<u>DIP Collateral</u>"), excluding only avoidance actions recovered or avoided under chapter 5 of the Bankruptcy Code.  Subject to the Carve-Out (as defined below), the DIP Liens (a) will constitute first priority liens in and to all DIP Collateral to the extent such assets of Debtor are not subject to any valid, perfected, enforceable and non-avoidable lien in existence as of the Petition Date including the Bridge Lender's liens, and (b) would be immediately junior in priority to any and all other valid, perfected, enforceable and non-avoidable liens on the assets of Debtor in existence as of the Petition Date.

---

[4]      In case of any inconsistency between the terms of the DIP Financing as described in this Motion and the DIP Financing Agreement, the DIP Financing Agreement shall control.

PRINTED ON

RECYCLED PAPER

7747793v3

JMBM | Jeffer Mangels Butler & Mitchell LLP

<u>Use of Proceeds</u>:  Proceeds of the DIP Financing shall be used solely in accordance with the Budget, as more particularly described in the Financing Orders.

<u>Carve Out</u>:   A professional fee carve-out for the reasonable fees and costs of Debtor's professionals in the amount of $135,000 (collectively, the "<u>Carve-Out</u>").

<u>Fees and Expenses</u>:  (i) A commitment fee of $25,000 and (ii) fees enumerated in the Newstar Loan Agreement.

<u>Interest</u>:  All outstanding advances under the DIP Financing shall bear interest at the non-default rate set forth in the Newstar Loan Agreement.

<u>Events of Default</u>:  Defaults and Events of Default under the DIP Credit Facility and with respect to all Financing shall be as set forth in the Newstar Loan Agreement except that the Events of Default   described in subsections 12.1(c)-(e) of the Loan and Security Agreement dated September 3, 2008, as amended, shall not be applicable during the Case so long as it is a chapter 11 case; and provided that each of the following shall constitute an additional Event of Default:

    i.    The entry of an order dismissing the Case or converting the Case to one under chapter 7 of the Bankruptcy Code;

    ii.    Debtor's failure for any one week to achieve total sales equal to or greater than 90 percent of the total sales projected for such week in the Budget;

    iii.    Debtor's failure for any one week to achieve total cash collections equal to or greater than 90 percent of cash collections projected for such week in the Budget;

    iv.    Debtor's total cumulative cash expenses at any time exceed 100 percent of the total expenses projected in the Budget; and

    v.    Failure to close the sale of the Debtor's assets pursuant to the APA by June 3, 2011.

PRINTED ON

RECYCLED PAPER
7747793v3

The Financing Orders also includes the following provisions and protections for the benefit of NEWSTAR.

Use of Cash Collateral/Adequate Protection Liens:  Debtor shall acknowledge and admit that its cash collateral constitutes "cash collateral" within the meaning of section 363(a), which entitles such parties to adequate protection of their interests in such collateral.  Debtor shall be authorized to use cash collateral in which the Prepetition Lenders[5] assert an interest to make payments to NEWSTAR under the DIP Credit Documents including, without limitation, in respect of Pre-Petition Debt.  The Prepetition Lenders shall each be granted postpetition replacement liens on all assets of Debtor (subject only to the Carve-Out and excluding Avoidance Actions) for any diminution in the value of such party's interest in Debtor's cash collateral or other assets.  The obligations under the Newstar Loan Agreement and the obligations under the DIP Credit Facility will be secured by all Pre-Petition Collateral and DIP Collateral, and all collections and proceeds of both Pre-Petition Collateral and DIP Collateral will be applied to amounts due to NEWSTAR under the Newstar Loan Agreement and the DIP Credit Facility, and the pre-petition credit facility by Newstar under the Newstar Loan Agreement will be merged into the DIP Credit Facility.

Certain Waivers:  Debtor irrevocably waives any rights that it may have to seek authority (i) at any time during the case, whether or not an Event of Default has occurred, (a) to obtain postpetition loans or other financial accommodations pursuant to sections 364(c) or (d) of the Bankruptcy Code other than from NEWSTAR unless such authority results in the obligations under the DIP Credit Documents being indefeasibly paid in full; or (b) to propose or support a plan of reorganization to the extent such act or plan would result in an Event of Default; or (ii) at any time during the case after the occurrence of an Event of Default, to seek relief under the Bankruptcy Code, including without limitation, under section 105, to the extent any such relief would in any way restrict or impair the rights and remedies of NEWSTAR.

---

[5] The obligations due under the Newstar Loan Agreement and the Bridge Loan as of the Petition Date shall be referred to hereinafter as the "Prepetition Obligations."  Relative to the Prepetition Obligations, NEWSTAR and the Bridge Lenders shall be referred to collectively as the "Prepetition Lenders."

Jeffer Mangels
Butler & Mitchell LLP

JMBM

1        <u>Surcharge Claims</u>:  Without otherwise affecting the provisions regarding the Carve-Out, no

2    costs or expenses of administration that have been or may be incurred in the case at any time shall

3    be charged against NEWSTAR, its claims, or the DIP Collateral pursuant to section 506(c) without

4    the prior written consent of NEWSTAR, and no such consent shall be implied from any other

5    action, inaction, or acquiescence by NEWSTAR.

6        <u>Accrued Deferred Time Off Compensation for Debtor's Employees</u>:  Provided that (i) the

7    APA has not terminated; (ii) the Debtor is continuing to pursue the sale of its assets pursuant to the

8    terms of the APA (including a sale to an alternative bidder) (the "Sale"), (iii) an Event of Default

9    has not occurred under the DIP Loan; and (iv) the Debtor terminates the employment of any of its

10   employees (each an "<u>Involuntarily Terminated Employee</u>") prior to the closing of the Sale, the

11   Debtor will be authorized to pay as expenses in accordance with forecasts in the Budget up to 50

12   percent of accrued deferred time off compensation ("<u>DTO</u>") to any such Involuntarily Terminated

13   Employee.  The foregoing, however, does not provide the Debtor with authority to pay the DTO to

14   any employee who voluntarily terminates his/her employment (each a "<u>Voluntarily Terminated</u>

15   <u>Employee</u>") prior to the closing of the Sale.  In the event the Debtor closes the Sale, the Debtor is

16   authorized to pay up to $194,000, less any amounts previously paid to Involuntarily Terminated

17   Employees for DTO, for (i) any DTO owing to any employee terminated as a result or consequence

18   of the Sale; (ii) any DTO owing to any Involuntarily Terminated Employee terminated prior to the

19   closing of the Sale; and (iii) any DTO owing to any Voluntarily Terminated Employee.

20       <u>Relief from Automatic Stay</u>:    The automatic stay provisions of section 362 of the

21   Bankruptcy Code shall be modified to the extent necessary to permit the DIP Financing and the

22   implementation of the terms of the Financing Orders.  Upon the occurrence of an Event of Default

23   under the DIP Credit Documents, subject to any cure periods provided therein, NEWSTAR shall be

24   entitled to take certain immediate actions to enforce its rights and remedies, including without

25   limitation terminating and withholding consent to Debtors' use of cash collateral and declaring all

26   obligations immediately due and payable, other than enforcing rights and remedies in connection

27   with the DIP Collateral.  Any action or exercise of rights by NEWSTAR with respect to its

28   collateral shall only be taken upon further order of the Court, but which may be heard on an

PRINTED ON

RECYCLED PAPER
7747793v3

JMBM | Jeffer Mangels Butler & Mitchell LLP

1   expedited basis on no less than five (5) business days' notice.

2       <u>Binding Effect</u>:  The acknowledgement of the liens and claims set forth above shall be

3   binding upon Debtor, any successors thereto (including without limitation any chapter 7 or 11

4   trustee appointed or elected for Debtor), and all other parties in interest, including, without

5   limitation, any official committee appointed in this case, unless (a) a party in interest (other than

6   Debtor) has timely filed an adversary proceeding or contested matter by no later than the date that is

7   60 days after the formation of a committee, or (b) in the event no committee is appointed, by any

8   party in interest within 60 days from the date of entry of the Final Order.  If no such adversary

9   proceeding or contested matter is timely filed, the obligations arising under the Newstar Loan

10  Agreement and the DIP Credit Documents shall be deemed allowed in full for all purposes in the

11  case and any subsequent chapter 7 case, and the liens and security interests of NEWSTAR or its

12  assignee shall be deemed to have been, as of the Petition Date, legal, valid, binding, and perfected,

13  not subject to recharacterization, subordination, or avoidance.

14  **V.**

15  **<u>SPECIFIC RELIEF REQUESTED</u>**

16      Debtor requests that the Court grant the financing described in the DIP Credit Documents

17  and authorize Debtor to use cash collateral.  Specifically, by this Motion, Debtor seeks approval of

18  the Interim Order and Final Order, in substantially the same form as the Interim Order attached

19  hereto, that provide, among other things, this Court's authorization under sections 105, 361, 362,

20  363, 364(c)(1), 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code:

21

22      (a)   to obtain secured DIP Financing from NEWSTAR pursuant to the terms and
    conditions of the DIP Credit Documents;

23

24      (b)   in order to secure Debtor's obligations under the DIP Financing (subject in
    each case only to the Carve-Out), to grant NEWSTAR the following:

25          (i)   priority in payment, pursuant to section 364(c)(1) of the Bankruptcy

26  Code, with respect to such obligations over any and all administrative expenses of

27  the kinds specified in Bankruptcy Code sections 503(b) and 507(b) to the extent

28  permitted by law;

PRINTED ON
RECYCLED PAPER
7747793v3

- 15 -

JMBM | Jeffer Mangels
Butler & Mitchell LLP

(ii)      perfected first priority liens, pursuant to section 364(c)(2) of the Bankruptcy Code, on any unencumbered property of the Debtor, other than Avoidance Actions;

(iii)      perfected first priority senior liens, pursuant to section 364(d)(1) of the Bankruptcy Code, on all property of the Debtor's that is subject to a lien other than and Avoidance Actions;

(c)      to use "cash collateral," pursuant to sections 361, 362 and 363 of the Bankruptcy Code that is subject to the interests of the Prepetition Lenders;

(d)      to borrow up to the amounts set forth in the Budget on an interim basis pending the Final Hearing;

(e)      to modify the automatic stay imposed pursuant to section 362 of the Bankruptcy Code in accordance with the Financing Orders; and

(f)      under Bankruptcy Rule 4001, to schedule Final Hearing and establish notice procedures in respect of the Final Hearing.

At the Final Hearing, Debtor requests that the Court enter the Final Order approving the DIP Financing, authorizing Debtor to enter into the DIP Credit Documents, and authorizing Debtor to use cash collateral.

## VI.

### BASIS FOR RELIEF REQUESTED

### A.      The DIP Financing Should Be Approved

Pursuant to section 364(c) of the Bankruptcy Code, a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit and the borrowing is in the best interests of the estate.  See, e.g., In re Simasko Production Co., 47 B.R. 444, 448-9 (D. Colo. 1985) (authorizing interim financing agreement where debtors' best business judgment indicated financing was necessary and reasonable for benefit of estate); In re Ames Dept. Stores, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to postpetition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties.")

JMBM | Jeffer Mangels
Butler & Mitchell LLP

PRINTED ON

RECYCLED PAPER
7747793v3

- 16 -

Section 364(c) of the Bankruptcy Code provides, in pertinent part, as follows: \

(c)      If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –

(1)      with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2)      secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3)      secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

Section 364(d)(1) of the Bankruptcy Code governs the incurrence of senior secured debt or "priming" liens. This provision provides as follows:

(d)      (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if –

(A)      the trustee is unable to obtain such credit otherwise; and

(B)      there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

Debtor satisfies the requirements of both sections 364(c) and (d) of the Bankruptcy Code because: (i) Debtor is unable to obtain unsecured credit or credit secured by a junior lien; and (ii) the interests of the Prepetition Lenders are adequately protected.

PRINTED ON

RECYCLED PAPER
7747793v3

- 17 -

The DIP Financing is for the benefit of Debtor's estate and creditors. Such financing is the sole means of preserving and enhancing Debtor's going concern value. With the credit provided by the DIP Financing, Debtor will be able to obtain goods and services in connection with its operations, pay employees, and operate its business in order to preserve going concern value for the benefit of all parties-in-interest. In addition, the availability of credit under the DIP Financing should give Debtor's vendors and suppliers the necessary confidence to continue ongoing relationships with Debtor, including the extension of credit terms for the payment of goods and services. It will also likely be viewed favorably by Debtor's employees and customers and thereby help promote Debtor's successful sale. Indeed, in the absence of the DIP Financing, Debtor will have to terminate operations and liquidate their assets for minimal value.

**B.     Debtor Is Unable To Obtain Credit On More Favorable Terms**

In satisfying the standards of section 364 of the Bankruptcy Code, a debtor need not seek credit from every available source but should make a reasonable effort to seek other sources of credit available of the type set forth in Bankruptcy Code §§ 364(a) and (b). See, e.g., In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986) (trustee had demonstrated by good faith effort that credit was not available without senior lien by unsuccessfully contacting other financial institutions in immediate geographic area; "the statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"); Ames, 115 B.R. at 40 (finding that debtors demonstrated the unavailability of unsecured financing where debtors approached several lending institutions).

As set forth herein, Debtor has been unable to secure any such alternative postpetition financing within the short time frame and on terms required by Debtor and more advantageous than those proposed by NEWSTAR. Accordingly, Debtor believes that the DIP Financing with NEWSTAR represents the best available credit to the estate at this time.

PRINTED ON
RECYCLED PAPER
7747793v3

- 18 -

## C.    The Prepetition Lenders Will Be Adequately Protected

Although adequate protection is not defined in the Bankruptcy Code, section 361 provides the following three nonexclusive examples of what may constitute adequate protection

> (1)    requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the…use…under section 363 of this title…results in a decrease in the value of such entity's interest in such property.

> (2)    providing to such entity an additional or replacement lien to the extent that such…use…results in a decrease in the value of such entity's interest in such property; or

> (3)    granting such other relief . . . as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361.

Neither section 361 of the Bankruptcy Code nor any other provision of the Bankruptcy Code defines the nature and extent of the "interest in property" of which a secured creditor is entitled to adequate protection under section 363 of the Bankruptcy Code.    However, the statute plainly provides that a qualifying interest demands protection where the use of the creditor's collateral will result in a decrease in "the value of such entity's interest in such property."    11 U.S.C. §§ 361, 363(e).    United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 108 S. Ct. 626, 98 L. Ed. 2d 740 (1988); see also In re Kain, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988); General Elec. Mortgage Corp. v. South Village, Inc., 25 B.R. 987, 989-90 & n.4 (Bankr. D. Utah 1982).

Timbers holds that the prepetition lenders are entitled to "adequate protection" when there is diminution in an interest in their collateral by reason of the use of cash collateral and the granting of "priming" liens.    In the instant case, there is no possible diminution in value with respect to the Prepetition Lenders because their liens are not "primed" by the proposed DIP Financing, and even if they were, the Prepetition Lenders are adequately protected because the DIP Financing will

JMBM | Jeffer Mangels
Butler & Mitchell LLP

PRINTED ON
RECYCLED PAPER
7747793v3

preserve the Debtor's going concern value.  The Prepetition Lenders also consent to the proposed DIP Financing and use of cash collateral.

NEWSTAR and the Bridge Lenders are Debtor's only creditors who assert a security interest in Debtor's cash collateral.  NEWSTAR and the Bridge Lenders consent to the relief requested by the Motion.

The DIP Financing will also preserve and sustain the value of the Prepetition Lenders' existing security interests by maintaining the going concern value of Debtor's operations and allowing the Debtor to consummate a sale.  See, e.g., In re Aqua Assocs., 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) ("The important question, in determination of whether the protection to a creditor's secured interest is adequate, is whether that interest, whatever it is, is being unjustifiably jeopardized."); In re Grant Broadcasting, 71 B.R. 376, 386-89 (Bankr. E.D. Pa.), aff'd, 75 B.R. 819 (E.D. Pa. 1987); In re Alyucan Interstate Corp., 12 B.R. 803, 809-12 (Bankr. B. Utah 1981).

Accordingly, Debtor submits that the terms and conditions of the DIP Credit Documents are fair and reasonable, were negotiated by the parties in good faith and at arm's length, and adequately protect the interests of the Prepetition Lenders.  For these reasons,  Debtor requests that the Court approve and authorize the DIP Financing and accord NEWSTAR the benefits of section 364(e) of the Bankruptcy Code in respect of the DIP Financing.

**D.** **Debtor Has Met Its Burden For Use of Cash Collateral.**

Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use, sell or lease cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and hearing, authorizes such use, sale or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).

In addition to the need for debtor in possession financing, Debtor's other pressing concern is the continuing need for immediate use of cash collateral in which the Prepetition Lenders are expected to assert an interest.  Debtor requires use of cash collateral to pay the Pre-Petition Debt NEWSTAR in order that NEWSTAR will advance funds under the DIP Credit Facility, which will be used to pay present operating expenses including payroll and to pay vendors to ensure a continued supply of materials essential to Debtor's continued viability.

JMBM | Jeffer Mangels
Butler & Mitchell LLP

1    A secured creditor is entitled to adequate protection for the use of cash collateral pursuant to

2   section 361 of the Bankruptcy Code.  As addressed above, NEWSTAR and the Bridge Lenders

3   consent to the relief requested by the Motion.  Debtor's access to cash will also ensure the going

4   concern value of the business and preserve the value of the Prepetition Lenders' collateral.

5   **E.    Interim Approval Should Be Granted.**

6    Bankruptcy Rule 4001(b) and (c) provide that a final hearing on a motion to use cash

7   collateral pursuant to section 363 of the Bankruptcy Code and to obtain credit pursuant to section

8   364 of the Bankruptcy Code may not be commenced earlier than fifteen (15) days after the service

9   of such motion.  Upon request, however, the Court is empowered to conduct a preliminary

10  expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit

11  to the extent necessary to avoid immediate and irreparable harm to the Debtor's estates.

12   Debtor requests that the Court conduct an expedited preliminary hearing on the Motion and

13  authorize Debtor from and after the entry of the Interim Order until the Final Hearing to utilize cash

14  collateral and to borrow up to the amounts set forth in the DIP Credit Documents as provided in the

15  Interim Order.  Such interim authority will enable Debtor to maintain ongoing operations and avoid

16  immediate and irreparable harm and prejudice to the estate and all parties in interest pending entry

17  of the Final Order.

18   **VII.**

19   **NOTICE**

20   Notice of this Motion has been given to the following parties or, in lieu thereof, to their

21  counsel, if known: (i) the Office of the United States Trustee; (ii) counsel to NEWSTAR; (iii) the

22  agent to the Bridge Lenders; and (iv) the twenty (20) largest unsecured creditors of Debtor.  Debtor

23  submits that, in light of the nature of the relief requested, no other or further notice need be given.

24

25

26

27

28

PRINTED ON

RECYCLED PAPER
7747793v3

# VIII.

## NOTICE OF INTERIM ORDER AND HEARING ON FINAL ORDER

Debtor also respectfully requests that the Court set a date for a Final Hearing on this Motion as soon as practicable and permitted by applicable law and an objection deadline on or before 5:00 p.m. three (3) business days prior to the date of the Final Hearing, and authorize Debtor to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, by first class mail upon (1) counsel to any official committee of unsecured creditors appointed in this case; (2) the Office of the United States Trustee; (3) all parties who have filed requests for notice under Bankruptcy Rule 2002 as of the date of service of the Interim Order; (4) counsel to NEWSTAR; (5) the agent to the Prepetition Lenders; and (6) the twenty (20) largest unsecured creditors of Debtor. Debtor requests that the Court consider such service of the Interim Order to be sufficient notice under Bankruptcy Rule 4001.

Debtor further requests that the Court order that any party in interest objecting to the relief sought at the Final Hearing shall file with the Court and serve such written objections, which objections shall be served upon Debtor's counsel, Jeffer Mangels Butler & Mitchell LLP, attention David M. Poitras, 1900 Avenue of the Stars, 7th Floor, Los Angeles, CA 90067, facsimile 310.712.8571; email dpoitras@jmbm.com; counsel for NEWSTAR, Hunton & Williams, LLP, 1445 Ross Avenue, Suite 3700, Dallas, TX 75202, facsimile 214.468.3599; email ghesse@hunton.com, attention Gregory Hesse; and counsel for Acquisition Corp., Paul, Hastings, Janofsky & Walker LLP, 191 N. Wacker Drive, 30th Floor, Chicago, IL 60606, facsimile 312.499.6119; email amitmehta@paulhastings.com, attention Amit Mehta.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# IX.

## <u>CONCLUSION</u>

Debtor requests that the Court grant the relief requested herein and order any other relief the Court deems necessary.

Respectfully submitted,

DATED: April 29, 2011                     JEFFER MANGELS BUTLER & MITCHELL LLP


By:/s/ David M. Poitras
    DAVID M. POITRAS
    Counsel for Westrim, Inc.
    Debtor and Debtor in Possession

PRINTED ON

RECYCLED PAPER
7747793v3

## DECLARATION OF RONALD B. COOPER

I, Ronald B. Cooper, declare:

1.      I am the President and Chief Executive Officer of Westrim, Inc., dba Westrim Crafts, a Delaware corporation, the debtor and debtor in possession in this chapter 11 case (the "Debtor").  I am authorized to make this declaration on behalf of Debtor.

2.      I am familiar with each of the facts stated herein, and they are stated of my own personal knowledge.  If called as a witness, I could and would competently testify with respect to the matters set forth herein.

3.      I have read and assisted in preparation of the Motion to which this declaration is attached.  Capitalized terms used in this declaration have the same meaning as such terms are given in the Motion.

4.      Each of the facts set forth in the Motion are true and correct, to the best of my actual knowledge, information and belief.

5.      Certain of the facts set forth in this declaration are based upon Debtor's business records.  The documents and papers which comprise the business records of Debtor are maintained by persons whose duty it is to keep such records accurately and correctly.  Said records are created by employees of Debtor by making a written record of each transaction or occurrence which relates to such events at or shortly after the time of such transaction or occurrence.  I have reviewed certain of Debtor's records prior to making this declaration.

6.      Debtor's cash flow projections for the period covered by the Motion are attached to this declaration and the Motion as Exhibit 1.

7.      The projections are based upon Debtor's actual historical business operations for the 12 month period prior to the Petition Date.

8.      The projections set forth detailed line item expenses on a weekly basis.

9.      The projections set forth projected income and collections on a weekly basis.

10.      The projections set forth Debtor's projected sales on a weekly basis.

11.      The projections set forth a weekly analysis of cash and other personal property collateral on a weekly basis.

12.     As set forth in the projections, the value of Debtor's asset base is projected to remain relatively stable (in the aggregate) over the projection period.

13.     Debtor needs financing and use of cash collateral, totaling approximately $1,472,000 over the two week period ending May 13, 2011 and $1,963,000 in the aggregate during the four week period ending May 27, 2011, to, among other things, pay: (a) payroll, (b) utilities, (c) rent, and (d) for raw materials.

14.     Prior to the Petition Date, NEWSTAR provided financial accommodations to Debtor pursuant to that certain Loan and Security Agreement (the "Newstar Loan Agreement"), dated as of September 3, 2008, as amended from time to time.

15.     As of the Petition Date, Debtor owed NEWSTAR approximately $5.7 million, which debt is secured by a senior perfected security interest in substantially all of Debtor's assets.

16.     Debtor has investigated and believes that NEWSTAR has a perfected and unavoidable security interest in substantially all of Debtor's assets.  The debt owed to NEWSTAR is secured by all assets of both Debtor and Creativity.

17.     Debtor is hopeful that the NEWSTAR debt will be paid in full through a combination of the cash to be paid at the closing of a sale of Debtor's assets in connection with the Blue Moon Beads unit and a further guaranteed payment in March 2012, the collection of Debtor's remaining accounts receivable (which are not part of the assets being sold under the transaction described in the Sale Motion), proceeds from sale of other assets not included in the transaction described in the Sale Motion, such as inventory and intellectual property not related to the Blue Moons Bead unit, furniture, fixtures and equipment, and the Earn Out.

18.     As of the Petition Date, a group of fourteen individuals/entities (the "Bridge Lenders") assert a claim against Debtor in the amount of approximately $1,025,000 plus accrued interest and costs (the "Bridge Loan").

19.     The Bridge Lenders are comprised of a group of shareholders of Creativity, including most of the members of Creativity's Board of Directors.

PRINTED ON

RECYCLED PAPER
7747793v3

- 25 -

20.     The Bridge Lenders provided the Bridge Loan to Debtor in June 2010 to fund certain operating shortfalls and to otherwise get Debtor to the "finish line" to complete an out-of-court going concern sale of Debtor's then (and still) remaining assets.  At that point in time, Debtor and the Bridge Lenders reasonably believed that the value of the company in a sale would be sufficient to pay creditors in full and provide a return to equity.  Unfortunately, as the Court and parties-in-interest can readily see, such is not now the case.

21.     The Bridge Lenders' debt is secured by a junior security interest in substantially all of Debtor's assets.

22.     The Bridge Loan is subordinate to the NEWSTAR loan.

23.     NEWSTAR and the Bridge Lenders are the only parties that Debtor is aware of that assert a perfected blanket security interest in the Debtor's assets.

24.     Debtor's principal assets are accounts receivable, inventory and equipment, intellectual property and intangibles, most or all of which appear to be subject to the security interests described above.

25.     As of April 22, 2011, the face amount of Debtor's outstanding accounts receivable was approximately $2,207,000.00.  Based upon past history, Debtor believes that as part of a going concern, the current receivables are collectible with a reserve of approximately $432,000.00.

26.     Debtor's inventory consists of finished goods, raw materials and packaging materials.  As of April 22, 2011, the value of Debtor's inventory subject to the pending sale, calculated as the value of Debtor's cost of such inventory, was approximately $3,000,000.  As of April 22, 2011, the value of Debtor's inventory not subject to the pending sale, again calculated at Debtor's cost of such inventory, was approximately $2,000,000.

27.     Debtor owns certain furniture, fixtures and equipment, the non-depreciated book value of which was approximately $2.5 million as of December 31, 2010.  Approximately 10% of these assets are subject to the pending sale and the remainder will remain with the Debtor and will be liquidated separately.

28.     Debtor's proposed budget includes normal operating expenses such as payroll, materials, *et cetera*.  Debtor's proposed budget also includes payments for real property and

PRINTED ON

RECYCLED PAPER
7747793v3

1  equipment leases that Debtor intends to use in the chapter 11 case.  Approval of the Motion will

2  greatly facilitate Debtor's efforts to reorganize by providing Debtor with the ability to utilize the

3  cash flow generated from business operations in the ordinary course of business while it attempts to

4  reorganize its financial affairs for the benefit of all concerned.

5        29.    Westrim acquired several craft companies between 2000 and 2006, with the intent of

6  leveraging a common "back office" infrastructure (warehousing, accounting, IT, HR) to provide

7  cost leverage and strengthen its relationships with key retail customers, including Michaels, JoAnn's

8  and Wal-Mart.

9        30.    Significant losses in product placement due to changes in retailer strategy and

10  increased competition resulted in a decline in revenue from approximately $125 million in 2005 to

11  $30 million in 2010.

12        31.    Westrim's current revenue and margins are not sufficient to pay its infrastructure

13  costs on an ongoing basis.

14        32.    In May, 2010 Westrim sold the assets of its scrapbooking, paper crafting, wall décor,

15  craft storage and general crafts business to ANW Crestwook.

16        33.    In June 2010, Westrim engaged investment banker Stifel Nicolaus to market the

17  assets of the Blue Moon Beads unit, with the intent of paying all debts and returning any remaining

18  capital to the shareholders once the sale was complete.

19        34.    Stifel Nicolaus assisted in preparation of a Confidential Memorandum regarding a

20  proposed sale of the Blue Moon Beads unit.  After contacting over 100 potential purchasers,

21  identified by Stifel Nicolaus and Debtor as the most likely candidates to acquire the Blue Moon

22  Beads unit, the Confidential Memorandum was sent in August 2010 to 40 parties who had requested

23  the material.  Subsequent discussions were had with each of these parties, and eventually 6 parties

24  attended on-site presentations in September and October 2010.  Eventual negotiations with the 6

25  parties resulted in the receipt of 3 proposals in November and December 2010.  After discussions

26  with the investment banker, the proposal received from Acquisition Corp. was determined to be the

27  only viable proposal.  Debtor provided additional information as requested by Acquisition Corp.,

28  and subsequent negotiations resulted in the Sale Agreement and the sale transaction proposed

PRINTED ON

RECYCLED PAPER
7747793v3

JMBM | Jeffer Mangels
Butler & Mitchell LLP

herein.  Upon the conclusion of the sale process, the offer set forth in the Sale Agreement provides the highest potential value to Debtor.

35.    Faced with the imminent prospect of a forced liquidation, in the exercise of its fiduciary duty, Debtor's board of directors determined to file this chapter 11 case to preserve and protect Debtor's assets for the benefit of all creditors, Debtor's employees, and to preserve the business as close to a going concern as possible under the circumstances presented, to allow for a sale of Debtor's assets for the benefit of all concerned, under the protection of the Bankruptcy Court.

36.    Debtor filed the chapter 11 petition in order to get the necessary DIP financing and use of cash collateral approved as soon as possible, so as to maintain ongoing business operations and to retain as much of its going concern value as possible.

37.    Debtor anticipates that it will attempt to market and sell its assets to obtain the highest and best value for them.  Debtor contemplates selling its assets pursuant to 11 U.S.C. § 363(b) subject to higher and better bids.  Debtor believes that a going concern sale is preferable to a liquidation.  The sale will preserve jobs and much of Debtor's going concern value.  In addition, because the contemplated sale is expressly subject to overbids and an auction process, Debtor believes that the sale will ensure that the maximum possible value is generated for Debtor's assets.

38.    Debtor has an urgent and immediate need for cash (in the form of DIP Financing) to sustain its business and attempt to consummate the proposed going concern sale of Debtor's assets.  Without immediate (and ongoing) access to the cash, Debtor will be unable to purchase product, pay employees, or continue to operate its business.  Consequently, Debtor will suffer irreparable harm, thereby jeopardizing any prospect for maximizing value in this bankruptcy case.  Without DIP Financing, Debtor's effort to sell its assets as a going concern will also be completely derailed.  Debtor will be liquidated for far less than the value that would be produced by a sale.

39.    If the DIP Financing is approved, Debtor will have sufficient cash to maintain its going concern value pending a sale, which should ultimately generate value in excess of amounts necessary to repay the DIP Financing and cure certain obligations.

PRINTED ON
RECYCLED PAPER
7747793v3

40.     Debtor believes that the proposed DIP Financing is fair and reasonable under the circumstances and according to ordinary and appropriate business terms.  The DIP Financing has been negotiated in good faith and at arms' length by and between the parties.  Debtor has been unable to obtain credit to finance its ongoing operations on an unsecured basis or subject to a junior lien on Debtor's assets.

41.     Throughout 2010 and 2011, Debtor has sought financing to finance business operations.  Debtor was not able to obtain DIP financing on terms better than those proposed in the Motion and the DIP Credit Documents.  For reasons which I believe are obvious based upon Debtor's current financial condition, I believe and represent that the DIP Financing with NEWSTAR represents the best available credit to the bankruptcy estate at this time.

42.     Debtor has no source of income other than cash collateral and the proposed financing available to pay its expenses.

43.     For the reasons set forth above, I submit and believe that the relief requested in the Motion is in the best interests of Debtor and all of its creditors.  By approving the Motion, the Court will provide Debtor with a meaningful opportunity to reorganize and pay its creditors, without prejudicing any creditor or party in interest.  On the contrary, if the Motion is not approved, Debtor will be forced to cease operating, in which event both Debtor and all creditors will suffer irreparable harm, for the reasons set forth above.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration was executed this 29th day of April 2011, at Windsor, California.


　　　　　　_/s/ Ronald B. Cooper_____
　　　　　　RONALD B. COOPER

# EXHIBIT 1

Chapter 11 - Stalking Horse Cash Flow Forecast
Creativity Inc.

| Forecast Week # | 1 W/E 4/22 | 2 W/E 4/29 | 3 W/E 5/6 | 4 W/E 5/13 | 5 W/E 5/20 | 6 W/E 5/27 | 7 W/E 6/3 | 7 Week Total |
|---|---|---|---|---|---|---|---|---|
| Beginning Revolver | $ 5,387 | $ 5,675 | $ 5,978 | $ 6,410 | $ 6,403 | $ 6,286 | $ 5,895 | |
| Sales Revenue | 691 | 453 | 160 | 920 | 125 | 255 | 195 | 2,799 |
| Cash Receipts | 108 | 262 | 186 | 295 | 432 | 568 | 279 | 2,130 |
| **Cash Disbursements** | | | | | | | | |
| Employee (Payroll, Benefits) | 137 | 87 | 137 | 75 | 131 | - | 131 | 697 |
| Accrued DTO | - | - | 90 | - | - | - | 104 | 194 |
| Facilities (Rent, Utils., Tax, Ins.) | - | 25 | 167 | 25 | - | - | 25 | 242 |
| Bead Suppliers | 67 | 350 | 150 | 150 | 150 | 150 | 150 | 1,167 |
| Hostage Expenses | - | 13 | - | - | - | - | - | 13 |
| Operational Expenses (post petition) | - | 65 | 16 | 36 | 32 | 25 | 15 | 189 |
| Core Fees | 12 | 25 | 57 | - | - | 25 | 45 | 189 |
| Debtor Professional Fees (Finance, Le... | 180 | - | 2 | 2 | 2 | 2 | 127 | 315 |
| **Total Cash Disbursements** | 396 | 565 | 619 | 288 | 314 | 177 | 596 | 2,955 |
| Net Cash Flow | (288) | (303) | (433) | 7 | 117 | 391 | (317) | (825) |
| Ending Revolver Balance | $ 5,675 | $ 5,978 | $ 6,410 | $ 6,403 | $ 6,286 | $ 5,895 | $ 6,212 | |

Confidential

4/25/2011

Exhibit "1" - 30

Chapter 11 - Stalking Horse Cash Flow Forecast
Creativity Inc.

| Forecast Week # | 1 W/E 4/22 | 2 W/E 4/29 | 3 W/E 5/6 | 4 W/E 5/13 | 5 W/E 5/20 | 6 W/E 5/27 | 7 W/E 6/3 | 7 Week Total |
|---|---|---|---|---|---|---|---|---|
| **Collateral Analysis** | | | | | | | | |
| Beginning Gross A/R | $ 2,002 | $ 2,594 | $ 2,766 | $ 2,717 | $ 2,926 | $ 3,288 | $ 2,529 | |
| A/R Reserves | 432 | 432 | 432 | 432 | 432 | 432 | 432 | |
| Beginning Net A/R | 1,570 | 2,162 | 2,334 | 2,285 | 2,866 | 2,494 | 2,097 | |
| Sales–Prime Beads | 526 | 315 | 120 | 920 | 125 | 255 | 195 | |
| Sales–Non-Prime Beads | 165 | 128 | | | | | | |
| Sales–Non Beads | 10 | 10 | 40 | | | | | |
| Total Sales | 691 | 453 | 160 | 920 | 125 | 255 | 195 | |
| Collections | 108 | 262 | 186 | 295 | 432 | 568 | 279 | |
| Writeoffs/D&A at 15% | (9) | 19 | 22 | 44 | 65 | 85 | 42 | |
| Ending/Gross A/R | $ 2,594 | $ 2,766 | $ 2,717 | $ 3,298 | $ 2,926 | $ 2,529 | $ 2,402 | |
| Beg Eligible Inventory--Prime Beads | $ 2,057 | $ 2,031 | $ 2,045 | $ 2,144 | $ 1,834 | $ 1,929 | $ 1,966 | |
| Beg Eligible Inventory--Non-Prime Beads | 2,416 | 1,641 | 1,001 | 1,001 | 1,001 | 1,001 | 1,001 | |
| Beg Eligible Inventory--Non Beads | 884 | 794 | 634 | 2 | 2 | 2 | 2 | |
| Purchases (Prime Beads) | 200 | 150 | 160 | 150 | 150 | 150 | 150 | |
| Sales at Cost--Prime Beads | 226 | 135 | 52 | 460 | 55 | 112 | 86 | |
| Sales at Cost--Non-Prime Beads | 775 | 640 | | | | | | |
| Sales at Cost--Non Beads | 90 | 160 | 632 | | | | | |
| End Eligible Inventory--Prime Beads | 2,031 | 2,046 | 2,144 | 1,834 | 1,929 | 1,966 | 2,031 | |
| End Eligible Inventory--Non-Prime Beads | 1,641 | 1,001 | 1,001 | 1,001 | 1,001 | 1,001 | 1,001 | |
| End Eligible Inventory--Non-Prime Be... | $ 794 | $ 634 | $ 2 | $ 2 | $ 2 | $ 2 | $ 2 | |
| **Payments** | | | | | | | | |
| Employee (Payroll, Benefits) | 137 | 87 | 137 | 75 | 131 | | 131 | 697 |
| Accrued DTO | | | 90 | | | | 104 | 194 |
| Facilities (Rent, Utilities, Taxes, Insur... | 67 | 25 | 16 | 25 | | | 25 | 242 |
| Bead Suppliers | | 350 | 150 | 150 | 150 | 150 | 150 | 1,357 |
| Hostage Expenses | | | | | | | 13 | 13 |
| Operational Expenses (post petition) | 66 | 66 | 16 | 36 | 32 | 25 | 15 | 189 |
| Core Fees | 12 | | 57 | | | | 45 | 139 |
| Debtor Professional Fees (Finance, Le... | 180 | | 2 | | | 2 | 127 | 315 |
| TOTAL Payments | $ 398 | $ 568 | $ 619 | $ 208 | $ 314 | $ 177 | $ 598 | |
| Beginning Loan Balance | $ 5,387 | $ 5,675 | $ 5,978 | $ 6,410 | $ 6,403 | $ 6,286 | $ 5,895 | |
| Ending Loan Balance | 5,675 | 5,978 | 6,410 | 6,403 | 6,286 | 5,895 | 6,212 | |

4/25/2011

Exhibit "1" - 31

# EXHIBIT 2



**LOAN AND SECURITY AGREEMENT**

by and between

**CORE BUSINESS CREDIT, LLC.**

as LENDER

and

**WESTRIM, INC.**

as BORROWER

Dated as of September 3, 2008

Exhibit "2" - 32

# LOAN AND SECURITY AGREEMENT

## Table of Contents

ARTICLE I        DEFINITIONS .................................................................................................... 1

    Section 1.1   Definitions ............................................................................. 1
    Section 1.2   Interpretive Provisions ........................................................ 13

ARTICLE II       REVOLVING LOANS ....................................................................... 13

    Section 2.1   Revolving Loans .................................................................. 13
    Section 2.2   Request for Revolving Loans. ............................................. 13
    Section 2.3   Deemed Request for Revolving Loans ................................ 14
    Section 2.4   Protective Advances ........................................................... 14

ARTICLE III      RESERVED ........................................................................................ 14

ARTICLE IV       LETTERS OF CREDIT ..................................................................... 14

    Section 4.1   Issuance............................................................................... 14
    Section 4.2   Particular Conditions ......................................................... 15
    Section 4.3   Request for Issuance .......................................................... 15
    Section 4.4   Payments Pursuant to Letters of Credit ............................. 15
    Section 4.5   Indemnification; Risk Allocation; Exoneration; Power of Attorney. .................. 16
    Section 4.6   Supporting Letter of Credit; Cash Collateral ..................... 16

ARTICLE V        INTEREST, FEES, REIMBURSEMENTS ......................................... 17

    Section 5.1   Interest. ............................................................................... 17
    Section 5.2   Fees ..................................................................................... 17
    Section 5.3   Increased Cost and Reduced Return ................................... 18
    Section 5.4   Taxes. .................................................................................. 18
    Section 5.5   Maximum Interest; Controlling Limitation. ....................... 19

ARTICLE VI       PAYMENT ......................................................................................... 20

    Section 6.1   Interest ................................................................................ 20
    Section 6.2   Revolving Loans ................................................................. 20
    Section 6.3   Mandatory Payments on Termination Date ........................ 20
    Section 6.4   Mandatory Prepayment in Respect of Certain Events ........ 20
    Section 6.5   Early Termination ............................................................... 20
    Section 6.6   General Payment Provisions ............................................... 21
    Section 6.7   Application .......................................................................... 21
    Section 6.8   Reinstatement ..................................................................... 21
    Section 6.9   Account Stated.................................................................... 22

ARTICLE VII      COLLATERAL .................................................................................. 22

    Section 7.1   Security Interest .................................................................. 22
    Section 7.2   Perfection and Protection of Lender's Security Interest ..... 22
    Section 7.3   Collateral Proceeds Management ....................................... 23

Section 7.4    Examinations; Inspections; Verifications ........................................................... 23
Section 7.5    Appraisals ............................................................................................................ 23
Section 7.6    Right to Cure ........................................................................................................ 23
Section 7.7    Power of Attorney ................................................................................................ 24
Section 7.8    Preservation of Lender's Rights ........................................................................... 24

ARTICLE VIII    CONDITIONS.................................................................................................... 25

Section 8.1    Conditions Precedent to Initial Loan ................................................................... 25
Section 8.2    Conditions Precedent to all Loans ....................................................................... 27
Section 8.3    Failure or Inability to Satisfy Conditions Precedent............................................ 27

ARTICLE IX    REPRESENTATIONS AND WARRANTIES ........................................................ 28

Section 9.1    Fundamental Information ...................................................................................... 28
Section 9.2    Prior Transactions ................................................................................................ 28
Section 9.3    Subsidiaries........................................................................................................... 28
Section 9.4    Authorization, Validity and Enforceability.......................................................... 28
Section 9.5    Noncontravention.................................................................................................. 29
Section 9.6    Financial Statements and Projections ................................................................... 29
Section 9.7    Litigation............................................................................................................... 29
Section 9.8    ERISA and Employee Benefit Plans..................................................................... 29
Section 9.9    Compliance with Laws ......................................................................................... 29
Section 9.10    Taxes..................................................................................................................... 29
Section 9.11    Location of Collateral and Books and Records ..................................................... 29
Section 9.12    Accounts ............................................................................................................... 30
Section 9.13    Inventory .............................................................................................................. 30
Section 9.14    Documents, Instruments, and Chattel Paper ......................................................... 30
Section 9.15    Proprietary Rights ................................................................................................. 30
Section 9.16    Investment Property .............................................................................................. 30
Section 9.17    Real Estate; Leases ............................................................................................... 30
Section 9.18    Material Agreements............................................................................................. 30
Section 9.19    Bank Accounts...................................................................................................... 30
Section 9.20    Title to Property .................................................................................................... 30
Section 9.21    Debt....................................................................................................................... 31
Section 9.22    Liens ..................................................................................................................... 31
Section 9.23    Solvency ............................................................................................................... 31
Section 9.24    Commercial Tort Claims ....................................................................................... 31
Section 9.25    Non-Regulated Entities......................................................................................... 31
Section 9.26    Governmental Authorization ................................................................................ 31
Section 9.27    Investment Banking or Finder's Fees .................................................................... 31
Section 9.28    Full Disclosure ..................................................................................................... 31
Section 9.29    Continuing Representations ................................................................................... 31

ARTICLE X    AFFIRMATIVE COVENANTS ........................................................................... 32

Section 10.1    Existence and Good Standing ............................................................................... 32
Section 10.2    Compliance with Laws ......................................................................................... 32
Section 10.3    Books and Records ............................................................................................... 32
Section 10.4    Financial Reporting.............................................................................................. 32
Section 10.5    Collateral Reporting.............................................................................................. 33
Section 10.6    Compliance Certificate ......................................................................................... 35

ii

Exhibit "2" - 34

Section 10.7    Notification to Lender.................................................................. 35
Section 10.8    Accounts ..................................................................................... 35
Section 10.9    Inventory..................................................................................... 35
Section 10.10    Equipment .................................................................................. 36
Section 10.11    Insurance .................................................................................... 36
Section 10.12    Minimum Availability ................................................................ 36
Section 10.13    ERISA ........................................................................................ 36
Section 10.14    Control Agreements .................................................................... 36
Section 10.15    Further Assurances ..................................................................... 37

ARTICLE XI    NEGATIVE  COVENANTS.................................................................... 37

Section 11.1    Fundamental Changes .................................................................. 37
Section 11.2    Collateral Locations .................................................................... 37
Section 11.3    Use of Proceeds .......................................................................... 37
Section 11.4    Business ...................................................................................... 37
Section 11.5    Debt............................................................................................. 37
Section 11.6    Guaranties ................................................................................... 37
Section 11.7    Liens ........................................................................................... 37
Section 11.8    Disposition of Property ............................................................... 37
Section 11.9    Sale and Leaseback ..................................................................... 38
Section 11.10    In-Transit Inventory .................................................................... 38
Section 11.11    Distributions ............................................................................... 38
Section 11.12    Restricted Investments ................................................................ 38
Section 11.13    Compensation ............................................................................. 38
Section 11.14    Transactions with Affiliates........................................................ 38
Section 11.15    New Subsidiaries ........................................................................ 38
Section 11.16    Financial Covenants.................................................................... 39
Section 11.17    Fiscal Year ................................................................................. 41

ARTICLE XII    EVENT OF DEFAULT.......................................................................... 41

Section 12.1    Event of Default.......................................................................... 41

ARTICLE XIII    REMEDIES ........................................................................................... 43

Section 13.1    Obligations.................................................................................. 43
Section 13.2    Collateral..................................................................................... 43
Section 13.3    Injunctive Relief ......................................................................... 44
Section 13.4    Setoff........................................................................................... 44

ARTICLE XIV    TERM AND TERMINATION................................................................ 44

Section 14.1    Term and Termination ................................................................. 44

ARTICLE XV    MISCELLANEOUS ............................................................................... 45

Section 15.1    No Waiver.................................................................................... 45
Section 15.2    Severability ................................................................................. 45
Section 15.3    Governing Law; Venue................................................................ 45
Section 15.4    Waiver of Jury Trial..................................................................... 45
Section 15.5    Fees and Expenses ...................................................................... 45

iii

Exhibit "2" - 35

Section 15.6    Notices ......................................................................................................... 46
Section 15.7    Waiver of Notices ......................................................................................... 46
Section 15.8    Non-applicability of Chapter 15 of Texas Credit Code ...................... 47
Section 15.9    Binding Effect ................................................................................................ 47
Section 15.10   Indemnity of Lender by Borrower ............................................................ 47
Section 15.11   Limitation of Liability .................................................................................. 47
Section 15.12   Continuing Rights of Lender in Respect of Obligations ..................... 47
Section 15.13   Acceptance and Performance ...................................................................... 47
Section 15.14   Schedules ......................................................................................................... 47
Section 15.15   Counterparts .................................................................................................... 47
Section 15.16   Captions ............................................................................................................ 47

73306.000005 EMF_US 25977875v11

Exhibit "2" - 36

LOAN AND SECURITY AGREEMENT

<u>SCHEDULES</u>

| | | |
|---|---|---|
| Schedule 9.1 | - | Fundamental Information |
| Schedule 9.7 | - | Litigation |
| Schedule 9.11 | - | Location of Collateral |
| Schedule 9.15 | - | Proprietary Rights |
| Schedule 9.16 | - | Investment Property |
| Schedule 9.17 | - | Real Estate; Leases |
| Schedule 9.18 | - | Material Agreements |
| Schedule 9.19 | - | Bank Accounts |
| Schedule 9.21 | - | Debt |
| Schedule 9.22 | - | Liens |
| Schedule 9.24 | - | Commercial Tort Claims |

73306.000005 EMF_US 25977875v11



## LOAN AND SECURITY AGREEMENT

This Loan and Security Agreement is executed and entered into as of September 3, 2008, by and between CORE BUSINESS CREDIT, LLC, a Delaware limited liability company (defined below as "Lender"), and WESTRIM, INC., a Delaware corporation (defined below as "Borrower").

## RECITALS

Lender and Borrower desire to enter into certain financing arrangements according to the terms and provisions as set forth hereinbelow. Therefore, for value received, the receipt and sufficiency of which is hereby acknowledged, together with the mutual benefits provided herein, Lender and Borrower hereby agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1      Definitions.  The following definitions shall apply throughout this Agreement:

"Account" has the meaning prescribed for such term as defined by the UCC, which definition is incorporated herein by reference and includes, without limitation, a right to payment of a monetary obligation, whether or not earned by performance, (i) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (ii) for services rendered or to be rendered, (iii) for a policy of insurance issued or to be issued, (iv) for a secondary obligation incurred or to be incurred, (iv) arising out of the use of a credit or charge card or information contained on or for use with the card.

"Account Debtor" means a person obligated on an Account, Chattel Paper, or General Intangible.

"Adjusted Base Rate" means a rate per annum equal to the greater of the Base Rate in effect for such day or 5.25%.

"Affiliate" means, as to any Person, any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person or which owns, directly or indirectly, five percent (5.0%) or more of the outstanding Equity Interest of such Person. For this purpose, a Person shall be deemed to control another Person if the controlling Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of the other Person, whether through the ownership of voting securities, by contract, or otherwise.

"Agreement" means this Loan and Security Agreement and all schedules, exhibits and addenda hereto, as may be renewed, extended, amended, supplemented, restated or otherwise modified from time to time.

"Agreement Date" means the date as of which this Agreement is dated as specified in the preamble to this Agreement.

"Applicable Law" means, as to a Person, any law (statutory or common), treaty, rule or regulation of a Governmental Authority or determination of a court or binding arbitrator, in each case applicable to

Exhibit "2" - 38

or binding upon such Person or any of its property or to which such Person or any of its property is subject, including, without limitation, the Fair Labor Standards Act of 1938, the Occupational Safety and Hazard Act of 1970, all applicable laws (including programs, permits and guidance promulgated by regulatory agencies) relating to public health or the protection or pollution of the environment, including the Comprehensive Environmental Response Compensation and Liability Act (42 U.S.C. § 9601 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. §§ 6991-6991i) and the Clean Water Act (33 U.S.C. §§ 1251 et seq.)

"Applicable Margin" means two and one-half percent (2.50%) per annum.

"Approved Location" means a location (i) not listed on Schedule 9.11, (ii) of which Borrower has given the Lender at least thirty (30) days prior written notice, and (iii) for which Borrower has delivered to Lender all documents that Lender reasonably requests in connection therewith, including without limitation, in the case of any leased location, an access and waiver agreement, signed by the owner of such location, in form and substance satisfactory to Lender.

"Availability" means, as of any date of determination, an amount equal to (a) the lesser of the Borrowing Base or the Revolving Credit Limit less (b) the aggregate amount of Letter of Credit Obligations less (c) the unpaid balance of Revolving Loans, in each case determined as of such day.

"Bankruptcy Code" means the United States Bankruptcy Code (11 U.S.C. § 101 et seq.).

"Base Rate" means the rate per annum published from time to time in the "Money Rates" table of *The Wall Street Journal* (or such other presentation within *The Wall Street Journal* as may be adopted hereafter for such information) as the base or prime rate for corporate loans at the nation's largest commercial banks (or if more than one such rate is published, the higher or highest of the rates so published). If such rate is no longer published by *The Wall Street Journal*, then Lender in its discretion shall substitute the base or prime rate for corporate loans at a large commercial bank for the base rate or prime rate published in *The Wall Street Journal*. Such rate may not necessarily be the lowest or best rate actually charged to any customer of such commercial bank.

"Borrower" means Westrim, Inc., a Delaware corporation, and its successors and assigns.

"Borrowing Base" means, as of any day of determination, an amount equal to

    (a)    the lesser of:

        (i)    the sum of (x) 80.0% of the Net Amount of Eligible Accounts plus (y) the lesser of (A) 50.0% of the Net Amount of Eligible Inventory or (B) 85.0% of NOLV of Eligible Inventory, in each case determined as of such day, provided, that (1) the amount includable under clause (y) preceding may not at any time exceed $10,000,000 and (2) the amount of Qualified In-Transit Inventory includable in clause (y) preceding may not at any time exceed $3,000,000; or

        (ii)    the Revolving Credit Limit,

    (b)    minus the aggregate amount of reserves implemented by Lender pursuant to Section 2.1, in each case determined as of such day.

"Borrowing Base Certificate" means a certificate of Borrower, signed by a Responsible Officer of Borrower, setting forth the calculation of the Borrowing Base, including a calculation of each component thereof, all in form, presentation and detail satisfactory to Lender in its discretion.

"Borrowing Notice" means a request for a Revolving Loan in compliance with Section 2.2.

"Business Day" means any day that is not a Saturday, Sunday or a day on which commercial banks in Dallas, Texas are required or permitted to be closed.

"Capital Expenditures" has the meaning prescribed for such term by GAAP.

"Capital Lease" means any lease of property by Borrower which, in accordance with GAAP, should be reflected as a capital lease on the balance sheet of Borrower.

"Change of Control" means any occurrence the result of which is that Parent shall no longer own, of record and beneficially, at least 100% of the Equity Interest and voting interest of Borrower.

"Change of Management" means (a) (i) Ronald Cooper is no longer appointed and acting full time as president and chief executive officer of Borrower or (ii) Fred A. Gysi is no longer appointed and acting full time as chief financial officer of Borrower and (b) in the case of any such occurrence described in clause (a) preceding, a successor to such Person, who is reasonably acceptable to Lender, in such capacity has not been appointed and commenced acting in such capacity within 30 days of such occurrence.

"Chattel Paper" has the meaning prescribed for such term as defined by the UCC, which definition is incorporated herein by reference, and includes, without limitation, a record or records that evidence both a monetary obligation and a security interest in specific goods, a security interest in specific goods and software used in the goods, a security interest in specific goods and license of software used in the goods, a lease of specific goods, or a lease of specific goods and license of software used in the goods. "Chattel Paper" includes, without limitation, electronic chattel paper.

"Collateral" means all property in which Borrower grants to Lender a Lien pursuant to Section 7.1, and all other property and interest in property of Borrower in which Borrower grants a Lien pursuant to the Loan Documents.

"Commercial Tort Claim" has the meaning prescribed for such term as defined by the UCC, which definition is incorporated herein by reference, and includes, without limitation, in the case of Borrower, any tort cause of action clamed by Borrower, including those listed on Schedule 9.24.

"Compliance Certificate" a certificate meeting the requirements of Section 10.6 and otherwise in form satisfactory to Lender.

"Control Agreement" means an agreement establishing control of Collateral in compliance with the UCC.

"Debt" means, with respect to a Person, (a) all obligations for borrowed money of such Person, (b) all obligations of such Person evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit, bankers acceptances, interest rate swaps, or other financial products, (c) all obligations or liabilities of others secured by a Lien on any asset of such Person, irrespective of whether such obligation or liability is assumed, (d) all obligations of such Person for the deferred purchase price of assets (other than trade debt incurred in the ordinary course of business and repayable in accordance with customary trade practices), (e) any obligation of such Person guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person, (f) asset securitizations and synthetic leases, (g) capitalized lease obligations, and (h) all net indebtedness, liabilities and obligations under interest rate, credit, commodity, foreign exchange or similar transactions for the purpose of hedging

Borrower's or its Subsidiaries' exposure to fluctuations in interest or exchange rates, currency valuations or commodity prices.

"Default" means an event, condition or occurrence that, with the giving of notice, the passage of time, or both, would constitute an Event of Default.

"Default Rate" means (a) with respect to the Obligations, a rate per annum equal to the sum of (i) the rate of interest applicable to such Obligations pursuant to Section 5.1(a) plus (ii) two percent (2.0%), provided, that the Default Rate shall be adjusted, from time to time, simultaneously with any change in the applicable rate referenced in clause (a)(i) preceding, and (b) with respect to Letters of Credit, a rate equal to the Letter of Credit fee specified by Section 5.2(d) plus by two percent (2.0%).

"Deposit Account" has the meaning prescribed for such term as defined by the UCC, which definition is incorporated herein by reference, and includes, without limitation, a nonnegotiable certificate of deposit or a demand, time, savings, passbook, or similar account maintained with a bank.

"Designated Account" means Borrower's account No. 86666-00480 maintained at Bank of America, N.A., ABA routing and ACH direct deposit No. 122000661, wire transfer No. 026009593.

"Distribution" means, with respect to a Person, any dividend or other distribution, in respect of its Equity Interests, any repayment of Debt owing to a holder of Equity Interests or any payment on account of the purchase, redemption or other acquisition or retirement of its Equity Interests.

"Document" has the meaning prescribed for such term as defined by the UCC, which definition is incorporated herein by reference, and includes, without limitation, any bill of lading, dock warrant, dock receipt, warehouse receipt or order for the delivery of goods, or any other document which in the regular course of business or financing is treated as adequately evidencing that the person in possession of it is entitled to receive, hold and dispose of the document and the goods it covers, and which purports to be issued by or addressed to a bailee and purporting to cover goods in the bailee's possession which are either identified or are fungible portions of an identified mass.

"Dollars" or "$" refers to lawful money of the United States of America.

"EBITDA" means, with respect to a Person for any period, consolidated net earnings (or loss), minus extraordinary gains plus Interest Expense, income taxes, and depreciation and amortization for such period, as determined in accordance with GAAP, in each case determined for such Person for such period.

"Eligible Account" means an Account of Borrower which is acceptable to Lender for purposes of determining the Borrowing Base and meets all criteria for inclusion in the Borrowing Base as determined and established by Lender from time to time in its discretion. Without limiting the discretion of Lender to establish other criteria of ineligibility, unless otherwise agreed by Lender, Eligible Accounts shall not include any Account: (a) which is not owned exclusively by Borrower, (b) which is not subject to a first priority and perfected security interest in favor of Lender, (c) with respect to which more than 90 days have elapsed since the date of the original invoice or which is unpaid, in whole or in part, more than 60 days after its original due date, (d) if 25.0% or more of the aggregate Dollar amount of outstanding Accounts owed at such time by the Account Debtor thereon is classified as ineligible under clause (c) preceding, (e) owed by an Account Debtor to the extent the amount owing thereon, when added to the aggregate amount owing on all Accounts owed by such Account Debtor, would exceed (i) 50.0% in the case of Michaels Stores, Inc., (ii) 30.0% in the case of Walmart, Inc. (iii) 75% in the aggregate in the case of Michaels Stores, Inc. and Walmart, Inc, or (iv) 20.0% in the case of all other Account Debtors, in each case of the aggregate amount of all Eligible Accounts owed at such time by all Account Debtors, (f)

which represents a sale on a bill-and-hold, guaranteed sale, sale and return, sale on approval, consignment, or other repurchase or return basis or a progress billing under an agreement which requires further performance by Borrower, (g) with respect to which any of the following events has occurred as to the Account Debtor on such Account: death or judicial declaration of incompetency, if the Account Debtor is an individual, the filing of any petition for relief under the Bankruptcy Code or similar insolvency laws, a general assignment for the benefit of creditors, the appointment of a receiver or trustee, application or petition for dissolution, the sale or transfer of all or any material part of the assets or the cessation of the business as a going concern, (h) owed by an Account Debtor which does not maintain its chief executive office in the United States or is not organized under the laws of the United States or any state thereof, (i) owed by an Account Debtor which is an Affiliate or employee of Borrower, (j) with respect to which either the perfection, enforceability, or validity of Lender's Lien in such Account, or Lender's right or ability to obtain direct payment to Lender of the proceeds of such Account, is governed by any federal, state, or local statutory requirements other than those of the UCC, (k) owed by an Account Debtor to which Borrower or any of its Subsidiaries is indebted in any way, or which is subject to any right of setoff or recoupment, or if the Account Debtor thereon has disputed liability or made any claim with respect to any other Account due from such Account Debtor, but in each such case only to the extent of such indebtedness, setoff, recoupment, dispute, or claim, (l) which is evidenced by a promissory note or other instrument or by chattel paper, (m) which arises out of a sale not made in the ordinary course of Borrower's business, (n) with respect to which the goods giving rise to such Account have not been shipped and delivered to and accepted by the Account Debtor or the services giving rise to such Account have not been fully performed by Borrower, and, if applicable, accepted by the Account Debtor, or with respect to which the Account Debtor has revoked its acceptance of any such goods or services, (o) which arises out of an enforceable contract or order which, by its terms, forbids, restricts or makes void or unenforceable the granting of a Lien by Borrower to Lender with respect to such Account, (p) owed by an Account Debtor, to the extent the amount owing thereon exceeds the credit limit extended to such Account Debtor by Borrower or (q) with respect to which Lender believes that the prospect of collection of such Account is impaired or that the Account may not be paid by reason of the Account Debtor's financial inability to pay. The identification of specific exclusions from eligibility herein is not exclusive. Lender reserves the right in its discretion to establish additional or different criteria for determining Eligible Accounts, at any time, without prior notice.

"Eligible Inventory" means Inventory of Borrower which is acceptable to Lender for purposes of determining the Borrowing Base and meets all criteria for inclusion in the Borrowing Base as determined and established by Lender from time to time in its discretion. Without limiting the discretion of Lender to establish other criteria of ineligibility, unless otherwise agreed by Lender, Eligible Inventory shall not include any Inventory (a) which is not owned exclusively by Borrower, (b) which is not subject to a first priority and perfected security interest in favor of Lender and is subject to no other Lien, (c) other than finished goods Inventory, (d) which is not in good condition, or is unmerchantable or does not meet all standards imposed by any Governmental Authority having regulatory authority over such goods or their use or sale, (e) which is not currently either usable or salable, at prices approximating at least cost, in the normal course of Borrower's business, or is slow moving or stale, (f) which is obsolete or returned or repossessed or used goods taken in trade, (g) which is located outside the United States or at a location other than as listed in Schedule 9.11 or an Approved Location, or is in-transit from vendors or suppliers, unless such Inventory is Qualified In-Transit Inventory, (h) which is located in a public warehouse or is in possession of a bailee or in a facility leased by Borrower unless the warehouseman, bailee, or lessor, as the case may be, has delivered to Lender a waiver or subordination agreement in form and substance satisfactory to Lender or (i) that contains or bears any Proprietary Rights licensed to Borrower by another Person unless Borrower has delivered to Lender a consent or sublicense agreement from such licensor in form and substance acceptable to Lender or Lender is otherwise satisfied that it may sell or otherwise dispose of such Inventory in accordance with Section 13.2 without infringing the rights of the licensor of such Proprietary Rights or violating any contract of Borrower with such licensor (and without payment of

Exhibit "2" - 42

any royalties other than any royalties due with respect to the sale or disposition of such Inventory pursuant to the existing license agreement). The identification of specific exclusions from eligibility herein is not exclusive. Lender reserves the right in its discretion to establish additional or different criteria for determining Eligible Inventory, at any time, without prior notice.

"Equipment" has the meaning prescribed for such term as defined by the UCC, which definition is incorporated herein by reference, and includes, without limitation, with respect to a Person, all goods other than inventory, farm products or consumer goods.

"Equity Interests" means, with respect to a Person, shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such interest.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute thereto.

"ERISA Affiliate" means (a) any Person subject to ERISA whose employees are treated as being employed by the same employer as the employees of Borrower under IRC Section 414(b), (b) any trade or business subject to ERISA whose employees are treated as being employed by the same employer as the employees of Borrower under IRC Section 414(c), (c) solely for purposes of Section 302 of ERISA and Section 412 of the IRC, any organization subject to ERISA that is a member of an affiliated service group of which Borrower is a member under IRC Section 414(m), or (d) solely for purposes of Section 302 of ERISA and Section 412 of the IRC, any Person subject to ERISA that is a party to an arrangement with Borrower and whose employees are aggregated with the employees of Borrower under IRC Section 414(o).

"ERISA Benefit Plan" means any "employee benefit plan" (as defined in Section 3(3) of ERISA) for which Borrower or any Subsidiary or ERISA Affiliate of Borrower is, or at any time during the immediately preceding six (6) years has been, an "employer" as defined in Section 3(5) of ERISA.

"Event of Default" has the meaning prescribed by Section 12.1.

"Fiscal Month" means a calendar month.

"Fiscal Quarter" means one of four fiscal quarters of a Fiscal Year, each consisting of a period of three (3) calendar months, with the first of such quarters beginning on the first day of a such Fiscal Year and the last of such quarters ending on the last day of such Fiscal Year.

"Fiscal Year" means Borrower's fiscal year for financial accounting purposes, beginning on January 1 and ending on December 31 of such year.

"Fixed Charge Coverage Ratio" means, for a Person as of the last day of a Fiscal Month, the ratio of (a) EBITDA minus unfinanced Capital Expenditures minus taxes paid by Borrower, to (b) Interest Expense plus principal payments made or required to be made on any and all long term Debt, in each case determined for the twelve Fiscal Months then ended.

"GAAP" means generally accepted accounting principles as promulgated by the American Institute of Certified Public Accountants, consistently applied, as in effect on the Agreement Date.

"General Intangibles" has the meaning prescribed for such term as defined by the UCC, which definition is incorporated herein by reference, and includes, without limitation, all personal property of

every kind and nature (other than Accounts, Chattel Paper, Commercial Tort Claims, Deposit Accounts, Documents, goods, Instruments, Investment Property, Letter of Credit Rights, Letters of Credit and money), including, without limitation, contract rights, business records, rights and claims against carriers and shippers, customer lists, registrations, licenses, franchises, tax refund claims, rights to indemnification, warranty or guaranty contract, claims for any damages arising out of or for breach or default under or in connection with any contract, rights to exercise or enforce remedies, powers and privileges under any contract and rights and claims to any amounts payable under any contract of insurance, including without limitation, business interruption, property, casualty, key employee life or any other insurance.

"Governmental Authority" means any federal, state or local government, any subdivision thereof, and any agency, entity or authority owned or controlled thereby.

"Guaranty" means, with respect to a Person, an obligation of, or agreement by, such Person which directly or indirectly guarantees or assures, or in effect guarantees or assures, the payment or performance of any obligations of another Person or assures or in effect assures the holder thereof against loss in respect thereof.

"Guarantor" means Parent and any other Person that executes and delivers a Guaranty, and "Guarantors" means all such Persons collectively.

"Indemnified Claims" means any and all claims, demands, actions, causes of action, judgments, obligations, liabilities, losses, damages and consequential damages, penalties, fines, costs, fees, expenses and disbursements (including without limitation, fees and expenses of attorneys and other professional consultants and experts in connection with investigation or defense) of every kind, known or unknown, existing or hereafter arising, foreseeable or unforeseeable, which may be imposed upon, threatened or asserted against, or incurred or paid by, an Indemnified Person at any time and from time to time, because of, resulting from, in connection with, or arising out of any transaction, act, omission, event or circumstance in any way connected with the Collateral, the Loan Documents (including enforcement of Lender's rights thereunder or defense of Lender's actions thereunder) or any acts or omissions taken by such Indemnified Person in connection with this Agreement or administration of the Loan Documents.

"Indemnified Persons" collectively means Lender and its Equity Interest owners, officers, directors, employees, agents and representatives.

"Instrument" has the meaning prescribed for such term as defined by the UCC, which definition is incorporated herein by reference, and includes, without limitation, a negotiable instrument or any other writing that evidences a right to the payment of a monetary obligation, is not itself a security agreement or lease, and is of a type that in ordinary course of business is transferred by delivery with any necessary indorsement or assignment.

"Intangible Assets" means assets that are treated as intangible pursuant to GAAP, including, without limitation: (a) obligations owing by officers, directors, members, managers, employees, subsidiaries, Affiliates or any Person in which any such officer, director, member, manager, employee, subsidiary, or Affiliate owns any interest and (b) any asset which is intangible or lacks intrinsic or marketable value or collectibility, including, without limitation, goodwill, noncompetition agreements, patents, copyrights, trademarks, franchises, organization or research and development costs.

"Interest Expense" means, for a Person for a period, total interest expense for such Person for such period, as determined in accordance with GAAP.

"Inventory" has the meaning prescribed for such term as defined by the UCC, which definition is incorporated herein by reference, and includes, without limitation, with respect to a Person, goods (other than farm products but including goods in-transit) that (a) are held or to be held by such Person for sale or lease or to be furnished under a contract of service, (b) are furnished under a contract of service, (c) are leased or to be leased by such Person as lessor or (d) consist of raw materials, work in process or materials used or consumed in such Person's business.

"Investment" means, with respect to a Person, any investment, loan, guarantee, advance or capital contribution by such Person in, to or with respect to any other Person or its Affiliates, or any acquisition of property in exchange for cash or other property.

"Investment Property" has the meaning prescribed for such term as defined by the UCC, which definition is incorporated herein by reference, and includes, without limitation, a security (whether certificated or uncertificated) security entitlement, securities account, commodity contract, or commodity account.

"IRC" means the Internal Revenue Code of 1986, as in effect from time to time.

"Lender" means Core Business Credit, LLC, a Delaware limited liability company with its principal place of business located in Dallas County, Texas, and its successors and assigns.

"Lender Expenses" has the meaning prescribed by Section 15.5.

"Lender's Liens" means Liens granted in favor of Lender pursuant to this Agreement or any of the other Loan Documents.

"Letter of Credit" has the meaning prescribed by Section 4.1.

"Letter of Credit Issuer" means Lender or any commercial bank acceptable to Lender, which issues a Letter of Credit.

"Letter of Credit Obligations" means, as of any date, the aggregate of all undrawn amounts of Letters of Credit outstanding on such date plus the aggregate amount of all drawings under Letters of Credit which have not been reimbursed as of such date.

"Letter of Credit Rights" has the meaning prescribed for such term as defined by the UCC, which definition is incorporated herein by reference, and includes, without limitation, a right to payment or performance under a letter of credit, whether or not the beneficiary has demanded or is at the time entitled to demand payment or performance.

"Lien" means, with respect to property of a Person, any interest in property securing an obligation owed by such Person or another Person, whether such interest is based on contract, statute or common law, including a security interest, lien, collateral assignment, charge, claim, encumbrance, pledge, hypothecation, assignment, deposit arrangement, conditional sale, trust receipt, lease, consignment or bailment for security purposes or similar agreement, and any interest created by any agreement to provide any of the foregoing.

"Loan" means any loan made by Lender to Borrower under this Agreement, and "Loans" means, collectively, all such loans.

"Loan Documents" means this Agreement, each Letter of Credit issued by or at the request of Lender pursuant to this Agreement and any application and/or agreement relating thereto, the Parent

Security Agreement, each Guaranty by a Guarantor, each subordination agreement in respect of Subordinated Debt, any intercreditor agreement in respect of any Collateral, any agreement entered into among Lender, Borrower and any other Person in respect of Inventory proposed as Qualified In-Transit Inventory or Documents related thereto, any landlord waiver, collateral access agreement, consent, waiver or subordination agreement executed by any Person in respect of Collateral, and any other documents or agreements executed in connection with any of the foregoing, and any other agreements, instruments, and documents heretofore, now or hereafter evidencing, securing, guaranteeing or otherwise relating to the Obligations, the Collateral or any other aspect of the transactions contemplated by this Agreement, and in each case including any and all renewals, extensions, modifications or amendments of any of the foregoing.

"Margin Stock" means "margin stock" as such term is defined in Regulation T, U or X of the Federal Reserve Board.

"Material Adverse Effect" means a materially adverse change in, or effect on, the business, assets, operations, prospects or condition, financial or otherwise, of Borrower or any Guarantor, or a material impairment of the ability of Borrower or any Guarantor to perform any obligations under the Loan Documents or a material adverse effect upon the legality, validity, binding effect or enforceability of any Loan Document.

"Maturity Date" means September 2, 2011.

"Maximum Rate" means the greater of (a) the "monthly ceiling" as referred to and in effect from time to time under the provisions of Section 303.004 of the Texas Finance Code, or (b) the maximum rate of interest permitted from day to day by any other applicable state or federal law.

"Multiemployer Plan" means a multiemployer plan defined as such in Section 3(37) of ERISA to which contributions have been made by Borrower or any ERISA Affiliate and which is covered by Title IV of ERISA.

"Net Amount" means, (a) with respect to Eligible Accounts at any time, the gross amount of Eligible Accounts less sales, excise or similar taxes, and less returns, discounts, claims, credits and allowances of any nature at any time issued, owing, granted, outstanding, available or claimed and (b) with respect to Eligible Inventory at any time, the lesser of cost value or market value thereof, in each case determined in a manner acceptable to Lender.

"Net Income" means, with respect to a Person for any period, net income, after income tax, if any, payable for such period, determined for such Person in accordance with GAAP.

"NOLV" means, with respect to Eligible Inventory, the net orderly liquidation value thereof, as determined by Lender in a manner acceptable to Lender.

"Obligations" means all obligations and indebtedness now or hereafter owing by Borrower under or otherwise arising in connection with this Agreement or any of the other Loan Documents, including, without limitation, all loan repayment obligations, accrued interest obligations, indemnity obligations and all obligations for payment or reimbursement for fees, costs, Lender Expenses and other expenses as provided by this Agreement or any of the other Loan Documents, whether direct or indirect, primary or secondary, joint, several, or joint and several, fixed or contingent, including any such obligations and indebtedness, if any, which may be assigned to or acquired by Lender, and any and all renewals and extensions of the foregoing or of any part thereof.

"Parent" means Creativity Crafts, Inc., a Delaware corporation, owner of 100% of the Equity Interests of Borrower.

"Parent Security Agreement" means a security agreement, duly executed by Parent, granting to Lender a continuing security interest, collateral assignment and lien in and to all of its assets, including without limitation all Equity Interests in Borrower, in form and substance satisfactory to Lender.

"PBGC" means the Pension Benefit Guaranty Corporation or any entity succeeding to all or any of its functions under ERISA

"Permitted Liens" means (a) Lender's Liens, (b) Liens for unpaid taxes that are not delinquent, (c) Liens, if any, described in Schedule 9.22, (d) Liens which constitute purchase money Liens or Liens under Capital Leases and secure Debt permitted under clause (d) of Section 11.5, but only to the extent such Liens attach only to the property (excluding proceeds thereof) acquired by the incurrence of such purchase money secured Debt or Capital Lease, (e) the interests of lessors under operating leases, (f) statutory Liens in favor of warehousemen, landlords, carriers, mechanics, materialmen, laborers or suppliers, incurred in the ordinary course of business of Borrower and not in connection with the borrowing of money, and which Liens are for sums not delinquent or (g) Liens arising from deposits made in connection with obtaining worker's compensation or other unemployment insurance.

"Person" means any individual, corporation, limited liability company, joint venture, general or limited partnership, trust, unincorporated organization, Governmental Authority or any other organization that is recognized as an entity under Applicable Law.

"Plan" means any employee benefit or other plan established or maintained by Borrower or any ERISA Affiliate and which is covered by Title IV of ERISA.

"Prohibited Transaction" means any transaction set forth in Section 406 of ERISA or Section 4975 of the Code.

"Proprietary Rights" means inventions, designs, blueprints, plans, specifications, licenses, permits, patents, patent rights, copyrights, works which are the subject matter of copyrights, trademarks, service marks, trade names, trade styles, patent, trademark and service mark applications, trade secrets, good will and all licenses and rights related to any of the foregoing, and all other rights under any of the foregoing, all extensions, renewals, reissues, divisions and continuations of any of the foregoing, and all rights to sue for past, present and future infringement of any of the foregoing.

"Protective Advances" has the meaning set forth in Section 2.4.

"Qualified In-Transit Inventory" means finished goods Inventory of Borrower (a) which have been purchased by Borrower from a third party seller under a purchase order, the delivery terms of which are F.O.B. place of shipment, (b) with respect to which no amounts are payable other than (i) unsecured amounts in respect of the purchase price payable to the seller, (ii) amounts payable to the shipper in respect of such Inventory in the ordinary course of business, (iii) amounts payable, or to become payable, to Carmichael International Services (or other customs broker) for customs clearing services performed or to be performed for or on behalf of Borrower in respect of such Inventory, (iv) customs and duties payable upon entry to the United States, and (v) freight charges payable to the carrier as shown on the related Documents, (c) with respect to which title has passed to Borrower, is owned solely by Borrower and with respect to which the seller has no right to stop or otherwise control delivery thereof, (d) which has been delivered by such seller or a shipper to a common carrier acceptable to Lender, and is in transit to Borrower for delivery at the Port of Los Angeles or the Port of Long Beach and subsequent transfer to a location listed in Schedule 9.11 or an Approved Location, (e) that is covered by a negotiable bill of

lading issued by such carrier providing that such Inventory is to be delivered to the order of Borrower, the original of which is in the possession of Lender or a customs broker that (i) is acceptable to Lender and located in a jurisdiction acceptable to Lender, (ii) is shown on such bill of lading as the Person to whom the carrier is directed to send notification of delivery and (iii) has entered into an agreement with Lender and Borrower, acknowledging Lender's rights in such bill of lading and such Inventory, agreeing to hold such bill of lading as agent for Lender and containing such other assurances as may be required by Lender, in form and substance satisfactory to Lender, (f) that is subject to a valid, first priority and exclusive perfected security interest in favor of Borrower, except for and subject only to any possessory Lien in favor of the carrier under Applicable Law securing only the freight and associated charges for the ocean transportation of such Inventory to the Port of Los Angeles or the Port of Long Beach as shown on such bill of lading, (g) that has been in-transit for less than 25 days, (h) that is insured against loss, damage, hazards, and risks, and in amounts, satisfactory to Lender, written by one of more insurers acceptable to Lender and with respect to which Lender has been named as loss payee, in form and substance satisfactory to Lender, (i) with respect to which Borrower has, or upon delivery of such Inventory is able to obtain, all requisite import and export licenses and other permits or consents required by Applicable Law, (j) with respect to which all notices, instruments and documents requested by Lender relating thereto have been delivered to Lender, (k) which conforms to the representations and warranties contained in this Agreement and (l) that otherwise continues to be acceptable to Lender in its discretion for purposes of this Agreement.

"Reportable Event" means any of the events set forth in Section 4043 of ERISA.

"Responsible Officer" means the chief executive officer or president of Borrower and, in addition, with respect to a Borrowing Base Certificate or a Compliance Certificate, the chief executive officer, president, chief financial officer or treasurer of Borrower.

"Restricted Investment" means, with respect to Borrower, any Investment other than (a) the purchase of Inventory in the ordinary course of business, (b) acquisitions (not otherwise prohibited by this Agreement) of Equipment for use in the ordinary course of business, (c) direct obligations of the United States of America or any agency thereof, or obligations guaranteed by the United States of America, that mature within one year from the date of acquisition thereof, certificates of deposit maturing within one year from the date of acquisition, issued by a commercial bank organized under the laws of the United States of America or any state thereof having capital and surplus aggregating at least $100,000,000, (d) travel and similar advances to employees made in the ordinary course of business, (e) advances or contributions by Borrower to Westrim Crafts in the ordinary course of business consistent with historical practices and not exceeding $900,000 during any Fiscal year, and (f) the purchase of licensing rights providing for the use of third-party trademarks or service marks on or in connection with Borrower's Inventory in the ordinary course of Borrower's business, so long as (i) Borrower has delivered to Lender a consent or sublicense agreement from such licensor in form and substance acceptable to Lender or (ii) Lender is otherwise satisfied that it may sell or otherwise dispose of such Inventory in accordance with Section 13.2 free and clear of, and without infringing, the rights of such licensor and without violating any contract of Borrower with such licensor (and without payment of any royalties, fees or other amounts).

"Revolving Credit Limit" means $20,000,000.

"Revolving Loans" has the meaning set forth in Section 2.1.

"Shareholder's Equity" means, as of any date, stockholder's equity as determined in accordance with GAAP.

"Solvent" means, when used with respect to a Person at the time of determination:

(a)    the assets of such Person, at a fair valuation, are in excess of the total amount of its debts (including contingent liabilities); and

(b)    the present fair saleable value of its assets is greater than its probable liability on its existing debts as such debts become absolute and matured; and

(c)    it is then able and expects to be able to pay its debts (including contingent debts and other commitments) as they mature; and

(d)    it has capital sufficient to carry on its business as conducted and as proposed to be conducted.

For purposes of determining whether a Person is Solvent, the amount of any contingent liability shall be computed as the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"Subordinated Debt" means Debt that is subordinated to the Obligations pursuant to a Subordination Agreement.

"Subordination Agreement" means, with respect to a Person, a subordination agreement among Lender, Borrower and such Person, pursuant to which all obligations and indebtedness now or hereafter owing by Borrower to such Person are subordinated to the Obligations in right of payment and claim, in form and substance satisfactory to Lender, including, without limitation, subordination and postponement of payments to such Person and limitation on the exercise of remedies by such Person.

"Subsidiary" means, with respect to a Person, any other Person of which more than fifty percent (50%) of the voting Equity Interests is owned or controlled directly or indirectly by such Person or one or more of its Subsidiaries, or a combination thereof.

"Tangible Net Worth" means, with respect to a Person, as of any date, (a) Shareholder's Equity less (b) Intangible Assets, in each case determined for such Person as of such date.

"Taxes" means any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, excluding, in the case of Lender, such taxes (including income taxes or franchise taxes) as are imposed on or measured by Lender's net income in any jurisdiction (whether federal, state or local and including any political subdivision thereof) under the laws of which Lender is organized or maintains a lending office.

"Termination Date" means the earlier of (a) the Maturity Date or (b) the effective date of termination of this Agreement (i) pursuant to mutual agreement by Lender and Borrower, (ii) by Lender pursuant to Section 14.1 or (iii) by Borrower pursuant to Section 8.3(b).

"Total Debt" means, with respect to Borrower as of any date of determination, all Debt as of such date, excluding any unsecured Debt consisting of accounts payable, intercompany payables, accrued liabilities, deferred rent, deferred income taxes and income taxes payable, in each case in the ordinary course of business.

"Total Facility" means an amount equal to the Revolving Credit Limit.

"UCC" means the Uniform Commercial Code in effect in the State of Texas, as amended from time to time.

"Westrim Crafts" means Westrim Crafts (Hong Kong) Limited, a Hong Kong company and wholly owned Subsidiary of Borrower.

Section 1.2    Interpretive Provisions. Unless expressly provided otherwise, any term which is defined by the UCC, wherever used in this Agreement, shall have the same meaning as is prescribed by the UCC. The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms. The words "hereof," "herein," "hereunder" and similar words refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless the context indicates otherwise, references to "Section," "Subsection," "clause" "Schedule" and "Exhibit" are references to this Agreement. The term "documents" (if not capitalized as a defined term) includes any and all instruments, documents, agreements, certificates, indentures, notices and other writings, however evidenced. The term "including" is not limiting and means "including without limitation." Unless the context requires otherwise, in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including," the words "to" and "until" each mean "to but excluding" and the word "through" means "to and including." The term, "discretion," when used in reference to a Person, means the sole and absolute discretion of such Person, honestly determined by such Person under the circumstances. The phrases, "Lender believes," "Lender deems," "determined by Lender," "satisfactory to Lender" and "acceptable to Lender," respectively, as the case may be, mean such belief, deeming, determination, satisfaction or acceptability as determined by Lender in its discretion. Unless otherwise expressly provided herein, references to agreements (including this Agreement) and other contractual documents shall be deemed to include all subsequent amendments, restatements and other modifications thereto, and references to any statute or regulation are to be construed as including all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting the statute or regulation. The captions and headings of this Agreement are for convenience of reference only and shall not affect the interpretation of this Agreement. This Agreement and the other Loan Documents are the result of negotiations among the parties, have been reviewed by counsel to each party and are the products of all parties, and in consideration thereof, it is agreed that they shall not be construed against either party solely because of such party's involvement in their preparation. Unless otherwise specified, any reference to time shall be deemed to mean Central Standard Time or Central Daylight Time, as applicable, as in effect in Dallas County, Texas.

ARTICLE II
REVOLVING LOANS

Section 2.1    Revolving Loans. Subject to the terms and provisions of this Agreement, Lender agrees to make Revolving Loans to Borrower from time to time during the period from the date of this Agreement to the Maturity Date. The aggregate unpaid principal amount of Revolving Loans outstanding, as of any time of determination, shall not at any time exceed the (a) the lesser of (i) the Borrowing Base or (ii) the Revolving Credit Limit less (b) the aggregate undrawn amount of Letter of Credit Obligations, in each case as of such time of determination. Borrower may borrow and repay Revolving Loans from time to time, subject to the terms of this Agreement. Lender shall have the continuing right to establish and maintain reserves for purposes of calculating the Borrowing Base in such amounts and at such times and with respect to such matters and for such purposes as Lender deems appropriate, without prior notice to Borrower, including reserves with respect to collection performance, slow moving or obsolete Inventory, contingencies, amounts Borrower is or may be required to pay (such as taxes, freight and shipping charges, insurance premiums, amounts owing to landlords, warehousemen, carriers, mechanics, materialmen, laborers or suppliers, or ad valorem, excise, sales, or other taxes) or any other matter in Lender's discretion. Any such reserves are solely for purposes of calculating the Borrowing Base and do not constitute or represent cash funds.

Section 2.2    Request for Revolving Loans.

(a)    Borrower shall request each Revolving Loan by delivering to Lender a written notice, signed by a Responsible Officer of Borrower, in form satisfactory to Lender, accompanied by a Borrowing Base Certificate complying with <u>Section 10.5</u> and reflecting sufficient Availability. Unless otherwise agreed by Lender, each request for a Revolving Loan shall be irrevocable and, in order to be effective, must be received by Lender prior to 11:00 a.m. on the requested funding date, specifying the amount of the requested Revolving Loan and the requested funding date, which shall be a Business Day.

(b)    With respect to a request for a Revolving Loan, in lieu of delivering a written Borrowing Notice, Borrower may give Lender telephonic or other verbal notice of such request by the required time and otherwise satisfying the requirements of <u>Section 2.2(a)</u>. Such telephonic or other verbal notice shall be irrevocable, and shall be confirmed in writing no later than the Business Day following the giving of such telephonic notice. Lender at all times shall be entitled to rely on such telephonic or other verbal notice in making any Revolving Loan requested thereby, regardless of whether Borrower sends or Lender receives any such confirmation. Lender is authorized and directed, at its option, to honor any or all such telephonic or other verbal notices from any Person whom Lender believes to be an authorized officer of Borrower, and for purposes of this Agreement, any such officer shall be deemed to be authorized to make any such notice on behalf of Borrower. Borrower agrees to indemnify and hold Lender harmless from any loss or liability incurred in connection with honoring any telephonic or other verbal notice. All written Borrowing Notices are effective only upon receipt by Lender. Each Borrowing Notice, whether written or oral, shall be irrevocable and binding upon Borrower.

(c)    Except for proceeds used on the Agreement Date to refinance indebtedness for money borrowed pursuant to <u>Section 11.3</u>, all proceeds of the Revolving Loan, when funded, shall be disbursed by Lender to the Designated Account.

Section 2.3    <u>Deemed Request for Revolving Loans</u>. Borrower irrevocably authorizes Lender, at its election and without necessity for request by Borrower, to make a Revolving Loan to Borrower in an amount equal to any amount chargeable to or required to be paid by Borrower pursuant to the terms of this Agreement and the other Loan Documents, including, without limitation, payments of principal, interest, fees and reimbursable expenses, and apply the proceeds thereof in payment of such Obligations.

Section 2.4    <u>Protective Advances</u>. Lender is authorized, from time to time in its discretion (but without any obligation to do so), to make Revolving Loans to Borrower which Lender deems necessary or appropriate to preserve or protect the Collateral, or any portion thereof. All such Revolving Loans shall be secured by the Collateral and shall be included in the Obligations.

ARTICLE III
<u>RESERVED</u>

ARTICLE IV
<u>LETTERS OF CREDIT</u>

Section 4.1    <u>Issuance</u>. Subject to the terms and conditions of this Agreement, at the request of Borrower, Lender agrees to cause the Letter of Credit Issuer to issue for the account of Borrower one or more commercial/documentary or standby letters of credit to provide credit enhancement in respect of the purchase of inventory in the ordinary course of business (each a "<u>Letter of Credit</u>" and collectively, the "<u>Letters of Credit</u>") from time to time during the term of this Agreement. Lender shall not have any obligation to cause to be issued any Letter of Credit at any time if (i) after giving effect to the issuance of such Letter of Credit, the aggregate Letter of Credit Obligations would exceed $500,000, (ii) after giving effect to the issuance of such Letter of Credit, the aggregate amount of Loans outstanding plus the Letter

of Credit Obligations would exceed the Availability at such time or (iii) such Letter of Credit has an expiration date later than thirty (30) days prior to the Maturity Date or more than twelve (12) calendar months from the date of issuance for standby letters of credit or two (2) calendar months from the date of issuance for commercial/documentary letters of credit.

Section 4.2    <u>Particular Conditions</u>.  In addition to being subject to the satisfaction of the applicable conditions precedent contained in <u>Article VIII</u>, the obligation of Lender to cause to be issued any Letter of Credit is subject to the following conditions precedent having been satisfied in a manner reasonably satisfactory to Lender:

(a)    Borrower shall have delivered to the Letter of Credit Issuer, at such times and in such manner as the Letter of Credit Issuer may prescribe, an application in form and substance satisfactory to the Letter of Credit Issuer and reasonably satisfactory to Borrower for the issuance of the Letter of Credit and such other documents as may be required pursuant to the terms thereof, and the form, terms, and purpose of the proposed Letter of Credit shall be satisfactory to Borrower and the Letter of Credit Issuer;

(b)    as of the date of issuance, no order of any court, arbitrator, or governmental authority shall purport by its terms to enjoin or restrain money center banks generally from issuing letters of credit of the type and in the amount of the proposed Letter of Credit, and no law, rule, or regulation applicable to money center banks generally and no request or directive (whether or not having the force of law) from any governmental authority with jurisdiction over money center banks generally shall prohibit, or request that the proposed Letter of Credit Issuer refrain from, the issuance of letters of credit generally; and

(c)    Borrower shall have paid all customary fees, costs and charges of the Letter of Credit Issuer associated with issuance of such Letter of Credit and the fee payable upon issuance of such Letter of Credit as required by <u>Section 5.2(d)</u>.

Section 4.3    <u>Request for Issuance</u>.  Borrower must notify Lender of such request for issuance at least three (3) Business Days prior to the proposed issuance date.  Such notice shall be irrevocable and must specify the original face amount of the Letter of Credit requested, the Business Day of issuance of such requested Letter of Credit, whether such Letter of Credit may be drawn in a single or in partial draws, the Business Day on which the requested Letter of Credit is to expire, the purpose for which such Letter of Credit is to be issued, and the beneficiary of the requested Letter of Credit.  Borrower shall attach to such notice the proposed form of the Letter of Credit.  Lender shall not be obligated to cause the Letter of Credit Issuer to extend or amend any Letter of Credit unless the requirements of this <u>Section 4.3</u> are met as though a new Letter of Credit were being requested and issued.  Any reimbursement or other payment by Lender to the Letter of Credit Issuer in respect of any Letter of Credit, including without limitation reimbursement of any draw under any Letter of Credit, shall constitute a Loan, which may be made by Lender whether or not the conditions specified by <u>Article VIII</u> have been satisfied.

Section 4.4    <u>Payments Pursuant to Letters of Credit</u>.  Borrower agrees to reimburse the Letter of Credit Issuer immediately for any draw under any Letter of Credit, and to pay the Letter of Credit Issuer the amount of all other charges and fees payable to the Letter of Credit Issuer under or in connection with any Letter of Credit immediately when due, irrespective of any claim, setoff, defense, or other right which Borrower may have at any time against the Letter of Credit Issuer or any other Person.  Each drawing under any Letter of Credit shall constitute a request by Borrower for a Loan in the amount of such drawing and a direction for Lender to disburse such Loan in reimbursement to the Letter of Credit Issuer, as of the date of such drawing, which may be made by Lender whether or not the conditions specified by <u>Article VIII</u> have been satisfied.

Section 4.5      Indemnification; Risk Allocation; Exoneration; Power of Attorney.

(a)      Without limiting any other provision of this Agreement, Borrower agrees to protect, indemnify, pay, and save Lender and the Letter of Credit Issuer harmless from and against any and all claims, demands, liabilities, damages, losses, costs, charges, and expenses (including attorneys' fees) which Lender or the Letter of Credit Issuer may incur or be subject to as a consequence, direct or indirect, of the issuance of any Letter of Credit other than any such amount arising from Lender's or the Letter of Credit Issuer's, as applicable, gross negligence or intentional misconduct. Borrower's obligations under this Section 4.5(a) shall survive payment of all other Obligations.

(b)      As among Borrower, Lender and the Letter of Credit Issuer, Borrower assumes all risks of the acts and omissions of, or misuse of any of the Letters of Credit by, the respective beneficiaries of such Letters of Credit. In furtherance and not in limitation of the foregoing, Lender and the Letter of Credit Issuer shall not be responsible for: (A) the form, validity, sufficiency, accuracy, genuineness, or legal effect of any document submitted by any Person in connection with the application for and issuance of and presentation of drafts with respect to any of the Letters of Credit, even if it should prove to be in any or all respects invalid, insufficient, inaccurate, fraudulent, or forged, (B) the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign any Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason, (C) the failure of the beneficiary of any Letter of Credit to comply duly with conditions required in order to draw upon such Letter of Credit, (D) errors, omissions, interruptions, or delays in transmission or delivery of any messages, by mail, cable, telegraph, telex, or otherwise, whether or not they be in cipher, (E) errors in interpretation of technical terms; (F) any loss or delay in the transmission or otherwise of any document required in order to make a drawing under any Letter of Credit or of the proceeds thereof, (G) the misapplication by the beneficiary of any Letter of Credit of the proceeds of any drawing under such Letter of Credit, (H) any consequences arising from causes beyond the control of Lender of the Letter of Credit Issuer, including any act or omission, whether rightful or wrongful, of any governmental authority or (I) the Letter of Credit Issuer's honor of a draw for which the draw or any certificate fails to comply in any respect with the terms of the Letter of Credit, provided, that the forgoing shall not absolve the Letter of Credit Issuer for any matter described in this clause (b) caused by the Letter of Credit Issuer's gross negligence or intentional misconduct. None of the foregoing shall affect, impair, or prevent the vesting of any rights or powers of Lender or the Letter of Credit Issuer under this Section 4.5(b).

(c)      Without limiting the foregoing, no action or omission whatsoever by Lender (excluding Lender in its capacity as the Letter of Credit Issuer) under or in connection with any Letter of Credit or any related matters shall result in any liability of Lender to Borrower, or relieve Borrower of any of its obligations hereunder to any such Person.

(d)      Nothing contained in this Agreement is intended to limit Borrower's rights, if any, with respect to the Letter of Credit Issuer which arise as a result of the letter of credit application and related documents executed by and between Borrower and the Letter of Credit Issuer.

Section 4.6      Supporting Letter of Credit; Cash Collateral. If any Letter of Credit is outstanding upon termination of this Agreement, then upon such termination Borrower shall deposit with Lender, with respect to each Letter of Credit then outstanding, as Lender in its discretion shall specify, either (i) a standby letter of credit (a "Supporting Letter of Credit") in an amount not less than 110% of the undrawn face amount of such Letter of Credit, in form and substance satisfactory to Lender and issued

LOAN AND SECURITY AGREEMENT – Page 16
73306.000005 EMF_US 25977875v11

by an issuer satisfactory to Lender, under which Supporting Letter of Credit Lender is entitled to draw amounts necessary to reimburse Lender or the Letter of Credit Issuer for payments to be made to Lender under such Letter of Credit and any fees and expenses associated with such Letter of Credit or (ii) cash Collateral, in either such case in an amount equal to the greatest amount for which such Letter of Credit may be drawn plus any fees and expenses associated with such Letter of Credit. Such Supporting Letter of Credit or deposit of cash Collateral shall be held by Lender as security for, and to provide for the payment of, the aggregate undrawn amount of such Letters of Credit remaining outstanding. Lender shall return the Supporting Letter of Credit or cash Collateral, as applicable, at Borrower's request at any time after the expiration of thirty (30) days after the payment in full of the Obligations and the cancellation of all Letters of Credit issued hereunder. The agreements in this Section shall survive termination of this Agreement and payment in full of the Obligations.

ARTICLE V
INTEREST, FEES, REIMBURSEMENTS

Section 5.1      Interest.

(a)      All outstanding Obligations shall bear interest on the unpaid principal amount thereof (including, to the extent permitted by law, on accrued interest thereon not paid when due) from the date made until paid in full in cash at a fluctuating per annum rate equal to the lesser of (i) the Adjusted Base Rate plus the Applicable Margin or (ii) the Maximum Rate. Each change in the Adjusted Base Rate resulting from any change in the Base Rate shall be reflected in the interest rate described in clause (a)(i) preceding as of the effective date of any such change. Subject to Section 5.5, interest shall be computed on the basis of a year of 360 days and actual days elapsed.

(b)      At any time when any Default or Event of Default has occurred and is continuing, upon written notice by Lender to Borrower, effective as of any date on or after the occurrence of such Default or Event of Default and continuing for so long as any such Default or Event of Default is continuing, as may be specified in such notice, all Obligations shall bear interest at a rate per annum equal to the Default Rate applicable thereto.

Section 5.2      Fees. Subject to the terms of this Agreement:

(a)      Commitment Fee. Borrower agrees to pay to Lender a commitment fee, which amount shall be payable on the Agreement Date, in an amount equal to 1.50% multiplied by the Total Facility.

(b)      Unused Line Fee. Borrower agrees to pay to Lender, on the first day of each month and on the Termination Date, an unused line fee in an amount equal to 0.50 % per annum multiplied by the amount by which the Revolving Credit Limit exceeded the sum of the average daily outstanding amount of Revolving Loans during the immediately preceding calendar month, or shorter period if calculated on the Termination Date. Such fee shall be computed on the basis of a 360-day year for the actual number of days elapsed. All payments on the Loans received by Lender shall be deemed to be credited to the Revolving Loans immediately upon receipt for purposes of calculating the amount payable pursuant to this Section 5.2(b).

(c)      Collateral Monitoring Fee. Borrower shall pay to Lender a monthly collateral monitoring fee in the amount of $2,500 for each calendar month, or portion thereof, during the term of this Agreement. The collateral monitoring fee for each calendar month shall be due and payable in arrears on the first day of each calendar month and on the Termination Date, and shall be prorated for any partial calendar month.

(d)    Letter of Credit Fee. Without limiting Borrower's obligation to pay customary fees, costs and charges of the Letter of Credit Issuer in respect of the issuance, extension or renewal of a Letter of Credit, with respect to any such issuance, extension or renewal of a Letter of Credit, Borrower shall pay to Lender a fee in an amount equal to 5.0% per annum of the aggregate face amount of such Letter of Credit, which fee shall be fully earned and payable upon issuance, extension or renewal of each Letter of Credit.

Section 5.3    Increased Cost and Reduced Return. If, after the date hereof, the adoption or change of any Applicable Law, or the interpretation or administration thereof by any Governmental Authority  or compliance by Lender with any directive of any such Governmental Authority shall (i) subject Lender to any tax, duty or other charge with respect to any Loan or Lender's obligation to make Loans, or change the basis of taxation of any amounts payable to Lender under this Agreement in respect of any Loans (other than taxes imposed on Lender's income and franchise taxes imposed on it by the jurisdiction under the laws of which Lender (or its applicable lending office) is organized), (ii) impose or modify any reserve, special deposit, assessment or similar requirement relating to any assets, liabilities or commitments of Lender or (iii) impose on Lender any condition affecting this Agreement or any extensions of credit or commitments hereunder, and the result of any of the foregoing is to increase the cost to Lender of making or maintaining any Loans or to reduce any amount received or receivable by Lender under this Agreement with respect to any Loans, then Borrower shall pay to Lender on demand such amount or amounts as will compensate Lender for such increased cost or reduction.

Section 5.4    Taxes.

(a)    Any and all payments by Borrower to Lender hereunder or under any other Loan Document shall be made free and clear of, and without deduction for, any and all present or future taxes, duties, levies, imposts, deductions, charges, or withholdings, and all liabilities with respect thereto, excluding taxes imposed on Lender's income, and franchise taxes imposed on it, by the jurisdiction under the laws of which Lender (or its applicable lending office) is organized or any political subdivision thereof (all such non-excluded taxes, duties, levies, imposts, deductions, charges, withholdings, and liabilities being hereinafter referred to as "Taxes"). If Borrower shall be required by law to deduct any Taxes from or in respect of any sum payable under this Agreement or any other Loan Document to Lender, (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) Borrower shall make such deductions, (iii) Borrower shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with Applicable Law, and (iv) Borrower shall furnish to Lender the original or a certified copy of a receipt evidencing payment thereof.

(b)    In addition, Borrower agrees to pay any and all present or future stamp or documentary taxes and any other excise or property taxes or charges or similar levies which arise from any payment made under this Agreement or any other Loan Document or from the execution or delivery of, or otherwise with respect to, this Agreement or any other Loan Document (hereinafter referred to as "Other Taxes").

(c)    Borrower agrees to indemnify Lender for the full amount of Taxes and Other Taxes (including, without limitation, any Taxes or Other Taxes imposed or asserted by any jurisdiction on amounts payable under this Section) paid by Lender and any liability (including penalties, interest, and expenses) arising therefrom or with respect thereto.

(d)    If requested by Lender, Borrower shall furnish to Lender the original or a certified copy of a receipt evidencing payment of Taxes or Other Taxes.

Exhibit "2" - 55

(e)        Without prejudice to the survival of any other agreement of Borrower hereunder, the agreements and obligations of Borrower contained in this Section shall survive the termination of the Commitments and the payment in full of the Loans.

Section 5.5        Maximum Interest; Controlling Limitation.

(a)        If the rate of interest on the Obligations, absent the limitations set forth in this Section 5.5, would have exceeded the Maximum Rate, then the actual rate of interest shall be the Maximum Rate, and, if in the future, the interest rate would otherwise be less than the Maximum Rate, then the interest rate shall remain at the Maximum Rate until such time as the amount of interest paid hereunder equals the amount of interest which would have been paid if the same had not been limited by the Maximum Rate.  In the event that, upon payment in full of the Obligations, the total amount of interest paid or accrued under the terms of this Agreement is less than the total amount of interest which would, but for this Section 5.5, have been paid or accrued if the interest rate otherwise provided by this Agreement had at all times been in effect, then Borrower shall, to the extent permitted by Applicable Law, pay to Lender an amount equal to the (a) the lesser of (i) the amount of interest which would have been paid or accrued if the Maximum Rate had, at all times, been in effect and (ii) the amount of interest which would have been paid or accrued had the interest rate otherwise set forth in this Agreement, at all times, been in effect, less (b) the amount of interest actually paid or accrued under this Agreement.

(b)        Lender and Borrower each acknowledges, agrees, and declares that it is its intention to expressly comply with all Applicable Law in respect of limitations on the amount or rate of interest that can legally be contracted for, charged or received under or in connection with the Loan Documents.  Notwithstanding anything to the contrary contained in any Loan Document (even if any such provision expressly declares that it controls all other provisions of the Loan Documents), in no contingency or event whatsoever shall the amount of interest (including the aggregate of all charges, fees, benefits, or other compensation which constitutes interest under any Applicable Law) under the Loan Documents paid by Borrower, received by Lender or the Letter of Credit Issuer, agreed to be paid by Borrower, or requested or demanded to be paid by Lender or the Letter of Credit Issuer, exceed the Maximum Rate, and all provisions of the Loan Documents in respect of the contracting for, charging, or receiving compensation for the use, forbearance, or detention of money shall be limited as provided by this Section 5.5.  All interest paid, or agreed to be paid, by Borrower, or taken, reserved, or received by Lender or the Letter of Credit Issuer shall be amortized, prorated, spread, and allocated in respect of the Obligations throughout the full term of this Agreement.  Notwithstanding any provision contained in any of the Loan Documents, or in any other related documents executed pursuant hereto, neither Lender nor the Letter of Credit Issuer shall ever be entitled to charge, receive, take, reserve, collect, or apply as interest any amount which, together with all other interest under the Loan Documents would result in a rate of interest under the Loan Documents in excess of the Maximum Rate and, in the event Lender or the Letter of Credit Issuer ever charges, receives, takes, reserves, collects, or applies any amount in respect of Borrower that otherwise would, together with all other interest under the Loan Documents, be in excess of the Maximum Rate, such amount shall automatically be deemed to be applied in reduction of the unpaid principal balance of the Obligations other than interest, in inverse order of maturity and, if the principal balance thereof is paid in full, any remaining excess shall forthwith be refunded to Borrower.  Borrower, Lender and the Letter of Credit Issuer shall, to the maximum extent permitted under any Applicable Law, (i) characterize any non-principal payment as a standby fee, commitment fee, prepayment charge, delinquency charge, expense, or reimbursement for a third-party expense rather than as interest and (ii) exclude prepayments, acceleration, and the effect thereof.  Nothing in any Loan Document shall be construed or so operate as to require or obligate Borrower to pay any interest, fees, costs, or charges greater than is permitted by any Applicable Law.  Subject to the foregoing,

Exhibit "2" - 56

Borrower hereby agrees that the actual effective rate of interest from time to time existing under the Loan Documents, including all amounts agreed to by Borrower pursuant to and in accordance with the Loan Documents which may be deemed to be interest under any Applicable Law, shall be deemed to be a rate which is agreed to and stipulated by Borrower and Lender in accordance with Applicable Law.

## ARTICLE VI
## PAYMENT

Section 6.1      Interest.  Accrued interest on the Loans shall be due and payable in arrears on the first day of each calendar month and on the Termination Date.

Section 6.2      Revolving Loans.    Borrower may prepay Revolving Loans at any time. Borrower promises to pay to Lender, on demand, the amount, if any, at any time, by which the aggregate amount of the unpaid balance of Revolving Loans plus Letter of Credit Obligations exceeds the lesser of the Borrowing Base or the Revolving Credit Limit, in each case determined as of such time.

Section 6.3      Mandatory Payments on Termination Date.  All Obligations are due and payable in full on the Termination Date.   On the Termination Date:

(a)      Borrower shall pay to Lender in full the outstanding principal balance of the Revolving Loans plus all unpaid accrued interest thereon;

(b)      If the Termination Date is prior to the third anniversary of the Agreement Date, Borrower promises to pay to Lender the amount required by Section 6.5; and

(c)      Borrower shall pay all unpaid costs and expenses and all other Obligations payable under the Loan Documents.

Section 6.4      Mandatory Prepayment in Respect of Certain Events.  All proceeds or other cash payments received by Borrower in respect of a Distribution to Borrower or in respect of the sale, lease or other disposition by Borrower of any asset, other than the sale of Inventory in the ordinary course of business, shall be promptly paid to Lender for application to the Obligations in such manner as Lender may determine in its discretion.

Section 6.5      Early Termination.  Borrower acknowledges that occurrence of the Termination Date prior to the Maturity Date would result in the loss by Lender of benefits under this Agreement and that the damages incurred by Lender as a result thereof would be difficult and impractical to ascertain. Subject to the terms of this Agreement, if for any reason the Termination Date occurs on any date prior to the third anniversary of the Agreement Date, Borrower shall pay to Lender, in addition to all other amounts payable under the Loan Documents, an amount, calculated as the Termination Date, equal to the product of (a) the Total Facility times (b) the following percentage, as applicable: (i) if the Termination Date is on any day during the period from the Agreement Date through the day preceding the date that is the first anniversary of the Agreement Date, 3.0%, (ii) if the Termination Date is on any day during the period from and including the date that is the first anniversary of the Agreement Date through the day preceding the date that is the second anniversary of the Agreement Date, 2.0% or (iii) if the Termination Date is on any day during the period from and including the date that is the second anniversary of the Agreement Date through the thirtieth day preceding the date that is the third anniversary of the Agreement Date, 1.0%, which amount Borrower and Lender each acknowledges to be the best estimate of the amount necessary to fairly and reasonably compensate Lender for its loss resulting from occurrence of the Termination Date prior to the Maturity Date.

(a)    Notwithstanding the foregoing, in the event of termination of this Agreement at the request of Borrower, effective after the first anniversary of the Agreement Date but on or prior to the thirtieth day preceding the third anniversary of the Agreement Date, in connection with a sale of Equity Interests of Borrower to, and concurrent merger or combination of Borrower with, a Person that is not an Affiliate of Borrower, Borrower's obligation for the payment required by this Section 6.5 shall be an amount, calculated as the effective date of any such Termination Date, equal to the product of (a) the Total Facility times (b) the following percentage, as applicable: (i) if such Termination Date is on any day on or prior to the first anniversary of the Agreement Date, 2.5%, (ii) if such Termination Date is on any day after the first anniversary of the Agreement Date through the day preceding the second anniversary of the Agreement Date, 1.5% or (iii) if such Termination Date is on or after the second anniversary of the Agreement Date and on or before the thirtieth day preceding the third anniversary of the Agreement Date, 0.5%, provided, that (A) Borrower notifies Lender of such requested termination within 60 days prior to the effective date of such sale and concurrent merger or combination, and specifies an effective termination date as of the effective date of such sale and concurrent merger or combination, (B) no Default or Event of Default exists as of the effective date of termination (other than an Event of Default arising solely by reason of a Change of Control resulting from such sale) and (C) Borrower pays all Obligations in full and executes and delivers to Lender a release of all obligations of Lender under or in connection with the Loan Documents, effective as of the date of such termination.

(b)    Notwithstanding the foregoing, Borrower shall have no obligation for the payment under this Section 6.5 in the event of termination by Borrower pursuant to and in compliance with Section 8.3(b).

Section 6.6    General Payment Provisions.  All payments to be made by Borrower under the Loan Documents shall be made without set-off, recoupment, or counterclaim.  Except as otherwise expressly provided herein, all payments by Borrower shall be made in Dollars and in immediately available funds to Lender at its address set forth in Section 15.6, no later than 2:00 p.m. on the date specified herein.  Any payment received by Lender later than 2:00 p.m. shall be deemed to have been received on the following Business Day and any applicable interest or fee shall continue to accrue. Whenever any payment is due on a day other than a Business Day, such payment shall be due on the following Business Day, and such extension of time shall in such case be included in the computation of interest or fees, as the case may be.

Section 6.7    Application.  All payments not relating to amounts due on Loans or specific fees, and all proceeds of Accounts or other Collateral received and applied by Lender pursuant to Section 7.3, shall be applied, subject to the provisions of this Agreement, first, to pay any Lender Expenses then due; second, to interest due and payable in respect of the Obligations; third, to pay or prepay principal of the Loans, in such manner and order as Lender determines in its discretion; and fourth, to the payment of any other Obligations, in such manner and order as Lender determines in its discretion.  Lender shall have the continuing right to apply and reverse and reapply any application, subject to the terms of this Agreement.

Section 6.8    Reinstatement.  If after receipt and application of any payment or proceeds any such application is invalidated, set aside, determined to be void or voidable for any reason, then the Obligations or part thereof intended to be satisfied by such application shall be revived and continued and this Agreement shall continue in full force as if such payment or proceeds had not been received by Lender and Borrower shall be liable to pay to Lender, and Borrower hereby does indemnify Lender and hold Lender harmless in, an amount equal to the amount of such application.  The provisions of this Section 6.8 shall survive the termination of this Agreement.

Section 6.9    <u>Account Stated</u>. Lender will provide to Borrower a monthly statement of Loans, payments, and other transactions pursuant to this Agreement. Such statement shall be deemed correct, accurate, and binding on Borrower and an account stated, subject to reversals and reapplications made as provided in <u>Section 6.8</u> and corrections of errors discovered by Lender, unless Borrower notifies Lender in writing to the contrary within thirty (30) days after such statement is rendered. In the event a timely written notice of objections is given by Borrower, only the items to which exception is expressly made will be considered to be disputed.

ARTICLE VII
COLLATERAL

Section 7.1    <u>Security Interest</u>. As security for the payment and performance of the Obligations, Borrower hereby grants to Lender a continuing security interest, lien and collateral assignment in all of Borrower's right, title and interest in and to all of the following, in each case both now owned and hereafter acquired: all Accounts, Inventory, Equipment, General Intangibles, Chattel Paper, Letter of Credit Rights, Proprietary Rights, Instruments, Documents and documents of title, Investment Property, Deposit Accounts, Commercial Tort Claims, money, cash, cash equivalents, securities and other personal property of any kind at any time held directly or indirectly by Lender or any affiliate of Lender, all books and records, whether in tangible or intangible form, all other assets, if any, and all accessions to, substitutions for and replacements, products and proceeds of any of the foregoing. Notwithstanding the foregoing, the Lien granted to Lender under this <u>Section 7.1</u> shall not extend or attach to (a) any agreement by which Proprietary Rights are licensed to Borrower if and to the extent that the grant of such Lien is prohibited by the terms thereof or, by such terms, would constitute or result in a breach or default by Borrower thereunder or the invalidation or unenforceability of any right, title or interest of Borrower thereunder, <u>provided</u>, however, that such Lien shall extend and attach immediately to any such agreement to the extent, if any, as may be allowed by a written consent executed by the grantor thereunder or at such time, if any, as any such agreement is modified to allow such Lien, or (b) Distributions made as allowed by <u>clause (b)</u> of <u>Section 11.11</u> and disbursed directly to Parent or, at Parent's discretion, directly to a Person who owns Equity Interests of Parent. Lender's Liens shall continue in full force and effect in all Collateral until all Obligations have been fully paid and all commitments of Lender under this Agreement have been terminated.

Section 7.2    <u>Perfection and Protection of Lender's Security Interest</u>. Lender's Liens at all times shall be and remain first, prior and senior to any other interests in the Collateral, except as may be expressly agreed otherwise by Lender in writing. Borrower shall take all action requested by Lender at any time to perfect, maintain, protect and enforce Lender's Liens and to ensure that Lender's Liens at all times are first, prior and senior to any other interests in the Collateral, except as may be expressly agreed otherwise by Lender in writing. Without limiting the foregoing, unless Lender agrees otherwise in writing, Borrower will cause all Inventory and Documents related to Inventory in-transit from abroad to comply with all requirements listed in <u>clauses (a)</u> through <u>(k)</u> of the definition of "Qualified In-Transit Inventory." Promptly upon the request of Lender, Borrower will deliver to Lender, or at Lender's direction, all Instruments, Documents and Chattel Paper, duly endorsed or assigned to Lender or such Person as Lender may direct, without restriction, and all certificates of title covering any portion of the Collateral for which certificates of title have been issued, together with executed applications for corrected certificates of title and other such documentation as may be requested by Lender. If at any time any Collateral is located on any leased premises not owned by Borrower, then Borrower shall, at the request of Lender, obtain written landlord lien waivers or subordinations with respect to such Collateral, in form and substance satisfactory to Lender. If Lender becomes a holder of any negotiable Document covering Inventory, Lender's interest in such Document and Inventory is a security interest (except and only to the extent, if any, that Lender purchases any such Collateral or accepts any such Collateral in full or partial satisfaction of the Obligations, in either such case pursuant to the UCC. If any Collateral is at any time in the possession or control of any warehouseman, bailee, processor or any other Person other

Exhibit "2" - 59

than Borrower, then Borrower shall notify Lender thereof and shall, at the request of Lender, notify such Person (in form and substance satisfactory to Lender) of Lender's Liens in such Collateral and instruct such Person to hold all such Collateral for Lender's account subject to Lender's instructions.

Section 7.3      Collateral Proceeds Management.  All collections and proceeds of Collateral shall be subject to an express trust for the benefit of Lender, and shall be delivered to Lender for application to the Obligations as follows:

(a)      Borrower shall establish a lock-box service for collections of Accounts at a commercial bank acceptable to Lender and subject to a collection account agreement by such bank providing, among other things, that (i) all items of payment received in such lock-box are received by such bank for Lender, (ii) such bank has no rights of setoff or recoupment or any other claim against such items (other than for payment of its service fees and other charges directly related to the administration of such lock-box), and (iii) such bank will immediately deposit all such collections to an account of Lender.  Borrower shall instruct all Account Debtors in writing to cause, and otherwise take reasonable steps to cause, all payments to be delivered directly to the address established for such lock-box service.

(b)      Borrower will not use, dispose, withhold or otherwise exercise dominion over any proceeds of Collateral.  If Borrower at any time receives any proceeds of Collateral, it shall receive such proceeds as Lender's trustee and shall immediately deliver such proceeds to Lender in their original form duly endorsed in blank or to the order of Lender.

(c)      All payments received by Lender pursuant to Section 7.3(a) or Section 7.3(b) shall be credited to the Obligations (conditional upon final collection) after allowing two Business Days for collection, provided, that such payments shall be deemed to be credited to the Obligations immediately upon receipt for purposes of determining Availability and calculating the unused line fee pursuant to Section 5.2(b).

Section 7.4      Examinations; Inspections; Verifications.  Lender shall have the right at any time without hindrance or delay to conduct field examinations to inspect the Collateral and to inspect, audit and copy Borrower's books and records relating to the Collateral or Borrower's business.  Lender is authorized to discuss Borrower's affairs with any Person, including without limitation employees of Borrower, as Lender may deem necessary in relation to the Collateral, Borrower's business or financial condition or Lender's rights under the Loan Documents.  Borrower agrees to pay Lender's customary fees and disbursements relating to all such field examinations and the preparation of reports thereof; provided, however, that so long as no Default or Event of Default has occurred, Borrower shall not be required to pay for more than four (4) field examinations during any calendar year.  Lender shall have full access to all records available to Borrower from any credit reporting service, bureau or similar service and shall have the right to examine and make copies of any such records.  Lender may exhibit a copy of this Agreement to such service and such service shall be entitled to rely on the provisions hereof in providing access to Lender as provided herein.  If requested by Lender, Borrower will deliver to Lender any authorization or consent necessary for Lender to obtain records from any such service.

Section 7.5      Appraisals.  At any time when a Default or Event of Default exists, and also at such other times not more frequently than twice a year as Lender requests, Borrower shall, at its expense, provide Lender with appraisals, or updates of appraisals, of any Collateral, prepared by an appraiser acceptable to Lender and on a basis satisfactory to the Lender.

Section 7.6      Right to Cure.  Lender may pay any amount or do any act required of Borrower hereunder or under any other Loan Document in order to preserve, protect, maintain or enforce the Collateral or Lender's Liens, and which Borrower fails to pay or do, including payment of any judgment

lien, insurance premium, charge, landlord's or bailee's claim on or with respect to the Collateral. All payments that Lender makes under this Section 7.6 and all out-of-pocket costs and expenses that Lender pays or incurs in connection therewith shall be paid or reimbursed to Lender on demand. Any action taken by Lender under this Section 7.6 shall not waive any Default or Event of Default or any rights of Lender with respect thereto.

Section 7.7    Power of Attorney. Borrower hereby irrevocably appoints Lender as Borrower's agent and attorney-in-fact to take any action necessary to preserve and protect the Collateral and Lender's interests under the Loan Documents or to sign and file any document necessary to perfect Lender's Liens. Without limiting the foregoing:

(a)    Lender shall have the right at any time to take any of the following action, in its own name or in the name of Borrower, whether or not an Event of Default is in existence: (i) make written or verbal requests for verification of the validity, amount or any other matter relating to any Collateral from any Person, (ii) endorse Borrower's name on checks, instruments or other evidences of payment on Collateral, (iii) sign and file, in Borrower's name or in Lender's name as secured party, any proof of claim or other document in any bankruptcy proceedings of any Account Debtor or obligor on Collateral, (iv) access, copy or utilize any information related to the Collateral, recorded or contained in any computer or data processing equipment or system maintained by Borrower in respect of the Collateral and (v) open mail addressed to Borrower and take possession of checks or other proceeds of Collateral for application in accordance with this Agreement.

(b)    Lender shall have the right at any time to take any of the following action, in its own name or in the name of Borrower, at any time when any Event of Default is in existence: (i) notify any or all Persons which Lender believes may be Account Debtors or obligors on Collateral to make payment directly to Lender, for the account of Borrower, (ii) redirect the deposit and disposition of collections and proceeds of Collateral; provided, that such proceeds shall be applied to the Obligations as provided by this Agreement, (iii) settle, adjust, compromise or discharge Accounts or extend time of payment upon such terms as Lender may determine, (iv) notify post office authorities, in the name of Borrower or in the name of Lender, as secured party, to change the address for delivery of Borrower's mail to an address designated by Lender, (v) sign Borrower's name and process and obtain customs and regulatory clearance for Inventory covered by Documents and cause all applicable duties and charges associated therewith to be paid (such amounts paid to constitute Lender Expenses), (vi) present Documents to a carrier and procure release of Inventory covered thereby, (vii) take possession of Inventory, and (viii) endorse and deliver Documents, in Borrower's name and on its behalf, to Lender or such Persons as Lender directs.

The powers granted under this Section 7.7 are coupled with an interest and are irrevocable until all Obligations have been paid in full and all commitments of Lender under this Agreement have been terminated. Costs and expenses incurred by Lender in connection with any of such actions by Lender, including attorneys' fees and out-of-pocket expenses, shall be reimbursed to Lender on demand.

Section 7.8    Preservation of Lender's Rights. To the extent allowed by law, neither Lender nor any of its officers, directors, employees or agents shall be liable or responsible in any way for the safekeeping of any Collateral or for any act or failure to act with respect to the Collateral, or for any loss or damage thereto or any diminution in the value thereof, or for any act by any other Person. In the case of any instruments and chattel paper included within the Collateral, Lender shall have no duty or obligation to preserve rights against prior parties. The Obligations shall not be affected by any failure of Lender to take any steps to perfect its security interests or to collect or realize upon the Collateral, nor shall loss of or damage to the Collateral release Borrower from any of the Obligations.

LOAN AND SECURITY AGREEMENT – Page 24
73306.000005 EMF_US 25977875v11

## ARTICLE VIII
## CONDITIONS

Section 8.1    Conditions Precedent to Initial Loan. The obligation of Lender to make the initial extension of credit or cause to be issued any Letter of Credit under this Agreement is subject to the fulfillment, to Lender's satisfaction, of each of the following conditions precedent on or before the expiration of 21 days after the Agreement Date:

(a)    Lender shall have received each of the following, in each case at Borrower's expenses and in form and substance satisfactory to Lender:

(i)    A copy of the organizational documents of Borrower, and all amendments thereto, accompanied by the certificate of the appropriate Governmental Authority of Borrower's jurisdiction of organization bearing a current date acceptable to Lender, to the effect that such copy is correct and complete and that Borrower is duly organized and validly existing in such jurisdiction;

(ii)    Certification by the appropriate Governmental Authority, bearing a current date acceptable to Lender, to the effect that Borrower is in good standing and qualified to transact business in Borrower's jurisdiction of organization and in each other jurisdiction where Borrower transacts business;

(iii)    (A) a copy of the bylaws or similar governing document of Borrower, and all amendments thereto, (B) certification of the name, signature and incumbency of all officers of Borrower who are authorized to execute any Loan Document or request Loans on behalf of Borrower and (C) a copy of authorizing resolutions approving this Agreement and the other Loan Documents to be executed and delivered by Borrower, authorizing the transactions contemplated thereby, and authorizing and directing a named officer or officers of Borrower to sign and deliver all Loan Documents to be executed by Borrower, duly adopted by Borrower's board of directors or similar governing body of Borrower, all accompanied by a certificate from a Responsible Officer of Borrower dated as of the Agreement Date to the effect that each such item is true and complete and in full force and effect as of the Agreement Date;

(iv)    For Parent:

(A)    A copy of its organizational documents, and all amendments thereto, accompanied by the certificate of the appropriate Governmental Authority of its jurisdiction of organization bearing a current date acceptable to Lender, to the effect that such copy is correct and complete and that its is duly organized and validly existing in such jurisdiction;

(B)    Certification by the appropriate Governmental Authority, bearing a current date acceptable to Lender, to the effect that its is in good standing and qualified to transact business in its jurisdiction of organization and in each other jurisdiction where it transacts business;

(C)    (A) a copy of its bylaws or similar governing document, and all amendments thereto, (B) certification of the name, signature and incumbency of all officers who are authorized to execute any Loan Document and (C) a copy of authorizing resolutions approving such Loan Documents to be executed and delivered by it, authorizing the transactions contemplated thereby, and

authorizing and directing a named officer or officers to sign and deliver all such Loan Documents to be executed by it, duly adopted by its board of directors or similar governing body, all accompanied by a certificate from an authorized officer dated as of the Agreement Date to the effect that each such item is true and complete and in full force and effect as of the Agreement Date;

(v)     This Agreement, duly executed by Borrower;

(vi)    The Parent Security Agreement and a Guaranty, each duly executed by Parent;

(vii)   Evidence of insurance in compliance with the requirements of this Agreement;

(viii)  All third-party waivers, subordinations and consents as may be required by Lender with respect to any Collateral located on premises not owned by Borrower;

(ix)    A Subordination Agreement with respect to any Debt proposed by Borrower as Subordinated Debt and a copy of the instrument evidencing any such debt;

(x)     If requested by Lender, a security agreement in respect of Proprietary Rights;

(xi)    A Control Agreement with respect to such Deposit Accounts and Investment Property as may be requested by Lender;

(xii)   Evidence satisfactory to Lender that Availability, after giving effect to the initial Revolving Loans, the refinancing of indebtedness for money borrowed as provided by Section 11.3, the payment of all fees, taxes and Lender Expenses payable on the Agreement Date and allowing for payment of all trade payables that are 60 or more days past due, will be in an amount equal to or greater than $2,000,000;

(xiii)  An appraisal of Borrower's Inventory, addressed to Lender and prepared by a credentialed appraiser acceptable to Lender on a valuation basis acceptable to Lender;

(xiv)   UCC-3 termination statements, partial releases or such other releases as may be required by Lender with respect to the Collateral;

(xv)    Copies of (i) a proposed final draft of Borrower's and Parent's financial statements for the Fiscal Year ending December 31, 2007 and (ii) Borrower's and Parent's financial statements for the Fiscal Month ending May 31, 2008, in each case reflecting no material deviation or change from the financial information furnished by Borrower to Lender for underwriting the transaction contemplated by this Agreement;

(xvi)   An opinion of counsel for Borrower and each Guarantor, addressing such matters as may be requested by Lender;

(xvii)  (A) With respect to the initial Revolving Loan, a request for Revolving Loan and Borrowing Base Certificate as required by Section 10.5(a), duly executed by a Responsible Officer; and

(xviii)  A closing certificate, certifying to the satisfaction of conditions precedent specified by this Section 8.1 and certifying to such other matters as may be requested by Lender, duly executed by a Responsible Officer;

(b)     Lender shall have completed a field examination of Borrower, the Collateral and Borrower's books and records, and the results thereof shall be satisfactory to Lender;

(c)     Lender shall have established cash proceeds management pursuant to Section 7.3 and confirmed that Borrower's reporting systems are acceptable to Lender;

(d)     Lender shall have filed all financing statements as required to perfect Lender's Liens in all Collateral with respect to which perfection can be achieved by filing a financing statement, and shall have received evidence or other confirmation of such filing, satisfactory to Lender;

(e)     Lender shall have received satisfactory reference checks with respect to Borrower's senior management and members of Borrower's board of directors who own Equity Interests in Borrower;

(f)     Lender shall have completed confirmation of Borrower's Accounts, and the results of such confirmation shall be satisfactory to Lender;

(g)     Borrower shall have paid all Lender Expenses; and

(h)     All legal and business matters in connection with the transaction contemplated by this Agreement shall be satisfactory to Lender.

Section 8.2     Conditions Precedent to all Loans.  In addition to the conditions precedent specified by Section 8.1, the obligation of Lender to make any Loan or cause to be issued any Letter of Credit shall be subject to the following conditions precedent:

(a)     All representations and warranties in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the date of such Loan, as though such representations and warranties are made on and as of such date (except to the extent any such representations and warranties relate solely to an earlier date);

(b)     No Default or Event of Default shall have occurred and be continuing on the date of such Loan, and no Default or Event of Default will occur after giving effect to such Loan;

(c)     The funding of such Loan shall not be prohibited by any Applicable Law;

(d)     Borrower shall have satisfied all applicable requirements for requesting such Loan or Letter of Credit; and

(e)     Lender shall be satisfied in its discretion that no Material Adverse Effect shall have occurred.

Any request for a Loan pending at a time when any condition precedent specified by Section 8.1 or Section 8.2 is not satisfied may be declined by Lender without prior notice.

Section 8.3     Failure or Inability to Satisfy Conditions Precedent.

(a)    In the event all conditions precedent required by <u>Section 8.1</u> and <u>Section 8.2</u> have not been satisfied or waived by Lender in writing, or the initial Loans have not been requested in compliance with <u>Section 2.2</u>, on or before the expiration of 21 days after the Agreement Date, Lender shall have no obligation to make Loans, cause Letters of Credit to be issued or otherwise extend credit under this Agreement, and any requests for Loans or Letters of Credit after such date may be granted or declined by Lender in its discretion.

(b)    In the event Borrower is unable, using its reasonable commercial efforts and through no fault of Borrower, to satisfy the conditions required by <u>Section 8.1</u> within 21 days after the Agreement Date, then unless such conditions are waived by Lender, or Lender and Borrower agree otherwise, Borrower may terminate this Agreement effective upon 5 days prior notice to Lender sent prior to the expiration of such period, <u>provided</u>, that no Loans have been funded, no Letters of Credit have been issued, and all other Obligations have been paid or satisfied in full, in each case on or prior to the effective date of such termination.

## ARTICLE IX
## REPRESENTATIONS AND WARRANTIES

In order to induce Lender to enter into this Agreement and make Loans, Borrower makes each of the following representations and warranties to Lender as being true, complete and correct in all material respects.

Section 9.1    <u>Fundamental Information</u>.  <u>Schedule 9.1</u> sets forth, for each of Borrower and its Subsidiaries, respectively (a) its legal name, (b) its federal tax identification number, (c) its jurisdiction of organization, (d) its address of its chief executive office, (e) jurisdictions in which qualification is necessary in order for it to own or lease its property and conduct its business, and (f) a true and complete listing of each class of Borrower's and each such Subsidiary's Equity Interests, all of which are validly issued, outstanding, fully paid and non-assessable, and owned beneficially and of record by the Person identified therein.  Borrower is a registered organization, as defined by the UCC, duly organized and validly existing and in good standing under the laws of its jurisdiction of organization, and is qualified to do business and is in good standing as a foreign organization in each jurisdiction in which qualification is necessary in order for it to own or lease its property and conduct its business and has all requisite power and authority to conduct its business and to own its property.

Section 9.2    <u>Prior Transactions</u>.  As of the Agreement Date, except as shown in <u>Schedule 9.2</u>, Borrower has not, during the past five (5) years, (a) changed its name or used any fictitious name, (b) been a party to any merger or organizational change or (c) acquired any of its property outside of the ordinary course of business.

Section 9.3    <u>Subsidiaries</u>.  Borrower has no Subsidiaries except as shown in <u>Schedule 9.1</u>. The aggregate value of the total assets of Westrim Crafts does not exceed $100,000.  The aggregate value of the total assets of Creativity, Inc. does not exceed $50,000.

Section 9.4    <u>Authorization, Validity and Enforceability</u>.  Borrower has the corporate power and authority to execute, deliver and perform this Agreement and the other Loan Documents to which it is a party, to incur the Obligations, and to grant the Lender's Liens.  Borrower has taken all necessary action to properly authorize its execution, delivery and performance of the Loan Documents to which it is a party.  This Agreement and the other Loan Documents to which Borrower is a party have been duly executed and delivered by Borrower, and constitute the legal, valid and binding obligations of Borrower, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency,

Exhibit "2" - 65

reorganization, moratorium or other laws affecting creditors' rights generally and general principles of equity, if any, under Applicable Law.

Section 9.5    Noncontravention.    Borrower's execution, delivery, and performance of this Agreement and the other Loan Documents to which it is a party do not and will not conflict with, or constitute a violation of or breach or default under (a) Borrower's organizational documents, (b) any agreement or instrument to which Borrower is a party or which is otherwise binding upon Borrower or (c) any Applicable Law applicable to Borrower or any of its Subsidiaries.

Section 9.6    Financial Statements and Projections.    Borrower has delivered to Lender a proposed final draft of the audited balance sheet and related statements of income, retained earnings, cash flows and changes in stockholders' equity for Parent and its consolidated Subsidiaries as of December 31, 2007, and for the Fiscal Year then ended. To the best of Borrower's knowledge and belief, no material changes, in comparison to such proposed final draft, will be reflected in Borrower's final amended balance sheet and related statements of income and cash flows for Parent and its consolidated Subsidiaries as of December 31, 2007. Borrower has also delivered to Lender the unaudited balance sheet and related statements of income and cash flows for Parent and its consolidated Subsidiaries as of June 30, 2008. All such financial statements have been prepared in accordance with GAAP and present accurately and fairly the financial position of Parent and its consolidated Subsidiaries as at the dates thereof and their results of operations for the specified periods. No Material Adverse Effect has occurred since the dates of such financial statements, respectively.

Section 9.7    Litigation.    Except as set forth on Schedule 9.7, there is no pending or, to the best of Borrower's knowledge, threatened, action, suit, proceeding or claim by any Person, or to the best of Borrower's knowledge, investigation by any Governmental Authority, or any basis for any of the foregoing, which could reasonably be expected to cause a Material Adverse Effect.

Section 9.8    ERISA and Employee Benefit Plans.    Each of Borrower and its Subsidiaries are in compliance in all material respects with all applicable provisions of ERISA. Neither a Reportable Event nor a Prohibited Transaction has occurred and is continuing with respect to any Plan. No notice of intent to terminate a Plan has been filed, nor has any Plan been terminated. No circumstances exist which constitute grounds entitling the PBGC to institute proceedings, to terminate or appoint a trustee to administer a Plan, nor has the PBGC instituted any such proceedings. Each of Borrower and its ERISA Affiliates has met its minimum funding requirements under ERISA with respect to all of its Plans, and the present value of all vested benefits under each Plan do not exceed the fair market value of all Plan assets allocable to such benefits, as determined on the most recent value date of the Plan and in accordance with ERISA.

Section 9.9    Compliance with Laws.    Borrower and its Subsidiaries each is in compliance, in all material respects, with Applicable Law.

Section 9.10    Taxes.    Borrower and its Subsidiaries have filed all federal and other tax returns and reports required to be filed, and have paid all federal and other taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable unless any such unpaid taxes, assessments fees or other charges would constitute a Permitted Lien.

Section 9.11    Location of Collateral and Books and Records.    As of the Agreement Date, Schedule 9.11 is a complete list of the location of the Collateral (other than Inventory in-transit to one of such locations) and of Borrower's books and records. Borrower is the owner of each location, except as identified in Schedule 9.11. If any such location is not owned by Borrower, Schedule 9.11 includes the name and mailing address of the owner thereof.

Exhibit "2" - 66

Section 9.12    Accounts.  Each Account represents a bona fide sale or lease and delivery of goods by Borrower, or rendition of services by Borrower in the ordinary course of Borrower's business. Each Account is for a liquidated amount payable by the Account Debtor thereon on the terms set forth in the invoice therefor and in the schedule of Accounts delivered to Lender, without any offset, deduction, defense or counterclaim except those known to Borrower and disclosed to Lender in writing.  No payment has been received, and no credit, discount or extension or agreement has been granted, on any Account except in accordance with Borrower's historical practices as disclosed to Lender in writing prior to the Agreement Date or as reported to Lender in writing.  Each copy of an invoice delivered to Lender by Borrower is a genuine copy of the original invoice sent to the Account Debtor named therein.  All goods described in any invoice representing a sale of goods have been delivered to the Account Debtor  named therein and all services of Borrower described in each invoice representing services have been performed.

Section 9.13    Inventory.  With respect to all Inventory (and all associated Documents) at any time included in a Borrowing Base Certificate and proposed to Lender as Qualified In-Transit Inventory, all requirements listed in clauses (a) through (k) of the definition of "Qualified In-Transit Inventory" have been satisfied.

Section 9.14    Documents, Instruments, and Chattel Paper.   All Documents, Instruments and Chattel Paper, and all signatures and endorsements thereon, are complete, valid and genuine.

Section 9.15    Proprietary Rights.  Schedule 9.15 sets forth a correct and complete list of all Proprietary Rights owned by Borrower.  None of such Proprietary Rights is subject to any licensing agreement or similar arrangement except as set forth on Schedule 9.15.  To Borrower's knowledge, none of such Proprietary Rights infringes on or conflicts with any other Person's property, and no other Person's property infringes on or conflicts with such Proprietary Rights.   The Proprietary Rights described on Schedule 9.15 and all other Propriety Rights in which Borrower has an interest constitute all of the property necessary to the current and anticipated future conduct of Borrower's business.

Section 9.16    Investment Property.  Schedule 9.16 sets forth a correct and complete list of all Investment Property owned by Borrower.  Borrower is the legal and beneficial owner of such Investment Property and has not sold, granted any option with respect to, assigned or transferred, or otherwise disposed of any of its rights or interest therein.

Section 9.17    Real Estate; Leases.  Schedule 9.17 sets forth a correct and complete list of all real property owned by Borrower and of any real property owned by any of its Subsidiaries, all leases and subleases of real property on which Borrower is lessee or sublessee, and all leases or subleases of real property on which Borrower is lessor or sublessor.  Each of such leases is valid and enforceable in accordance with its terms (subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and general principles of equity, if any, under Applicable Law) and is in full force and effect, and no default by any party to such lease exists thereunder.

Section 9.18    Material Agreements.  As of the Agreement Date, Schedule 9.18 sets forth all material agreements to which Borrower or any of its Subsidiaries is a party or is otherwise bound.

Section 9.19    Bank Accounts.  Schedule 9.19 contains a complete list of all Deposit Accounts, securities accounts and commodity accounts maintained by Borrower.

Section 9.20    Title to Property.  Except for the Liens to be terminated simultaneously with the use of proceeds of Revolving Loans as contemplated by Section 11.3(b), Borrower has good, marketable and exclusive title to all of its property, free of all Liens except Permitted Liens.  Lender's Liens are not subject or junior to any other Lien.

Exhibit "2" - 67

Section 9.21 <u>Debt</u>. After giving effect to the making of the initial Loans, Borrower and its Subsidiaries have no Debt except (a) the Obligations, (b) operating leases incurred by Borrower in the ordinary course of business, (c) Debt described on <u>Schedule 9.21</u> and (d) trade payables and other contractual obligations arising in the ordinary course of business. After giving effect to application of proceeds of the initial Loans pursuant to <u>clause (b)</u> of <u>Section 11.3</u>, Borrower has no ongoing indebtedness or liability to Bank of America, N.A., other than customary fees and charges in the ordinary course of business relating to Deposit Accounts listed in <u>Section 9.19</u> and lock-box services required by <u>Section 7.3</u>.

Section 9.22 <u>Liens</u>. There are no Liens on any property (including without limitation, Deposit Accounts) of Borrower other than (a) Liens under operating leases incurred by Borrower in the ordinary course of business, (b) Liens, if any, described on <u>Schedule 9.22</u> and (c) prior to application of proceeds of the initial Loans pursuant to <u>clause (b)</u> of <u>Section 11.3</u>, existing Liens in favor of Bank of America, N.A., which Liens will be released contemporaneously upon such application. Without limiting the foregoing, no Person other than Lender has been granted control (as defined by the UCC) of any Deposit Account of Borrower, other than in connection with Liens described in <u>clause (c)</u> preceding, which control will be released contemporaneously upon release of such Liens as described in such <u>clause (c)</u>.

Section 9.23 <u>Solvency</u>. Borrower is Solvent prior to and after giving effect to the making of the initial Loans.

Section 9.24 <u>Commercial Tort Claims</u>. Borrower has no Commercial Tort Claims other than as (a) listed on <u>Schedule 9.24</u> and (b) disclosed in writing to Lender after the Agreement Date.

Section 9.25 <u>Non-Regulated Entities</u>. Neither Borrower nor any Affiliate of Borrower is an "Investment Company" within the meaning of the Investment Company Act of 1940. Borrower is not subject to regulation under the Public Utility Holding Company Act of 1935, the Federal Power Act, the Interstate Commerce Act, any state public utilities code or law, or any other federal or state statute or regulation limiting its ability to incur indebtedness.

Section 9.26 <u>Governmental Authorization</u>. No approval, consent, exemption, authorization or other action by, or notice to, or filing with, any Governmental Authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, Borrower or any of its Subsidiaries of this Agreement or any other Loan Document.

Section 9.27 <u>Investment Banking or Finder's Fees</u>. Neither Borrower nor any of its Subsidiaries has agreed to pay or is otherwise obligated to pay or reimburse any Person with respect to any investment banking or similar or related fee, underwriter's fee, finder's fee or broker's fee in connection with this Agreement.

Section 9.28 <u>Full Disclosure</u>. None of the representations or warranties made by Borrower in the Loan Documents and none of the statements contained in any Schedule or any report, statement or certificate furnished to Lender by or on behalf of Borrower in connection with the Loan Documents contains any untrue statement of a material fact or omits any material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances under which they are made, not misleading as of the time when made or delivered.

Section 9.29 <u>Continuing Representations</u>. Each request for a Loan or Letter of Credit, and acceptance by Borrower of the proceeds of any Loan or the issuance of any such Letter of Credit, shall constitute a representation and warranty by Borrower, as of the date of each such request and acceptance, and after giving effect thereto that all such representations and warranties are true, complete and correct

LOAN AND SECURITY AGREEMENT – Page 31
73306.000005 EMF_US 25977875v11

in all material respects, as of each such date, as though separately made and stated on and as of each such date (except to the extent that any such representations and warranties expressly relate solely to an earlier date). All representations and warranties under this Agreement shall survive the execution and delivery of this Agreement.

ARTICLE X
AFFIRMATIVE COVENANTS

Until termination of this Agreement and payment and performance in full of the Obligations, Borrower agrees as follows:

Section 10.1    Existence and Good Standing. Borrower and its Subsidiaries each shall maintain its existence and its qualification and good standing in all jurisdictions in which the failure to maintain such qualification or good standing could reasonably be expected to have a Material Adverse Effect.

Section 10.2    Compliance with Laws. Borrower and its Subsidiaries each shall comply in all material respects with all Applicable Law. Without limiting the foregoing, Borrower and each of its Subsidiaries will timely file all tax returns, timely pay all taxes due and payable by Borrower or its Subsidiaries (except such taxes as may be contested in good faith by appropriate proceedings; provided, that adequate reserves shall be maintained as are appropriate according to GAAP and no Lien (other than a Permitted Lien) results from any non-payment) make all required withholding and other tax deposits, and establish adequate reserves for payment of all such items.

Section 10.3    Books and Records. Borrower shall maintain at all times correct and complete books and records in which complete, correct and timely entries are made of its transactions in accordance with GAAP applied consistently with the audited financial statements required to be delivered pursuant to Section 10.4.

Section 10.4    Financial Reporting. Borrower shall promptly furnish to Lender all such financial information with respect to Borrower and its Subsidiaries as Lender may reasonably request. Without limiting the foregoing, Borrower will furnish to Lender the following:

(a)    As soon as available, but in any event not later than 120 days after the end of each Fiscal Year, audited consolidated and consolidating balance sheets, and statements of income and expense, cash flow and stockholders' equity for Parent and its Subsidiaries for such Fiscal Year, and the accompanying notes thereto, prepared in accordance with GAAP, in reasonable detail and fairly presenting the financial position and results of operations of Borrower and its consolidated Subsidiaries as of the date thereof and for the Fiscal Year then ended. Such statements shall be examined in accordance with generally accepted auditing standards by independent certified public accountants selected by Borrower and reasonably satisfactory to Lender, whose report thereon shall accompany such financial statements and not be qualified in any respect. Borrower hereby authorizes Lender to communicate directly with its certified public accountants and, by this provision, authorizes such accountants to disclose to Lender any and all financial statements and other supporting financial documents and schedules relating to Borrower and to discuss directly with Lender the finances and affairs of Borrower. At Lender's request, Borrower will deliver to such accountants and Lender a consent to such authorization, signed by an authorized officer of Parent.

(b)    As soon as available, but in any event not later than 30 days after the end of each Fiscal Month, consolidated and consolidating unaudited balance sheets of Borrower and its consolidated Subsidiaries as of the end of such Fiscal Month, and consolidated and consolidating unaudited statements of income and expense and cash flow for Borrower and its consolidated

Subsidiaries for such Fiscal Month and for the period from the beginning of the Fiscal Year to the end of such Fiscal Month, all in reasonable detail, fairly presenting the financial position and results of operations of Borrower and its consolidated Subsidiaries as of the date thereof and for such Fiscal Months, and prepared in accordance with GAAP applied consistently with the audited financial statements required by <u>Section 10.4(a)</u>. Borrower shall certify by a certificate signed by a Responsible Officer that all such statements have been prepared in accordance with GAAP and present fairly, subject to normal year-end adjustments, Borrower's financial position as of the dates thereof and its results of operations for the Fiscal Months then ended.

(c)    No sooner than 120 days and not less than 30 days prior to the beginning of each Fiscal Year, annual forecasts (to include forecasted consolidated and consolidating balance sheets, statements of income and expenses and statements of cash flow) for Borrower and its Subsidiaries as of the end of and for each Fiscal Month of such Fiscal Year.

(d)    As soon as available, but in any event not later than 15 days after Borrower's receipt thereof, a copy of all management reports and management letters prepared for Borrower by any independent certified public accountants of Borrower.

(e)    Promptly after filing, a copy of each tax return filed by Borrower and each Guarantor.

(f)    Within 30 days after the Agreement date, Borrower will deliver to Lender a copy of Borrower's and Parent's financial statements for the Fiscal Year ending December 31, 2007, accompanied by an unqualified opinion of independent certified public accountants acceptable to Lender.

(g)    Promptly after the filing or receipt thereof, copies of all reports, including annual reports, and notices which Borrower or any Subsidiary files with or receives from the PBGC or the U.S. Department of Labor under ERISA; and as soon as possible and in any event within five (5) days after Borrower or any Subsidiary knows or has reason to know that any Reportable Event or Prohibited Transaction has occurred with respect to any Plan or that the PBGC or Borrower or any Subsidiary has instituted or will institute proceedings under Title IV of ERISA to terminate any Plan, a certificate of the chief financial officer of Borrower setting forth the details as to such Reportable Event or Prohibited Transaction or Plan termination and the action that Borrower proposes to take with respect thereto.

(h)    Such additional information as Lender may from time to time reasonably request regarding the financial and business affairs of Borrower or any of its Subsidiaries.

Section 10.5    <u>Collateral Reporting</u>. Borrower shall timely provide the following to Lender:

(a)    At least once during each calendar week, at the time of each request for a Revolving Loan and at any other time requested by Lender, a Borrowing Base Certificate including (i) a detailed calculation of the Borrowing Base; (ii) a certification of Eligible Accounts and Eligible Inventory, and (ii) all supporting documents and information (including, without limitation, sales journals, credit memos, cash receipts journals, reconciliation of changes from the most recent certificate delivered to Lender);

(b)    Monthly, not later than the 20th day of each Fiscal Month:

(i)    a schedule of Accounts and a schedule of payments on Accounts, as of the last day of the preceding Fiscal Month;

Exhibit "2" - 70

(ii)      a reconciliation to the Borrowing Base as calculated in the most recent Borrowing Base Certificate delivered to Lender, in form prescribed by Lender;

(iii)     an aging of Borrower's Accounts as of the last day of the preceding Fiscal Month, showing (A)(i) Accounts aged 30 days or less from date of invoice, (ii) Accounts aged over 30 days, but less than 61 days, from date of invoice, (iii) Accounts aged over 60 days, but less than 91 days, from date of invoice, (iv) Accounts aged over 90 days, but less than 120 days, from date of invoice, and (v) Accounts aged 120 days or more from date of invoice and (B) a reconciliation to the previous calendar month's aging of Borrower's Accounts and to Borrower's general ledger;

(iv)     an aging of Borrower's accounts payable as of the last day of the preceding Fiscal Month;

(v)      Inventory reports as of the last day of the preceding Fiscal Month, by category and location, with detail showing additions to and deletions from Inventory, together with a reconciliation to the general ledger, and showing Inventory that has been reported to Lender as Qualified In-Transit Inventory together with such information in respect thereof as may be requested by Lender;

(vi)     upon request, copies of invoices in connection with Borrower's Accounts, customer statements, credit memos, remittance advices and reports, deposit slips, shipping and delivery documents in connection with Borrower's Accounts and for Inventory and Equipment acquired by Borrower, purchase orders and invoices; and

(vii)    at Lender's request, copies of invoices and supporting delivery or service records, copies of credit memos or other advices of credit or reductions against amounts previously billed, shipping and delivery documents, purchase orders and such other copies or reports in respect of any Collateral as Lender may request from time to time.

(c)      Semi-annually, not later than the 20th day of each January and July, and at such other times as may be requested by Lender, a listing of the name and complete address of each Account Debtor and such other information in connection therewith as Lender may request.

Each Borrowing Base Certificate, schedule, reconciliation, aging, copy or report delivered to Lender shall bear a signed statement by a Responsible Officer of Borrower certifying the accuracy and completeness of all information included therein.  The execution and delivery of a Borrowing Base Certificate shall in each instance constitute a representation and warranty by Borrower to Lender that no Account included therein is excluded from inclusion in the Borrowing Base by clauses (a) through (p) of the definition of "Eligible Accounts" and that no Inventory included therein is excluded from inclusion in the Borrowing Base by clauses (a) through (i) of the definition of "Eligible Inventory."  In the event any request for a Revolving Loan, or a Borrowing Base Certificate or other information required by this Section 10.5 is delivered to Lender by Borrower electronically or otherwise without signature, such request, or such Borrowing Base Certificate or other information shall, upon such delivery, be deemed to be signed and certified on behalf of Borrower by a Responsible Officer and constitute a representation to Lender as to the authenticity thereof.  Lender shall have the right to review and adjust any such calculation of the Borrowing Base to reflect exclusions from Eligible Accounts or Eligible Inventory, reserves pursuant to Section 2.1, declines in value of Collateral or such other matters as are necessary to determine the Borrowing Base.  Lender shall have the continuing right to establish and adjust reserves in determining or re-determining the Borrowing Base, pursuant to Section 2.1.

Section 10.6    <u>Compliance Certificate</u>. With each of the financial statements delivered pursuant to <u>Section 10.4(a)</u> and <u>Section 10.4(b)</u>, respectively, Borrower shall deliver to Lender a certificate signed by a Responsible Officer (i) setting forth in detail the calculations required to establish that Borrower was in compliance with the covenants set forth in <u>Section 11.16</u> during the period covered in such financial statements and as of the end thereof and (ii) stating that, except as explained in detail in such certificate (A) all of the representations and warranties of Borrower contained in this Agreement and the other Loan Documents are correct and complete in all material respects as at the date of such certificate as if made at such time, except for those that are solely effective as of a particular date, (B) on the date of such certificate, Borrower is in compliance in all material respects with all of its respective covenants and agreements in this Agreement and the other Loan Documents, (C) no Default or Event of Default then exists or existed during the period covered by such financial statements and (E) Borrower does not reasonably expect that any Default or Event of Default will occur. If such certificate discloses that a representation or warranty is not correct or complete, or that a covenant has not been complied with, or that a Default or Event of Default existed or exists or reasonably expected to occur, such certificate shall set forth what action Borrower has taken or proposes to take with respect thereto.

Section 10.7    <u>Notification to Lender</u>. Borrower shall notify Lender in writing immediately (a) after becoming aware of any Default or Event of Default, or if Borrower reasonably expects that any Default or Event of Default will occur, (b) after becoming aware of any event or circumstance, including without limitation any pending or threatened action, suit or claim by any Person, any pending or threatened investigation by a Governmental Authority or any violation of any Applicable Law, that would be treated as a contingent liability of Borrower under GAAP and is in an amount in excess of $100,000 or which could have or cause a Material Adverse Effect and (c) immediately if its board of directors or other governing board or committee authorizes the filing by Borrower of a petition in bankruptcy. Each notice given shall describe the subject matter thereof in reasonable detail and specify the action that Borrower or any of its Subsidiaries, as applicable, has taken or proposes to take with respect thereto.

Section 10.8    <u>Accounts</u>. If Borrower becomes aware of any matter adversely affecting the collectibility of any Account involving an amount greater than $75,000, including information regarding the Account Debtor's creditworthiness, Borrower will promptly so advise Lender. Borrower will promptly notify Lender of all disputes and claims in excess of $75,000 with respect to any Account Debtor. No discount, credit or allowance which is not consistent with Borrower's historical practices as disclosed to Lender in writing prior to the Agreement Date shall be granted to any such Account Debtor without Lender's prior written consent. Borrower shall deliver to Lender a copy of each credit memorandum in excess of $75,000, as soon as issued.

Section 10.9    <u>Inventory</u>.

(a)    All Inventory shall be held for sale in the ordinary course of Borrower's business, and is and will be fit for such purpose. Borrower will keep the Inventory in good and marketable condition, at its own expense. Borrower will not acquire or accept any Inventory on consignment or approval. Borrower will not sell any Inventory on a bill-and-hold, guaranteed sale, sale and return, sale on approval, consignment or other repurchase or return basis. Borrower will not sell any Inventory on a guaranteed sale basis except for sales guaranteed by Borrower in an aggregate amount not to exceed $250,000 at any time.

(b)    Borrower will maintain a perpetual inventory system at all times. Borrower will continue its current policy and procedure to conduct cycle counts of the Inventory such that all Inventory is counted at least once per Fiscal Year, and at Lender's request Borrower shall supply Lender with a copy of such count.

(c)    Borrower shall promptly report to Lender in writing any Inventory returned by an Account Debtor involving an amount in excess of $75,000. All such returned Inventory shall be segregated from all other Inventory, and shall not be reportable as Eligible Inventory unless and until Borrower demonstrates to Lender's satisfaction that such returned Inventory is in saleable condition and meets all criteria for Eligible Inventory. Unless otherwise agreed by Lender, the amount of Borrower's Accounts relating to such returned Inventory shall be deemed excluded from Eligible Accounts. Borrower shall not issue any credits or allowances with respect to such returned Inventory without Lender's prior written consent. All returned Inventory shall be subject to Lender's Liens.

(d)    All Inventory included on a Borrowing Base Certificate and reported to Lender as Qualified In-Transit Inventory shall comply at all times with all requirements listed in clauses (a) through (k) of the definition of "Qualified In-Transit Inventory." Promptly after delivery to Borrower by the carrier and in any event, within 20 days thereafter (subject to delay caused by strike, natural disaster, war or riot), in-transit Inventory will be transferred to a location identified in Schedule 9.11 or an Approved Location.

Section 10.10    Equipment. All Equipment will be used or held for use in the ordinary course of Borrower's business and shall be maintained in good operating condition and repair, ordinary wear and tear excepted. Current maintenance records will be maintained on all Equipment in accordance with Borrower's historical practices in effect on the Agreement Date and made available to Lender upon request. Borrower will not alter or remove any identifying symbol or number on any Equipment or allow any Equipment to become a fixture to real property without Lender's prior written consent.

Section 10.11    Insurance. Borrower shall keep and maintain adequate insurance with respect to its business and all Collateral, written by insurers acceptable to Lender. Such insurance shall be with respect to loss, damages, and liability of amounts acceptable to Lender and shall include, at a minimum, business interruption, workers compensation, general premises liability, fire, theft, casualty and all risk. Borrower will make timely payment of all premiums required to maintain such insurance in force. Borrower shall cause Lender to be an additional insured and loss payee under all policies of insurance covering any of the Collateral, to the extent of Lender's interest, in form satisfactory to Lender. All insurance proceeds paid to Lender shall be applied in reduction of the Obligations unless otherwise agreed by Lender. Borrower shall deliver copies of each insurance policy to Lender upon request.

Section 10.12    Minimum Availability. Borrower will maintain minimum Availability, after giving effect to Revolving Loans, the refinancing of indebtedness for money borrowed as provided by Section 11.3, the payment of all fees, taxes and Lender Expenses payable by Borrower under this Agreement, in an amount equal to or greater than $500,000;

Section 10.13    ERISA. Borrower will comply, and will cause each Subsidiary to comply, with all minimum funding requirements, and all other material requirements, of ERISA, if applicable, so as not to give rise to any liability thereunder.

Section 10.14    Control Agreements. On or before the date that is 120 days after the Agreement Date, Borrower will cause the certain Deposit Account Control Agreement dated as of September 5, 2008 among Borrower, Lender and Bank of America, N.A., to be (a) amended to include a representation by the depository bank, in form and substance satisfactory to Lender, stating that it has not received any notice regarding, and has not entered into any agreement with respect to, any security interest in or other claim on the Deposit Accounts and related Collateral covered thereby, or (b) replaced with a new Control Agreement with a depository bank acceptable to Lender, containing the representation described in clause (a) preceding and otherwise in form and substance satisfactory to Lender.

Section 10.15    Further Assurances. Borrower shall execute and deliver, or cause to be executed and delivered, to Lender such documents and agreements, and shall take or cause to be taken such actions, as Lender may, from time to time, reasonably request to carry out the terms and conditions of this Agreement and the other Loan Documents.

ARTICLE XI
NEGATIVE COVENANTS

Section 11.1    Fundamental Changes. Neither Borrower nor any of its Subsidiaries shall enter into any transaction of merger, reorganization or consolidation, wind-up, liquidate or dissolve. Borrower will not change its name, jurisdiction of organization, organizational type or location of its chief executive office unless it gives the Lender at least thirty (30) days prior written notice thereof and executes all documents that Lender reasonably requests in connection therewith.

Section 11.2    Collateral Locations. Except for Inventory in transit to Borrower in the ordinary course of business, Borrower will not maintain any Collateral at any location other than those locations listed on Schedule 9.11 or an Approved Location.

Section 11.3    Use of Proceeds. Borrower will not use any proceeds of any Loan, directly or indirectly, for any purpose other than (a) on the Agreement Date, to pay transactional fees, costs and expenses incurred in connection with the Loan Documents, (b) on the Agreement Date, to refinance or pay off indebtedness for money borrowed incurred prior to the Agreement Date and (c) on the Agreement Date and thereafter, for working capital in the ordinary course of Borrower's business. Borrower will not use any proceeds of any Loan, directly or indirectly, to purchase or carry margin stock, repay or otherwise refinance indebtedness incurred to purchase or carry Margin Stock or to extend credit for the purpose of purchasing or carrying any Margin Stock.

Section 11.4    Business. Borrower and its Subsidiaries will not engage, directly or indirectly, in any line of business other than the businesses in which Borrower and its Subsidiaries, respectively, are engaged on the Agreement Date.

Section 11.5    Debt. Neither Borrower nor any of its Subsidiaries shall incur or maintain any Debt, other than (a) the Obligations, (b) trade payables and contractual obligations to suppliers and customers arising in the ordinary course of business, (c) Debt described on Schedule 9.21, and (d) Debt incurred to finance the acquisition or lease of Equipment in the ordinary course of Borrower's business, provided, that (i) the principal amount of such Debt does not exceed the purchase or lease price for such Equipment, (ii) no Default or Event of Default exists as of the time of such incurrence or after giving effect thereto and (iii) the aggregate principal amount of such Debt incurred during any calendar year does not exceed $50,000.

Section 11.6    Guaranties. Neither Borrower nor any of its Subsidiaries shall make, issue or be or become liable on any Guaranty, except in favor of Lender.

Section 11.7    Liens. Neither Borrower nor any of its Subsidiaries shall create, incur, assume, or permit to exist any Lien on any property now owned or hereafter acquired by any of them, except Permitted Liens. Borrower will not enter into or become subject to any agreement whereby Borrower is prohibited from, or would otherwise be in default as a result of, creating, assuming, incurring, or suffering to exist, directly or indirectly, any Lien on any of its assets in favor of Lender.

Section 11.8    Disposition of Property. Neither Borrower nor any of its Subsidiaries will transfer, sell, assign, lease or otherwise dispose of any of its property, or agree to do any of the foregoing, except the (a) use of money or cash equivalents, not constituting proceeds of Collateral, in the ordinary

course of business and in a manner that is not prohibited by this Agreement, (b) sale of Inventory in the ordinary course of business and (c) sale or other disposition of Equipment in the ordinary course of business that is obsolete or no longer useable by Borrower in its business, provided, that (i) if such sale or disposition is made without replacement of such Equipment, or such Equipment is replaced by Equipment leased by Borrower, then Borrower shall deliver to Lender all net proceeds of any such sale or disposition for application to the Obligations or (ii) if such sale or disposition is made in connection with the purchase by Borrower of replacement Equipment, then Borrower shall use the proceeds of such sale or disposition to purchase such replacement Equipment and shall deliver to Lender written evidence of the use of such proceeds for such purchase.

Section 11.9    Sale and Leaseback.  Neither Borrower nor any of its Subsidiaries shall directly or indirectly enter into any arrangement with any Person providing for Borrower or such Subsidiary to lease or rent property that Borrower or such Subsidiary has sold or will sell or otherwise transfer to such Person.

Section 11.10    In-Transit Inventory.  Borrower will not allow any customs broker or other Person to possess or process Documents covering Inventory included or proposed as Qualified In-Transit Inventory other than a Person with respect to whom all requirements of clauses (e)(i) (e)(ii) and (e)(iii) of the definition of "Qualified In-Transit Inventory" have been satisfied.

Section 11.11    Distributions.  Neither Borrower nor any of its Subsidiaries shall directly or indirectly declare or make, or incur any liability to make, any Distribution, except (a) Distributions to Borrower by its Subsidiaries and (b) Distributions to Parent (which may be disbursed by Borrower directly to Parent or, at Parent's discretion, directly to a Person who owns Equity Interests of Parent), provided, that (i) no Default or Event of Default exists or would result from the making of such Distribution, (ii) Borrower's Net Income calculated for the previous Fiscal Year most recently ended is greater than $0, (iii) Borrower's Net Income calculated for the twelve completed Fiscal Months preceding the date of payment of such Distribution is greater than $0, (iv) Borrower's EBITDA calculated for the previous Fiscal Year most recently ended is greater than $4,000,000, and (v) after giving effect to such Distribution, the principal amount of all Distributions made pursuant to clause (b) preceding during any Fiscal Year of Borrower does not exceed $1,400,000.

Section 11.12    Restricted Investments.  Neither Borrower nor any of its Subsidiaries shall make any Restricted Investment.

Section 11.13    Compensation.  Borrower will not pay to any Person who is an officer of Borrower or Parent compensation (directly or indirectly, in whatever form or forms, and including, without limitation, salary, loans, bonus and, if such Person is also a director of Borrower or Parent, compensation in such capacity) in an amount that exceeds 107% of aggregate such compensation payable to such Person for the preceding Fiscal Year (specifically excluding any bonus paid to such Person in accordance with Borrower's compensation policy approved by Lender).  Borrower will not pay to any other Person who is a director of Borrower or Parent compensation, in such capacity, in excess of $20,000 per Fiscal Year.

Section 11.14    Transactions with Affiliates.  Borrower will not engage in any transaction with any Affiliate other than (a) distributions made as allowed by Section 11.11 and (b) transactions in the ordinary course of business and in amounts and upon terms no less favorable to Borrower than would be obtained in a comparable arm's-length transaction with a Person who is not an Affiliate.

Section 11.15    New Subsidiaries.  Borrower shall not organize, create or acquire any Subsidiary.

Section 11.16    Financial Covenants.

(a)    EBITDA for Borrower, determined as of the last day of any Fiscal Month, shall not be less than the amount specified below, in each case determined as of such date for the calculation period indicated:

| Calculation Period | Period Ending | Minimum EBITDA |
|---|---|---|
| 7 Fiscal Months | July 31, 2008 | $ 250,000 |
| 8 Fiscal Months | August 31, 2008 | $ 250,000 |
| 9 Fiscal Months | September 30, 2008 | $ 1,000,000 |
| 10 Fiscal Months | October 31, 2008 | $ 1,250,000 |
| 11 Fiscal Months | November 30, 2008 | $ 1,250,000 |
| 12 Fiscal Months | December 31, 2008 | $ 1,250,000 |
| 12 Fiscal Months | Jan-09 | $ 1,500,000 |
| 12 Fiscal Months | Feb-09 | $ 1,500,000 |
| 12 Fiscal Months | Mar-09 | $ 1,500,000 |
| 12 Fiscal Months | Apr-09 | $ 1,650,000 |
| 12 Fiscal Months | May-09 | $ 1,650,000 |
| 12 Fiscal Months | Jun-09 | $ 2,000,000 |
| 12 Fiscal Months | Jul-09 | $ 2,000,000 |
| 12 Fiscal Months | Aug-09 | $ 3,000,000 |
| 12 Fiscal Months | Sep-09 | $ 3,000,000 |
| 12 Fiscal Months | Oct-09 | $ 3,000,000 |
| 12 Fiscal Months | Nov-09 | $ 3,000,000 |
| 12 Fiscal Months | Dec-09 | $ 4,000,000 |
| 12 Fiscal Months | Thereafter | $ 4,000,000 |

(b)    The ratio of (i) Total Debt to (ii) Tangible Net Worth, determined for Borrower as of the last day of any Fiscal Month, shall not be greater than the amount specified below for such date:

| | |
|---|---|
| July 2008 | 2.25 |
| August 2008 | 2.25 |
| September 2008 | 2.10 |
| October 2008 | 2.10 |
| November 2008 | 2.00 |
| December 2008 | 2.00 |
| January 2009 | 2.00 |
| February 2009 | 2.00 |
| March 2009 | 2.00 |
| April 2009 | 1.75 |
| May 2009 | 1.75 |
| June 2009 | 1.50 |

LOAN AND SECURITY AGREEMENT – Page 39
73306.000005 EMF_US 25977875v11

Exhibit "2" - 76

| | |
|---|---|
| July 2009 | 1.50 |
| August 2009 | 1.50 |
| September 2009 | 1.50 |
| October 2009 | 1.50 |
| November 2009 | 1.50 |
| December 2009 | 1.50 |
| Thereafter | 1.50 |

(c)    Tangible Net Worth, determined for Borrower as of the last day of any Fiscal Month of Borrower, shall not be less than the amount specified below for such date:

| | | |
|---|---|---|
| July 2008 | $ | 8,750,000 |
| August 2008 | $ | 8,750,000 |
| September 2008 | $ | 9,000,000 |
| October 2008 | $ | 9,000,000 |
| November 2008 | $ | 9,000,000 |
| December 2008 | $ | 9,000,000 |
| January 2009 | $ | 9,500,000 |
| February 2009 | $ | 9,500,000 |
| March 2009 | $ | 9,750,000 |
| April 2009 | $ | 9,750,000 |
| May 2009 | $ | 9,750,000 |
| June 2009 | $ | 10,500,000 |
| July 2009 | $ | 10,500,000 |
| August 2009 | $ | 10,500,000 |
| September 2009 | $ | 10,750,000 |
| October 2009 | $ | 10,750,000 |
| November 2009 | $ | 10,750,000 |
| December 2009 | $ | 11,750,000 |
| Thereafter | $ | 11,750,000 |

(d)    The Fixed Charge Coverage Ratio, determined for Borrower as of the last day of any Fiscal Month, shall not be less than the amount specified below, in each case calculated as of such date for the calculation period indicated:

| Calculation Period | Period Ending | Minimum Ratio |
|---|---|---|
| 7 Fiscal Months | July 2008 | 1.20 |
| 8 Fiscal Months | Aug-08 | 1.20 |
| 9 Fiscal Months | Sep-08 | 1.50 |
| 10 Fiscal Months | Oct-08 | 1.50 |
| 11 Fiscal Months | Nov-08 | 1.50 |
| 12 Fiscal Months | Dec-08 | 1.50 |
| 12 Fiscal Months | Jan-09 | 1.75 |
| 12 Fiscal Months | Feb-09 | 1.75 |

Exhibit "2" - 77

| 12 Fiscal Months | Mar-09 | 1.75 |
|---|---|---|
| 12 Fiscal Months | Apr-09 | 1.75 |
| 12 Fiscal Months | May-09 | 1.75 |
| 12 Fiscal Months | Jun-09 | 2.00 |
| 12 Fiscal Months | Jul-09 | 2.00 |
| 12 Fiscal Months | Aug-09 | 2.25 |
| 12 Fiscal Months | Sep-09 | 2.25 |
| 12 Fiscal Months | Oct-09 | 2.25 |
| 12 Fiscal Months | Nov-09 | 2.25 |
| 12 Fiscal Months | Dec-09 | 2.50 |
| 12 Fiscal Months | Thereafter | 2.50 |

(e)    Capital Expenditures for Borrower during any Fiscal Year shall not exceed $850,000.

(f)    Net Income, determined for Borrower as of the last day of each Fiscal Month on and after January 31, 2009, calculated for the preceding twelve Fiscal Months, shall be greater than $0.

Section 11.17    Fiscal Year.    Borrower will not change its Fiscal Year used for financial reporting.

ARTICLE XII
EVENT OF DEFAULT

Section 12.1    Event of Default.    Each of the following shall constitute an Event of Default under this Agreement:

(a)    any failure by Borrower to timely pay any of the Obligations when due;

(b)    any representation or warranty made or deemed made by Borrower in this Agreement or by Borrower or any of its Subsidiaries in any Loan Documents, any financial statement, or any information furnished by Borrower to Lender shall be untrue in any material respect as of the date on which made, deemed made or furnished;

(c)    any noncompliance or breach of any requirements contained in:

(i)    Sections 10.1 through 10.4, Sections 10.5 through 10.7, Sections 10.10 through 10.11, Section 11.1, or Sections 11.3 through 11.16;

(ii)    Section 10.12 and any such failure continues for a period of three Business Days;

(iii)    Sections 10.8, Section 10.9, Section 10.13 or Section 11.2, and any such failure continues for a period of five Business Days; or

(iv)    any provision of the Loan Documents other than those listed in clauses (i) and (ii) preceding of this Section 12.1(c), and such failure continues for a period of ten days after the earlier of Borrower's actual knowledge thereof or written or verbal notice thereof by Lender to Borrower;

(d)     Borrower or any of its Subsidiaries shall (i) file a voluntary petition in bankruptcy or otherwise commence any action or proceeding seeking reorganization, arrangement or readjustment of its debts, or consent to or acquiesce in any such petition, action or proceeding; (ii) apply for or acquiesce in the appointment of a receiver, assignee, liquidator, custodian, trustee or similar officer for it or for all or any part of its property; (iii) make an assignment for the benefit of creditors; or (iv) be unable generally to pay its debts as they become due;

(e)     an involuntary petition shall be filed or an action or proceeding otherwise commenced seeking relief under the Bankruptcy Code or seeking any reorganization, arrangement, consolidation or readjustment of the debts of Borrower or any of its Subsidiaries under any other bankruptcy or insolvency law;

(f)     a receiver, assignee, liquidator, custodian, trustee or similar officer shall be appointed for Borrower or any of its Subsidiaries or for all or any part of its property or a warrant of attachment, execution or similar process shall be issued against any part of the property of Borrower or any of its Subsidiaries;

(g)     Borrower or any of its Subsidiaries shall file a certificate of dissolution or shall be liquidated, dissolved or wound-up or shall commence or have commenced against it any action or proceeding for dissolution, winding-up or liquidation, or shall take any action in furtherance thereof;

(h)     Default shall occur with respect to any Debt for borrowed money (other than the Obligations) and such default shall continue for more than the period of grace, if any, therein with respect thereto, if the effect thereof (with or without the giving of notice or further lapse of time or both) is to accelerate, or to permit the holder of any such Debt to accelerate, the maturity of any such Debt, or any such Debt shall be declared due and payable or be required to be prepaid (other than by a regularly scheduled required prepayment) prior to the stated maturity thereof;

(i)     one or more judgments, orders, decrees or arbitration awards is entered against Borrower involving in the aggregate liability (to the extent not covered by independent third-party insurance as to which the insurer does not dispute coverage) of $250,000 or more;

(j)     the filing or commencement of any attachment, sequestration, garnishment, execution or other Lien or action against or with respect to any Collateral;

(k)     any Loan Document ceases to be in full force and effect or any Lien with respect to any material portion of the Collateral intended to be secured thereby ceases to be, or is not, valid, perfected (for any reason other than the failure of Lender to file a financing statement or continuation thereof to maintain perfection) and prior to all other Liens (other than Permitted Liens) or is terminated, revoked or declared void, or any Loan Document shall terminate (other than in accordance with its terms with the written consent of Lender) or become void or unenforceable, or the validity or enforceability of any Loan Document shall be contested by Borrower or any Guarantor or any Affiliate of Borrower or any Guarantor;

(l)     Lender at any time believes, in accordance with the standards prescribed by the UCC, that the prospect for payment or performance of the Obligations is impaired;

(m)     the occurrence of any event or circumstance which Lender believes in its discretion has resulted or may result in a Material Adverse Effect;

(n)    a Change of Control or a Change in Management occurs; or

(o)    any of the following events shall occur or exist with respect to Borrower or any ERISA Affiliate: (i) any Prohibited Transaction involving any Plan; (ii) any Reportable Event with respect to any Plan; (iii) the filing under Section 4041 of ERISA of a notice of intent to terminate any Plan or the termination of any Plan; (iv) any event or circumstance that might constitute grounds entitling the PBGC to institute proceedings under Section 4042 of ERISA for the termination of, or for the appointment of a trustee to administer, any Plan, or the institution by the PBGC of any such proceedings; or (v) complete or partial withdrawal under Section 4201 or 4204 of ERISA from a Multiemployer Plan or the reorganization, insolvency, or termination of any Multiemployer Plan; and, in each case above, such event or condition, together with all other events or conditions, if any, have subjected or could in the reasonable opinion of the Lender subject Borrower to any tax, penalty, or other liability to a Plan, a Multiemployer Plan, the PBGC, or otherwise (or any combination thereof) which in the aggregate exceed or could reasonably be expected to exceed $250,000.

## ARTICLE XIII
## REMEDIES

Section 13.1    Obligations.

(a)    Upon the occurrence of any Event of Default described in Sections 12.1(d), 12.1(e), 12.1(f) or 12.1(g), this Agreement shall automatically and immediately terminate and all Obligations shall automatically become immediately due and payable without notice or demand of any kind.

(b)    If a Default or an Event of Default exists, Lender may do any one or more of the following at any time or times and in any order, without notice to or demand on Borrower: (i) reduce the Revolving Credit Limit, or the advance rates used in computing the Borrowing Base, and (ii) restrict the amount of or refuse to make Loans.

(c)    If an Event of Default exists, Lender may do any one or more of the following, in addition to the actions described in the preceding sentence, at any time or times and in any order, without notice to or demand on Borrower: (i) terminate the Agreement, (ii) declare any or all Obligations to be immediately due and payable and (iii) pursue its other rights and remedies under the Loan Documents or otherwise under applicable law.

Section 13.2    Collateral. If an Event of Default has occurred and is continuing, Lender shall have, in addition to all other rights of Lender, the rights and remedies of a secured party under the UCC. Without limiting Section 7.7(b), at any time when an Event of Default is in existence: (i) Lender may notify Account Debtors to make payment directly to Lender, or to such address as Lender may specify, and enforce, settle or adjust Accounts, General Intangibles or Chattel Paper with Account Debtors or obligors thereon for amounts and upon terms which Lender considers appropriate, and in such case, Lender will credit the Obligations with only the net amounts received by Lender in payment thereof after deducting all Lender Expenses incurred or expended in connection therewith; (ii) Lender may take possession of the Collateral and keep it on Borrower's premises or remove all or any part of it to another location selected by Lender; (iii) on request by Lender, Borrower will, at Borrower's cost, assemble the Collateral and make it available to Lender at a place reasonably convenient to Lender; and (iv) Lender may sell or otherwise dispose of any Collateral at public or private sales, for cash, upon credit or otherwise, at such prices and upon such terms as Lender deems appropriate. Lender is irrevocably authorized and empowered to endorse and negotiate Documents, in Borrower's name and on Borrower's behalf, in connection with any disposition described in clause (iv) preceding. Unless the Collateral is

perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Borrower reasonable notice of the time and place of any public sale thereof or of the time after which any private sale or any other intended disposition thereof is to be made. For this purpose, it is agreed that at least five (5) days notice of the time of sale or other intended disposition of the Collateral delivered in accordance with Section 15.6 shall be deemed to be reasonable notice in conformity with the UCC. Lender may adjourn or otherwise reschedule any public sale by announcement at the time and place specified in the notice of such public sale, and such sale may be made at the time and place as so announced without necessity of further notice. Lender shall not be obligated to sell or dispose of any Collateral, notwithstanding any prior notice of intended disposition. If any Collateral is sold on terms other than payment in full at the time of sale, no credit shall be given in reduction of the Obligations until Lender receives payment in cash, and if any such buyer defaults in payment, Lender may resell the Collateral without further notice to Borrower. In the event Lender seeks to take possession of all or any portion of the Collateral by judicial process, Borrower waives the posting of any bond, surety or security with respect thereto which might otherwise be required. Borrower agrees that Lender has no obligation to preserve rights to the Collateral or marshal any Collateral for the benefit of any Person. Lender is hereby granted a license or other right to use, without charge, Borrower's labels, patents, copyrights, name, trade secrets, trade names, trademarks in completing production of, advertising or selling any Collateral, and Borrower's rights under all licenses shall inure to Lender's benefit for such purpose. The proceeds of any sale or disposition of Collateral shall be applied first to all expenses of sale, including reasonable attorneys' fees, and then to the Obligations. Borrower shall remain liable for any deficiency.

Section 13.3    Injunctive Relief. All cash proceeds of Collateral from time to time existing, including without limitation collections and payments of Accounts, whether consisting of cash, checks or other similar items, at all times shall be subject to an express trust for the benefit of Lender. All such proceeds shall be subject to Lender's Liens. Except as may be specifically allowed otherwise by this Agreement, Borrower is expressly prohibited from using, spending, retaining or otherwise exercising any dominion over such proceeds. Borrower acknowledges and agrees that an action for damages against Borrower for any breach of such prohibitions shall not be an adequate remedy at law. In the event of any such breach, Borrower agrees to the fullest extent allowed by law that Lender shall be entitled to injunctive relief to restrain such breach and require compliance with the requirements of this Agreement.

Section 13.4    Setoff. Borrower irrevocably authorizes Lender to charge any account of Borrower maintained with Lender with such amount as may be necessary from time to time to pay any Obligations when due. Borrower agrees that Lender shall have a contractual right to setoff any and all deposits or other sums at any time credited by or due from Lender to Borrower against any part of the Obligations.

ARTICLE XIV
TERM AND TERMINATION

Section 14.1    Term and Termination. Lender may terminate this Agreement without notice at any time on or after the continuation of an Event of Default. Upon the effective date of termination of this Agreement for any reason, Lender's obligation to make Loans shall automatically terminate and all Obligations shall become immediately due and payable in full. Notwithstanding the termination of this Agreement, until all Obligations are paid in cash and performed in full, Borrower shall remain bound by the terms of this Agreement and Lender shall retain all rights and remedies under the Loan Documents. Within 20 days after Lender receives a request by written notice from Borrower sent after all Obligations have been paid in full and this Agreement and all commitments of Lender to make Loans, cause Letters of Credit to be issued or otherwise extend credit or give value have been terminated, Lender shall, at Borrower's expense, send Borrower a termination statement, or file a termination statement in the appropriate filing office, for each financing statement filed pursuant to this Agreement.

ARTICLE XV
MISCELLANEOUS

Section 15.1    No Waiver.  No failure by Lender to exercise any right, remedy or option under the Loan Documents, or delay by Lender in exercising same, will operate as a waiver thereof.  No waiver by Lender will be effective unless it is in writing, signed by Lender, and then only to the extent specifically stated.  No waiver by Lender on any occasion shall impair Lender's rights thereafter to require strict performance by Borrower of any provision of the Loan Documents.

Section 15.2    Severability.  The illegality or unenforceability of any provision of any Loan Document shall not in any way affect or impair the legality or enforceability of the remaining provisions thereof.

Section 15.3    Governing Law; Venue.

(a)    THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS.

(b)    ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT MAY BE BROUGHT IN THE COURTS OF THE STATE OF TEXAS OR IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF BORROWER AND LENDER CONSENTS TO THE NON-EXCLUSIVE JURISDICTION OF THOSE COURTS.  EACH OF BORROWER AND LENDER IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO VENUE ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY SUCH ACTION OR PROCEEDING IN SUCH JURISDICTION.  NOTWITHSTANDING THE FOREGOING, LENDER SHALL HAVE THE RIGHT TO BRING ANY ACTION OR PROCEEDING AGAINST BORROWER OR ITS PROPERTY IN THE COURTS OF ANY OTHER JURISDICTION LENDER DEEMS NECESSARY OR APPROPRIATE IN ORDER TO EXERCISE REMEDIES WITH RESPECT TO THE COLLATERAL.

Section 15.4    Waiver of Jury Trial.  BORROWER AND LENDER EACH IRREVOCABLY WAIVES ITS RESPECTIVE RIGHT TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY KIND BROUGHT BY EITHER AGAINST THE OTHER, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE.  BORROWER AND LENDER EACH AGREES THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT WITHOUT A JURY.  WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS OR ANY PROVISION HEREOF OR THEREOF.  THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, WHETHER OR NOT SPECIFICALLY SET FORTH THEREIN.

Section 15.5    Fees and Expenses.  Borrower agrees to pay to Lender, on demand, all costs and expenses that Lender pays or incurs in connection with the negotiation, preparation, consummation, administration, enforcement, and termination of this Agreement or any of the other Loan Documents, including: (a) reasonable attorneys fees and costs for preparation, negotiation and closing of the Loan

Exhibit "2" - 82

Documents and any amendment, supplement, waiver, consent or subsequent closing in connection with the Loan Documents and the transactions contemplated thereby, (b) ongoing administration of the Loan Documents, including without limitation, reasonable attorneys fees and costs incurred in consultation with attorneys, (c) costs and expenses of lien and title searches, (d) taxes, fees and other charges for filing financing statements and other actions to perfect, protect and continue Lender's Liens, (e) sums paid or incurred to pay any amount or take any action required of Borrower under the Loan Documents that Borrower fails to pay or take, (f) costs of appraisals, inspections and verifications of the Collateral, including travel, lodging, and meals for inspections of the Collateral and Borrower's operations by Lender, (g) costs and expenses of disbursing Loans and administering cash management of Collateral proceeds, including collection accounts and lock-boxes, (h) costs and expenses of preserving and protecting the Collateral, (i) costs and expenses, including reasonable attorneys fees and costs, paid or incurred to enforce Lender's Liens, sell or dispose of the Collateral, and obtain payment of the Obligations and (j) costs and expenses, including reasonable attorneys fees and costs, paid or incurred to defend any claims made or threatened against Lender arising out of the transactions contemplated by the Loan Documents (all such costs, expenses and fees described in this Section 15.5, the "Lender Expenses").  The foregoing shall not limit any other provisions of the Loan Documents regarding costs and expenses to be paid by Borrower.

Section 15.6    Notices.  Except as otherwise expressly provided in any Loan Document, all notices, demands and requests that any party is required to give to any other party shall be in writing and shall become effective (a) upon personal delivery, (b) five (5) days after it shall have been mailed by United States mail, first class, certified or registered, with postage prepaid, or (c) when properly transmitted by telecopy, in each case addressed to the party to be notified as follows:

If to Lender:

Core Business Credit, LLC
8080 North Central Expressway, Suite 800
Dallas, Texas 75206
Fax No.: (214) 242-5810
Attention:  Portfolio Manager, URGENT

with a complete copy to:

Hunton & Williams LLP
1445 Ross Avenue, Suite 3700
Dallas, Texas 75202
Fax No.: (214) 880-0011
Attention:  Daniel C. Garner, Esq.

If to Borrower:

Westrim, Inc.
7855 Havenhurst Avenue
Van Nuys, California 91406
Fax No.: (818) 901-9677
Attention: Chief Financial Officer

or to such other address as each party may designate for itself by like notice.

Section 15.7    Waiver of Notices.  Unless otherwise expressly provided in any Loan Document, Borrower hereby waives presentment and notice of demand or dishonor and protest, notice of intent to

LOAN AND SECURITY AGREEMENT – Page 46
73306.000005 EMF_US 25977875v11

accelerate the Obligations and notice of acceleration of the Obligations, as well as any and all other notices to which it might otherwise be entitled. No notice to or demand on Borrower which Lender may elect to give shall entitle Borrower to any or further notice or demand in the same, similar or other circumstances.

Section 15.8    Non-applicability of Chapter 15 of Texas Credit Code. Chapter 15 of the Texas Credit Code shall not be applicable to this Agreement or the Loans.

Section 15.9    Binding Effect. This Agreement shall be binding upon and inure to the benefit of Borrower and Lender and their respective representatives, successors, and assigns, provided, that no interest herein may be assigned, and no obligation may be delegated, by Borrower without prior written consent of Lender. The rights and benefits of Lender under the Loan Documents shall inure to any Person acquiring any interest in the Obligations, unless otherwise agreed by Lender and any such Person.

Section 15.10    Indemnity of Lender by Borrower. BORROWER AGREES TO DEFEND, INDEMNIFY AND HOLD EACH INDEMNIFIED PERSON HARMLESS FROM AND AGAINST ANY AND ALL INDEMNIFIED CLAIMS, PROVIDED, THAT BORROWER SHALL HAVE NO OBLIGATION HEREUNDER TO ANY INDEMNIFIED PERSON WITH RESPECT TO INDEMNIFIED LIABILITIES TO THE EXTENT RESULTING FROM THE WILLFUL MISCONDUCT OR GROSS NEGLIGENCE OF SUCH INDEMNIFIED PERSON. THE AGREEMENTS IN THIS SECTION SHALL SURVIVE ANY TERMINATION OF THIS AGREEMENT OR PAYMENT OF ALL OTHER OBLIGATIONS.

Section 15.11    Limitation of Liability. No claim may be made by Borrower against Lender or any of its affiliates, directors, officers, employees or agents for any special, indirect, consequential or punitive damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement or any other Loan Document, or any act, omission or event occurring in connection therewith, and Borrower hereby waives, releases and agrees not to sue upon any claim for such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

Section 15.12    Continuing Rights of Lender in Respect of Obligations. In the event any amount from time to time applied in reduction of the Obligations is subsequently set aside, avoided, declared invalid or recovered by Borrower or any trustee or in bankruptcy, or in the event Lender is otherwise required to refund or repay any such amount pursuant to any applicable law, then the Obligations shall automatically be deemed to be revived and increased to the extent of such amount and the same shall continue to be secured by the Collateral as if such amount had not been so applied.

Section 15.13    Acceptance and Performance. This Agreement shall become effective only upon acceptance by Lender at its offices in Dallas, Dallas County, Texas. The Obligations are payable at Lender's offices in Dallas, Dallas County, Texas.

Section 15.14    Schedules. All Schedules referenced herein and attached hereto are incorporated in this Agreement and made a part hereof for all purposes.

Section 15.15    Counterparts. This Agreement may be executed in any number of counterparts, and signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are physically attached to the same document. A telecopy of any such executed counterpart signature page shall be deemed valid as an original.

Section 15.16    Captions. The captions contained in this Agreement are for convenience of reference only, are without substantive meaning and may not be construed to modify, enlarge or restrict any provision of this Agreement.

THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL
AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE
OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE
PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

Remainder of page blank
Signatures follow

Exhibit "2" - 85

IN WITNESS WHEREOF, the parties have entered into this Agreement as of the Agreement Date.

CORE BUSINESS CREDIT, LLC, as Lender

By: _____

Greg Gentry
Senior Vice President

WESTRIM, INC., as Borrower

By: _____

Fred A. Gysi
Senior Vice President

STATE OF CALIFORNIA            )
                               )  ss.
COUNTY OF LOS ANGELES          )

On _____, 2008 before me, _____, Notary Public, personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

Witness my hand and official seal.

_____
Notary Public

LOAN AND SECURITY AGREEMENT – Page 49
73306.000005 EMF_US 25977875v11

Exhibit "2" - 86

IN WITNESS WHEREOF, the parties have entered into this Agreement as of the Agreement Date.

CORE BUSINESS CREDIT, LLC, as Lender

By:_____
    Greg Gentry
    Senior Vice President

WESTRIM, INC., as Borrower

By:_____
    Fred A. Gysi
    ~~Senior Vice President~~ *Chief Financial Officer*

STATE OF CALIFORNIA          )
                                ) ss.
COUNTY OF LOS ANGELES    )

On *9-3-* , 2008 before me, *Debbie F. Collatos* Notary Public, personally appeared *FRED A. GYSI* , who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he/~~she~~ executed the same in his/~~her~~ authorized capacity, and that by his/~~her~~ signature on the instrument the person, or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

Witness my hand and official seal.

_____
Notary Public



DEBBIE F. COLLATOS
Commission # 1724509
Notary Public - California
Los Angeles County
My Comm. Expires Feb 28, 2011

LOAN AND SECURITY AGREEMENT – Page 49
73306.000005 EMF_US 25977875v11

Exhibit "2" - 87

SCHEDULE 9.1
Fundamental Information


(a) Legal Name:   Westrim, Inc.

(b) Federal tax identification number:   95-4890701

(c) Jurisdiction of organization:   Delaware

(d) Address of executive office:   7855 Hayvenhurst Avenue, Van Nuys, CA 91406

(e) Jurisdictions in which qualification is necessary to own or lease its property and conduct its business:
California, Arkansas, Texas

(f) Relationship to Borrower of Parent and Subsidiaries:

  1) Creativity Crafts Inc. - parent corporation/holding company
    Federal tax identification number: 94-3307521
    Address: 7855 Hayvenhurst Ave., Van Nuys, CA 91406
    Jurisdiction of organization: Delaware
    Jurisdiction where qualification is necessary: California
    Creativity Crafts Inc. owns 100% of Westrim, Inc. consisting of 1,000 shares


  2) Creativity Inc. - wholly-owned subsidiary of Westrim, Inc. for name holding purposes only.
    Federal tax identification number: none
    Address: 7855 Hayvenhurst Ave., Van Nuys, CA 91406
    Jurisdiction of organization: Delaware
    Corporate No.: 4109243
    Jurisdiction where qualification is necessary: none


  3) Westrim Crafts (Hong Kong) Limited - wholly-owned subsidiary of Westrim, Inc.
    Federal tax identification number: none
    Address: Flat 2401-2, Perfect Ind.Bldg., 31 Tai Yau Street; Sanpokong, Kowloon, Hong Kong
    Jurisdiction of organization: Hong Kong
    Company No.: 621147
    Jurisdiction where qualification is necessary: none
    Equity Interests: Westrim, Inc. owns all 100 shares outstanding

(g) True and complete listing of each class of Borrower's and each such Subsidiary's and Affiliate's Equity Interest:

| Company | Shareholder | Ownership Interest in Company |
|---|---|---|
| Westrim, Inc. | Creativity Crafts, Inc. | 100% of outstanding shares |
| Creativity Inc. | Westrim, Inc. | 100% of outstanding shares |
| Westrim Crafts (Hong Kong) Limited | Westrim, Inc. | 100% of outstanding shares |

Exhibit "2" - 88

**SCHEDULE 9.2**

Fictitious Names

1.  Westrim Crafts
2.  Crop-In Style
3.  Blue Moon Beads
4.  Distinct Marketing Designs, Inc.
5.  DMD
6.  Autumn Leaves

SCHEDULE 9.7

Litigation

Threatened Actions

1.      **Seastone LC (Utah) – Westrim's Gift Card Tin Line/Infringement Charges
        U.S. Patents and Trade Dress (Our Docket 48808)**

Westrim, Inc. ("Westrim") received a notice letter dated January 31, 2007 from attorneys
representing Seastone LC (Utah), charging patent and trade dress infringement. Seastone's
demand letter claimed infringement of U.S. Utility Pat. No. 7,163,152 B2 for a "Protective
Container for Readable Cards", granted by the USPTO January 16, 2007.

Seastone's infringement charges were directed at Westrim's line of Gift Tins which Seastone
referred to as copies, knock-offs, etc. and it threatened to pursue legal action unless Westrim
immediately complied. Westrim produces and markets gift card tins under the brand name
TREASURE TINS – which is the subject of a U.S. trademark registration.

Westrim responded through counsel by way of a letter dated February 9, 2007, asking that all
relevant U.S. patents be identified and that Seastone identify all individual features and
combinations of them defining the supposed "trade dress" deemed proprietary.

A further letter from Seastone's attorneys dated March 28, 2007, informed that another patent
was imminent – but Westrim's intellectual property counsel have periodically checked the
USPTO records and not noted any other relevant issued U.S. patent. Since Seastone's attorneys
have not provided specifics, counsel continues to assume that no other relevant patent has yet
been granted.

Seastone's President, Eric Child, sent a cease and desist letter dated January 4, 2008 to the
Westrim's customer, i.e., Michaels Stores, Inc./Texas, identifying the same U.S. patent as
previously asserted against Westrim. On April 22, 2008, counsel for Westrim contacted and
spoke with Seastone's attorney, Angus C. Fox, III, Esq. (Utah) and confronted him with the
above, while requesting clarification and a response. Westrim has not received a response from
Seastone or its attorney.

2.      **Crocs, Inc. and Jibbitz (Colorado) – Westrim's SNAP ITZ Sports Clog and Charms
        Line/Infringement Charges, U.S. Patents and Trade Dress (Our Docket 49220)**

Westrim has marketed charms (i.e., novelty buttons for decorating clothing, footwear, bracelets,
etc.) since approx. March 2007 and sport clogs (footwear) since approx. November 2007, under
the trademark SNAP ITZ. A major account for the SNAP ITZ line is Michaels Stores, Inc./Texas
which operates multiple retail stores in the U.S. and Canada.

Jibbitz, LLC (CO) asserted infringement and unfair competition claims against Westrim by way
of a notice letter dated May 22, 2007 directed at the SNAP ITZ charms. Jibbitz, LLC claimed to
hold rights for trademarks, trade dress and copyrights in a line of hand-made accessories (charms)
sold under JIBBITZ Marks. These intellectual property rights were obliquely referred to as
"distinctive shoe accessory designs".

CRTY\47338\745537.1

In its notice letter, Jibbitz, LLC placed Westrim on notice as to "provisional U.S. patent rights based on a published U.S. Patent Application Publication No. 2007/0006502 (published January 11, 2007)" entitled "System and Method for Securing Accessories to Clothing". A copy of the published utility patent application was provided. Since this dispute commenced, Jibbitz, LLC was acquired by Crocs, Inc. (CO) and they will be collectively referred to herein as "Crocs/Jibbitz".

On June 27, 2007 counsel for Westrim responded to the Crocs/Jibbitz letter of May 22, 2007 asking for specifics as to the asserted published utility patent application and requesting details as to the vaguely asserted copyright, trademark, trade dress and unfair competition claims. Westrim's counsel informed that an investigation was in progress and required the assistance of Crocs/Jibbitz to understand the nature and scope of the existing and potential claims against Westrim's SNAP ITZ products. At that time, only the SNAP ITZ charms were charged with infringement. These has been one further direct communication between the parties regarding this dispute, specifically a letter of July 23, 2007 from Crocs/Jibbitz attorneys which identified a number of U.S. trademark registrations for the JIBBITZ name and logo. It was indicated that Crocs/Jibbitz "takes its intellectual property rights very seriously" and that Westrim should "refrain from infringing" any of those intellectual property rights.

Government Investigations

1.      Westrim, Inc. is undergoing an IRS tax audit for 2006.

CRTY\47338\745537.1

**SCHEDULE 9.11**
**Location of Collateral**

1.  7855 Hayvenhurst Avenue
    Van Nuys, CA  91406
       Owner / Landlord:          AMB Property, L.P.
       Address:                   Pier 1, Bay 1
                                  San Francisco, CA  94111

2.  28470 West Witherspoon Parkway
    Valencia, CA  91355
       Owner / Landlord:          VIF Valencia Gateway, LLC
       Address:                   c/o Sheridan-Ebbert Development Company
                                  13120 Telfair Avenue
                                  Sylmar, CA 91342

SCHEDULE 9.15

Proprietary Rights

1. See list of patents attached hereto as Attachment A.
2. See list of copyrights attached hereto as Attachment B dated as of July 2008
3. See World Wide Trademark Summary (attached) as of July 24, 2008
4. Agreement dated February 25, 2008 with Fashion Cents, LLC for licensing rights for Project Runway
5. Agreement dated February 7, 2008 with Marjorie Sarnat & Associates, Inc. for designs and copyrights associated with paper dolls and related products
6. Agreements dated October 1, 2004 and January 17, 2006 with Rhonna Farrar for designs and copyrights associated with scrapbook related products
7. Agreement dated November 19, 2007 with Heather Bailey for designs and artwork associated with scrapbook related products
8. Agreement dated May 28, 2008 with Sandy Genovese for designs and copyrights associated with paper and scrapbook related products
9. Asset Purchase Agreement dated September 12, 2005 with Paper Craft, Inc. and Jeff Lam for the Autumn Leaves designs, copyrights, and trademarks

Westrim, Inc.

Patents

As of July 16, 2008

| Docket No. | Country | Case Type | Title | Patent No. | Issue Date | Serial No. | Filling Date | Assig/Owner |
|---|---|---|---|---|---|---|---|---|
| 40753 | Canada | Patent (Foreign Design) | PAPER TOTE/ORGANIZER | 99340 | 4/23/2003 | 99340 | 5/7/2002 | Westrim, Inc. |
| 42645 | Canada | Patent (Foreign Design) | TOTE/ORGANIZER FOR STAMPS AND ACCESSORIES | 100558 | 1/15/2004 | 100558 | 9/10/2002 | Westrim, Inc. |
| 40749 | USA | Patent (US) | PAPER TOTE/ORGANIZER | 6,672,439 | 1/6/2004 | 10/167,371 | 6/10/2002 | Westrim, Inc. |
| 40750 | USA | Patent (US Design) | PAPER TOTE/ORGANIZER | D465,651 | 11/19/2002 | 29/159,278 | 4/17/2002 | Westrim, Inc. |
| 42304 | USA | Patent (US Design) | STAMP AND ACCESSORIES | D474,598 | 5/20/2003 | 165,311 | 8/7/2002 | Westrim, Inc. |
| 44831 | USA | Patent (US Design) | LUGGAGE (P3) | D501,601 | 2/8/2005 | 29/195,325 | 12/8/2003 | Curtis Richard Platte III |

**ATTACHMENT A**

## Copyrights (United States)

### Westrim, Inc.

| Title (or Description) of Work | U.S. Certificate of Copyright Registration No. (or Status of Application) | Registration Issuance Date |
|---|---|---|
| BABY KOO (hand puppet, doll, plastic) | VA 69-666 | 12/26/84 |
| CHUBBY CUBBY (hand puppet, bear figure, soft sculpture) | VA 69-668 | 12/26/84 |
| HUGGY BABY (Hand puppet, doll, soft sculpture) | VA 69-667 | 12/26/84 |
| BIRTHDAY BABE™ (with curly hair) (girl doll head) | VA 183-728 | 1/23/85 |
| BIRTHDAY BABE™ (with pacifier) (baby doll head) | VA 183-730 | 1/23/85 |
| IVORINE™ (bead necklace with multiple animal figurine beads) | VA 183-729 | 1/23/85 |
| DECORATED TREE MADE OF BEADS (miniature toy Christmas trees) | VA 76-482 | 5/20/85 |
| TREE MADE OF BEADS (miniature toy tree) | VA 76-481 | 5/20/85 |
| A CHRISTMAS TREE/8185 | TX 1 636 840 | 8/6/85 |
| THE MINITREE™/1985 Christmas Supplement to Product Catalog 37 | TX 1 636 839 | 8/6/85 |
| GLASS TOYS (group of theme decorations and toys) | VA 203 537 | 10/21/85 |
| CHRISTMAS STOCKING WITH BEADED TREE/James (decoration and toy) | VA 256-118 | 1/13/86 |
| CHRISTMAS STOCKING WITH DECORATED BEADED TREE (decoration and toy) | VA 256-119 | 1/13/86 |
| CANDLE & WREATH WITH BERRIES AND TOYS (decoration and toy) | VA 256-120 | 1/13/86 |
| CANDLE WITH POINSETTIAS/ORNAMENTS (decoration and toy) | VA 256-121 | 1/13/86 |
| WALL WREATH WITH BOW (decoration and toy) | VA 256-122 | 1/13/86 |
| HANGING WREATH WITH BEADED CANDLE (decoration and toy) | VA 256-123 | 1/13/86 |

## ATTACHMENT B

July 2008

| Title (or Description) of Work | U.S. Certificate of Copyright Registration No. (or Status of Application) | Registration Issuance Date |
|---|---|---|
| MINIATURE TWISTED TREE TRUNK & BRANCHES (decoration and toy) | VA 256-124 | 1/13/86 |
| WESTRIM CRAFTS/Product Catalog No. 39 1986-87 | TX 17½525 | 1/24/86 |
| WESTRIM CRAFTS/Product Catalog No. 39 1986-87 | TX 1 762 525 | 2/24/86 |
| ACRYLIC RHINESTONE IRON-ON APPLIQUE Package | VA 108-229 | 3/19/97 |
| NEW WESTRIM CRAFTS HOLIDAY & SEASONAL RESIN PLAQUES (catalog sell sheet) | TX 2 074 601 | 6/16/87 |
| 1987 SUPPLEMENT TO PRODUCT CATALOG No. 39 | TX 2 074 602 | 6/16/87 |
| 1987 MINITREE™ CHRISTMAS SUPPLEMENT TO CATALOG NO. 39 | TX 2 098 501 | 6/17/87 |
| SANTA CLAUS MOP HEAD, Item 9501 (soft sculpture) | VA 416 150 | 7/17/90 |
| OLD LADY MOP HEAD, Item 9506 (soft sculpture) | VA 186 183 | 7/18/90 |
| 1995 WESTRIM FUN BEADS CATALOG | TX 4-103-992 | 8/28/95 |
| COUNTRY CLUTTER™ TRANSFERS - AMERICAN FOLK ART COLLECTION (5 images, artwork) | VA 747-923 | 10/27/95 |
| CRAFTING BASICS (advertisement) | VA 1-068-113 | 10/25/01 |
| PAPER BLISS/A New Dimension in Paper Arts 2002 Seasonal Catalog (advertisement/catalog) | VA 1-211-529 | 6/6/03 |
| PAPER BLISS/A New Dimension in Paper Arts 2002, 2003 Catalog (advertisement/catalog) | VA 1-211-530 | 6/6/03 |
| PAPER BLISS/A New Dimension in Color/2003 New Product (advertisement/catalog) | VA 1-211-528 | 6/6/03 |
| PAPER BLISS/A New Dimension in Paper Art/2003 Winter Catalog (advertisement/catalog) | VA 1-210-950 | 6/25/03 |
| LETTER DEPOT (advertisement/catalog) | VA 1-254-396 | 10/31/03 |
| TEN SHADOW TEMPLATES Unit (multi-element kit) | VA 1-247-933 | 11/28/03 |
| ACCESSORY KITS/TOOLS & TEMPLATES (advertisement/catalog) | VA 1-230-055 | 11/28/03 |

**ATTACHMENT B**                    July 2008

| Title (or Description) of Work | U.S. Certificate of Copyright Registration No. (or Status of Application) | Registration Issuance Date |
|---|---|---|
| THE ULTIMATE IN ORGANIZATION/CROP IN STYLE (catalog) | VA 1-294-127 | 12/22/04 |
| AUTUMN LEAVES CHA 2006 WINTER (catalog) | VA 1-374-849 | 4/18/06 |
| FOOF-A-LA, ARTISTIC EXPRESSIONS, MOD CHA 2006 WINTER (catalog) | VA 1-374-850 | 4/18/06 |
| CROP IN STYLE/THE ULTIMATE IN ORGANIZATION, Catalog 2006 | VA 1-374-655 | 4/14/06 |
| SNAP ITZ DECORATIVE CHARMS/1st Catalog (Published January 2007) | VA 1-418-931 | 6/18/07 |
| SNAP ITZ DECORATIVE CHARMS/2nd Catalog (Published July 2007) | VA 1-428-201 | 9/29/07 |
| SNAP-ITZ DECORATIVE CHARMS/3rd Catalog (Published February 2008) | Pending | Submitted 4/11/08 |
| PROJECT RUNWAY/Fashion Accessory Embellishments | Pending | Submitted 3/31/08 |
| PROJECT RUNWAY/Designer Doll Starter Kit | Pending | Submitted 4/9/08 |

**ATTACHMENT B**                    July 2008

# WORLDWIDE TRADEMARK SUMMARY

## Westrim, Inc.

**July 2008**

## INDEX OF MARKS
## U.S. TRADEMARK REGISTRATIONS & APPLICATIONS

**Page**

Westrim, Inc. (including DMD Division) ........................... 1 - 14
    Registrations ................................................ 1 - 13
    Applications ................................................ 14
Blue Moon Beads (Division) .................................... 15 - 16
    Registrations ............................................... 15
    Applications ................................................ 16
Crop In Style (Division) ....................................... 17 - 21
    Registrations .............................................. 17- 21

## FOREIGN TRADEMARK REGISTRATIONS & APPLICATIONS

**Page**

Westrim, Inc. (including DMD Division) ......................... 22 - 36
    Australia ................................................... 22 - 23
    Canada .................................................... 24 - 27
    CTM (European Union/Community Trade Mark) .............. 28 - 29
    China (Peoples Republic of) ................................ 30
    Hong Kong ................................................. 31
    Japan ..................................................... 32
    New Zealand ............................................... 32 - 34
    South Korea ............................................... 34 - 35
    Taiwan .................................................... 35
Blue Moon Beads (Division) .................................... 36
Crop In Style (Division) ....................................... 37

July 2008

Exhibit "2" - 99

## Index to International Classification

| | |
|---|---|
| Int. Cl. **14** generally covers: | precious metals and stones, jewelry, etc. |
| Typical goods listed in Westrim registrations include: | jewelry, imitation jewelry, beads, bead strings, pearls, rings, pins bracelets, chains, ear clips, sculptures and figures in precious metals, findings, fobs, castings, sequins. |
| Int. Cl. **16** generally covers: | paper and cardboard goods, printed matter, stationery, artist and teaching materials, etc. |
| Typical goods listed in Westrim registrations include: | scrap booking and photo albums, paper die cut outs, templates, paper bags, stickers, emblems, rulers, punches, art images, scissors, paper sheets, memory books, stationery, pencils, greeting cards, paper gift and novelty packages, and three-dimensional paper embellishments |
| Int. Cl. **18** generally covers: | leather, leather imitations, trunks, traveling bags, etc. |
| Typical goods listed in Westrim registrations include: | tote bags, travel bags, backpacks, luggage, wheeled tote and luggage carts, tote bag handles and straps |
| Int. Cl. **20** generally covers: | furniture, mirrors, picture frames, etc. |
| Typical goods listed in Westrim registrations include: | furniture, modular storage containers, cubes, bookcases, organizers, storage racks, shelves and doorknobs |
| Int. Cl. **28** generally covers: | games, playthings, sporting equipment, Christmas tree decorations, etc. |
| Typical goods listed in Westrim registrations include: | toy figures, miniature and novelty critters, foam toys and blocks, toy train and building blocks, puzzles, magnets, hobby and craft kits, bead and jewelry kits, Christmas tree ornaments and kits, toy blocks and alphabets, craft kits with multiple pieces and instructions, and dolls |

Exhibit "2" - 100

# WORLDWIDE TRADEMARK SUMMARY

## WESTRIM, INC.

### U.S. Registrations

| | |
|---|---|
| Mark: | WESTRIM |
| Owner: | Westrim, Inc. |
| Reg. No.: | 1,051,225 |
| Int. Class: | 14 |
| Granted: | October 26, 1976 |
| Our Docket: | TM-866 |
| Comments: | Renewal due within one year prior to October 26, 2016. |

| | |
|---|---|
| Mark: | WT Logo |
| Owner: | Westrim, Inc. |
| Reg. No.: | 1,060,725 |
| Int. Class: | 14 |
| Granted: | March 8, 1977 |
| Our Docket: | TM-908 |
| Comments: | Renewal due within one year prior to March 8, 2017. |



| | |
|---|---|
| Mark: | MINITREE |
| Owner: | Westrim, Inc. |
| Reg. No.: | 1,398,664 |
| Int. Class: | 28 |
| Granted: | June 24, 1986 |
| Our Docket: | TM-1835A |
| Comments: | Renewal due within one year prior to June 24, 2016. |

| | |
|---|---|
| Mark: | AUTUMN LEAVES |
| Owner: | Westrim, Inc. |
| Reg. No.: | 2,086,435 |
| Int. Class: | 16 |
| Granted: | August 5, 1997 |
| Our Docket: | 48082 |
| Comments: | Renewal due within one year prior to August 5, 2017. |

July 2008

## WESTRIM, INC.

### U.S. Registrations

| | |
|---|---|
| Mark: | MEMORIES FOREVER |
| Owner: | Westrim, Inc. |
| Reg. No.: | 2,116,409 |
| Int. Class: | 16 |
| Granted: | November 25, 1997 |
| Our Docket: | 36165 |
| Comments: | Renewal due within one year prior to November 25, 2017. |

| | |
|---|---|
| Mark: | WESTRIM |
| Owner: | Westrim, Inc. |
| Reg. No.: | 2,281,513 |
| Int. Classes: | 16 & 28 |
| Granted: | September 28, 1999 |
| Our Docket: | 37101 |
| Comments: | Renewal due within one year prior to September 28, 2009. |

| | |
|---|---|
| Mark: | MEMORIES FOREVER/THE CHERISHED LINE Logo |
| Owner: | Westrim, Inc. |
| Reg. No.: | 2,304,863 |
| Int. Class: | 16 |
| Granted: | December 28, 1999 |
| Our Docket: | 37111 |
| Comments: | Renewal due within one year prior to December 28, 2009. |

| | |
|---|---|
| Mark: | THE CHERISHED LINE |
| Owner: | Westrim, Inc. |
| Reg. No.: | 2,315,012 |
| Int. Class: | 16 |
| Granted: | February 1, 2000 |
| Our Docket: | 37112 |
| Comments: | Renewal due within one year prior to February 1, 2010. |

2                                                        July 2008

## WESTRIM, INC.

### U.S. Registrations

| | | |
|---|---|---|
| Mark: | WT Logo | |
| Owner: | Westrim, Inc. | |
| Reg. No.: | 2,361,368 | |
| Int. Classes: | 16 & 28 | |
| Granted: | June 27, 2000 | |
| Our Docket: | 37102 | |
| Comments: | Renewal due within one year prior to June 27, 2010. | |

Mark: TONS OF FUN Logo
Owner: Westrim, Inc.
Reg. No.: 2,484,324
Int. Class: 28
Granted: September 4, 2001
Our Docket: 37872
Comments: Renewal due within one year prior to September 4, 2011.

Mark: WESTRIM CRAFTS
Owner: Westrim, Inc.
Reg. No.: 2,512,227
Int. Classes: 14, 16 & 28
Granted: November 27, 2001
Our Docket: 38848
Comments: Renewal due within one year prior to November 27, 2011.

Mark: PUTTING ON THE GLITZ
Owner: Westrim, Inc.
Reg. No.: 2,798,587
Int. Class: 14
Granted: December 23, 2003
Our Docket: 40382
Comments: Continued Use Declaration due within one year prior to
December 23, 2009.

3                                          July 2008

Exhibit "2" - 103

## WESTRIM, INC.

### U.S. Registrations

| | |
|---|---|
| Mark: | LETTER DEPOT |
| Owner: | Westrim, Inc. |
| Reg. No.: | 2,807,367 |
| Int. Class: | 28 |
| Granted: | January 20, 2004 |
| Our Docket: | 43644 |
| Comments: | Continued Use Declaration due within one year prior to January 20, 2010. |

| | |
|---|---|
| Mark: | PAPER BLISS Logo |
| Owner: | Westrim, Inc. |
| Reg. No.: | 2,819,263 |
| Int. Class: | 16 |
| Granted: | March 2, 2004 |
| Our Docket: | 43929 |
| Comments: | Continued Use Declaration due within one year prior to March 2, 2010. |

**Paper BLISS**

| | |
|---|---|
| Mark: | MOSAIC MAGIC Logo |
| Owner: | Westrim, Inc. |
| Reg. No.: | 2,822,877 |
| Int. Class: | 14 |
| Granted: | March 16, 2004 |
| Our Docket: | 44047 |
| Comments: | Continued Use Declaration due within one year prior to March 16, 2010. |

**Mosaic Magic**

| | |
|---|---|
| Mark: | WESTRIM |
| Owner: | Westrim, Inc. |
| Reg. No.: | 2,824,728 |
| Int. Class: | 18 |
| Granted: | March 23, 2004 |
| Our Docket: | 41119 |
| Comments: | Continued Use Declaration due within one year prior to March 23, 2010. |

Exhibit "2" - 104

# WESTRIM, INC.

## U.S. Registrations

| | |
|---|---|
| Mark: | WT |
| Owner: | Westrim, Inc. |
| Reg. No.: | 2,878,845 |
| Int. Classes: | 14, 16, 18 & 28 |
| Granted: | August 31, 2004 |
| Our Docket: | 44064 |
| Comments: | Continued Use Declaration due within one year prior to August 31, 2010. |

| | |
|---|---|
| Mark: | LETTER DEPOT Logo |
| Owner: | Westrim, Inc. |
| Reg. No.: | 2,882,737 |
| Int. Class: | 28 |
| Granted: | September 7, 2004 |
| Our Docket: | 44250 |
| Comments: | Continued Use Declaration due within one year prior to September 7, 2010. |



| | |
|---|---|
| Mark: | PAPERBILITIES |
| Owner: | Westrim, Inc. |
| Reg. No.: | 2,902,971 |
| Int. Class: | 16 |
| Granted: | November 16, 2004 |
| Our Docket: | 43934 |
| Comments: | Continued Use Declaration due within one year prior to November 16, 2010. |

| | |
|---|---|
| Mark: | DMD |
| Owner: | Westrim, Inc. |
| Reg. No: | 2,910,021 |
| Int. Class: | 16 |
| Granted: | December 14, 2004 |
| Our Docket: | 44690 |
| Comments: | Continued Use Declaration due within one year prior to December 14, 2010. |

## WESTRIM, INC.

### U.S. Registrations

| | |
|---|---|
| Mark: | FOOFALA |
| Owner: | Westrim, Inc. |
| Reg. No.: | 2,927,349 |
| Int. Class: | 16 |
| Granted: | February 22, 2005 |
| Our Docket: | 48083 |
| Comments: | Continued Use Declaration due within one year prior to February 22, 2011. |

| | |
|---|---|
| Mark: | PAPER BLISS |
| Owner: | Westrim, Inc. |
| Reg. No.: | 2,948,724 |
| Int. Class: | 16 |
| Granted: | May 10, 2005 |
| Our Docket: | 40721 |
| Comments: | Continued Use Declaration due within one year prior to May 10, 2011. |

| | |
|---|---|
| Mark: | PAPER REFLECTIONS |
| Owner: | Westrim, Inc. |
| Reg. No: | 2,969,317 |
| Int. Class: | 16 |
| Granted: | July 19, 2005 |
| Our Docket: | 44694 |
| Comments: | Continued Use Declaration due within one year prior to July 19, 2011. |

**July 2008**

Exhibit "2" - 106

## WESTRIM, INC.

### U.S. Registrations

| | |
|---|---|
| Mark: | DISTINCT MARKETING DESIGNS |
| Owner: | Westrim, Inc. |
| Reg. No.: | 2,975,305 |
| Int. Class: | 16 |
| Granted: | July 26, 2005 |
| Our Docket: | 44691 |
| Comments: | Continued Use Declaration due within one year prior to July 26, 2011. |

| | |
|---|---|
| Mark: | CREATIVITY, INC. |
| Owner: | Westrim, Inc. |
| Reg. No.: | 2,987,837 |
| Int. Classes: | 14, 16 & 18 |
| Granted: | August 23, 2005 |
| Our Docket: | 44447 |
| Comments: | Continued Use Declaration due within one year prior to August 23, 2011. |

| | |
|---|---|
| Mark: | DMD, DISTINCT MARKETING DESIGNS, INC./ Diamond & Squares Logo |
| Owner: | Westrim, Inc. |
| Reg. No.: | 3,012,534 |
| Int. Class: | 16 |
| Granted: | November 8, 2005 |
| Our Docket: | 44692 |
| Comments: | Continued Use Declaration due within one year prior to November 8, 2011. |

7

July 2008

Exhibit "2" - 107

## WESTRIM, INC.

### U.S. Registrations

Mark:          BRINGING CREATIVE PEOPLE
               AND PRODUCTS TOGETHER
Owner:         Westrim, Inc.
Reg. No.:      3,024,127
Int. Classes:  14, 16, 18 & 28
Granted:       December 6, 2005
Our Docket:    44448
Comments:      Continued Use Declaration due within one year prior to
               December 6, 2011.


Mark:          PAPER REFLECTIONS Logo
Owner:         Westrim, Inc.
Reg. No.:      3,061,908
Int. Class:    16
Granted:       February 28, 2006
Our Docket:    47033
Comments:      Continued Use Declaration due within one year prior to
               February 28, 2012.




Mark:          BEAD IN STYLE
Owner:         Westrim, Inc.
Reg. No.:      3,121,268
Int. Classes:  18 & 20
Granted:       July 25, 2006
Our Docket:    46707
Comments:      Continued Use Declaration due within one year prior to
               July 25, 2012.

July 2008

Exhibit "2" - 108

## WESTRIM, INC.

### U.S. Registrations

| | |
|---|---|
| Mark: | CREATIVITY INC. |
| Owner: | Westrim, Inc. |
| Reg. No.: | 3,171,161 |
| Int. Class: | 28 |
| Granted: | November 14, 2006 |
| Our Docket: | 48312 |
| Comments: | Continued Use Declaration due within one year prior to November 14, 2012. |

| | |
|---|---|
| Mark: | FOOFALA Logo |
| Owner: | Westrim, Inc. |
| Reg. No.: | 3,201,687 |
| Int. Class: | 16 |
| Granted: | January 23, 2007 |
| Our Docket: | 48692 |
| Comments: | Continued Use Declaration due within one year prior to January 23, 2013. |

foof·a·La

| | |
|---|---|
| Mark: | AUTUMN LEAVES Logo |
| Owner: | Westrim, Inc. |
| Reg. No.: | 3,208,245 |
| Int. Class: | 16 |
| Granted: | February 13, 2007 |
| Our Docket: | 48691 |
| Comments: | Continued Use Declaration due within one year prior to February 13, 2013. |

AUTUMN LEAVES

| | |
|---|---|
| Mark: | BEAD IN STYLE |
| Owner: | Westrim, Inc. |
| Reg. No.: | 3,209,216 |
| Int. Class: | 14 |
| Granted: | February 13, 2007 |
| Our Docket: | 48662 |
| Comments: | Continued Use Declaration due within one year prior to February 13, 2013. |

Exhibit "2" - 109

## WESTRIM, INC.

### U.S. Registrations

| | |
|---|---|
| Mark: | ARTISTIC EXPRESSIONS |
| Owner: | Westrim, Inc. |
| Reg. No.: | 3,255,029 |
| Int. Classes: | 14 & 28 |
| Granted: | June 26, 2007 |
| Our Docket: | 48123 |
| Comments: | Continued Use Declaration due within one year prior to June 26, 2013. |

| | |
|---|---|
| Mark: | CRAFTS-TO-GO BY WESTRIM |
| Owner: | Westrim, Inc. |
| Reg. No.: | 3,257,787 |
| Int. Classes: | 14 & 28 |
| Granted: | July 12, 2007 |
| Our Docket: | 47698 |
| Comments: | Continued Use Declaration due within one year prior to July 12, 2013. |

| | |
|---|---|
| Mark: | WT/Slant Logo |
| Owner: | Westrim, Inc. |
| Reg. No.: | 3,293,456 |
| Int. Classes: | 14, 16 & 28 |
| Granted: | September 18, 2007 |
| Our Docket: | 49596 |
| Comments: | Continued Use Declaration due within one year prior to September 18, 2013. |

Exhibit "2" - 110

## WESTRIM, INC.

### U.S. Registrations

Mark:            COLOR COORDINATES - RAINBOW OF
                 CHOICES CREATED TO INSPIRE!
Owner:           Westrim, Inc.
Reg. No.:        3,321,813
Int. Class:      14
Granted:         October 23, 2007
Our Docket:      49219
Comments:        Continued Use Declaration due within one year prior to
                 October 23, 2013.


Mark:            DIGITAL DESIGNS/MEMORIES MADE
                 SIMPLE Logo
Owner:           Westrim, Inc.
Reg. No.:        3,332,611                    [digital·designs]
Int. Class:      16                           MEMORIES MADE SIMPLE
Granted:         November 6, 2007
Our Docket:      48941
Comments:        Continued Use Declaration due one year prior to
                 November 6, 2013.


Mark:            WT/Slant Logo
Owner:           Westrim, Inc.
Reg. No.:        3,342,860
Int. Class:      6
Granted:         November 7, 2007
Our Docket:      49597
Comments:        Continued Use Declaration due one year prior to
                 November 7, 2013.

Exhibit "2" - 111

## WESTRIM, INC.

### U.S. Registrations

Mark:           SNAP ITZ Logo
Owner:          Westrim, Inc.
Reg. No.:       3,367,803
Int. Class:     26
Granted:        January 15, 2008
Our Docket:     49392
Comments:       Continued Use Declaration due one year prior to
                January 15, 2014.


Mark:           Distinctive Packaging Design ("Gift Card
                Tin" Line)
Owner:          Westrim, Inc.
Reg. No.:       3,043,767 [Supplemental Register]
Int. Class:     6
Granted:        March 25, 2008
Our Docket:     49598
Comments:       Continued Use Declaration due one year prior to
                March 25, 2014.


Mark:           SNAP-ITZ Logo
Owner:          Westrim, Inc.
Reg. No.:       3,430,857
Int. Class:     14
Granted:        May 20, 2008
Our Docket:     50363
Comments:       Continued Use Declaration due within one year prior to
                May 20, 2014.

Exhibit "2" - 112

- - -

# WESTRIM, INC.

## U.S. Registrations

| | |
|---|---|
| Mark: | TREASURE TINS |
| Owner: | Westrim, Inc. |
| Reg. No.: | 3,441,730 |
| Int. Class: | 6 |
| Granted: | June 3, 2008 |
| Our Docket: | 49712 |
| Comments: | Continued Use Declaration due within one year prior to June 3, 2014. |


| | |
|---|---|
| Mark: | BEAD BOUTIQUE |
| Owner: | Westrim, Inc. |
| Reg. No.: | 3,465,183 |
| Int. Class: | 14 |
| Granted: | July 15, 2008 |
| Our Docket: | 49550 |
| Comments: | Continued Use Declaration due within one year prior to July 15, 2014. |

July 2008

Exhibit "2" - 113

**WESTRIM, INC.**

<u>U.S. Applications</u>

| | |
|---|---|
| Mark: | FUN FOAM Logo      **FUN FOAM** |
| Owner: | Westrim, Inc. |
| S.N.: | 76/509,122 |
| Int. Class: | 28 |
| Filed: | April 24, 2003 |
| Our Docket: | 33253-A |
| Comments: | Suspended, per TTAB cancellation proceeding with Headstrom Corp. TTAB inquiry received July 2008. |

| | |
|---|---|
| Mark: | SNAP-ITZ Logo      **SnapItz** |
| Owner: | Westrim, Inc. |
| S.N.: | 77/281,451 |
| Int. Class: | 25 |
| Filed: | September 17, 2007 |
| Our Docket: | 50362 |
| Comments: | Allegation of Use accepted July 15, 2008. |

| | |
|---|---|
| Mark: | BEAD SHOP |
| Owner: | Westrim, Inc. |
| S.N.: | 78/834,808 |
| Int. Class: | 14 |
| Filed: | March 10, 2006 |
| Our Docket: | 48661 |
| Comments: | Response to PTO Office Action filed May 22, 2008. |

## BLUE MOON BEADS DIVISION

### U.S. Registrations

| | |
|---|---|
| Mark: | BLUE MOON BEADS/Moon Logo |
| Owner: | Westrim, Inc. |
| Reg. No.: | 3,039,005 |
| Int. Class: | 14 |
| Granted: | January 10, 2006 |
| Our Docket: | 43935 |
| Comments: | Continued Use Declaration due within one year prior to January 26, 2012. |

| | |
|---|---|
| Mark: | BLUE MOON BEADS |
| Owner: | Westrim, Inc. |
| Reg. No.: | 3,059,867 |
| Int. Class: | 14 |
| Granted: | February 21, 2006 |
| Our Docket: | 43965 |
| Comments: | Continued Use Declaration due within one year prior to February 21, 2012. |

| | |
|---|---|
| Mark: | BLUE MOON BEADS SHOP |
| Owner: | Westrim, Inc. |
| Reg. No.: | 3,222,145 |
| Int. Class: | 14 |
| Granted: | March 27, 2007 |
| Our Docket: | 48660 |
| Comments: | Continued Use Declaration due within one year prior to March 27, 2013. |

| | |
|---|---|
| Mark: | NATURAL ELEGANCE |
| Owner: | Westrim, Inc. |
| Reg. No.: | 3,463,428 |
| Int. Class: | 14 |
| Granted: | July 8, 2008 |
| Our Docket: | 49740-A |
| Comments: | Continued Use Declaration due within one year prior to July 8, 2014. |

15                                                                July 2008

## BLUE MOON BEADS DIVISION

### U.S. Applications

| | |
|---|---|
| Mark: | BLUE MOON BEADS/Moon Character Logo |
| Owner: | Westrim, Inc. |
| S.N.: | 77/082,410 |
| Int. Class: | 14 |
| Filed: | January 12, 2007 |
| Our Docket: | 49583 |
| Comments: | Suspended, per TTAB opposition with Kapes (N. Mex.) |



| | |
|---|---|
| Mark: | ONCE IN A BLUE MOON |
| Owner: | Westrim, Inc. |
| S.N.: | 77/281,470 |
| Int. Class: | 14 |
| Filed: | September 17, 2007 |
| Our Docket: | 50364 |
| Comments: | Suspended, per TTAB opposition with Kapes (N. Mex.) |

| | |
|---|---|
| Mark: | BLUE MOON |
| Owner: | Westrim, Inc. |
| S.N.: | 77/324,656 |
| Int. Class: | 14 |
| Filed: | November 8, 2007 |
| Our Docket: | 50526 |
| Comments: | Suspended, per TTAB opposition with Kapes (N. Mex.) |

July 2008

Exhibit "2" - 116

## CROP IN STYLE DIVISION

### U.S. Registrations

| | |
|---|---|
| Mark: | CROP IN STYLE Logo |
| Owner: | Westrim, Inc. |
| Reg. No.: | 2,279,310 |
| Int. Class: | 16 |
| Granted: | September 21, 1999 |
| Our Docket: | 43148 |
| Comments: | Renewal due within one year prior to September 21, 2009. |

| | |
|---|---|
| Mark: | PSB PAPER/STICKER BINDER |
| Owner: | Westrim, Inc. |
| Reg. No.: | 2,495,829 |
| Int. Class: | 35 |
| Granted: | October 9, 2001 |
| Our Docket: | 43149 |
| Comments: | Renewal due within one year prior to October 9, 2011. |

| | |
|---|---|
| Mark: | PAPER TAKER |
| Owner: | Westrim, Inc. |
| Reg. No.: | 2,695,288 |
| Int. Class: | 18 |
| Granted: | March 11, 2003 |
| Our Docket: | 40730 |
| Comments: | Continued Use Declaration due within one year prior to March 11, 2009. |

| | |
|---|---|
| Mark: | CROP IN STYLE JR. Logo |
| Owner: | Westrim, Inc. |
| Reg. No.: | 2,699,948 |
| Int. Class: | 18 |
| Granted: | March 25, 2003 |
| Our Docket: | 40761 |
| Comments: | Continued Use Declaration due within one year prior to March 25, 2009. |

17

July 2008

Exhibit "2" - 117

- - -

## CROP IN STYLE DIVISION

### U.S. Registrations

| | |
|---|---|
| Mark: | CROP IN STYLE Logo |
| Owner: | Westrim, Inc. |
| Reg. No.: | 2,720,862 |
| Int. Classes: | 16 & 18 |
| Granted: | June 3, 2003 |
| Our Docket: | 40759 |
| Comments: | Continued Use Declaration due within one year prior to June 3, 2009. |



| | |
|---|---|
| Mark: | CROP IN STYLE |
| Owner: | Westrim, Inc. |
| Reg. No.: | 2,752,068 |
| Int. Classes: | 16 & 18 |
| Granted: | August 19, 2003 |
| Our Docket: | 40760 |
| Comments: | Continued Use Declaration due within one year prior to August 19, 2009. |

| | |
|---|---|
| Mark: | STAMP STORE |
| Owner: | Westrim, Inc. |
| Reg. No.: | 2,815,509 |
| Int. Class: | 18 |
| Granted: | February 17, 2004 |
| Our Docket: | 40737 |
| Comments: | Continued Use Declaration due within one year prior to February 17, 2010. |

18                                    July 2008

**CROP IN STYLE DIVISION**

<u>U.S. Registrations</u>

| | |
|---|---|
| Mark: | CROP IN STYLE/NA NAVIGATOR Logo |
| Owner: | Westrim, Inc. |
| Reg. No.: | 2,816,846 |
| Int. Class: | 18 |
| Granted: | February 24, 2004 |
| Our Docket: | 44063 |
| Comments: | Continued Use Declaration due within one year prior to February 24, 2010. |



| | |
|---|---|
| Mark: | STORE IN STYLE |
| Owner: | Westrim, Inc. |
| Reg. No.: | 2,972,455 |
| Int. Classes: | 18 & 20 |
| Granted: | July 19, 2005 |
| Our Docket: | 45063 |
| Comments: | Continued Use Declaration due within one year prior to July 19, 2011. |

| | |
|---|---|
| Mark: | THE STOREHOUSE |
| Owner: | Westrim, Inc. |
| Reg. No.: | 2,987,919 |
| Int. Class: | 18 |
| Granted: | August 23, 2005 |
| Our Docket: | 45112 |
| Comments: | Continued Use Declaration due within one year prior to August 23, 2011. |

| | |
|---|---|
| Mark: | XXL |
| Owner: | Westrim, Inc. |
| Reg. No.: | 3,099,478 (Supplemental Register) |
| Int. Class: | 18 |
| Granted: | March 30, 2006 |
| Our Docket: | 47036 |
| Comments: | Continued Use Declaration due within one year prior to March 30, 2012. |

Exhibit "2" - 119

## CROP IN STYLE DIVISION

### U.S. Registrations

| | |
|---|---|
| Mark: | STORE IN STYLE Logo |
| Owner: | Westrim, Inc. |
| Reg. No.: | 3,132,252 |
| Int. Classes: | 18 & 20 |
| Granted: | August 22, 2006 |
| Our Docket: | 47372 |
| Comments: | Continued Use Declaration due within one year prior to August 22, 2012. |



| | |
|---|---|
| Mark: | CIS Logo |
| Owner: | Westrim, Inc. |
| Reg. No.: | 3,154,521 |
| Int. Classes: | 18 & 20 |
| Filed: | October 10, 2006 |
| Our Docket: | 45106 |
| Comments: | Continued Use Declaration due within one year prior to October 10, 2012. |



| | |
|---|---|
| Mark: | CIS |
| Owner: | Westrim, Inc. |
| Reg. No.: | 3,181,316 |
| Int. Classes: | 18 & 20 |
| Granted: | December 5, 2006 |
| Our Docket: | 45105 |
| Comments: | Continued Use Declaration due within one year prior to December 5, 2012. |

Exhibit "2" - 120

## CROP IN STYLE DIVISION

### U.S. Registrations

| | |
|---|---|
| Mark: | STORE IN STYLE/THINKING INSIDE THE BOX Logo |
| Owner: | Westrim, Inc. |
| Reg. No.: | 3,247,065 |
| Int. Class: | 18 |
| Granted: | May 29, 2007 |
| Our Docket: | 48715A |
| Comments: | Continued Use Declaration due within one year prior to May 29, 2013. |



| | |
|---|---|
| Mark: | CRAFT IN STYLE |
| Owner: | Westrim, Inc. |
| Reg. No.: | 3,378,278 |
| Int. Classes: | 18 & 20 |
| Granted: | February 5, 2008 |
| Our Docket: | 50047 |
| Comments: | Continued Use Declaration due one year prior to February 5, 2014. |

| | |
|---|---|
| Mark: | STORE IN STYLE/THINKING INSIDE THE BOX Logo |
| Owner: | Westrim, Inc. |
| Reg. No.: | 3,398,538 |
| Int. Class: | 20 |
| Granted: | March 18, 2008 |
| Our Docket: | 48715 |
| Comments: | Continued Use Declaration due one year prior to March 18, 2014. |



July 2008

Exhibit "2" - 121

# WESTRIM, INC.

## Foreign Registrations/Applications

| | |
|---|---|
| Country: | Australia |
| Owner: | Westrim, Inc. |
| Mark: | MEMORIES FOREVER |
| Int. Class: | 16 |
| Reg. No.: | 781,162 |
| Granted: | December 16, 1998 |
| Our Docket: | 37420 |
| Status: | Renewal due prior to December 16, 2008; reminder letters to client 6/19 & 7/21/08. |

| | |
|---|---|
| Country: | Australia |
| Owner: | Westrim, Inc. |
| Mark: | MEMORIES FOREVER/THE CHERISHED LINE Logo |
| Int. Class: | 16 |
| Reg. No.: | 781,163 |
| Granted: | December 16, 1998 |
| Our Docket: | 37421 |
| Status: | Renewal due prior to December 16, 2008; reminder letters to client 6/19 & 7/21/08. |

| | |
|---|---|
| Country: | Australia |
| Owner: | Westrim, Inc. |
| Mark: | WESTRIM |
| Int. Class: | 16 |
| Reg. No.: | 781,160 |
| Granted: | December 16, 1998 |
| Our Docket: | 37422 |
| Status: | Renewal due prior to December 16, 2008; reminder letters to client 6/19 & 7/21/08. |

July 2008

Exhibit "2" - 122

## WESTRIM, INC.

### Foreign Registrations/Applications

| | |
|---|---|
| Country: | Australia |
| Owner: | Westrim, Inc. |
| Mark: | WT Logo |
| Int. Class: | 16 |
| Reg. No.: | 781,161 |
| Granted: | December 16, 1998 |
| Our Docket: | 37423 |
| Status: | Renewal due prior to December 16, 2008; reminder letters to client 6/19 & 7/21/08. |

| | |
|---|---|
| Country: | Australia |
| Owner: | Westrim, Inc. |
| Mark: | PAPER BLISS |
| Int. Class: | 16 |
| Reg. No.: | 947,839 |
| Granted: | March 21, 2003 |
| Our Docket: | 44074 |
| Status: | Renewal due prior to March 21,2013. |

| | |
|---|---|
| Country: | Australia |
| Owner: | Westrim, Inc. |
| Mark: | WESTRIM |
| Int. Classes: | 14 & 28 |
| Reg. No.: | 1,071,082 |
| Granted: | August 19, 2005 |
| Our Docket: | 47912 |
| Status: | Renewal due prior to August 19, 2015. |

| | |
|---|---|
| Country: | Australia |
| Owner: | Westrim, Inc. |
| Mark: | SNAP ITZ Logo |
| Int. Class: | 26 |
| Reg. No.: | 1,182,434 |
| Granted: | June 12, 2007 |
| Our Docket: | 50059 |
| Status: | Renewal due prior to June 12, 2017. |

Exhibit "2" - 123

# WESTRIM, INC.

## Foreign Registrations/Applications

| | |
|---|---|
| Country: | Canada |
| Owner: | Westrim, Inc. |
| Mark: | WESTRIM |
| Reg. No.: | 520,762 |
| Granted: | December 20, 1999 |
| Our Docket: | 37073 |
| Status: | Renewal due prior to December 20, 2014. |

| | |
|---|---|
| Country: | Canada |
| Owner: | Westrim, Inc. |
| Mark: | WT Logo |
| Reg. No.: | 520,765 |
| Granted: | December 20, 1999 |
| Our Docket: | 37074 |
| Status: | Renewal due prior to December 20, 2014. |

| | |
|---|---|
| Country: | Canada |
| Owner: | Westrim, Inc. |
| Mark: | MEMORIES FOREVER |
| Reg. No.: | 899,163 |
| Granted: | June 13, 2000 |
| Our Docket: | 37385 |
| Status: | Renewal due prior to June 13, 2015. |

| | |
|---|---|
| Country: | Canada |
| Owner: | Westrim, Inc. |
| Mark: | MINITREE |
| Reg. No.: | 557,967 |
| Granted: | February 15, 2002 |
| Our Docket: | 37419 |
| Status: | Renewal due prior to February 15, 2017. |

Exhibit "2" - 124

-----

## WESTRIM, INC.

### Foreign Registrations/Applications

| | |
|---|---|
| Country: | Canada |
| Owner: | Westrim, Inc. |
| Mark: | MEMORIES FOREVER/THE CHERISHED LINE Logo |
| Reg. No.: | 567,708 |
| Granted: | September 19, 2002 |
| Our Docket: | 37386 |
| Status: | Renewal due prior to September 19, 2017. |

| | |
|---|---|
| Country: | Canada |
| Owner: | Westrim, Inc. |
| Mark: | PAPER BLISS |
| Reg. No.: | 597,056 |
| Granted: | December 10, 2003 |
| Our Docket: | 41115 |
| Status: | Renewal due prior to December 10, 2018. |

| | |
|---|---|
| Country: | Canada |
| Owner: | Westrim, Inc. |
| Mark: | LETTER DEPOT |
| Reg. No.: | 633,944 |
| Granted: | March 1, 2005 |
| Our Docket: | 44860 |
| Status: | Renewal due prior to March 1, 2020. |

| | |
|---|---|
| Country: | Canada |
| Owner: | Westrim, Inc. |
| Mark: | CREATIVITY INC. |
| Reg.. No.: | 630,453 |
| Granted: | January 18, 2005 |
| Our Docket: | 44683 |
| Status: | Renewal due prior to January 18, 2020. |

July 2008

Exhibit "2" - 125

.... .......

## WESTRIM, INC.

### Foreign Registrations/Applications

Country:            Canada
Owner:              Westrim, Inc.
Mark:               BRINGING CREATIVE PEOPLE AND
                    PRODUCTS TOGETHER
Reg. No.:           630,671
Granted:            January 20, 2005
Our Docket:         44685
Status:             Renewal due prior to January 20, 2020.


Country:            Canada
Owner:              Westrim, Inc.  ·
Mark:               PAPER REFLECTIONS
Reg. No.:           626,876
Granted:            November 26, 2004
Our Docket:         44695
Status:             Renewal due prior to November 26, 2019.


Country:            Canada
Owner:              Westrim, Inc.
Mark:               PAPERBILITIES
Reg. No.:           650,934
Granted:            October 20, 2005
Our Docket:         46953
Status:             Renewal due prior to October 20, 2020.


Country:            Canada
Owner:              Westrim, Inc.
Mark:               DISTINCT MARKETING DESIGNS
Reg. No.:           649,029
Granted:            September 27, 2005
Our Docket:         46954
Status:             Renewal due prior to September 27, 2020.


July 2008

## WESTRIM, INC.

### Foreign Registrations/Applications

| | |
|---|---|
| Country: | Canada |
| Owner: | Westrim, Inc. |
| Mark: | AUTUMN LEAVES |
| Reg. No.: | 690,397 |
| Granted: | June 20, 2007 |
| Our Docket: | 48124 |
| Status: | Renewal due prior to June 20, 2022. |

| | |
|---|---|
| Country: | Canada |
| Owner: | Westrim, Inc. |
| Mark: | FOOFALA |
| Reg. No.: | 686,851 |
| Granted: | May 3, 2007 |
| Our Docket: | 48125 |
| Status: | Renewal due prior to May 3, 2022. |

| | |
|---|---|
| Country: | Canada |
| Owner: | Westrim, Inc. |
| Mark: | SNAP ITZ Logo (first application) |
| App. No.: | 1,351,743 |
| Filed: | June 23, 2007 |
| Our Docket: | 50066 |
| Status: | Will soon be approved for advertisement. |

| | |
|---|---|
| Country: | Canada |
| Owner: | Westrim, Inc. |
| Mark: | SNAP ITZ Logo (second application) |
| App. No.: | 1,368,677 |
| Filed: | October 23, 2007 |
| Our Docket: | 50451 |
| Status: | Awaiting signed Declaration from G. Deitsch (sent 6/26/08) -and- thereafter, mark will be approved for advertisement. |

July 2008

Exhibit "2" - 127

# WESTRIM, INC.

## Foreign Registrations/Applications

| | |
|---|---|
| Country: | CTM (European Union/Community Trade Mark) |
| Owner: | Westrim, Inc. |
| Mark: | BEADY'S BY WESTRIM |
| Int. Classes: | 14, 16 & 28 |
| Granted: | July 24, 2001 |
| Reg. No.: | 1,734,896 |
| Our Docket: | 38787 |
| Status: | Renewal due prior to July 3, 2010. |

| | |
|---|---|
| Country: | CTM |
| Owner: | Westrim, Inc. |
| Mark: | MEMORIES FOREVER/THE CHERISHED LINE Logo |
| Int. Classes: | 14, 16 & 28 |
| Granted: | September 11, 2001 |
| Reg. No.: | 1,734,920 |
| Our Docket: | 38786 |
| Status: | Renewal due prior to July 3, 2010. |

| | |
|---|---|
| Country: | CTM |
| Owner: | Westrim, Inc. |
| Mark: | WT Logo |
| Int. Classes: | 14, 16 & 28 |
| Granted: | September 11, 2001 |
| Reg. No.: | 1,734,797 |
| Our Docket: | 38785 |
| Status: | Renewal due prior to July 3, 2010. |

| | |
|---|---|
| Country: | CTM |
| Owner: | Westrim, Inc. |
| Mark: | WESTRIM |
| Int. Classes: | 14, 16 & 28 |
| Granted: | September 11, 2001 |
| Reg. No.: | 1,734,888 |
| Our Docket: | 38779 |
| Status: | Renewal due prior to July 3, 2010. |

28                                                July 2008

# WESTRIM, INC.

## Foreign Registrations/Applications

| | |
|---|---|
| Country: | CTM |
| Owner: | Westrim, Inc. |
| Mark: | WESTRIM CRAFTS |
| Int. Classes: | 14, 16 & 28 |
| Granted: | September 12, 2001 |
| Reg. No.: | 1,822,311 |
| Our Docket: | 38868 |
| Status: | Renewal due prior to August 17, 2010. |

| | |
|---|---|
| Country: | CTM |
| Owner: | Westrim, Inc. |
| Mark: | MEMORIES FOREVER |
| Int. Classes: | 14, 16 & 28 |
| Granted: | March 8, 2004 |
| Reg. No.: | 2,941,649 |
| Our Docket: | 43624 |
| Status: | Renewal due prior to November 21, 2012. |

| | |
|---|---|
| Country: | CTM |
| Owner: | Westrim, Inc. |
| Mark: | PAPER BLISS |
| Int. Classes: | 14, 16 & 28 |
| Granted: | May 5, 2006 |
| Reg. No.: | 3,104,163 |
| Our Docket: | 44068 |
| Status: | Renewal due prior to March 20, 2013. |

| | |
|---|---|
| Country: | CTM |
| Owner: | Westrim, Inc. |
| Mark: | CREATIVITY INC. |
| Int. Classes: | 14, 16, 18 & 28 |
| Granted: | July 21, 2005 |
| Reg. No.: | 3,373,149 |
| Our Docket: | 44684 |
| Status: | Renewal due prior to September 25, 2013. |

Exhibit "2" - 129

## WESTRIM, INC.

### Foreign Registrations/Applications

| | |
|---|---|
| Country: | China (Peoples Republic of) |
| Owner: | Westrim, Inc. |
| Mark: | WESTRIM CRAFTS |
| Int. Class: | 16 |
| Granted: | January 21, 2004 |
| Reg. No.: | 3,282,379 |
| Our Docket: | 41126 |
| Status: | Renewal due prior to January 20, 2014. |

| | |
|---|---|
| Country: | China (Peoples Republic of) |
| Owner: | Westrim, Inc. |
| Mark: | WT Logo |
| Int. Class: | 16 |
| Granted: | January 21, 2004 |
| App. No.: | 3,282,378 |
| Our Docket: | 41127 |
| Status: | Renewal due prior to January 20, 2014. |

| | |
|---|---|
| Country: | China (Peoples Republic of) |
| Owner: | Westrim, Inc. |
| Mark: | MEMORIES FOREVER |
| Int. Class: | 16 |
| Granted: | January 14, 2004 |
| Reg. No.: | 3,282,377 |
| Our Docket: | 41128 |
| Status: | Renewal due prior to January 13, 2014. |

| | |
|---|---|
| Country: | China (Peoples Republic of) |
| Owner: | Westrim, Inc. |
| Mark: | LETTER DEPOT |
| Int. Class: | 28 |
| Granted: | October 7, 2006 |
| Reg. No.: | 3,786,840 |
| Our Docket: | 44859 |
| Status: | Renewal due prior to October 7, 2016. |

* * * *

July 2008

Exhibit "2" - 130

## WESTRIM, INC.

### Foreign Registrations/Applications

| | |
|---|---|
| Country: | Hong Kong |
| Owner: | Westrim, Inc. |
| Mark: | WT Logo |
| Int. Class: | 16 |
| Granted: | May 14, 2002 |
| Reg. No.: | B4506/2003 |
| Our Docket: | 40571 |
| Status: | Renewal due prior to May 14, 2009 |

| | |
|---|---|
| Country: | Hong Kong |
| Owner: | Westrim, Inc. |
| Mark: | WESTRIM CRAFTS |
| Int. Class: | 16 |
| Granted: | May 14, 2002 |
| Reg. No.: | 4232/2003 |
| Our Docket: | 40570 |
| Status: | Renewal due prior to May 14, 2009. |

| | |
|---|---|
| Country: | Hong Kong |
| Owner: | Westrim, Inc. |
| Mark: | LETTER DEPOT |
| Int. Class: | 28 |
| Granted: | October 30, 2003 |
| Reg. No.: | 300,103,373 |
| Our Docket: | 44858 |
| Status: | Renewal due prior to October 29, 2013. |

| | |
|---|---|
| Country: | Hong Kong |
| Owner: | Westrim, Inc. |
| Mark: | LETTER DEPOT Logo |
| Int. Class: | 28 |
| Granted: | January 19, 2004 |
| Reg. No.: | 300,144,981 |
| Our Docket: | 45123 |
| Status: | Renewal due prior to January 18, 2014. |

* * * *

July 2008

Exhibit "2" - 131

# WESTRIM, INC.

## Foreign Registrations/Applications

| | |
|---|---|
| Country: | Japan |
| Owner: | Westrim, Inc. |
| Mark: | WESTRIM CRAFTS |
| Int. Class: | 16 |
| Granted: | October 4, 2002 |
| Reg. No.: | 4,610,942 |
| Our Docket: | 40517 |
| Status: | Renewal due between April 5, 2012 and October 4, 2012. |

| | |
|---|---|
| Country: | Japan |
| Owner: | Westrim, Inc. |
| Mark: | WT Logo |
| Int. Class: | 16 |
| Granted: | October 4, 2002 |
| Reg. No.: | 4,610,943 |
| Our Docket: | 40518 |
| Status: | Renewal due between April 5, 2012 and October 4, 2012. |

| | |
|---|---|
| Country: | Japan |
| Owner: | Westrim, Inc. |
| Mark: | MEMORIES FOREVER |
| Int. Class: | 16 |
| Granted: | October 4, 2002 |
| Reg. No.: | 4,610,944 |
| Our Docket: | 40519 |
| Status: | Renewal due between April 5, 2012 and October 4, 2012. |

* * * *

| | |
|---|---|
| Country: | New Zealand |
| Owner: | Westrim, Inc. |
| Mark: | PAPER BLISS |
| Int. Class: | 16 |
| Granted: | February 9, 2005 |
| App. No.: | 677,157 |
| Our Docket: | 44075 |
| Status: | Renewal due prior to February 9, 2010. |

Exhibit "2" - 132

## WESTRIM, INC.

### Foreign Registrations/Applications

| | |
|---|---|
| Country: | New Zealand |
| Owner: | Westrim, Inc. |
| Mark: | WESTRIM |
| Int. Class: | 16 |
| Granted: | October 23, 2003 |
| Reg. No.: | 677,158 |
| Our Docket: | 44187 |
| Status: | Renewal due prior to April 23, 2010. |

| | |
|---|---|
| Country: | New Zealand |
| Owner: | Westrim, Inc. |
| Mark: | WT Logo |
| Int. Class: | 16 |
| Granted: | October 23, 2003 |
| Reg. No.: | 677,159 |
| Our Docket: | 44188 |
| Status: | Renewal due prior to April 23, 2010. |

| | |
|---|---|
| Country: | New Zealand |
| Owner: | Westrim, Inc. |
| Mark: | MEMORIES FOREVER |
| Int. Class: | 16 |
| Granted: | October 23, 2003 |
| App. No.: | 677,160 |
| Our Docket: | 44189 |
| Status: | Renewal due prior to April 23, 2010. |

| | |
|---|---|
| Country: | New Zealand |
| Owner: | Westrim, Inc. |
| Mark: | MEMORIES FOREVER/THE CHERISHED LINE Logo |
| Int. Class: | 16 |
| Granted: | October 23, 2003 |
| Reg. No.: | 677,161 |
| Our Docket: | 44190 |
| Status: | Renewal due prior to April 23, 2010. |

33                                          July 2008

Exhibit "2" - 133

# WESTRIM, INC.

## Foreign Registrations/Applications

| | |
|---|---|
| Country: | New Zealand |
| Owner: | Westrim, Inc. |
| Mark: | WESTRIM |
| Int. Classes: | 14 & 28 |
| Granted: | August 22, 2005 |
| Reg. No.: | 734,499 |
| Our Docket: | 47914 |
| Status: | Renewal due prior to August 22, 2015. |

| | |
|---|---|
| Country: | New Zealand |
| Owner: | Westrim, Inc. |
| Mark: | SNAP ITZ Logo |
| Int. Class: | 26 |
| Granted: | June 13, 2007 |
| Reg. No.: | 770,298 |
| Our Docket: | 50060 |
| Status: | Renewal due prior to June 13, 2017. |

* * * *

| | |
|---|---|
| Country: | South Korea |
| Owner: | Westrim, Inc. |
| Mark: | WESTRIM CRAFTS |
| Int. Class: | 16 |
| Granted: | June 17, 2003 |
| Reg. No.: | 551,276 |
| Our Docket: | 40534 |
| Status: | Renewal due between June 18, 2012 and June 17, 2013. |

| | |
|---|---|
| Country: | South Korea |
| Owner: | Westrim, Inc. |
| Mark: | WT Logo |
| Int. Class: | 16 |
| Granted: | June 17, 2003 |
| Reg. No.: | 551,277 |
| Our Docket: | 40535 |
| Status: | Renewal due between June 18, 2012 and June 17, 2013. |

Exhibit "2" - 134

# WESTRIM, INC.

## Foreign Registrations/Applications

Country:        South Korea
Owner:          Westrim, Inc.
Mark:           MEMORIES FOREVER
Int. Class:     16
Granted:        March 23, 2004
Reg. No.:       578,185
Our Docket:     40536A
Comments:       Renewal due between March 24, 2013 and March 23, 2014.


Country:        Taiwan
Owner:          Westrim, Inc.
Mark:           WT Logo
Int. Class:     16
Granted:        February 16, 2003
Reg. No.:       1,033,633
Our Docket:     40532
Status:         Renewal prior to February 15, 2013.


Country:        Taiwan
Owner:          Westrim, Inc.
Mark:           WESTRIM CRAFTS
Int. Class:     16
Granted:        April 16, 2003
Reg. No.:       1,040,767
Our Docket:     40531
Status:         Renewal due prior to April 15, 2013.


Country:        Taiwan
Owner:          Westrim, Inc.
Mark:           MEMORIES FOREVER
Int. Class:     16
Granted:        May 1, 2003
Reg. No.:       1,042,072
Our Docket:     40533
Status:         Renewal due prior to April 30, 2013.


July 2008


Exhibit "2" - 135

# BLUE MOON BEADS DIVISION

## Foreign Registrations/Applications

| | |
|---|---|
| Country: | Australia |
| Owner: | Westrim, Inc. |
| Mark: | BLUE MOON |
| Int. Classes: | 16 & 28 |
| Reg. No.: | 1,071,081 |
| Granted: | August 19, 2005 |
| Our Docket: | 47908 |
| Status: | Renewal due prior to August 19, 2015. |

* * * *

| | |
|---|---|
| Country: | Canada |
| Owner: | Westrim, Inc. |
| Mark: | BLUE MOON BEADS |
| App. No.: | 1,291,882 |
| Filed: | February 28, 2006 |
| Our Docket: | 48481 |
| Status: | Registration fee paid in May 2008. |

* * * *

| | |
|---|---|
| Country: | New Zealand |
| Owner: | Westrim, Inc. |
| Mark: | BLUE MOON |
| Int. Classes: | 14, 16 & 28 |
| Granted: | August 22, 2005 |
| Reg. No.: | 734,500 |
| Our Docket: | 47910 |
| Status: | Renewal due prior to August 22, 2015. |

July 2008

Exhibit "2" - 136

## CROP IN STYLE DIVISION

Foreign Registrations/Applications

Country:        Australia
Owner:          Westrim, Inc.
Mark:           CROP IN STYLE
Int. Class:     18
Reg. No.:       1,071,080
Granted:        August 19, 2005
Our Docket:     47921
Status:         Renewal due prior to August 19, 2015.

* * * *

Country:        Canada
Owner:          Westrim, Inc.
Mark:           CROP IN STYLE Logo
Reg. No.:       593,838  (comparable to Int. Cls. 16 & 18)
Granted:        November 4, 2003
Our Docket:     40804
Status:         Renewal due prior to November 4, 2018.

* * * *

Country:        New Zealand
Owner:          Westrim, Inc.
Mark:           CROP IN STYLE
Int. Class:     18
Granted:        August 22, 2005
Reg. No.:       734,501
Our Docket:     47922
Status:         Renewal due prior to August 22, 2015.

**July 2008**

Exhibit "2" - 137

SCHEDULE 9.16

<u>Investment Property</u>

1.      Equity interest in the outstanding shares of Creativity Inc.

2.      Equity interest in the outstanding shares of Westrim Crafts (Hong Kong) Limited.

SCHEDULE 9.17

Real Estate; Leases

**Owned Real Estate:**   None

**Leases:**   See below

| Property Location | Lessor | Termination Date |
|---|---|---|
| **VAN NUYS WAREHOUSE**<br>7855 Hayvenhurst Avenue<br>Van Nuys, CA 91406 | AMB Property Corp<br>P.O. Box 6156<br>PRJT# PVANNUY03<br>LEASE ID# LWESTCR01<br>HICKSVILLE, NY 11802-6156 | 11/15/2011 |
| **VALENCIA WAREHOUSE**<br>28470 West Witherspoon Parkway<br>Valencia, CA | VIF Valencia Gateway, LLC<br>c/o Sheridan-Ebbert Development Co<br>13120 Telfair Avenue<br>Sylmar, CA 91342 | 4/1/2012 |
| **SPRINGDALE WAREHOUSE**<br>2300 & 2400 South Old Missouri Road<br>Sprindale Arkansas | Edwards Properties<br>P.O. Box 1549<br>Springdale, AR 72765 | 5/31/2018 |
| **SHERMAN WAY OFFICES**<br>16600 Sherman Way, Suite 170<br>Van Nuys, CA 91406 | Century National Properties, Inc.<br>2811 Wilshire Blvd., Suite 640<br>Santa Monica, CA 90403 | 11/14/2010 |
| **SHERMAN OAKS OFFICES**<br>14140 Ventura Blvd. Suite 202<br>Sherman Oaks, CA | 14140 Investments, Ltd.<br>c/o VDA Management Services Inc<br>16217 Kittridge Street<br>Van Nuys, CA 91406 | 11/30/2009 |
| **HONG KONG SHOWROOM**<br>Rm 501<br>Perfect Industrial Building # 31<br>Tai Yau St<br>San Po Kong Kowloon | Orient Union Limited<br>Flat L<br>12 Floor BLK 3 Camelpaint Bldg<br>60 Hoi Yuen Rd<br>Kwun Tong Kowloon | 9/30/2010 |
| **TEXAS SHOWROOM**<br>8409 Sterling, Suite B<br>Irving, TX 75063 | Charter Freeport Partner, L.P.<br>1845 Woodall Rogers Freeway<br>Suite 1720<br>Dallas, TX 75201 | 4/30/2013 |

CRTY\47338\745091.1

SCHEDULE 9.18

Material Agreements

1. Employment Agreement with Christopher McLain dated April 15, 2003

2. Forbearance Agreement with Bank of America dated June 25, 2008

3. See list of agreement with sales representatives attached to this Schedule 9.18 as Attachment 9.18 a

4. See list of medical benefits contracts attached to this Schedule 9.18 as Attachment 9.18 b

5. See list of agreements with customers attached to this Schedule 9.18 as Attachment 9.18 c

6. See list of agreements with suppliers attached to this Schedule 9.18 as Attachment 9.18 d

7. Asset Purchase Agreement dated September 12, 2005 among Borrower and Paper Craft, Inc. and Jeff Lam

8. Consulting Agreement dated September 12, 2005 among Borrower and Paper Craft, Inc. and Jeff Lam

9. Card Stock Agreement dated September 12, 2005 between Borrower and Paper Craft, Inc.

10. See list of insurance policies attached to this Schedule 9.18 as Attachment 9.18 e

11. All other contracts or agreements to which Borrower is a party or that are otherwise binding on Borrower that are disclosed in Schedules 9.15 and 9.17.

**Attachment 19.18 a**

CRTY\47338\745095.1

**Attachment 19.18 a**

**Sales Representative Agreements**

| OUTSIDE REPS | DATE AGREEMENT ENTERED INTO | CONTRACT TERMS |
|---|---|---|
| 1610 - RICK & ASSOCIATES | 4/1/03 | 30-day written notice |
| 5010 - PETER GRODSKY | 7/26/04 | 30-day written notice |
| 5030 - PAT HOBBS | 8/1/04 | 30-day written notice |
| 6944 - JACK ABELARDE | 1/1/05 | 30-day written notice |
| 6954 - CLAUDE HAMILTON | 9/1/05 | 30-day written notice |
| 6964 - HILLMER MARKETING | 12/1/05 | 30-day written notice |
| 7000 - PINNACLE MARKETING GROUP | 12/27/05 | 30-day written notice |
| 7001 - NOBIS SALES & MARKETING | 11/19/05 | 30-day written notice |

| AUTUMN LEAVES REPS | DATE AGREEMENT ENTERED INTO | CONTRACT TERMS |
|---|---|---|
| 1500 - J'S KNICKNACKS | 9/15/03 | 30-day written notice |
| 1501 - FINER LINES | 5/1/03 | 30-day written notice |
| 1502 - BARBARA GOLDEN COLLECTION | 6/16/00 | 30-day written notice |
| 1504 - LFM SALES | 4/15/00 | 30-day written notice |
| 1505 - WENDY & COMPANY | 4/30/00 | 30-day written notice |
| 1506 - DIANE SMITH | 4/24/01 | 30-day written notice |
| 1507 - P.S. PAUL COMPANY | 5/15/00 | 30-day written notice |
| 1508 - BRICKING LTD. | 1/1/00 | 30-day written notice |
| 1509 - ROBIN JONES | 10/4/01 | 30-day written notice |
| 1510 - ERICKSON & ASSOCIATES | 3/15/02 | 30-day written notice |
| 1514 - NET 30 INC | 3/29/06 | 30-day written notice |
| 2193 - OASIS MARKETING INC | 4/1/03 | 30-day written notice |
| 1511 - THE COLLINS GROUP | 8/1/07 | 30-day written notice |

Attachment 19.18 b
Medical Benefits Contracts

MEDICAL
   Aetna HMO - Westrim Only, Contract From 6/1/08 to 5/31/09
   Aetna PPO - Westrim & DMD, Contract From 6/1/08 to 5/31/09
   Kaiser Permanente - Westrim Only, Contract From 6/1/08 to 5/31/09
   Exec-u-Care Executive Reimbursement - Westrim Only, 1/1/08 to
   12/31/08

DENTAL
   Aetna HMO - Westrim Only, Contract From 6/1/08 to 5/31/09
   Aetna PPO - Westrim Only, Contract From 6/1/08 to 5/31/09
   Humana PPO - DMD Only, Contract From 2/1/08 to 1/31/09

VISION
   Ameritas - Westrim & DMD, Contract From 6/1/08 to 5/31/09)

LIFE
   Met Life - Life Insurance/ADD - Westrim & DMD, Contract From 6/1/08 to
   5/31/09
   Met Life Optional Life Insurance - Westrim Only, Contract From 6/1/08 to
   5/31/09

LTD
   Met Life Long Term Disability Insurance - Westrim Only, Contract From
   6/1/08 to 5/31/09
   Met Life Executive LTD - Westrim Only, Contract From 6/1/08 to 5/31/09


401k   Fidelity effective 1/1/06.

**ATTACHMENT 9.18 c**
**CUSTOMER AGREEMENTS**

| | DATE OF AGREEMENT, AGREEMENT PERIOD OR END DATE |
|---|---|
| A.C. MOORE-Autumn Leaves | 2008 |
| A.C. MOORE-Blue Moon Beads | 2008 |
| A.C. MOORE-Crop In Style | 2008 |
| A.C. MOORE-DMD | 2008 |
| A.C. MOORE Westrim | 2008 |
| ARCHIVERS-Autumn Leaves | 2007 |
| ARCHIVERS-Crop In Style | 2007 |
| ARCHIVERS-DMD | 2007 |
| ARCHIVERS-Westrim | 2007 |
| DOLGENCORP(DOLLAR GENERAL) | January, 2005 |
| FACTORY CARD & PARTY OUTLET-Westrim | 5/24/07 - ONGOING |
| FACTORY CARD & PARTY OUTLET-DMD | October 26,2006 |
| JO-ANN STORES-Blue Moon Beads | 1/30/2010 |
| JO-ANN STORES-Crop In Style | 1/30/2010 |
| JO-ANN STORES-DMD | 1/30/2010 |
| JO-ANN STORES-Westrim | 1/30/2010 |
| MICHAELS-Autumn Leaves | 2/2/2008 |
| MICHAELS-Blue Moon Beads | 2/2/2008 |
| MICHAELS CANADA-Blue Moon Beads | 2/2/2008 |
| MICHAELS-Crop In Style | 2/2/2008 |
| MICHAELS CANADA-Crop In Style | 2/2/2008 |
| MICHAELS-DMD | 2/2/2008 |
| MICHAELS-Westrim | 2/2/2008 |
| MICHAELS CANADA-Westrim | 2/2/2008 |
| MICHAELS-Westrim IMPORT | 2/2/2008 |
| NOTIONS-DMD | 2008 |
| NOTIONS-Autumn Leaves | 2008 |
| NOTIONS-Crop In Style | 2008 |
| NOTIONS-Blue Moon Beads | 2008 |
| NOTIONS-Westrim | 2008 |
| RECOLLECTION-Autumn Leaves | 2/2/2008 |
| RECOLLECTION-Crop In Style | 2/2/2008 |
| RECOLLECTION-DMD | 2/2/2008 |
| RECOLLECTION-Westrim | 2/2/2008 |
| SHOPKO-DMD | 2007 |
| SHOPKO-Westrim | 2007 |
| TARGET-TNC-Westrim | 2/1/07-1/31/08 |
| WALMART-Westrim | Jul-08 |
| WALMART CANADA-Westrim | 6/10/08 |
| ZELLERS | April, 2006 |

**ATTACHMENT19.18 d**
**SUPPLIER AGREEMENTS**

<u>Supplier</u>

**DATE OF AGREEMENT OR**
**AGREEMENT PERIOD**

| Supplier | Date of Agreement or Agreement Period |
|---|---|
| Main Choice | 2008 |
| True Blue | 2008 |
| KPI | 1/1/2005 |

# DRAFT

---

### NAMED INSURED

**WESTRIM, INC.**

**DBA: WESTRIM CRAFTS**

**DBA: CROP-IN STYLE**

**DBA: BLUE MOON BEADS**

**DBA: DISTINCT MARKETING DESIGNS, INC.**

**DBA: DMD**

**DBA: AUTUMN LEAVES**

**CREATIVITY, INC.**

**DBA: WESTRIM (IMPORT)**

BOLTON&Company

# PACKAGE POLICY

### Travelers Property Casualty Co. of America
### #Y6302379A057-TIL-08
### 03/01/08 to 03/01/09

## PROPERTY INSURANCE

**LOCATIONS:**

1) 7855 Hayvenhurst Avenue, Van Nuys, CA 91406
2) 28470 Witherspoon Parkway, Valencia, CA 91355
3) 2300 S. Old Missouri Road, Springdale, AR 72764
4) 2400 S. Old Missouri Road, Springdale, AR 72764
5) 16600 Sherman Way, Van Nuys, CA 91406
7) 8409 Sterling Street, Irving, TX 75063 (liability only)

| Limit | Coverage |
|---|---|
| $32,350,558 | **Business Personal Property**<br>Blanket Locations #1 through 5<br>• Causes of Loss - Special Form excluding Earthquake & Flood<br>• Subject to a $10,000 Deductible Each Occurrence<br>• No Co-Insurance<br>• Replacement Cost<br>• Includes Equipment Breakdown; Selling Price Valuation |
| $16,600,000 | **Business Income including Extra Expense and Rents**<br>Blanket at Locations #1 through 5<br>• Causes of Loss - Special Form excluding Earthquake & Flood<br>• Agreed Value based on 50% Coinsurance<br>• Includes Equipment Breakdown<br>• Waiting Period: 72 Hours<br>• Ordinary Payroll Included<br>• Extended Period of Indemnity 120 Days |
| $ 1,150,600 | **Building Tenants Improvements**<br>Blanket at Locations #1, 2, 3, 5<br>• Causes of Loss - Special Form excluding Earthquake & Flood<br>• Subject to a $10,000 Deductible Each Occurrence<br>• No Co-Insurance<br>• Replacement Cost<br>• Includes Equipment Breakdown |
| $ 230,000 | **Personal Property at Undescribed Premises**<br>• At Any One Exhibition<br>• At Any Other Not Owned, Leased or Regularly Operated Premises<br>• Subject to a $10,000 Deductible Each Occurrence |

BOLTON & Company

## PACKAGE POLICY

### (cont'd.)

| Limit | Coverage |
|---|---|
| | **Electronic Data Processing** |
| $ 1,314,000 | Hardware, Location 1 |
| $ 30,000 | Software, Location 1 |
| $ 30,000 | Extra Expense and Business Income at Location 1 |
| $ 87,920 | Hardware, Location 2 |
| $ 209,255 | Hardware, Location 3 |
| $ 31,000 | Software, Location 3 |
| $ 30,000 | Extra Expense, Location 3 |
| $ 100,000 | Hardware, Location 4 |
| $ 30,000 | Software, Location 4 |

- Causes of Loss - Special Form excluding Earthquake & Flood
- 90% Co-Insurance
- Subject to a $2,500 Deductible

BOLTON & Company

## DELUXE PROPERTY COVERAGE FORM

| | Limits of Insurance |
|---|---|
| Accounts Receivable: | |
| On Premises | $25,000 |
| In Transit or at Undescribed Premises | $10,000 |
| Appurtenant Buildings and Structures | $100,000 |
| Claim Data Expense | $25,000 |
| Debris Removal (Additional Limit) | $250,000 |
| Expediting Expense | $25,000 |
| Fine Arts | $50,000 |
| Fire Department Service Charge | Policy Limit |
| Fire Equipment Discharge | Policy Limit |
| Newly Constructed or Acquired Property: | |
| Buildings – Each | $2,000,000 |
| Personal Property at Each Premises | $1,000,000 |
| Ordinance or Law | $250,000 |
| Outdoor Property | $25,000 |
| Overseas Business Travel – Personal Property | $25,000 |
| Personal Effects | $25,000 |
| Personal Property at Undescribed Premises – Limited* | $10,000 |
| Personal Property in Transit – Limited* | $10,000 |
| Pollutant Clean-Up and Removal – Aggregate | $100,000 |
| Preservation of Property | Policy Limit |
| Reward Coverage | $25,000 |
| Theft Damage to Rented Property | Policy Limit |
| Valuable Papers: | |
| On Premises | $25,000 |
| In Transit or at Undescribed Premises | $10,000 |
| Water Damage, Other Liquids, Powder or Molten Material Damage | Policy Limit |

*Does Not Apply if a Limit is Shown Previously

BOLTON & Company

### DELUXE BUSINESS INCOME
### ADDITIONAL COVERAGES AND COVERAGE EXTENSION

The following Limits of Insurance are included in the coverage form and apply in any one occurrence unless otherwise stated.

| | Limits of Insurance |
|---|---|
| Business Income from Dependent Property | $100,000 |
| Claim Data Expense | $25,000 |
| Newly Acquired Locations | $500,000 |
| Ordinance or Law – Increased Period of Restoration | $250,000 |

BOLTON & Company

## GENERAL LIABILITY INSURANCE
### (INCLUDED IN PACKAGE)

| Limit | Coverage |
|---|---|
| $ 5,000,000 | General Aggregate Limit of Liability |
| $ 2,000,000 | Products/Completed Operations Aggregate Limit |
| $ 1,000,000 | Personal and Advertising Injury Limit |
| $ 1,000,000 | Each Occurrence Limit |
| $ 100,000 | Fire Damage Limit – Any One Fire |
| $ 5,000 | Medical Expense – Any One Person |

Covers:
- Premises/Operations
- Blanket Additional Insured Endorsement #CGD1871103 for Vendors, Managers and Lessors of premises and equipment
- Primary/Non-Contributory Endorsement #CGD0370405
- Blanket Waiver of Subrogation Endorsement #CGD1871103

| | |
|---|---|
| $ 1,000,000 | Employee Benefit Liability Each Claim |
| $ 2,000,000 | Annual Aggregate |

- Claims Made Form, Retro Date: 8/7/94
- Deductible Per Claim - None

**Exclusions include, but are not limited to:**
- Absolute Pollution
- Broad Form Nuclear Energy
- Punitive Damages
- Year 2000 Exclusion
- Trademark-Infringement Coverage
- Asbestos
- War
- Employment Related Practices
- Discrimination
- Lead
- Unsolicited Communications
- Mobile Equipment Redefined – Exclusion of vehicles subject to motor vehicle laws (new)

BOLTON & Company

## COMMERCIAL GENERAL LIABILITY COVERAGE FORM

**Manufacturers and Wholesalers XTEND Endorsement Includes**

A.  Broadened Named Insured
B   Blanket Broad Form Vendors
C.  Limited Worldwide Liability Coverage – Indemnity Basis
D.  Fire Damage Liability Extension
    • Perils of Fire, Explosion, Lightning, Smoke, Water
    • Limit Increased to $300,000
E.  Blanket Waiver of Subrogation
F.  Blanket Additional Insured – Managers or Lessors of Premises
G.  Blanket Additional Insured – Lessor of Leased Equipment
H.  Incidental Medical Malpractice
I.  Personal Injury – Assumed by Contract
J.  Extension of Coverage – Bodily Injury
K.  Injury to Co-Employees
L.  Aircraft Chartered with Crew
M.  Non-Owned Watercraft – Increased from 25 Feet to 50 Feet
N.  Increased Supplementary Payments
    • Cost for Bail Bonds increased to $2,500
    • Loss of Earnings increased to $500 per day
O.  Medical Payments – Limit increased to $10,000 per person
P.  Knowledge and Notice of Occurrence or Offense
Q.  Unintentional Omission
R.  Reasonable Force – Bodily Injury or Property Damage

BOLTON & Company

# CRIME POLICY

**Travelers Casualty & Surety Company**
**#104898213**
**03/01/08 to 03/01/09**

| Limits | Coverage |
|---|---|
| $  500,000 | Employee Dishonesty<br>• Subject to a $10,000 Deductible |
| $  500,000 | Forgery or Alteration<br>• Subject to a $10,000 Deductible |
| $  500,000 | ERISA Fidelity<br>• Subject to $0 Deductible |

BOLTON & Company

## AUTOMOBILE POLICY

**Travelers Property Casualty Co. of America**
**#Y8102379A057-TIL-08**
**03/01/08 to 03/01/09**

| <u>Limit</u> | <u>Coverage</u> | |
|---|---|---|
| $ 1,000,000 | Each Accident - Bodily Injury and Property Damage Liability Covering Owned, Non-Owned, and Hired Automobiles | |
| $ 1,000,000 | Uninsured Motorist Bodily Injury – All Owned Vehicles | |
| $ 5,000 | Auto Medical Payments Limit Per Person – All Owned Vehicles | |
| **Actual Cash Value** | Comprehensive | $1,000 Deductible |
| **Actual Cash Value** | Collision | $1,000 Deductible |

- Hired Auto Physical Damage – Actual Cash Value or Cost of Repair, whichever is less, subject to $1,000 Deductible Comprehensive and Collision
- Rental Reimbursement - $40 per day for 30 days on Private Passenger and Light Trucks
- Includes Employees as Insured's for Vehicles rented for Business Use in Employee's Name
- Blanket Loss Payable Endorsement
- Policy is on Composite Rate - Subject to Final Audit

### *AUTOMOBILE SCHEDULE*

| | VEHICLE DESCRIPTION VIN # | LIAB. | MED. | UM | COMP. | COLL. |
|---|---|---|---|---|---|---|
| 1. | 1997 Ford F150 Super Cab Pickup VIN #1FTDX17WXVNC46982 | X | X | X | X | X |
| 2. | 2002 Ford F150 Pickup VIN #1FTRW07L42KD88959 | X | X | X | X | X |
| 3. | 1995 Freightliner Truck (DMD) VIN #1FV6HLAC3SL762029 | X | X | X | X | X |
| 4. | 1998 Ford F700 Truck (DMD) VIN #1FDNF70J8WVA02799 | X | X | X | X | X |

Note:  Victor Chevalier included as additional insured and loss payee on Vehicle #2
(Employee as lessor)

BOLTON & Company

# UMBRELLA POLICY

## Travelers Property Casualty Co. of America
## #CUP2379A057TIL08
## 03/01/08 to 03/01/09

| Limit | Coverage |
|---|---|
| **$ 15,000,000** | Each Occurrence Limit on Bodily Injury and/or Property Damage Liability |
| **$ 15,000,000** | Aggregate |
| **No** | Self-Insured Retention |

Limits are in excess of Primary General Liability, Employee Benefits Liability, Automobile Liability including Owned, Hired/Non-Owned Auto Liability, Employer's Liability and Foreign Liability.

**Exclusions include, but are not limited to:**
- Nuclear Energy Liability Exclusion Endorsement (Broad Form)
- Amendment of Coverage – Named Insured
- Excess Personal, Advertising and Web Site Injury
- Employment-Related Practices Exclusion
- Exclusion – Asbestos
- Employee Benefits Liability Endorsement
- Fire Damage Liability Extension
- Discrimination Exclusion
- Exclusion – Aircraft Products and Grounding
- Real and/or Personal Property Exclusion
- Prejudgment Interest Defense Amendment
- Knowledge and Notice of Occurrence or Offense – Unintentional Omission
- War
- Uninsured/Underinsured Motorists Liability
- Lead
- Unsolicited Communications

BOLTON & Company

# FOREIGN LIABILITY POLICY

### Great Northern Insurance Company
### #3575-4515LOA
### 03/01/08 to 03/01/09

**International General Liability**

| Limit | Coverage |
|---|---|
| $ 1,000,000 | Each Occurrence |
| $ 1,000,000 | Personal and Advertising Injury |
| $ 1,000,000 | Bodily Injury and Property Damage Aggregate |
| $ 1,000,000 | Product/Completed Operations Aggregate |
| $ 1,000,000 | Property Damage to Rental or Occupied Premises |
| $ 10,000 | Medical Payments |

**Exclusions**
Asbestos
Biological Agents

**Coverage Territory**
International Territory
Foreign Suits only for worldwide occurrences

**International Auto Liability**

| | For Owned, Hired & Nonowned Autos |
|---|---|
| $ 1,000,000 | Bodily Injury and Property Damage |
| $ 10,000 | Auto Medical Payments |
| $ None | Threshold Amount Benefit |

**International Workers Compensation**

| | Foreign Voluntary WC (Primary Coverage) |
|---|---|
| State of Hire Benefits | International Executives Employees |
| Country of Origin Benefits | Other International Employees |

**Employers Liability:**

| | |
|---|---|
| $ 1,000,000 | Bodily Injury by Accident, Each Accident |
| $ 1,000,000 | Bodily Injury by Disease, Policy Limit |
| $ 1,000,000 | Bodily Injury by Disease, Each Employee |
| $ 250,000 | Repatriation for each employee* |
| $ 500,000 | Repatriation aggregate* |

*Covers International Executive employees, Other International employees and Local National employees

*BOLTON & Company*

# OCEAN CARGO POLICY

### Federal Insurance Company
### #00067988LAO
### 03/01/08 to 03/01/09

| | |
|---|---|
| **Merchandise Insured:** | Craft Items, Scrapbooking Supplies, Seasonal Items packed in Corrugated Cartons and Containerized. |
| **Voyages Covered:** | World to World, but excluding shipments to or from countries which the Assured is legally prohibited from trading or where there is a legal or regulatory prohibition against providing insurance. |
| **Conveyances Covered:** | Metal-hulled self-propelled vessels, aircraft, and connecting conveyances by land, sea or air, including messenger, if required. Shipments aboard metal-hulled barges as the principal conveyance are also insured if a limit is shown in the Limits clause. |

**Limits of Liability:**

| | |
|---|---|
| $1,500,000 | Merchandise aboard any one conveyance or in any one place at any one time,.**Except:** |
| $ 150,000 | A. On deck, subject to an on deck bill of lading |
| $ 1,000 | B. In any one package by mail or parcel post |
| $ 25,000 | C. Via messenger as a connecting conveyance |
| $ 100,000 | D. Aboard any one barge or any one tow as a principal conveyance |

| | |
|---|---|
| **Deductible:** | $1,000 |
| **Insuring Terms:** | "All Risks" as per Chubb's Open Ocean Cargo Policy |
| **Reporting Method/Frequency:** | Annual reporting with adjustments at end of policy period. |

BOLTON & Company

## DIC – EARTHQUAKE POLICY

**Companies:**

Layer 1:
Pacific Insurance Co./National Fire & Marine Insurance Co.
#RV0003503/CV0003503
Limit: $10,000,000

Layer 2:
Mt. Hawley Insurance Company
#MDC0201979
Limit: $10,000,000 excess $10,000,000

**Locations:**

7855 Hayvenhurst Avenue, Van Nuys, CA 91406
28470 Witherspoon Parkway, Valencia, CA 91355

**Perils:**

Difference in Conditions Including Earthquake, Earthquake Sprinkler
Leakage excluding Flood

**Coverage:**

Business Personal Property, Electronic Data Processing Hardware, Contents,
Stock, Materials and Supplies, Business Income/Extra Expense

| **Limits:** | $20,000,000 | Per Occurrence for All Coverage's Combined Subject to an annual aggregate for the peril of Earthquake and Earthquake Sprinkler Leakage |
|---|---|---|
| **Total Insurable Values:** | $30,564,237 | Per Statement of Values on File with Company |
| **Deductibles:** | $   25,000<br>5% | Per Occurrence, All Other Perils except;<br>of Total Values at Risk per Unit (including Time Element if Applicable) at the time of loss subject to a minimum of $25,000 in respect of Earthquake and Earthquake Sprinkler Leakage |

**Valuation:**

Replacement Cost Valuation except Actual Loss Sustained with Respects
Time Element

**Coinsurance:**

Not Applicable

BOLTON & Company

# DIC – EARTHQUAKE

## (Continued)

**Exclusions:**
- Asbestos
- Pollution
- Contamination
- Mold, Mildew and Fungi
- Seepage
- Computer Failure Exclusions
- Terrorism
- Flood
- Per Policy Forms

BOLTON & Company

# WORKERS' COMPENSATION POLICY

**Travelers Insurance Company**
**#8673L10708**
**01/01/08 to 01/01/09**

**Workers' Compensation - Statutory Limits – States: CA, AR, DC, IL, MI, MO, NC, NE, GA, TX**

Employers Liability:

| | |
|---|---|
| $ 1,000,000 | Each Accident - Bodily Injury by Accident |
| $ 1,000,000 | Each Employee - Bodily Injury by Disease |
| $ 1,000,000 | Policy Limit - Bodily Injury by Disease |

Includes Stop Gap for WA

Excluded Officers:        None

**HIGHER LIMITS MAY BE AVAILABLE FOR ALL COVERAGES**

BOLTON & Company

# CLAIMS-MADE LIABILITY POLICY

A Claims-Made Liability Policy provides Bodily Injury and Property Damage Liability coverage when a claim for damages is first made during the policy period. The incident causing the claim must also occur during the same policy period.

**Retroactive Date**

The retroactive date is important in determining if a Claims-Made Policy will respond to a claim. The injury or damage must occur after the retroactive date shown in the policy and the claim must be made during the coverage period.

**Extended Reporting Period**

In order for a claim to be covered by a Claims-Made Policy, the claim must be made during that policy period or during its Extended Reporting Period (the tail). Limited or mini-tail coverage is provided for claims made during the specified term following the end of the coverage period, arising out of an occurrence happening after the Retroactive Date and before the expiration of the coverage. The "tail" will apply if the policy is cancelled, non-renewed, renewed with an advanced Retroactive Date, or replaced by an "Occurrence" policy. The Extended Reporting Period (mini-tail) does not extend coverage, it only extends the reporting period.

Some policies may also offer an additional extended reporting period beyond the mini-tail, subject to payment of an additional premium. This is not offered on all policies.

*BOLTON & Company*

Exhibit "2" - 160

### DIRECTORS & OFFICERS AND
### EMPLOYMENT PRACTICES LIABILITY POLICY

**National Union Fire Insurance Company Of Pittsburgh, PA**
**#2592877**
**09/30/07 to 09/30/08**

| Aggregate Limit of Liability (Inclusive of "Defense Costs") | Employment Practices Claims Retention Each Loss (Per Policy Terms) | Securities Claims (Other Than Private Placements) Retention Each Loss (Per Policy Terms) | All Other Claims (Including Private Placements) Retention Each Loss (Per Policy Terms) | Employment Practices Sublimits |
|---|---|---|---|---|
| $10,000,000 | $100,000 | $100,000 | $100,000 | $2,000,000 |

| Coverage | | Continuity Date |
|---|---|---|
| 1. | Coverage A and B(ii): | 09/01/1998 |
| 2. | Coverage B(i): | 09/01/1998 |
| 3. | Outside Entity Coverage: | 09/30/1998 |

Endorsements include but are not limited to:
1. California Cancellation/Nonrenewal Endorsement
2. Nuclear Energy Liability Exclusion (Broad Form)
3. Captive Insurance Company Exclusion
4. Commissions Exclusion
5. Outside Entity Coverage: Per Expiring (Attached)
6. Exclusion (o) Amended FLSA
7. No Liability Provision Deleted
8. Prior Acts Exclusion – EPLI 9/30/03
9. Specific Claim Exclusion: Glenda Arnhart
10. Sublimit 2,000,000 for EPLI
11. Terrorism Exclusion
12. Coverage Territory Endorsement (OFAC)

The following have been attached to the policy.

Appendix A – Securities Claim Panel Counsel List
Appendix A – Employment Practices Claim Panel Counsel

BOLTON & Company

# FIDUCIARY LIABILITY POLICY

## Federal Insurance Company
### #68019311
### 09/30/07 to 09/30/08

| | |
|---|---|
| Maximum Aggregate Limit of Liability for this coverage section | $5,000,000 |

**Deductible Amounts**

| | |
|---|---|
| Fiduciary Liability Coverage | $10,000 |

**Pending & Prior Litigation**

Fiduciary Liability Coverage: 12/20/04 for $2,000,000, and 02/27/08 for $5,000,000 limit

**General Terms and Conditions:**

Endorsements -- The titles and headings are for convenience only. Please refer to the policy and endorsements for a description of coverage.

| | |
|---|---|
| 14-02-11260 | Domestic Partner Coverage Endorsement |
| 14-02-1350 | California Premium Endorsement |
| 14-02-4091 | California Amendatory Endorsement to the General Terms and Conditions Section |
| 14-02-9228 | Compliance with Applicable Trade Sanction Laws |

**ForeFront Portfolio[SM] on Federal Insurance Company Liability Coverage Sections:**

Fiduciary Liability Coverage Section -- Form #14-02-3798

Endorsements: The titles and headings are for convenience only. Please refer to the policy and endorsements for a description of coverage.

| | |
|---|---|
| 14-02-5935 | HIPAA Extension Endorsement |
| 99-10-0769 | Notice to Purchasers of Employment Practices Liability Coverage or Fiduciary Liability Coverage |

**Non-Liability Coverage Sections**
N/A

Extended Reporting Period:

1.  A 365 day extended reporting period is available for 100% of the premium.

### HIGHER LIMITS MAY BE AVAILABLE FOR ALL COVERAGES

BOLTON&Company

# CLAIMS-MADE LIABILITY POLICY

A Claims-Made Liability Policy provides Bodily Injury and Property Damage Liability coverage when a claim for damages is first made during the policy period. The incident causing the claim must also occur during the same policy period.

## Retroactive Date

The retroactive date is important in determining if a Claims-Made Policy will respond to a claim. The injury or damage must occur after the retroactive date shown in the policy and the claim must be made during the coverage period.

## Extended Reporting Period

In order for a claim to be covered by a Claims-Made Policy, the claim must be made during that policy period or during its Extended Reporting Period (the tail). Limited or mini-tail coverage is provided for claims made during the specified term following the end of the coverage period, arising out of an occurrence happening after the Retroactive Date and before the expiration of the coverage. The "tail" will apply if the policy is cancelled, non-renewed, renewed with an advanced Retroactive Date, or replaced by an "Occurrence" policy. The Extended Reporting Period (mini-tail) does not extend coverage, it only extends the reporting period.

Some policies may also offer an additional extended reporting period beyond the mini-tail, subject to payment of an additional premium. This is not offered on all policies.

BOLTON & Company

SCHEDULE 9.19

Bank Accounts

Bank of America:

| Account Name | Account No. |
|---|---|
| Westrim, Inc. General Account | 86666-00480 |
| Westrim, Inc., dba Westrim Crafts | 86666-12827 |
| Westrim, Inc. - A/P | 87655-15604 |
| Westrim, Inc., dba Westrim Crafts Payroll | 87654-03031 |

SCHEDULE 9.19
73306.000002 EMF_US 25977875v2

**SCHEDULE 9.21**

<u>Debt</u>

None.

CRTYW7338\745568.1

**SCHEDULE 9.22**

<u>Liens</u>

None.

SCHEDULE 9.22

CRTY\47338\745096.1

**SCHEDULE 9.24**

<u>Commercial Tort Claims</u>

None.

<u>FIRST AMENDMENT TO LOAN AND SECURITY AGREEMENT</u>

THIS FIRST AMENDMENT TO LOAN AND SECURITY AGREEMENT ("<u>Amendment</u>"), dated as of November 24, 2008 (the "<u>Amendment Date</u>"), is among WESTRIM, INC. ("<u>Borrower</u>") and CORE BUSINESS FUNDING, LLC ("<u>Lender</u>"), assignee of Core Business Credit, LLC ("<u>CBC</u>"), as follows:

RECITALS:

A.      Borrower and Lender, as assignee of CBC, are parties to the certain Loan and Security Agreement dated as of September 3, 2008 (collectively, the "<u>Loan Agreement</u>").

B.      Borrower and Lender have agreed to amend the Loan Agreement as provided hereinbelow.

NOW THEREFORE, in consideration of the premises herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

ARTICLE 1
Definitions

Section 1.1      <u>Definitions</u>.  Terms defined by the Loan Amendment and not otherwise defined herein shall have the same meanings as are prescribed by the Loan Agreement.

ARTICLE 2
Amendments

Section 2.1      <u>Amendment to Section 10.5(a)</u>.  Effective as of the Amendment Date, <u>Section 10.5(a)</u> of the Loan Agreement are hereby amended to read as follows, respectively:

(a)      Periodically as specified:

(i)      At least once during each calendar week, at the time of each request for a Revolving Loan and at any other time requested by Lender, a Borrowing Base Certificate including: (A) a detailed calculation of the Borrowing Base, (B) a certification of Eligible Accounts and Eligible Inventory, including an updated report of Accounts that are not Eligible Accounts and Inventory that is not Eligible Inventory, and (C) all supporting documents and information in respect of the foregoing (including, without limitation, sales journals, credit memos, cash receipts journals, reconciliation of changes from the most recent certificate delivered to Lender); and

(ii)      At least once during each calendar week or at such other periodic interval as may be designated from time to time in writing to Borrower by Lender in its discretion:

(A)      an aging of Borrower's Accounts as of the last day of the preceding Fiscal Month, showing Accounts aged 30

FIRST AMENDMENT TO LOAN AND SECURITY AGREEMENT, Page 1
73306.000005 EMF_US 26514626v1

days or less from date of invoice; Accounts aged over 30 days, but less than 61 days, from date of invoice; Accounts aged over 60 days, but less than 91 days, from date of invoice; Accounts aged over 90 days, but less than 120 days, from date of invoice; Accounts aged 120 days or more from date of invoice; and a reconciliation to the previous aging of Borrower's Accounts and to Borrower's general ledger; and

(B)      an aging of Borrower's accounts payable as of the last day of the preceding Fiscal Month.

Section 2.2      Amendment to Section 10.5(b).  Effective as of the Amendment Date, clause (iii) and clause (iv) of Section 10.5(b) of the Loan Agreement each is hereby amended to read, "Reserved", respectively.

Section 2.3      Amendment to Section 10.12.  Effective as of the Amendment Date, Section 10.12 of the Loan Agreement are hereby amended to read as follows, respectively:

Section 10.12  Minimum Availability.  Borrower will maintain minimum Availability, after giving effect to Revolving Loans, the refinancing of indebtedness for money borrowed as provided by Section 11.3, the payment of all fees, taxes and Lender Expenses payable by Borrower under this Agreement, in an amount equal to or greater than (a) $500,000 on any day from the Agreement Date through November 23, 2008, (b) $200,000 on any day on and after November 24, 2008 through and including December 11, 2008 and (c) $500,000 on any day on and after December 12, 2008.

ARTICLE 3
Conditions

Section 3.1      Conditions Precedent.  The effectiveness of Article 2 of this Amendment is subject to the satisfaction of the following conditions precedent:

(a)      the representations and warranties contained herein and in all other Loan Documents, as amended hereby, shall be true and correct in all material respects as of the date hereof as if made on the date hereof, except for such representations and warranties limited by their terms to a specific date;

(b)      no Default or Event of Default shall be in existence;

(c)      Borrower shall have delivered to Lender an executed original copy of this Amendment, in form and substance satisfactory to Lender;

(d)      Borrower shall have paid to Lender the fee required by Section 3.2; and

(e)      all proceedings taken in connection with the transactions contemplated by this Amendment and all documentation and other legal matters incident thereto shall be satisfactory to Lender.

Section 3.2      Amendment Fee.  In consideration of this Amendment, subject to the terms of the Loan Agreement, Borrower agrees to pay to Lender and amendment fee of $10,000, payable upon execution of this Amendment by Borrower and Lender.  Such fee is fully earned and non-refundable, subject to the terms of the Loan Agreement.

FIRST AMENDMENT TO LOAN AND SECURITY AGREEMENT, Page 2
73306.000005 EMF_US 26514626v1

## ARTICLE 4
### Ratifications, Representations and Warranties

**Section 4.1**   **Ratifications**.   The terms and provisions set forth in this Amendment shall modify and supersede all inconsistent terms and provisions set forth in the Loan Agreement and, except as expressly modified and superseded by this Amendment, the terms and provisions of the Loan Agreement and the other Loan Documents are ratified and confirmed and shall continue in full force and effect. The Borrowers and the Lender agree that the Loan Agreement as amended hereby and the other Loan Documents shall continue to be legal, valid, binding, and enforceable in accordance with their respective terms.

**Section 4.2**   **Representations and Warranties**.   Borrower hereby represents and warrants to Lender that (a) the execution, delivery, and performance of this Amendment and any and all other Loan Documents executed and/or delivered in connection herewith have been authorized by all requisite action on the part of Borrower and will not violate the governing documents of Borrower, (b) the representations and warranties contained in the Loan Agreement, as amended hereby, and the other Loan Documents are true and correct on and as of the date hereof as though made on and as of the date hereof (except to the extent that such representations and warranties were expressly made only in reference to a specific date), (c) no Default or Event of Default has occurred and is continuing, and (d) Borrower is in full compliance with all covenants and agreements contained in the Loan Agreement, as amended hereby, and the other Loan Documents.

## ARTICLE 5
### Miscellaneous

**Section 5.1**   **Survival of Representations and Warranties**.   All representations and warranties made in this Amendment or any other Loan Document delivered in connection with this Amendment shall survive the execution and delivery of this Amendment.

**Section 5.2**   **Reference to Loan Agreement**.   Each of the Loan Documents, including the Loan Agreement and any and all other agreements, documents, or instruments now or hereafter executed and delivered pursuant to the terms hereof or pursuant to the terms of the Loan Agreement as amended hereby, are hereby amended so that any reference in such Loan Documents to the Loan Agreement shall mean a reference to the Loan Agreement as amended hereby.

**Section 5.3**   **Severability**.   Any provision of this Amendment held by a court of competent jurisdiction to be invalid or unenforceable shall not impair or invalidate the remainder of this Amendment and the effect thereof shall be confined to the provision so held to be invalid or unenforceable.

**Section 5.4**   **Successors and Assigns**.   This Amendment is binding upon and shall inure to the benefit of Borrower and Lender and their respective successors and assigns, except Borrower may not assign or transfer any of its respective rights or obligations hereunder without the prior written consent of Lender.

**Section 5.5**   **Counterparts**.   This Amendment may be executed in one or more counterparts, and on telecopy counterparts each of which when so executed shall be deemed to be an original, but all of which when taken together shall constitute one and the same agreement.

**Section 5.6**      <u>Ratification</u>.   Borrower reaffirms its obligations under each of such Loan Documents, as amended hereby, and agrees that each of the Loan Documents, as amended hereby, remains in full force and effect and is hereby ratified and confirmed.

**Section 5.7**      <u>Headings</u>.  The headings, captions, and arrangements used in this Amendment are for convenience only and shall not affect the interpretation of this Amendment.

**Section 5.8**      <u>Waiver and Release</u>.   IN CONSIDERATION OF THIS AGREEMENT, BORROWER REPRESENTS AND WARRANTS THAT THERE ARE NO OFFSETS, DEFENSES OR COUNTERCLAIMS AGAINST OR IN RESPECT OF ITS OBLIGATIONS UNDER THE LOAN DOCUMENTS AND BORROWER HEREBY RELEASES AND DISCHARGES LENDER AND ITS RESPECTIVE AGENTS, EMPLOYEES, SUCCESSORS AND ASSIGNS, OF AND FROM ALL CLAIMS, ACTIONS, CAUSES OF ACTION, DAMAGES, COSTS, EXPENSES AND LIABILITIES, KNOWN OR UNKNOWN, FIXED, CONTINGENT OR CONDITIONAL, AT LAW OR IN EQUITY, IN CONNECTION WITH THE LOAN DOCUMENTS OR ANY TRANSACTIONS OR ACTS IN CONNECTION THEREWITH, ORIGINATING IN WHOLE OR IN PART ON OR BEFORE THE DATE OF THIS AGREEMENT, WHICH BORROWER MAY HAVE AGAINST ANY SUCH PERSON, IRRESPECTIVE OF WHETHER ANY SUCH CLAIMS, ACTIONS, CAUSES OF ACTION, DAMAGES, COSTS, EXPENSES OR LIABILITIES ARE BASED ON CONTRACT, TORT OR OTHERWISE.

**Section 5.9**      <u>Entire Agreement</u>.   THIS AMENDMENT EMBODIES THE FINAL, ENTIRE AGREEMENT AMONG THE PARTIES HERETO RELATING TO THE SUBJECT MATTER HEREOF AND SUPERSEDES ANY AND ALL PRIOR AGREEMENTS, WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER OF THIS AMENDMENT. THIS AMENDMENT MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF THE PARTIES HERETO. THERE ARE NO ORAL AGREEMENTS AMONG THE PARTIES.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Amendment effective as of the date first written above.

BORROWER:

WESTRIM, INC.

By: _____
Name: _____
Title: _____

LENDER:

CORE BUSINESS FUNDING, LLC

By: _____
Name: _____
Title: _____

FIRST AMENDMENT TO LOAN AND SECURITY AGREEMENT, Page 4
73306.000005 EMF_US 26514626v1

Exhibit "2" - 171

## CONSENT AND REAFFIRMATION

Reference is made to the foregoing First Amendment to Loan and Security Agreement (the "First Amendment") dated as of November [24], 2008, among Westrim, Inc. and Core Business Funding, LLC, as assignee of Core Business Credit, LLC, pursuant to which the Loan Agreement, as defined therein (the "Loan Agreement") is amended as provided therein.   Terms defined in the First Amendment, where used in this Consent and Reaffirmation and not otherwise defined herein, shall have the same meanings as are prescribed by the First Amendment.

The undersigned hereby (a) consents to the execution, delivery and performance of the First Amendment, (b) reaffirms its obligations under the Guaranty Agreement (the "Parent Guaranty") dated as of September 3, 2008, and the Security Agreement (the "Parent Security Agreement") dated as of September 3, 2008, each executed by the undersigned in connection therewith, and (c) acknowledges and agrees that the Parent Guaranty and the Parent Security Agreement each remains in full force and effect, free of any defense, offset or counterclaim, and is hereby ratified and confirmed as being and continuing in full force and effect, in each case for the benefit of Lender as assignee of CBC.

CREATIVITY CRAFTS, INC.

By: _____
Name: _____
Title: _____

## SECOND AMENDMENT TO LOAN AND SECURITY AGREEMENT

THIS SECOND AMENDMENT TO LOAN AND SECURITY AGREEMENT ("Amendment"), effective as of December 1, 2008 (the "Amendment Date"); is among WESTRIM, INC. ("Borrower") and CORE BUSINESS FUNDING, LLC ("Lender"), assignee of Core Business Credit, LLC ("CBC"), as follows:

### RECITALS:

A.       Borrower and Lender, as assignee of CBC, are parties to the certain Loan and Security Agreement dated as of September 3, 2008, as amended by the First Amendment to Loan and Security Agreement dated as of November 24, 2008 (collectively, the "Loan Agreement").

B.       Borrower has advised Lender that it will not be able to deliver its annual forecasts for the Fiscal Year of 2009 not less than 30 days prior to the beginning of the Fiscal Year of 2009 as required by Section 10.4(c) of the Loan Agreement. Borrower has requested that Lender consent to Borrower's departure from the requirements of Section 10.4(c) of the Loan Agreement with respect to the delivery by Borrower and its Subsidiaries of the annual forecasts for the Fiscal Year of 2009 and grant an extension of the delivery of the annual forecasts for the Fiscal Year of 2009 ("2009 Annual Forecasts Delivery Extension").

C.       Borrower has requested that Lender amend certain provisions of the Loan Agreement as provided hereinbelow.

D.       Subject to the limitations and satisfaction of the conditions set forth herein, Lender hereby consents to the 2009 Annual Forecasts Delivery Extension and agrees to amend the Loan Agreement, each as specifically provided hereinbelow.

NOW THEREFORE, in consideration of the premises herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

### ARTICLE 1
### Definitions

Section 1.1       Definitions.  Terms defined by the Loan Amendment and not otherwise defined herein shall have the same meanings as are prescribed by the Loan Agreement.

### ARTICLE 2
### Amendment

Section 2.1       Amendment to Definition of "Eligible Account."  Effective as of the Amendment Date, clause (e) of the definition of "Eligible Account" in Section 1.1 of the Loan Agreement is hereby amended and restated to read as follows:

(e) owed by an Account Debtor to the extent the amount owing thereon, when added to the aggregate amount owing on all Accounts owed by such Account Debtor, would exceed (i) 45.0% in the case of Michaels Stores, Inc., (ii) 45.0% in the case of Walmart, Inc. (iii) 75% in the aggregate  in the case of Michaels Stores, Inc. and Walmart, Inc, or

(iv) 20.0% in the case of all other Account Debtors, in each case of the aggregate amount of all Eligible Accounts owed at such time by all Account Debtors,

## ARTICLE 3
### Consent

Section 3.1    Consent to 2009 Annual Forecasts Delivery Extension.  To induce Lender to agree to the 2009 Annual Forecasts Delivery Extension, Borrower agrees that:

(a)    Borrower will deliver the annual forecasts for the Fiscal Year of 2009 meeting the requirements set forth in Section 10.4(c) of the Loan Agreement on or before December 26, 2008.  The failure to deliver such annual forecasts by that date shall be an Event of Default.

(b)    The consent of Lender set forth herein shall not be deemed a consent to the departure from or a waiver of: Section 10.4(c) of the Loan Agreement for any purpose other than as specifically set forth herein with respect to the delivery of the annual forecasts for the Fiscal Year of 2009, or (b) any other covenant or condition in any Loan Document, or (c) any Default that may otherwise arise or that may be reflected in the annual forecasts delivered pursuant to subsection (a) above.  The failure to comply fully with Section 10.4(c) of the Loan Agreement with respect to any other Fiscal Year, shall each constitute an Event of Default.

## ARTICLE 4
### Conditions

Section 4.1    Conditions Precedent.  The effectiveness of Article 2 of this Amendment is subject to the satisfaction of the following conditions precedent:

(a)    the representations and warranties contained herein and in all other Loan Documents, as amended hereby, shall be true and correct in all material respects as of the date hereof as if made on the date hereof, except for such representations and warranties limited by their terms to a specific date;

(b)    no Default or Event of Default shall be in existence;

(c)    Borrower shall have delivered to Lender an executed original copy of this Amendment, in form and substance satisfactory to Lender; and

(d)    all proceedings taken in connection with the transactions contemplated by this Amendment and all documentation and other legal matters incident thereto shall be satisfactory to Lender.

## ARTICLE 5
### Ratifications, Representations and Warranties

Section 5.1    Ratifications.  The terms and provisions set forth in this Amendment shall modify and supersede all inconsistent terms and provisions set forth in the Loan Agreement and, except as expressly modified and superseded by this Amendment, the terms and provisions of the Loan Agreement and the other Loan Documents are ratified and confirmed and shall continue in full force and effect.  The Borrowers and the Lender agree that the Loan Agreement as amended hereby and the other

Exhibit "2" - 174

Loan Documents shall continue to be legal, valid, binding, and enforceable in accordance with their respective terms.

Section 5.2     Representations and Warranties.   Borrower hereby represents and warrants to Lender that (a) the execution, delivery, and performance of this Amendment and any and all other Loan Documents executed and/or delivered in connection herewith have been authorized by all requisite action on the part of Borrower and will not violate the governing documents of Borrower, (b) the representations and warranties contained in the Loan Agreement, as amended hereby, and the other Loan Documents are true and correct on and as of the date hereof as though made on and as of the date hereof (except to the extent that such representations and warranties were expressly made only in reference to a specific date), (c)  no Default or Event of Default has occurred and is continuing, and (d) Borrower is in full compliance with all covenants and agreements contained in the Loan Agreement, as amended hereby, and the other Loan Documents; provided, however, Borrower makes no representation or warranty in this Amendment as to its compliance with the financial covenants set forth in Article X of the Loan Agreement for the Fiscal Month of November 2008.

ARTICLE 6<br>Miscellaneous

Section 6.1     Survival of Representations and Warranties.   All representations and warranties made in this Amendment or any other Loan Document delivered in connection with this Amendment shall survive the execution and delivery of this Amendment.

Section 6.2     Reference to Loan Agreement.   Each of the Loan Documents, including the Loan Agreement and any and all other agreements, documents, or instruments now or hereafter executed and delivered pursuant to the terms hereof or pursuant to the terms of the Loan Agreement as amended hereby, are hereby amended so that any reference in such Loan Documents to the Loan Agreement shall mean a reference to the Loan Agreement as amended hereby.

Section 6.3     Severability.   Any provision of this Amendment held by a court of competent jurisdiction to be invalid or unenforceable shall not impair or invalidate the remainder of this Amendment and the effect thereof shall be confined to the provision so held to be invalid or unenforceable.

Section 6.4     Successors and Assigns.   This Amendment is binding upon and shall inure to the benefit of Borrower and Lender and their respective successors and assigns, except Borrower may not assign or transfer any of its respective rights or obligations hereunder without the prior written consent of Lender.

Section 6.5     Counterparts.   This Amendment may be executed in one or more counterparts, and on telecopy counterparts each of which when so executed shall be deemed to be an original, but all of which when taken together shall constitute one and the same agreement.

Section 6.6     Ratification.   Borrower reaffirms its obligations under each of such Loan Documents, as amended hereby, and agrees that each of the Loan Documents, as amended hereby, remains in full force and effect and is hereby ratified and confirmed.

Section 6.7     Headings.   The headings, captions, and arrangements used in this Amendment are for convenience only and shall not affect the interpretation of this Amendment.

Section 6.8    <u>Waiver and Release</u>.  IN CONSIDERATION OF THIS AGREEMENT, BORROWER REPRESENTS AND WARRANTS THAT THERE ARE NO OFFSETS, DEFENSES OR COUNTERCLAIMS AGAINST OR IN RESPECT OF ITS OBLIGATIONS UNDER THE LOAN DOCUMENTS AND BORROWER HEREBY RELEASES AND DISCHARGES LENDER AND ITS RESPECTIVE AGENTS, EMPLOYEES, SUCCESSORS AND ASSIGNS, OF AND FROM ALL CLAIMS, ACTIONS, CAUSES OF ACTION, DAMAGES, COSTS, EXPENSES AND LIABILITIES, KNOWN OR UNKNOWN, FIXED, CONTINGENT OR CONDITIONAL, AT LAW OR IN EQUITY, IN CONNECTION WITH THE LOAN DOCUMENTS OR ANY TRANSACTIONS OR ACTS IN CONNECTION THEREWITH, ORIGINATING IN WHOLE OR IN PART ON OR BEFORE THE DATE OF THIS AGREEMENT, WHICH BORROWER MAY HAVE AGAINST ANY SUCH PERSON, IRRESPECTIVE OF WHETHER ANY SUCH CLAIMS, ACTIONS, CAUSES OF ACTION, DAMAGES, COSTS, EXPENSES OR LIABILITIES ARE BASED ON CONTRACT, TORT OR OTHERWISE.

Section 6.9    <u>Entire Agreement</u>.  THIS AMENDMENT EMBODIES THE FINAL, ENTIRE AGREEMENT AMONG THE PARTIES HERETO RELATING TO THE SUBJECT MATTER HEREOF AND SUPERSEDES ANY AND ALL PRIOR AGREEMENTS, WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER OF THIS AMENDMENT.  THIS AMENDMENT MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF THE PARTIES HERETO. THERE ARE NO ORAL AGREEMENTS AMONG THE PARTIES.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Amendment on December 12, 2008, but is effective as of the Amendment Date.

BORROWER:

WESTRIM, INC.

By: _____
Name: _____
Title: ___Chief Financial Officer___

ADDITIONAL SIGNATURES FOLLOW
LENDER:

CORE BUSINESS FUNDING, LLC

By: _____
Name: ___Greg Gentry_____
Title: ___Sr. Vice President_____

Exhibit "2" - 176

## CONSENT AND REAFFIRMATION

Reference is made to the foregoing Second Amendment to Loan and Security Agreement (the "Second Amendment") dated as of December 12, 2008, among Westrim, Inc. and Core Business Funding, LLC, as assignee of Core Business Credit, LLC, pursuant to which the Loan Agreement, as defined therein (the "Loan Agreement") is amended as provided therein.    Terms defined in the Second Amendment, where used in this Consent and Reaffirmation and not otherwise defined herein, shall have the same meanings as are prescribed by the Second Amendment.

The undersigned hereby (a) consents to the execution, delivery and performance of the Second Amendment, (b) reaffirms its obligations under the Guaranty Agreement (the "Parent Guaranty") dated as of September 3, 2008, and the Security Agreement   (the "Parent Security Agreement") dated as of September 3, 2008, each executed by the undersigned in connection therewith, and (c) acknowledges and agrees that the Parent Guaranty and the Parent Security Agreement each remains in full force and effect, free of any defense, offset or counterclaim, and is hereby ratified and confirmed as being and continuing in full force and effect, in each case for the benefit of Lender as assignee of CBC.

CREATIVITY CRAFTS, INC.

By: _____

Name: _____

Title: _____

<u>FORBEARANCE AGREEMENT AND</u>
<u>THIRD AMENDMENT TO LOAN AND SECURITY AGREEMENT</u>

THIS FORBEARANCE AGREEMENT AND THIRD AMENDMENT TO LOAN AND SECURITY AGREEMENT ("<u>Amendment</u>"), effective as of January 12, 2009 (the "<u>Amendment Date</u>"), is among WESTRIM, INC. ("<u>Borrower</u>") and CORE BUSINESS FUNDING, LLC ("<u>Lender</u>"), assignee of Core Business Credit, LLC ("<u>CBC</u>"), as follows:

RECITALS:

A.     Borrower and Lender, as assignee of CBC, are parties to the certain Loan and Security Agreement dated as of September 3, 2008, as amended by the First Amendment to Loan and Security Agreement dated as of November 24, 2008 and the Second Amendment to Loan and Security Agreement dated as of December 1, 2008 (the "<u>Loan Agreement</u>").

B.     Borrower failed to comply with the requirements of <u>Section 11.16</u> of the Loan Agreement as of November 30, 2008. Each such instance of non-compliance constitutes an Event of Default (herein collectively called the "<u>Existing Events of Default</u>").

C.     Borrower has requested that Lender agree to a limited forbearance in respect of the Existing Events of Default, and Lender is willing to do so on the terms as provided hereinbelow.

NOW THEREFORE, in consideration of the premises herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

ARTICLE 1
Definitions

Section 1.1     <u>Definitions</u>.  Terms defined by the Loan Amendment and not otherwise defined herein shall have the same meanings as are prescribed by the Loan Agreement.

ARTICLE 2
Amendments

Section 2.1     <u>Amendment to Definition of "Applicable Margin"</u>.   Effective as of the Amendment Date, the definition of "Applicable Margin" in <u>Section 1.1</u> of the Loan Agreement is hereby amended and restated to read as follows:

"<u>Applicable Margin</u>" means four percent (4.00%) per annum.

Section 2.2     <u>Amendment to Definition of "Borrowing Base"</u>.  Effective as of the Amendment Date, the definition of "Borrowing Base" in <u>Section 1.1</u> of the Loan Agreement is hereby amended and restated to read as follows:

"<u>Borrowing Base</u>" means, as of any day of determination, an amount equal to:

(a)     the <u>lesser</u> of:

(i)     the <u>sum</u> of (x) the AR Advance Percentage of the Net Amount of Eligible Accounts <u>plus</u> (y) the <u>lesser</u> of (A) 50.0% of the Net Amount of Eligible Inventory or (B) 85.0% of NOLV of Eligible Inventory, in each case determined as of such day, <u>provided</u>, that (1) the amount includable under <u>clause (y)</u> preceding may not at any time exceed $10,000,000 and (2) the amount of Qualified In-Transit Inventory includable in <u>clause (y)</u> preceding may not at any time exceed $3,000,000; or

(ii)    the Revolving Credit Limit,

(b)    <u>minus</u> the aggregate amount of reserves implemented by Lender pursuant to <u>Section 2.1</u>, in each case determined as of such day.

Section 2.3    <u>Addition of Definition of "AR Advance Percentage"</u>.  Effective as of the Amendment Date, the definition of "AR Advance Percentage" is added to <u>Section 1.1</u> of the Loan Agreement in proper alphabetical order and shall read as follows:

"<u>AR Advance Percentage</u>" means (a) at all times prior to the "Forbearance Expiration Date" (as such term is defined in that certain Forbearance Agreement and Third Amendment to Loan and Security Agreement dated as of January 12, 2009 between Borrower and Lender), eighty-five percent (85.00%) per annum and (b) on the Forbearance Expiration Date and at all times thereafter, eighty percent (80.00%) per annum.

ARTICLE 3
<u>Forbearance</u>

Section 3.1    <u>Forbearance</u>.

(a)    At the request of Borrower, subject to the terms of this Amendment and without waiving any Default or Event of Default, now existing or hereafter occurring, Lender agrees that during the period (such period, the "<u>Forbearance Period</u>") beginning on the Amendment Date and continuing through and including the earlier of (i) April 15, 2009 (such date, the "<u>Forbearance Expiration Date</u>") or (ii) breach by Borrower of any obligation under this Amendment or the occurrence of any Default or Event of Default other than the Existing Events of Default, Lender will not take any of the following actions solely by reason of the Existing Events of Default: (A) exercise remedies to enforce payment of the Obligations, (B) refuse a request for a Loan, (C) implement the interest rate provided by <u>Section 5.1(b)</u> of the Loan Agreement, or (D) take possession or dispose of any of the Collateral or take action to foreclose Lender's Liens, <u>provided</u>, that Lender's agreements under this <u>Section 3.1(a)</u> are <u>expressly conditioned</u> upon compliance with the provisions of <u>Section 3.2</u>.

(b)    Subject to the terms of this Amendment, Lender agrees that noncompliance by Borrower with the requirements of <u>Section 10.12</u> of the Loan Agreement on any day during the Forbearance Period shall not constitute an Event of Default, <u>provided</u>, that on each day during the Forbearance Period Borrower maintains minimum Availability, after giving effect to Revolving Loans, the refinancing of indebtedness for money borrowed as provided by <u>Section 11.3</u>, the payment of all fees, taxes and Lender Expenses payable by Borrower under this Amendment, in an amount equal to or greater than $200,000. Failure to maintain Availability in an amount equal or exceeding the amount required by the <u>proviso</u> preceding shall constitute an Event of Default.

Section 3.2    Additional Terms and Conditions.  In consideration for Lender's agreements under Section 3.1, and in addition to the terms of the Loan Agreement, Borrower agrees as follows:

(a)    Aggregate sales revenues of Borrower, determined as of the last day of any calendar week for the period beginning on December 14, 2008 and ending on such day, will not be less than an amount equal to 90% of projected sales revenues for such period as reflected in Exhibit A (herein, the "Projected Sales").

(b)    Aggregate disbursements of Borrower, determined as of the last day of any calendar week for the period beginning on December 14, 2008 and ending on such day, will not be more than an amount equal to: (i) 105% of projected disbursements for such period as reflected in Exhibit A at any time that the aggregate sales revenue of Borrower for the same period is greater than or equal to 90% but less than 105% of the Projected Sales for such period as reflected on Exhibit A and (ii) 120% of projected disbursements for such period as reflected in Exhibit A at any time that the aggregate sales revenue of Borrower for the same period is greater than or equal to 105% but less than 120% of the Projected Sales for such period as reflected on Exhibit A. This clause (b) does not limit the amount of aggregate disbursements of Borrower during any period that the aggregate sales revenue of Borrower is greater than or equal to 120% of the Projected Sales for such period as reflected on Exhibit A.

(c)    In addition to the reporting required by Section 10.5 of the Loan Agreement, Borrower agrees to deliver to Lender, not later than Wednesday of each calendar week, a summary report of Borrower's revenues and disbursements for the preceding calendar week, in form sufficient for comparison to the Budget and otherwise in form satisfactory to Lender.

(d)    Subject to the terms of the Loan Agreement, in consideration of the agreements of Lender under this Amendment, upon the date of termination of the Forbearance Period, Borrower agrees to pay to Lender a forbearance fee in the amount of $15,000. Subject to the terms of the Loan Agreement, upon execution of this Amendment by Borrower and Lender, such forbearance fee shall be fully earned and non-refundable, payable as provided herein.

(e)    Without limiting any other provision of this Amendment or the Loan Agreement, any breach of, or other noncompliance with, any requirements of this Section 3.2 shall constitute an Event of Default.

Section 3.3    Exercise of Remedies On and After Expiration of Forbearance Period.  The effectiveness of Lender's agreement under Section 3.1(a) shall automatically terminate without notice to Borrower upon expiration of the Forbearance Period.  Notwithstanding any provision of the Loan Documents, upon the occurrence of any Event of Default other than an Existing Event of Default, Lender may immediately exercise any and all rights and remedies provided by the Loan Documents, without prior notice.  Borrower expressly acknowledges that the right of Lender to exercise any such rights and remedies under the Loan Documents, immediately and without prior notice on or after expiration of the Forbearance Period is expressly bargained for and agreed to in consideration of the benefits provided to Borrower under this Amendment, and agrees not to prevent, hinder or delay Lender in taking any such action.  In consideration of the benefits of this Amendment, to the maximum extent allowed by Applicable Law, Borrower hereby waives and renounces any right to prior notice of the exercise by Lender of any such remedies.  Borrower and Lender each acknowledges and agrees that such waiver and renunciation by Borrower is entered into by Borrower after the occurrence, and during the continuation, of an Event of Default.

FORBEARANCE AGREEMENT AND THIRD AMENDMENT TO LOAN AND SECURITY AGREEMENT, Page 3

Section 3.4     No Waiver; Reservation.   Unless and until otherwise agreed in writing by Lender, the funding of any Loan or provision of any other extension of credit shall be without prejudice to Lender's rights under the Loan Agreement and shall not constitute any waiver of any Default or Event of Default, now existing or hereafter occurring.  Except as expressly provided by this Amendment, all rights and remedies of Lender under the Loan Documents are expressly reserved.  This agreement is expressly limited as provided herein.  Subject to the terms of this Amendment, until the Obligations are paid in full, all terms and provisions of the Loan Documents remain in full force and effect in accordance with their terms, and Lender reserves the right to require strict compliance at all times with the Loan Agreement and the other Loan Documents.

### ARTICLE 4
#### Conditions

Section 4.1     Conditions Precedent.   The effectiveness of Article 2 and Article 3 of this Amendment is subject to the satisfaction of the following conditions precedent:

(a)     the representations and warranties contained herein and in all other Loan Documents, as amended hereby, shall be true and correct in all material respects as of the date hereof as if made on the date hereof, except for such representations and warranties limited by their terms to a specific date;

(b)     no Default or Event of Default other than the Existing Events of Default shall be in existence;

(c)     Borrower shall have delivered to Lender an executed original copy of this Amendment, in form and substance satisfactory to Lender; and

(d)     all proceedings taken in connection with the transactions contemplated by this Amendment and all documentation and other legal matters incident thereto shall be satisfactory to Lender.

### ARTICLE 5
#### Ratifications, Representations and Warranties

Section 5.1     Ratifications.   The terms and provisions set forth in this Amendment shall modify and supersede all inconsistent terms and provisions set forth in the Loan Agreement and, except as expressly modified and superseded by this Amendment, the terms and provisions of the Loan Agreement and the other Loan Documents are ratified and confirmed and shall continue in full force and effect.  The Borrowers and the Lender agree that the Loan Agreement as amended hereby and the other Loan Documents shall continue to be legal, valid, binding, and enforceable in accordance with their respective terms.

Section 5.2     Representations and Warranties.   Borrower hereby represents and warrants to Lender that the execution, delivery, and performance of this Amendment and any and all other Loan Documents executed and/or delivered in connection herewith have been authorized by all requisite action on the part of Borrower and will not violate the governing documents of Borrower, and that except with respect to the Existing Events of Default, (a) the representations and warranties contained in the Loan Agreement and the other Loan Documents are true and correct on and as of the date hereof as though made on and as of the date hereof (except to the extent that such representations and warranties were expressly made only in reference to a specific date), (b)  no Default or Event of Default has occurred and

FORBEARANCE AGREEMENT AND THIRD AMENDMENT TO LOAN AND SECURITY AGREEMENT, Page 4

is continuing, and (c) Borrower is in full compliance with all covenants and agreements contained in the Loan Agreement and the other Loan Documents.

## ARTICLE 6
### Miscellaneous

Section 6.1     Survival of Representations and Warranties. All representations and warranties made in this Amendment or any other Loan Document delivered in connection with this Amendment shall survive the execution and delivery of this Amendment.

Section 6.2     Reference to Loan Agreement. Each of the Loan Documents, including the Loan Agreement and any and all other agreements, documents, or instruments now or hereafter executed and delivered pursuant to the terms hereof or pursuant to the terms of the Loan Agreement as amended hereby, are hereby amended so that any reference in such Loan Documents to the Loan Agreement shall mean a reference to the Loan Agreement as amended hereby.

Section 6.3     Severability. Any provision of this Amendment held by a court of competent jurisdiction to be invalid or unenforceable shall not impair or invalidate the remainder of this Amendment and the effect thereof shall be confined to the provision so held to be invalid or unenforceable.

Section 6.4     Successors and Assigns. This Amendment is binding upon and shall inure to the benefit of Borrower and Lender and their respective successors and assigns, except Borrower may not assign or transfer any of its respective rights or obligations hereunder without the prior written consent of Lender.

Section 6.5     Counterparts. This Amendment may be executed in one or more counterparts, and on telecopy counterparts each of which when so executed shall be deemed to be an original, but all of which when taken together shall constitute one and the same agreement.

Section 6.6     Ratification. Borrower reaffirms its obligations under each of such Loan Documents, as amended hereby, and agrees that each of the Loan Documents, as amended hereby, remains in full force and effect and is hereby ratified and confirmed.

Section 6.7     Headings. The headings, captions, and arrangements used in this Amendment are for convenience only and shall not affect the interpretation of this Amendment.

Section 6.8     No Claims, Offsets or Defenses. Borrower represents and warrants that there are no claims, offsets, defenses or counterclaims against the Obligations and hereby waives any and all such claims, offsets, defenses or counterclaims, whether known or unknown, arising on or prior to the date hereof. Borrower represents and warrants to Lender that, except for the Existing Events of Default (a) no Default or Event of Default has occurred and is continuing and (b) the representations and warranties set forth in the Loan Documents are true and correct in all material respects on and as of the date hereof with the same effect as though made on and as of such date, except with respect to any representations and warranties which are limited by their terms to a specific date.

Section 6.9     Waiver and Release. IN CONSIDERATION OF THIS AGREEMENT, BORROWER REPRESENTS AND WARRANTS THAT THERE ARE NO OFFSETS, DEFENSES OR COUNTERCLAIMS AGAINST OR IN RESPECT OF ITS OBLIGATIONS UNDER THE LOAN DOCUMENTS AND BORROWER HEREBY RELEASES AND DISCHARGES LENDER AND ITS RESPECTIVE AGENTS, EMPLOYEES, SUCCESSORS AND ASSIGNS, OF AND

FROM ALL CLAIMS, ACTIONS, CAUSES OF ACTION, DAMAGES, COSTS, EXPENSES AND LIABILITIES, KNOWN OR UNKNOWN, FIXED, CONTINGENT OR CONDITIONAL, AT LAW OR IN EQUITY, IN CONNECTION WITH THE LOAN DOCUMENTS OR ANY TRANSACTIONS OR ACTS IN CONNECTION THEREWITH, ORIGINATING IN WHOLE OR IN PART ON OR BEFORE THE DATE OF THIS AGREEMENT, WHICH BORROWER MAY HAVE AGAINST ANY SUCH PERSON, IRRESPECTIVE OF WHETHER ANY SUCH CLAIMS, ACTIONS, CAUSES OF ACTION, DAMAGES, COSTS, EXPENSES OR LIABILITIES ARE BASED ON CONTRACT, TORT OR OTHERWISE.

Section 6.10    Entire Agreement.   THIS AMENDMENT EMBODIES THE FINAL, ENTIRE AGREEMENT AMONG THE PARTIES HERETO RELATING TO THE SUBJECT MATTER HEREOF AND SUPERSEDES ANY AND ALL PRIOR AGREEMENTS, WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER OF THIS AMENDMENT.   THIS AMENDMENT MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF THE PARTIES HERETO. THERE ARE NO ORAL AGREEMENTS AMONG THE PARTIES.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Amendment as of the Amendment Date.

BORROWER:

WESTRIM, INC.

By: _____
Name: _Fred Gysi_____
Title: _Chief Financial Officer___

LENDER:

CORE BUSINESS FUNDING, LLC

By: _____
Name: _Greg Genta_____
Title: _Sr. Vice President_____

Exhibit "2" - 183

## CONSENT AND REAFFIRMATION

Reference is made to the foregoing Forbearance Agreement and Third Amendment to Loan and Security Agreement (the "Third Amendment") dated as of December [__], 2008, among Westrim, Inc. and Core Business Funding, LLC, as assignee of Core Business Credit, LLC, pursuant to which the Loan Agreement, as defined therein (the "Loan Agreement") is amended as provided therein. Terms defined in the Third Amendment, where used in this Consent and Reaffirmation and not otherwise defined herein, shall have the same meanings as are prescribed by the Third Amendment.

The undersigned hereby (a) consents to the execution, delivery and performance of the Third Amendment, (b) reaffirms its obligations under the Guaranty Agreement (the "Parent Guaranty") dated as of September 3, 2008, and the Security Agreement (the "Parent Security Agreement") dated as of September 3, 2008, each executed by the undersigned in connection therewith, and (c) acknowledges and agrees that the Parent Guaranty and the Parent Security Agreement each remains in full force and effect, free of any defense, offset or counterclaim, and is hereby ratified and confirmed as being and continuing in full force and effect, in each case for the benefit of Lender as assignee of CBC.

CREATIVITY CRAFTS, INC.

By: _____

Name: Fred Zysi

Title: Chief Financial Officer

FORBEARANCE AGREEMENT AND THIRD AMENDMENT TO LOAN AND SECURITY AGREEMENT, Page 7

EXHIBIT A
TO
FORBEARANCE AGREEMENT AND
THIRD AMENDMENT TO LOAN AND SECURITY AGREEMENT

Westlin Inc. Forecast

| | 12/19/08 | 12/24/08 | 12/31/08 | 1/16/09 | 1/23/09 | 1/30/09 | 2/6/09 | 2/13/09 | 2/20/09 | 2/27/09 | 3/6/09 | 3/13/09 | 3/20/09 | 3/27/09 | TOTAL 09 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Loan Balance | 17,318 | 16,843 | 16,263 | 15,935 | 16,308 | 16,610 | 17,051 | 17,256 | 17,481 | 17,268 | 16,113 | 17,107 | 17,527 | 17,896 | |
| Beginning Borrowing Base | 17,318 | 16,843 | 16,263 | 15,935 | 16,308 | 16,610 | 17,051 | 17,256 | 17,481 | 17,268 | 16,113 | 17,107 | 17,527 | 17,896 | |
| Beginning Availability (BB-LB) | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| Collections | 1,852 | 1,994 | 1,436 | 1,650 | 800 | 500 | 1,000 | 925 | 1,025 | 1,750 | 750 | 2,300 | 885 | 1,052 | 1,151 | 68,323 |
| Tax Refund | | | | | | | | | | | | | | | |
| Payroll | (500) | (20) | (500) | (105) | (738) | (556) | (438) | (475) | (433) | (20) | (433) | (20) | (433) | (20) | (433) | (11,236) |
| Payments to Suppliers | (887) | (1,194) | (283) | (404) | (707) | | (503) | (475) | (987) | (1,342) | (987) | (663) | (572) | (1,261) | (1,017) | (38,846) |
| Payments to Core | | | (125) | | | | | (347) | | | | (147) | | | | (1,619) |
| Rent/Insurance | | | | (314) | (160) | | | (175) | (150) | | | (314) | (150) | (150) | | (6,568) |
| Other payments | (200) | (200) | (200) | (200) | (200) | (200) | (200) | (176) | (224) | (175) | (175) | (150) | (180) | (150) | (150) | (9,529) |
| Sub Total | 475 | 580 | 328 | 627 | (1,025) | (276) | (441) | (206) | 224 | 213 | (845) | (314) | (420) | (388) | (446) | 4,523 |
| | | | | | | | | | | | | | | | |
| Loan (payment)/draw | (476) | (580) | (328) | (627) | 1,025 | 276 | 441 | 206 | 224 | (213) | 845 | 1,008 | 420 | 389 | 449 | |
| Ending Loan Balance | 16,843 | 16,263 | 15,935 | 15,308 | 16,333 | 16,609 | 17,051 | 17,480 | 17,480 | 17,288 | 18,113 | 17,107 | 17,527 | 17,896 | 18,345 | |
| Ending Borrowing Base | 16,843 | 16,263 | 15,308 | 16,333 | 16,610 | 17,051 | 17,256 | 17,481 | 17,288 | 18,113 | 17,107 | 17,527 | 17,896 | 18,345 | |
| Loan | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| **Borrowing Base Forecast** | | | | | | | | | | | | | | | |
| Beginning Eligible AR | 11,170 | 10,659 | 10,066 | 9,830 | 8,981 | 9,288 | 9,550 | 9,906 | 10,151 | 10,418 | 10,171 | 11,188 | 10,110 | 10,767 | 11,367 | |
| Sales | 1,484 | 1,534 | 1,354 | 959 | 1,161 | 1,247 | 1,438 | 1,243 | 1,492 | 1,616 | 1,865 | 1,347 | 1,618 | 1,751 | 2,020 | 75,000 |
| Collections | (1,852) | (1,994) | (1,436) | (1,650) | (800) | (500) | (1,000) | (925) | (1,025) | (1,760) | (750) | (2,300) | (885) | (1,082) | (1,151) | (68,323) |
| Write-offs | (113) | (133) | (154) | (168) | (64) | (485) | (82) | (73) | (200) | (113) | (118) | (104) | (74) | (89) | (98) | (6,184) |
| Eligible AR | 10,659 | 10,066 | 9,830 | 8,981 | 9,288 | 9,550 | 9,906 | 10,151 | 10,418 | 10,171 | 11,188 | 10,110 | 10,767 | 11,367 | 12,140 | |
| Eligible AR @ 80% to 58% | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| Beginning Eligible Inventory | 18,406 | 8,274 | 18,062 | 17,766 | 17,889 | 17,953 | 18,028 | 18,304 | 18,300 | 18,234 | 18,289 | 18,262 | 18,069 | 17,793 | 17,511 | |
| Purchases | 600 | 555 | 400 | 680 | 980 | 720 | 1,020 | 622 | 748 | 808 | 833 | 500 | 560 | 645 | 654 | 33,079 |
| Sales at Cost | (732) | (767) | (677) | (486) | (596) | (646) | (744) | (626) | (751) | (814) | (839) | (713) | (836) | (927) | (1,070) | (37,741) |
| Other Changes | | | | | | | | | | | | | | | |
| Ending Eligble Inventory at 50% | 18,274 | 8,062 | 17,785 | 17,889 | 17,953 | 18,028 | 18,304 | 18,300 | 18,234 | 18,289 | 18,262 | 18,069 | 17,793 | 17,611 | 17,095 | |
| | | | | | | | | | | | | | | | |
| Ending Eligble AR + Inv | | | | | | | | | | | | | | | |
| Letter of Credit | (236) | (236) | (236) | (236) | (236) | (236) | (236) | (236) | (236) | (236) | (236) | (236) | (236) | (236) | (236) | |
| Landlord deposit | (86) | (86) | (86) | (86) | (86) | (86) | (86) | (86) | (86) | (86) | (86) | (86) | (86) | (86) | (86) | |
| Reserve | (500) | (500) | (500) | (500) | (500) | (500) | (500) | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| Beginning Accounts Payable | 8,528 | 8,441 | 7,802 | 7,919 | 8,115 | 8,038 | 8,202 | 8,419 | 8,568 | 8,821 | 8,287 | 8,232 | 8,069 | 8,077 | 7,461 | |
| Payments to Suppliers | (887) | (1,194) | (283) | (707) | (737) | (556) | (503) | (475) | (491) | (1,342) | (987) | (663) | (572) | (1,261) | (1,017) | (35,846) |
| Product Purchases | 600 | 555 | 400 | 600 | 680 | 720 | 1,020 | 622 | 748 | 808 | 933 | 500 | 580 | 645 | 654 | 33,079 |
| Other Payments | (200) | (200) | (200) | (514) | (360) | (200) | (200) | (489) | (325) | (175) | (175) | (484) | (300) | (160) | (160) | (15,097) |
| Other Purchases/Expenses | 200 | 200 | 200 | 514 | 200 | 200 | 200 | 525 | 325 | 175 | 175 | 484 | 310 | 150 | 150 | 15,087 |
| Ending Accounts Payable | 8,441 | 7,802 | 7,919 | 8,115 | 8,038 | 8,202 | 8,419 | 8,568 | 8,821 | 8,287 | 8,232 | 8,069 | 8,077 | 7,461 | 7,098 | |

## FOURTH AMENDMENT TO LOAN AND SECURITY AGREEMENT

THIS FOURTH AMENDMENT TO LOAN AND SECURITY AGREEMENT ("Amendment"), effective as of April 20, 2009 (the "Amendment Date"), is among WESTRIM, INC. ("Borrower") and CORE BUSINESS FUNDING, LLC ("Lender"), assignee of Core Business Credit, LLC ("CBC"), as follows:

### RECITALS:

A.    Borrower and Lender, as assignee of CBC, are parties to the certain Loan and Security Agreement dated as of September 3, 2008, as amended by the First Amendment to Loan and Security Agreement dated as of November 24, 2008, the Second Amendment to Loan and Security Agreement dated as of December 1, 2008 and the Forbearance and Third Amendment to Loan and Security Agreement dated as of January 12, 2009 (the "Forbearance and Third Amendment") (all of the foregoing, collectively, the "Loan Agreement").

B.    Borrower has requested that Lender agree to waive the Existing Events of Default (defined in the Forbearance and Third Amendment) and amend certain provisions of the Loan Agreement, and Lender is willing to do so on the terms provided by this Agreement.

NOW THEREFORE, in consideration of the premises, the mutual promises and benefits herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

### ARTICLE 1
### Definitions

Section 1.1    Definitions.    Terms defined by the Loan Amendment and not otherwise defined herein shall have the same meanings as are prescribed by the Loan Agreement.

### ARTICLE 2
### Amendments

Section 2.1    Amendment to Definitions.    Effective as of the Amendment Date, Section 1.1 of the Loan Agreement is amended as follows:

(a)    The following definitions are amended and restated to read as follows, respectively:

"Applicable Margin" means, (a) 5.75% on any day before September 1, 2009, and (b) 5.25% on any day on or after September 1, 2009.

"AR Advance Percentage" means eighty-five percent (85.00%) per annum.

"Borrowing Base" means, as of any day of determination, an amount equal to:

(a)    the lesser of:

(i)    the sum of (x) the AR Advance Percentage of the Net Amount of Eligible Accounts plus (y) (A) on any day prior to September 1, 2009, the Inventory Advance Percentage of the Net Amount of Eligible

Exhibit "2" - 186

Inventory or (B) on any day on or after September 1, 2009, the lesser of the Inventory Advance Percentage of the Net Amount of Eligible Inventory or 85.0% of NOLV of Eligible Inventory, in each case determined as of such day , provided, that (1) the amount includable under clause (y) preceding may not at any time exceed $10,000,000 and (2) the amount of Qualified In-Transit Inventory includable in clause (y) preceding may not at any time exceed $3,000,000, or

(ii)        the Revolving Credit Limit; minus

(b)        the aggregate amount of reserves implemented by Lender pursuant to Section 2.1, in each case determined as of such day.

"EBITDA" means, with respect to a Person for any period, consolidated net earnings (or loss), minus extraordinary gains minus profit or loss from the sale of obsolete or slow moving Inventory conducted by Borrower in accordance with past practices plus Interest Expense, income taxes, and depreciation and amortization for such period, as determined in accordance with GAAP, in each case determined for such Person for such period.

"Tangible Net Worth" means, with respect to a Person, as of any date, (a) Shareholder's Equity, excluding any assets or liabilities in respect of deferred income taxes or accrued lease obligations, less (b) Intangible Assets, in each case determined for such Person as of such date.

(b)        The following definitions are added to Section 1.1 of the Loan Agreement, each in its appropriate alphabetical position:

"Inventory Advance Percentage" means (a) 50.0% on any day prior to July 1, 2009, (b) 44.5% on any day on or after July 1, 2009 and before September 1, 2009, and (c) 50.0% on any day on and after September 1, 2009.

"LIBOR Rate" means, with respect to any day, the rate per annum published for such day in the "Money Rates" table of *The Wall Street Journal* (or such other presentation within *The Wall Street Journal* as may be adopted hereafter for such information) as the London interbank offered rate for deposits in Dollars for an interest period of one month. If for any reason such published rate is not available, "LIBOR Rate" shall mean, with respect to such day, a rate per annum equal to the London interbank offered rate for such day, for an interest period of one month, as determined by Lender in such other manner as is acceptable to Lender in its discretion. If, notwithstanding the foregoing, Lender is unable to determine the LIBOR Rate in the manner provided above, then the "LIBOR Rate" shall be deemed to be a rate determined according to such other reference or index as may be selected by Lender in its discretion.

Section 2.2        Amendment to Section 5.1(a).  Effective as of the Amendment Date, Section 5.1(a) of the Loan Agreement is amended and restated to read as follows:

(a)        All outstanding Obligations shall bear interest on the unpaid principal amount thereof (including, to the extent permitted by law, on accrued interest thereon not paid when due) from the date made until paid in full in cash at a fluctuating per annum rate equal to the lesser of (i) (A) the greater of the LIBOR Rate or 3.00% per annum plus (B) the Applicable Margin, or (ii) the Maximum Rate.  Each change in the LIBOR Rate shall be reflected in the interest rate described in clause (a)(i) preceding as of the effective date of

any such change.  Subject to Section 5.5, interest shall be computed on the basis of a year of 360 days and actual days elapsed.

Section 2.3    Amendment to Section 10.12.  Effective as of the Amendment Date, Section 10.12 of the Loan Agreement is amended and restated to read as follows:

Section 10.12    Minimum Availability.    Borrower will maintain minimum Availability, after giving effect to the Revolving Loans, the refinancing of indebtedness for money borrowed as provided by Section 11.3, the payment of all fees, taxes and Lender Expenses payable by Borrower under this Agreement, in an amount equal to or greater than (a) $200,000 on any day before April 19, 2009, (b) $300,000 on any day on and after April 19, 2009 and before October 31, 2009, and (c) $500,000 on any day on and after October 31, 2009.

Section 2.4    Amendment to Section 11.16.  Effective as of the Amendment Date, Section 11.16 of the Loan Agreement is amended and restated to read as follows:

Section 11.16    Financial Covenants.

(a)    EBITDA for Borrower, determined as of the last day of any Fiscal Month, shall not be less than the amount specified below, in each case determined as of such date for the calculation period indicated:

| Calculation Period | Period Ending | Minimum EBITDA |
|---|---|---|
| 3 Fiscal Months | March 2009 | $    500,000 deficit |
| 4 Fiscal Months | April 2009 | $    645,000 deficit |
| 5 Fiscal Months | May 2009 | $    745,000 deficit |
| 6 Fiscal Months | June 2009 | $    325,000 |
| 7 Fiscal Months | July 2009 | $    1,500,000 |
| 8 Fiscal Months | August 2009 | $    1,500,000 |
| 9 Fiscal Months | September 2009 | $    2,300,000 |
| 10 Fiscal Months | October 2009 | $    2,425,000 |
| 11 Fiscal Months | November 2009 | $    2,485,000 |
| 12 Fiscal Months | December 2009 | $    2,735,000 |
| 12 Fiscal Months | January 2010 | $    2,735,000 |
| 12 Fiscal Months | February 2010 | $    2,735,000 |
| 12 Fiscal Months | March 2010 | $    2,735,000 |
| 12 Fiscal Months | April 2010 | $    2,735,000 |
| 12 Fiscal Months | May 2010 | $    2,735,000 |
| 12 Fiscal Months | June 2010 | $    2,735,000 |
| 12 Fiscal Months | July 2010 | $    3,000,000 |
| 12 Fiscal Months | Thereafter | $    3,000,000 |

(b)    The ratio of (i) Total Debt to (ii) Tangible Net Worth, determined for Borrower as of the last day of any Fiscal Month, shall not be greater than the amount specified below with respect to such Fiscal Month:

| | |
|---|---|
| March 2009 | 3.35 |
| April 2009 | 3.35 |
| May 2009 | 3.35 |
| June 2009 | 3.30 |
| July 2009 | 3.30 |
| August 2009 | 3.00 |
| September 2009 | 2.40 |
| October 2009 | 2.40 |
| November 2009 | 2.30 |
| December 2009 | 2.30 |
| January 2010 | 2.30 |
| February 2010 | 2.30 |
| March 2010 | 2.30 |
| April 2010 | 2.30 |
| May 2010 | 2.30 |
| June 2010 | 2.30 |
| July 2010 | 2.30 |
| August 2010 | 2.30 |
| September 2010 | 2.30 |
| Thereafter | 2.00 |

(c)    Tangible Net Worth, determined for Borrower as of the last day of any Fiscal Month of Borrower, shall not be less than the amount specified below with respect to such Fiscal Month:

| | | |
|---|---|---|
| March 2009 through May 2009 | $ | 5,000,000 |
| June 2009 | $ | 5,400,000 |
| July 2009 and August 2009 | $ | 5,900,000 |
| September 2009 and October 2009 | $ | 6,275,000 |
| November 2009 and December 2009 | $ | 6,250,000 |
| January 2010 through July 2010 | $ | 6,325,000 |
| August 2010 through July 2011 | $ | 7,125,000 |
| Thereafter | $ | 8,000,000 |

(d)    The Fixed Charge Coverage Ratio, determined for Borrower as of the last day of any Fiscal Month, shall not be less than the amount specified below with respect to such Fiscal Month, in each case calculated as of such date for the calculation period indicated:

FOURTH AMENDMENT TO LOAN AND SECURITY AGREEMENT, Page 4
73306.000005 EMF_US 27123488v3

Exhibit "2" - 189

| Calculation Period | Period Ending | Minimum Ratio |
|---|---|---|
| 3 Fiscal Months | March 2009 | negative 1.25 |
| 4 Fiscal Months | April 2009 | negative 1.15 |
| 5 Fiscal Months | May 2009 | negative 1.05 |
| 6 Fiscal Months | June 2009 | 0.40 |
| 7 Fiscal Months | July 2009 | 1.25 |
| 8 Fiscal Months | August 2009 | 1.25 |
| 9 Fiscal Months | September 2009 | 1.50 |
| 10 Fiscal Months | October 2009 | 1.50 |
| 11 Fiscal Months | November 2009 | 1.50 |
| 12 Fiscal Months | December 2009 | 1.50 |
| 12 Fiscal Months | January 2010 | 1.50 |
| 12 Fiscal Months | February 2010 | 1.50 |
| 12 Fiscal Months | March 2010 | 1.50 |
| 12 Fiscal Months | April 2010 | 1.50 |
| 12 Fiscal Months | May 2010 | 1.50 |
| 12 Fiscal Months | June 2010 | 1.50 |
| 12 Fiscal Months | July 2010 | 1.50 |
| 12 Fiscal Months | August 2010 | 1.50 |
| 12 Fiscal Months | September 2010 | 1.50 |
| 12 Fiscal Months | October 2010 | 1.50 |
| 12 Fiscal Months | November 2010 | 1.50 |
| 12 Fiscal Months | December 2010 | 1.75 |
| 12 Fiscal Months | Thereafter | 1.75 |

(e)     Capital Expenditures for Borrower during any Fiscal Year shall not exceed $850,000.

(f)     Net Income, determined for Borrower as of the last day of each Fiscal Month on and after January 31, 2010, calculated for the preceding twelve Fiscal Months, shall be greater than $0.

## ARTICLE 3
### Waiver of Existing Events of Default

Section 3.1     Waiver.  Subject to Section 3.2 and Section 4.1 of this Amendment, effective as of the Amendment Date, Lender hereby waives each of the Existing Events of Default.

Section 3.2     The waiver provided by this Section 3.2 is strictly limited as provided herein and shall not be deemed to constitute a waiver of any other Default or Event of Default, or a consent to noncompliance with any term or provision of the Loan Agreement (including, without limitation, Section 11.16) as of any date or for any period other than as specified herein with respect to the Existing Events of Default.  Subject to the terms of this Amendment, until the Obligations are paid in full, all terms and provisions of the Loan Documents remain in full force and effect in accordance with their terms, and Lender reserves the right to require strict compliance at all times with the Loan Agreement and the other Loan Documents.

Exhibit "2" - 190

ARTICLE 4
Conditions

Section 4.1    Conditions Precedent.    The effectiveness of Article 2 and Article 3 of this Amendment is subject to the satisfaction of the following conditions precedent:

(a)    the representations and warranties contained herein and in all other Loan Documents, as amended hereby, shall be true and correct in all material respects as of the date hereof as if made on the date hereof, except for such representations and warranties limited by their terms to a specific date;

(b)    no Default or Event of Default other than the Existing Events of Default shall be in existence;

(c)    Borrower shall have delivered to Lender an executed original copy of this Amendment, in form and substance satisfactory to Lender;

(d)    Borrower shall have paid to Lender the fee required by Section 3.2(d) of the Forbearance and Third Amendment; and

(e)    all proceedings taken in connection with the transactions contemplated by this Amendment and all documentation and other legal matters incident thereto shall be satisfactory to Lender.

ARTICLE 5
Ratifications, Representations and Warranties

Section 5.1    Ratifications.    The terms and provisions set forth in this Amendment shall modify and supersede all inconsistent terms and provisions set forth in the Loan Agreement and, except as expressly modified and superseded by this Amendment, the terms and provisions of the Loan Agreement and the other Loan Documents are ratified and confirmed and shall continue in full force and effect. The Borrowers and the Lender agree that the Loan Agreement as amended hereby and the other Loan Documents shall continue to be legal, valid, binding, and enforceable in accordance with their respective terms.

Section 5.2    Representations and Warranties.    Borrower hereby represents and warrants to Lender that the execution, delivery, and performance of this Amendment and any and all other Loan Documents executed and/or delivered in connection herewith have been authorized by all requisite action on the part of Borrower and will not violate the governing documents of Borrower, and that, after giving effect to this Amendment, (a) the representations and warranties contained in the Loan Agreement and the other Loan Documents are true and correct on and as of the date hereof as though made on and as of the date hereof (except to the extent that such representations and warranties were expressly made only in reference to a specific date, in which case such representations and warranties are true and correct as of such date), (b) no Default or Event of Default has occurred and is continuing, and (c) Borrower is in full compliance with all covenants and agreements contained in the Loan Agreement and the other Loan Documents.

ARTICLE 6
Other Agreements

Section 6.1    Waiver and Amendment Fee.    Subject to the terms of the Loan Agreement, in consideration of the waiver and agreements of Lender pursuant to this Amendment, Borrower agrees to pay to Lender a waiver and amendment fee in the amount of $10,000, which shall be deemed fully earned upon execution and delivery by Lender of this Amendment.

FOURTH AMENDMENT TO LOAN AND SECURITY AGREEMENT, Page 6
73306.000005 EMF_US 27123488v3

Section 6.2    Delivery of December 31, 2008 Financial Statements.  Lender agrees that the deadline for delivery by Borrower of its audited consolidated and consolidating financial statements for Borrower's Fiscal Year ended December 31, 2008 is hereby extended to May 31, 2009. Notwithstanding the provisions of Section 10.4(a) of the Loan Agreement, delivery of such financial statements after the expiration of 120 days after the end of such Fiscal Year shall not constitute a Default or Event of Default, provided, that such financial statements are delivered to Lender on or before May 31, 2009. The extension provided by this Section 6.2 is expressly limited as provided herein and shall not constitute an extension or waiver of the requirements of Section 10.4(a) of the Loan Agreement with respect to any other compliance date or an extension or waiver of any other requirements of the Loan Agreement. The accommodation provided by Lender pursuant to this Section 6.2 shall not create or constitute a course of dealing or a basis for any anticipation or expectation by Borrower that any such accommodation will be provided in the future. Except as provided by this Section 6.2, Lender reserves all rights to require strict compliance with the requirements of the Loan Agreement, including without limitation Section 10.4(a) thereof.

Section 6.3    Survival of Representations and Warranties.  All representations and warranties made in this Amendment or any other Loan Document delivered in connection with this Amendment shall survive the execution and delivery of this Amendment.

Section 6.4    Reference to Loan Agreement.  Each of the Loan Documents, including the Loan Agreement and any and all other agreements, documents, or instruments now or hereafter executed and delivered pursuant to the terms hereof or pursuant to the terms of the Loan Agreement as amended hereby, are hereby amended so that any reference in such Loan Documents to the Loan Agreement shall mean a reference to the Loan Agreement as amended hereby.

Section 6.5    Loan Document.  This Amendment is a Loan Document.

Section 6.6    Severability.  Any provision of this Amendment held by a court of competent jurisdiction to be invalid or unenforceable shall not impair or invalidate the remainder of this Amendment and the effect thereof shall be confined to the provision so held to be invalid or unenforceable.

Section 6.7    Successors and Assigns.  This Amendment is binding upon and shall inure to the benefit of Borrower and Lender and their respective successors and assigns, except Borrower may not assign or transfer any of its respective rights or obligations hereunder without the prior written consent of Lender.

Section 6.8    Counterparts.  This Amendment may be executed in one or more counterparts, and on telecopy counterparts each of which when so executed shall be deemed to be an original, but all of which when taken together shall constitute one and the same agreement.

Section 6.9    Ratification.  Borrower reaffirms its obligations under each of such Loan Documents, as amended hereby, and agrees that each of the Loan Documents, as amended hereby, remains in full force and effect and is hereby ratified and confirmed, provided, that on and after the Amendment Date the provisions of Section 3.2 of the Forbearance and Third Amendment shall be of no further effect.

Section 6.10    Headings.  The headings, captions, and arrangements used in this Amendment are for convenience only and shall not affect the interpretation of this Amendment.

Section 6.11    No Claims, Offsets or Defenses.  Borrower represents and warrants that there are no claims, offsets, defenses or counterclaims against the Obligations and hereby waives any and all such claims, offsets, defenses or counterclaims, whether known or unknown, arising on or prior to the date hereof.

FOURTH AMENDMENT TO LOAN AND SECURITY AGREEMENT, Page 7
73306.000005 EMF_US 27123488v3

Section 6.12     Waiver and Release.    IN CONSIDERATION OF THIS AGREEMENT, BORROWER REPRESENTS AND WARRANTS THAT THERE ARE NO OFFSETS, DEFENSES OR COUNTERCLAIMS AGAINST OR IN RESPECT OF ITS OBLIGATIONS UNDER THE LOAN DOCUMENTS AND BORROWER HEREBY RELEASES AND DISCHARGES LENDER AND ITS RESPECTIVE AGENTS, EMPLOYEES, SUCCESSORS AND ASSIGNS, OF AND FROM ALL CLAIMS, ACTIONS, CAUSES OF ACTION, DAMAGES, COSTS, EXPENSES AND LIABILITIES, KNOWN OR UNKNOWN, FIXED, CONTINGENT OR CONDITIONAL, AT LAW OR IN EQUITY, IN CONNECTION WITH THE LOAN DOCUMENTS OR ANY TRANSACTIONS OR ACTS IN CONNECTION THEREWITH, ORIGINATING IN WHOLE OR IN PART ON OR BEFORE THE DATE OF THIS AGREEMENT, WHICH BORROWER MAY HAVE AGAINST ANY SUCH PERSON, IRRESPECTIVE OF WHETHER ANY SUCH CLAIMS, ACTIONS, CAUSES OF ACTION, DAMAGES, COSTS, EXPENSES OR LIABILITIES ARE BASED ON CONTRACT, TORT OR OTHERWISE.

Section 6.13     Entire Agreement.    THIS AMENDMENT EMBODIES THE FINAL, ENTIRE AGREEMENT AMONG THE PARTIES HERETO RELATING TO THE SUBJECT MATTER HEREOF AND SUPERSEDES ANY AND ALL PRIOR AGREEMENTS, WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER OF THIS AMENDMENT.  THIS AMENDMENT MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF THE PARTIES HERETO.   THERE ARE NO ORAL AGREEMENTS AMONG THE PARTIES.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Amendment as of the Amendment Date.

BORROWER:

WESTRIM, INC.

By: _____
     Fred A. Gysi, Chief Financial Officer

LENDER:

CORE BUSINESS FUNDING, LLC

By: _____
     Greg Gentry, Senior Vice President

## CONSENT AND REAFFIRMATION

Reference is made to the foregoing Fourth Agreement to Loan and Security Agreement (the "Fourth Amendment") dated as of April 20, 2009, among Westrim, Inc. and Core Business Funding, LLC, as assignee of Core Business Credit, LLC, pursuant to which the Loan Agreement, as defined therein (the "Loan Agreement") is amended as provided therein.  Terms defined in the Loan Documents, where used in this Consent and Reaffirmation and not otherwise defined herein, shall have the same meanings as are prescribed by the Loan Documents.

The undersigned hereby (a) consents to the execution, delivery and performance of the Fourth Amendment, (b) reaffirms its obligations under the Guaranty Agreement (the "Parent Guaranty") dated as of September 3, 2008, and the Security Agreement (the "Parent Security Agreement") dated as of September 3, 2008, each executed by the undersigned in connection therewith, and (c) acknowledges and agrees that the Parent Guaranty and the Parent Security Agreement each remains in full force and effect, free of any defense, offset or counterclaim, and is hereby ratified and confirmed as being and continuing in full force and effect, in each case for the benefit of Lender as assignee of CBC.

CREATIVITY CRAFTS, INC.

By: _____
      Fred A. Gysi, Chief Financial Officer

CONSENT AND REAFFIRMATION
73306.000005 EMF_US 27123488v3

FIFTH AMENDMENT TO LOAN AND SECURITY AGREEMENT

THIS FIFTH AMENDMENT TO LOAN AND SECURITY AGREEMENT ("Amendment"), effective as of August 1, 2009 (the "Amendment Date"), is among WESTRIM, INC. ("Borrower") and CORE BUSINESS FUNDING, LLC ("Lender"), assignee of Core Business Credit, LLC ("CBC"), as follows:

RECITALS:

A.      Borrower and Lender, as assignee of CBC, are parties to the certain Loan and Security Agreement dated as of September 3, 2008, as amended by the First Amendment to Loan and Security Agreement dated as of November 24, 2008, the Second Amendment to Loan and Security Agreement dated as of December 1, 2008k, the Forbearance and Third Amendment to Loan and Security Agreement dated as of January 12, 2009 and the Fourth Amendment to Loan and Security Agreement dated as of April 20, 2009 (all of the foregoing, collectively, the " Loan Agreement").

B.      Borrower and Lender have agreed to amend certain provisions of the Loan Agreement as provided hereinbelow.

NOW THEREFORE, in consideration of the premises herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

ARTICLE 1
Definitions

Section 1.1      Definitions.  Terms defined by the Loan Amendment and not otherwise defined herein shall have the same meanings as are prescribed by the Loan Agreement.

ARTICLE 2
Amendment

Section 2.1      Amendment to Definition of "Eligible Account."  Effective as of the Amendment Date, clause (e) of the definition of "Eligible Account" in Section 1.1 of the Loan Agreement is hereby amended and restated to read as follows:

(e) (1) prior to September 11, 2009, owed by an Account Debtor to the extent the amount owing thereon, when added to the aggregate amount owing on all Accounts owed by such Account Debtor, would exceed (i) 35.0% in the case of Michaels Stores, Inc., (ii) 45.0% in the case of Walmart, Inc., (iii) 35.0% in the case of JoAnn's, (iv) 85% in the aggregate in the case of Michaels Stores, Inc., Walmart, Inc and JoAnn's, or (v) 20.0% in the case of all other Account Debtors, in each case of the aggregate amount of all Eligible Accounts owed at such time by all Account Debtors, or (2) on and after September 11, 2009, owed by an Account Debtor to the extent the amount owing thereon, when added to the aggregate amount owing on all Accounts owed by such Account Debtor, would exceed (i) 45.0% in the case of Michaels Stores, Inc., (ii) 45.0% in the case of Walmart, Inc. (iii) 75% in the aggregate  in the case of Michaels Stores, Inc. and Walmart, Inc, or (iv) 20.0% in the case of all other Account Debtors, in each case of the aggregate amount of all Eligible Accounts owed at such time by all Account Debtors,

Exhibit "2" - 195

## ARTICLE 3
### Conditions

Section 3.1    Conditions Precedent.  The effectiveness of Article 2 of this Amendment is subject to the satisfaction of the following conditions precedent:

(a)    the representations and warranties contained herein and in all other Loan Documents, as amended hereby, shall be true and correct in all material respects as of the date hereof as if made on the date hereof, except for such representations and warranties limited by their terms to a specific date;

(b)    no Default or Event of Default shall be in existence;

(c)    Borrower shall have delivered to Lender an executed original copy of this Amendment, in form and substance satisfactory to Lender;

(d)    Borrower shall have paid the fee required by Section 3.2; and

(e)    all proceedings taken in connection with the transactions contemplated by this Amendment and all documentation and other legal matters incident thereto shall be satisfactory to Lender.

Section 3.2    Amendment Fee.  Subject to the terms of the Loan Agreement, in consideration of this Amendment, Borrower agrees to pay to Lender an amendment fee in the amount of $10,000, payable upon execution by this Amendment by Borrower and Lender.

## ARTICLE 4
### Ratifications, Representations and Warranties

Section 4.1    Ratifications.  The terms and provisions set forth in this Amendment shall modify and supersede all inconsistent terms and provisions set forth in the Loan Agreement and, except as expressly modified and superseded by this Amendment, the terms and provisions of the Loan Agreement and the other Loan Documents are ratified and confirmed and shall continue in full force and effect.  The Borrowers and the Lender agree that the Loan Agreement as amended hereby and the other Loan Documents shall continue to be legal, valid, binding, and enforceable in accordance with their respective terms.

Section 4.2    Representations and Warranties.  Borrower hereby represents and warrants to Lender that (a) the execution, delivery, and performance of this Amendment and any and all other Loan Documents executed and/or delivered in connection herewith have been authorized by all requisite action on the part of Borrower and will not violate the governing documents of Borrower, (b) the representations and warranties contained in the Loan Agreement, as amended hereby, and the other Loan Documents are true and correct on and as of the date hereof as though made on and as of the date hereof (except to the extent that such representations and warranties were expressly made only in reference to a specific date, in which case such representations and warranties are true and correct as of such date), (c) no Default or Event of Default has occurred and is continuing, and (d) Borrower is in full compliance with all covenants and agreements contained in the Loan Agreement, as amended hereby, and the other Loan Documents.

FIFTH AMENDMENT TO LOAN AND SECURITY AGREEMENT, Page 2

## ARTICLE 5
### Miscellaneous

Section 5.1  <u>Survival of Representations and Warranties</u>. All representations and warranties made in this Amendment or any other Loan Document delivered in connection with this Amendment shall survive the execution and delivery of this Amendment.

Section 5.2  <u>Reference to Loan Agreement</u>. Each of the Loan Documents, including the Loan Agreement and any and all other agreements, documents, or instruments now or hereafter executed and delivered pursuant to the terms hereof or pursuant to the terms of the Loan Agreement as amended hereby, are hereby amended so that any reference in such Loan Documents to the Loan Agreement shall mean a reference to the Loan Agreement as amended hereby.

Section 5.3  <u>Loan Document</u>. This Amendment is a Loan Document.

Section 5.4  <u>Severability</u>. Any provision of this Amendment held by a court of competent jurisdiction to be invalid or unenforceable shall not impair or invalidate the remainder of this Amendment and the effect thereof shall be confined to the provision so held to be invalid or unenforceable.

Section 5.5  <u>Successors and Assigns</u>. This Amendment is binding upon and shall inure to the benefit of Borrower and Lender and their respective successors and assigns, except Borrower may not assign or transfer any of its respective rights or obligations hereunder without the prior written consent of Lender.

Section 5.6  <u>Counterparts</u>. This Amendment may be executed in one or more counterparts, and on telecopy counterparts each of which when so executed shall be deemed to be an original, but all of which when taken together shall constitute one and the same agreement.

Section 5.7  <u>Ratification</u>. Borrower reaffirms its obligations under each of such Loan Documents, as amended hereby, and agrees that each of the Loan Documents, as amended hereby, remains in full force and effect and is hereby ratified and confirmed.

Section 5.8  <u>Headings</u>. The headings, captions, and arrangements used in this Amendment are for convenience only and shall not affect the interpretation of this Amendment.

Section 5.9  <u>No Claims, Offsets or Defenses</u>. Borrower represents and warrants that there are no claims, offsets, defenses or counterclaims against the Obligations and hereby waives any and all such claims, offsets, defenses or counterclaims, whether known or unknown, arising on or prior to the date hereof.

Section 5.10  <u>Waiver and Release</u>. IN CONSIDERATION OF THIS AGREEMENT, BORROWER REPRESENTS AND WARRANTS THAT THERE ARE NO OFFSETS, DEFENSES OR COUNTERCLAIMS AGAINST OR IN RESPECT OF ITS OBLIGATIONS UNDER THE LOAN DOCUMENTS AND BORROWER HEREBY RELEASES AND DISCHARGES LENDER AND ITS RESPECTIVE AGENTS, EMPLOYEES, SUCCESSORS AND ASSIGNS, OF AND FROM ALL CLAIMS, ACTIONS, CAUSES OF ACTION, DAMAGES, COSTS, EXPENSES AND LIABILITIES, KNOWN OR UNKNOWN, FIXED, CONTINGENT OR CONDITIONAL, AT LAW OR IN EQUITY, IN CONNECTION WITH THE LOAN DOCUMENTS OR ANY TRANSACTIONS OR ACTS IN CONNECTION THEREWITH, ORIGINATING IN WHOLE OR IN PART ON OR BEFORE THE DATE OF THIS AGREEMENT, WHICH BORROWER MAY HAVE

Exhibit "2" - 197

AGAINST ANY SUCH PERSON, IRRESPECTIVE OF WHETHER ANY SUCH CLAIMS, ACTIONS, CAUSES OF ACTION, DAMAGES, COSTS, EXPENSES OR LIABILITIES ARE BASED ON CONTRACT, TORT OR OTHERWISE.

      Section 5.11     Entire Agreement.     THIS AMENDMENT EMBODIES THE FINAL, ENTIRE AGREEMENT AMONG THE PARTIES HERETO RELATING TO THE SUBJECT MATTER HEREOF AND SUPERSEDES ANY AND ALL PRIOR AGREEMENTS, WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER OF THIS AMENDMENT.  THIS AMENDMENT MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF THE PARTIES HERETO. THERE ARE NO ORAL AGREEMENTS AMONG THE PARTIES.

SIGNATURES FOLLOW ON NEXT PAGE<br>
REMAINDER OF THIS PAGE BLANK

Exhibit "2" - 198

IN WITNESS WHEREOF, Borrower and Lender have executed and delivered this Amendment on the dates shown adjacent to their respective signatures below, effective as of the Amendment Date.

**BORROWER:**

**WESTRIM, INC.**

By: _Ronald U Coen_

Name: _RONALD  B.  COOPER_

Title: _CEO_

Date: _AUGUST 5, 2009_

**LENDER:**

**CORE BUSINESS FUNDING, LLC**

By: _Greg Gentry_

Name: _GREG GENTRY_

Title: _SR VICE PRESIDENT_

Date: _August 5, 2009_

FIFTH AMENDMENT TO LOAN AND SECURITY AGREEMENT, Page 5

## CONSENT AND REAFFIRMATION

Reference is made to the foregoing Fifth Amendment to Loan and Security Agreement (the "Fifth Amendment") dated as of August 1, 2009, among Westrim, Inc. and Core Business Funding, LLC, as assignee of Core Business Credit, LLC, pursuant to which the Loan Agreement, as defined therein (the "Loan Agreement") is amended as provided therein. Terms defined in the Fifth Amendment, where used in this Consent and Reaffirmation and not otherwise defined herein, shall have the same meanings as are prescribed by the Fifth Amendment.

The undersigned hereby (a) consents to the execution, delivery and performance of the Fifth Amendment, (b) reaffirms its obligations under the Guaranty Agreement (the "Parent Guaranty") dated as of September 3, 2008, and the Security Agreement (the "Parent Security Agreement") dated as of September 3, 2008, each executed by the undersigned in connection therewith, and (c) acknowledges and agrees that the Parent Guaranty and the Parent Security Agreement each remains in full force and effect, free of any defense, offset or counterclaim, and is hereby ratified and confirmed as being and continuing in full force and effect, in each case for the benefit of Lender as assignee of CBC.

CREATIVITY CRAFTS, INC.

By: _Ronald B. Cooper_

Name: _RONALD B. COOPER_

Title: _CEO_

8/5/09

**FIFTH AMENDMENT TO LOAN AND SECURITY AGREEMENT, Page 6**

Exhibit "2" - 200

## SIXTH AMENDMENT TO LOAN AND SECURITY AGREEMENT

THIS SIXTH AMENDMENT TO LOAN AND SECURITY AGREEMENT ("Amendment"), effective as of September 10, 2009 (the "Amendment Date"), is among WESTRIM, INC. ("Borrower") and CORE BUSINESS FUNDING, LLC ("Lender"), assignee of Core Business Credit, LLC ("CBC"), as follows:

### RECITALS:

A.     Borrower and Lender, as assignee of CBC, are parties to the certain Loan and Security Agreement dated as of September 3, 2008, as amended by the First Amendment to Loan and Security Agreement dated as of November 24, 2008, the Second Amendment to Loan and Security Agreement dated as of December 1, 2008, the Forbearance and Third Amendment to Loan and Security Agreement dated as of January 12, 2009, the Fourth Amendment to Loan and Security Agreement dated as of April 20, 2009 and the Fifth Amendment to Loan and Security Agreement dated as of August 1, 2009 (all of the foregoing, collectively, the " Loan Agreement").

B.     Borrower and Lender have agreed to amend certain provisions of the Loan Agreement as provided hereinbelow.

NOW THEREFORE, in consideration of the premises herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

### ARTICLE 1
### Definitions

Section 1.1     Definitions.  Terms defined by the Loan Amendment and not otherwise defined herein shall have the same meanings as are prescribed by the Loan Agreement.

### ARTICLE 2
### Amendment

Section 2.1     Amendment to Definition of "Eligible Account."  Effective as of the Amendment Date, clause (e) of the definition of "Eligible Account" in Section 1.1 of the Loan Agreement is hereby amended and restated to read as follows:

(e) owed by an Account Debtor to the extent the amount owing thereon, when added to the aggregate amount owing on all Accounts owed by such Account Debtor, would exceed (i) 45.0% in the case of Michaels Stores, Inc., (ii) 45.0% in the case of Walmart, Inc., (iii) 45.0% in the case of JoAnn's, (iv) 75% in the aggregate in the case of any two of Michaels Stores, Inc., Walmart, Inc and JoAnn's, (v) 85.0% in the aggregate for Michaels Stores, Inc., Walmart, Inc and JoAnn's combined or (vi) 20.0% in the case of all other Account Debtors, in each case of the aggregate amount of all Eligible Accounts owed at such time by all Account Debtors,

Exhibit "2" - 201

ARTICLE 3
Conditions

Section 3.1    Conditions Precedent.  The effectiveness of Article 2 of this Amendment is subject to the satisfaction of the following conditions precedent:

(a)      the representations and warranties contained herein and in all other Loan Documents, as amended hereby, shall be true and correct in all material respects as of the date hereof as if made on the date hereof, except for such representations and warranties limited by their terms to a specific date;

(b)      no Default or Event of Default shall be in existence;

(c)      Borrower shall have delivered to Lender an executed original copy of this Amendment, in form and substance satisfactory to Lender;

(d)      Borrower shall have paid the fee required by Section 3.2; and

(e)      all proceedings taken in connection with the transactions contemplated by this Amendment and all documentation and other legal matters incident thereto shall be satisfactory to Lender.

Section 3.2    Amendment Fee.  Subject to the terms of the Loan Agreement, in consideration of this Amendment, Borrower agrees to pay to Lender an amendment fee in the amount of $15,000, payable upon execution by this Amendment by Borrower and Lender.

ARTICLE 4
Ratifications, Representations and Warranties

Section 4.1    Ratifications.  The terms and provisions set forth in this Amendment shall modify and supersede all inconsistent terms and provisions set forth in the Loan Agreement and, except as expressly modified and superseded by this Amendment, the terms and provisions of the Loan Agreement and the other Loan Documents are ratified and confirmed and shall continue in full force and effect.  The Borrowers and the Lender agree that the Loan Agreement as amended hereby and the other Loan Documents shall continue to be legal, valid, binding, and enforceable in accordance with their respective terms.

Section 4.2    Representations and Warranties.  Borrower hereby represents and warrants to Lender that (a) the execution, delivery, and performance of this Amendment and any and all other Loan Documents executed and/or delivered in connection herewith have been authorized by all requisite action on the part of Borrower and will not violate the governing documents of Borrower, (b) the representations and warranties contained in the Loan Agreement, as amended hereby, and the other Loan Documents are true and correct on and as of the date hereof as though made on and as of the date hereof (except to the extent that such representations and warranties were expressly made only in reference to a specific date, in which case such representations and warranties are true and correct as of such date), (c) no Default or Event of Default has occurred and is continuing, and (d) Borrower is in full compliance with all covenants and agreements contained in the Loan Agreement, as amended hereby, and the other Loan Documents.

ARTICLE 5
Miscellaneous

Section 5.1      Survival of Representations and Warranties.  All representations and warranties made in this Amendment or any other Loan Document delivered in connection with this Amendment shall survive the execution and delivery of this Amendment.

Section 5.2      Reference to Loan Agreement.  Each of the Loan Documents, including the Loan Agreement and any and all other agreements, documents, or instruments now or hereafter executed and delivered pursuant to the terms hereof or pursuant to the terms of the Loan Agreement as amended hereby, are hereby amended so that any reference in such Loan Documents to the Loan Agreement shall mean a reference to the Loan Agreement as amended hereby.

Section 5.3      Loan Document.  This Amendment is a Loan Document.

Section 5.4      Severability.  Any provision of this Amendment held by a court of competent jurisdiction to be invalid or unenforceable shall not impair or invalidate the remainder of this Amendment and the effect thereof shall be confined to the provision so held to be invalid or unenforceable.

Section 5.5      Successors and Assigns.  This Amendment is binding upon and shall inure to the benefit of Borrower and Lender and their respective successors and assigns, except Borrower may not assign or transfer any of its respective rights or obligations hereunder without the prior written consent of Lender.

Section 5.6      Counterparts.  This Amendment may be executed in one or more counterparts, and on telecopy counterparts each of which when so executed shall be deemed to be an original, but all of which when taken together shall constitute one and the same agreement.

Section 5.7      Ratification.  Borrower reaffirms its obligations under each of such Loan Documents, as amended hereby, and agrees that each of the Loan Documents, as amended hereby, remains in full force and effect and is hereby ratified and confirmed.

Section 5.8      Headings.  The headings, captions, and arrangements used in this Amendment are for convenience only and shall not affect the interpretation of this Amendment.

Section 5.9      No Claims, Offsets or Defenses.  Borrower represents and warrants that there are no claims, offsets, defenses or counterclaims against the Obligations and hereby waives any and all such claims, offsets, defenses or counterclaims, whether known or unknown, arising on or prior to the date hereof.

Section 5.10    Waiver and Release.  IN CONSIDERATION OF THIS AGREEMENT, BORROWER REPRESENTS AND WARRANTS THAT THERE ARE NO OFFSETS, DEFENSES OR COUNTERCLAIMS AGAINST OR IN RESPECT OF ITS OBLIGATIONS UNDER THE LOAN DOCUMENTS AND BORROWER HEREBY RELEASES AND DISCHARGES LENDER AND ITS RESPECTIVE AGENTS, EMPLOYEES, SUCCESSORS AND ASSIGNS, OF AND FROM ALL CLAIMS, ACTIONS, CAUSES OF ACTION, DAMAGES, COSTS, EXPENSES AND LIABILITIES, KNOWN OR UNKNOWN, FIXED, CONTINGENT OR CONDITIONAL, AT LAW OR IN EQUITY, IN CONNECTION WITH THE LOAN DOCUMENTS OR ANY TRANSACTIONS OR ACTS IN CONNECTION THEREWITH, ORIGINATING IN WHOLE OR IN PART ON OR BEFORE THE DATE OF THIS AGREEMENT, WHICH BORROWER MAY HAVE

AGAINST ANY SUCH PERSON, IRRESPECTIVE OF WHETHER ANY SUCH CLAIMS, ACTIONS, CAUSES OF ACTION, DAMAGES, COSTS, EXPENSES OR LIABILITIES ARE BASED ON CONTRACT, TORT OR OTHERWISE.

Section 5.11    Entire Agreement.    THIS AMENDMENT EMBODIES THE FINAL, ENTIRE AGREEMENT AMONG THE PARTIES HERETO RELATING TO THE SUBJECT MATTER HEREOF AND SUPERSEDES ANY AND ALL PRIOR AGREEMENTS, WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER OF THIS AMENDMENT.  THIS AMENDMENT MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF THE PARTIES HERETO. THERE ARE NO ORAL AGREEMENTS AMONG THE PARTIES.

SIGNATURES FOLLOW ON NEXT PAGE
REMAINDER OF THIS PAGE BLANK

IN WITNESS WHEREOF, Borrower and Lender have executed and delivered this Amendment on the dates shown adjacent to their respective signatures below, effective as of the Amendment Date.

BORROWER:

WESTRIM, INC.

By: _____
Name: _____
Title: _____
Date: _____

LENDER:

CORE BUSINESS FUNDING, LLC

By: _____
Name: _____
Title: _____
Date: _____

## CONSENT AND REAFFIRMATION

Reference is made to the foregoing Sixth Amendment to Loan and Security Agreement (the "Sixth Amendment") dated as of September 10, 2009, among Westrim, Inc. and Core Business Funding, LLC, as assignee of Core Business Credit, LLC, pursuant to which the Loan Agreement, as defined therein (the "Loan Agreement") is amended as provided therein. Terms defined in the Sixth Amendment, where used in this Consent and Reaffirmation and not otherwise defined herein, shall have the same meanings as are prescribed by the Fifth Amendment.

The undersigned hereby (a) consents to the execution, delivery and performance of the Sixth Amendment, (b) reaffirms its obligations under the Guaranty Agreement (the "Parent Guaranty") dated as of September 3, 2008, and the Security Agreement  (the "Parent Security Agreement") dated as of September 3, 2008, each executed by the undersigned in connection therewith, and (c) acknowledges and agrees that the Parent Guaranty and the Parent Security Agreement each remains in full force and effect, free of any defense, offset or counterclaim, and is hereby ratified and confirmed as being and continuing in full force and effect, in each case for the benefit of Lender as assignee of CBC.

CREATIVITY CRAFTS, INC.

By: _____

Name: _____

Title: _____

Exhibit "2" - 206

SEVENTH AMENDMENT TO LOAN AND SECURITY AGREEMENT

THIS SEVENTH AMENDMENT TO LOAN AND SECURITY AGREEMENT ("Amendment"), effective as of December 28, 2009 (the "Amendment Date"), is among WESTRIM, INC. ("Borrower") and CORE BUSINESS FUNDING, LLC ("Lender"), assignee of Core Business Credit, LLC ("CBC"), as follows:

RECITALS:

A.    Borrower and Lender, as assignee of CBC, are parties to the certain Loan and Security Agreement dated as of September 3, 2008, as amended by the First Amendment to Loan and Security Agreement dated as of November 24, 2008, the Second Amendment to Loan and Security Agreement dated as of December 1, 2008, the Forbearance and Third Amendment to Loan and Security Agreement dated as of January 12, 2009, the Fourth Amendment to Loan and Security Agreement dated as of April 20, 2009, the Fifth Amendment to Loan and Security Agreement dated as of August 1, 2009 and the Sixth Amendment to Loan and Security Agreement dated as of September 10, 2009 (all of the foregoing, collectively, the "Loan Agreement").

B.    Borrower and Lender have agreed to amend certain provisions of the Loan Agreement as provided hereinbelow.

NOW THEREFORE, in consideration of the premises herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

ARTICLE 1
Definitions

Section 1.1    Definitions.  Terms defined by the Loan Amendment and not otherwise defined herein shall have the same meanings as are prescribed by the Loan Agreement.

ARTICLE 2
Amendment

Section 2.1    Amendment to Definition of "Borrowing Base."  Effective as of the Amendment Date, clause (e) of the definition of "Borrowing Base" in Section 1.1 of the Loan Agreement is hereby amended and restated to read as follows:

"Borrowing Base" means, as of any day of determination, an amount equal to:

(a)    the lesser of:

(i)    the sum of

(x) the AR Advance Percentage of the Net Amount of Eligible Accounts plus ,

(y) (A) on any day prior to January 11, 2010, (1) with respect to Eligible Inventory consisting of "warehouse" Inventory, 43.80% or (2) with respect to Eligible Inventory other than "warehouse"

SEVENTH AMENDMENT TO LOAN AND SECURITY AGREEMENT, Page 1
73306.000005 EMF_US 29298320v2

Exhibit "2" - 207

Inventory, the lesser of the Inventory Advance Percentage of the Net Amount of Eligible Inventory or 85.0% of NOLV of Eligible Inventory, in each case determined as of such day, or (B) on any day on or after January 11, 2010, the lesser of the Inventory Advance Percentage of the Net Amount of Eligible Inventory or 85.0% of NOLV of Eligible Inventory, in each case determined as of such day, provided, that (1) the amount includable under this clause (y) may not at any time exceed $10,000,000 and (2) the amount of Qualified In-Transit Inventory includable in this clause (y) may not at any time exceed $3,000,000, or

(ii)     the Revolving Credit Limit; minus

(b)     the aggregate amount of reserves implemented by Lender pursuant to Section 2.1, in each case determined as of such day.

Section 2.2     Amendment to Section 10.12.     Effective as of the Amendment Date, Section 10.12 of the Loan Agreement is amended and restated to read as follows:

Section 10.12   Minimum Availability.   Borrower will maintain minimum Availability, after giving effect to the Revolving Loans, the refinancing of indebtedness for money borrowed as provided by Section 11.3, the payment of all fees, taxes and Lender Expenses payable by Borrower under this Agreement, in an amount equal to or greater than (a) $200,000 on any day before April 19, 2009, (b) $300,000 on any day on and after April 19, 2009 and before October 31, 2009, (c) $500,000 on any day on and after October 31, 2009 and before December 28, 2009, (d) $200,000 on any day on or after December 28, 2009 and before January 11, 2010 and (e) $500,000 on any day on or after January 11, 2010.

ARTICLE 3
Conditions

Section 3.1     Conditions Precedent.   The effectiveness of Article 2 of this Amendment is subject to the satisfaction of the following conditions precedent:

(a)     the representations and warranties contained herein and in all other Loan Documents, as amended hereby, shall be true and correct in all material respects as of the date hereof as if made on the date hereof, except for such representations and warranties limited by their terms to a specific date;

(b)     no Default or Event of Default shall be in existence;

(c)     Borrower shall have delivered to Lender an executed original copy of this Amendment, in form and substance satisfactory to Lender; and

(d)     all proceedings taken in connection with the transactions contemplated by this Amendment and all documentation and other legal matters incident thereto shall be satisfactory to Lender.

## ARTICLE 4
### Ratifications, Representations and Warranties

Section 4.1    Ratifications.    The terms and provisions set forth in this Amendment shall modify and supersede all inconsistent terms and provisions set forth in the Loan Agreement and, except as expressly modified and superseded by this Amendment, the terms and provisions of the Loan Agreement and the other Loan Documents are ratified and confirmed and shall continue in full force and effect. The Borrowers and the Lender agree that the Loan Agreement as amended hereby and the other Loan Documents shall continue to be legal, valid, binding, and enforceable in accordance with their respective terms.

Section 4.2    Representations and Warranties.    Borrower hereby represents and warrants to Lender that (a) the execution, delivery, and performance of this Amendment and any and all other Loan Documents executed and/or delivered in connection herewith have been authorized by all requisite action on the part of Borrower and will not violate the governing documents of Borrower, (b) the representations and warranties contained in the Loan Agreement, as amended hereby, and the other Loan Documents are true and correct on and as of the date hereof as though made on and as of the date hereof (except to the extent that such representations and warranties were expressly made only in reference to a specific date, in which case such representations and warranties are true and correct as of such date), (c) no Default or Event of Default has occurred and is continuing, and (d) Borrower is in full compliance with all covenants and agreements contained in the Loan Agreement, as amended hereby, and the other Loan Documents.

## ARTICLE 5
### Miscellaneous

Section 5.1    Survival of Representations and Warranties.    All representations and warranties made in this Amendment or any other Loan Document delivered in connection with this Amendment shall survive the execution and delivery of this Amendment.

Section 5.2    Reference to Loan Agreement.    Each of the Loan Documents, including the Loan Agreement and any and all other agreements, documents, or instruments now or hereafter executed and delivered pursuant to the terms hereof or pursuant to the terms of the Loan Agreement as amended hereby, are hereby amended so that any reference in such Loan Documents to the Loan Agreement shall mean a reference to the Loan Agreement as amended hereby.

Section 5.3    Loan Document.    This Amendment is a Loan Document.

Section 5.4    Severability.    Any provision of this Amendment held by a court of competent jurisdiction to be invalid or unenforceable shall not impair or invalidate the remainder of this Amendment and the effect thereof shall be confined to the provision so held to be invalid or unenforceable.

Section 5.5    Successors and Assigns.    This Amendment is binding upon and shall inure to the benefit of Borrower and Lender and their respective successors and assigns, except Borrower may not assign or transfer any of its respective rights or obligations hereunder without the prior written consent of Lender.

Section 5.6    Counterparts.    This Amendment may be executed in one or more counterparts, and on telecopy counterparts each of which when so executed shall be deemed to be an original, but all of which when taken together shall constitute one and the same agreement.

SEVENTH AMENDMENT TO LOAN AND SECURITY AGREEMENT, Page 3
73306.000005 EMF_US 29298320v2

Section 5.7    Ratification.  Borrower reaffirms its obligations under each of such Loan Documents, as amended hereby, and agrees that each of the Loan Documents, as amended hereby, remains in full force and effect and is hereby ratified and confirmed.

Section 5.8    Headings.  The headings, captions, and arrangements used in this Amendment are for convenience only and shall not affect the interpretation of this Amendment.

Section 5.9    No Claims, Offsets or Defenses.  Borrower represents and warrants that there are no claims, offsets, defenses or counterclaims against the Obligations and hereby waives any and all such claims, offsets, defenses or counterclaims, whether known or unknown, arising on or prior to the date hereof.

Section 5.10    Waiver and Release.  IN CONSIDERATION OF THIS AGREEMENT, BORROWER REPRESENTS AND WARRANTS THAT THERE ARE NO OFFSETS, DEFENSES OR COUNTERCLAIMS AGAINST OR IN RESPECT OF ITS OBLIGATIONS UNDER THE LOAN DOCUMENTS AND BORROWER HEREBY RELEASES AND DISCHARGES LENDER AND ITS RESPECTIVE AGENTS, EMPLOYEES, SUCCESSORS AND ASSIGNS, OF AND FROM ALL CLAIMS, ACTIONS, CAUSES OF ACTION, DAMAGES, COSTS, EXPENSES AND LIABILITIES, KNOWN OR UNKNOWN, FIXED, CONTINGENT OR CONDITIONAL, AT LAW OR IN EQUITY, IN CONNECTION WITH THE LOAN DOCUMENTS OR ANY TRANSACTIONS OR ACTS IN CONNECTION THEREWITH, ORIGINATING IN WHOLE OR IN PART ON OR BEFORE THE DATE OF THIS AGREEMENT, WHICH BORROWER MAY HAVE AGAINST ANY SUCH PERSON, IRRESPECTIVE OF WHETHER ANY SUCH CLAIMS, ACTIONS, CAUSES OF ACTION, DAMAGES, COSTS, EXPENSES OR LIABILITIES ARE BASED ON CONTRACT, TORT OR OTHERWISE.

Section 5.11    Entire Agreement.   THIS AMENDMENT EMBODIES THE FINAL, ENTIRE AGREEMENT AMONG THE PARTIES HERETO RELATING TO THE SUBJECT MATTER HEREOF AND SUPERSEDES ANY AND ALL PRIOR AGREEMENTS, WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER OF THIS AMENDMENT.  THIS AMENDMENT MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF THE PARTIES HERETO. THERE ARE NO ORAL AGREEMENTS AMONG THE PARTIES.


SIGNATURES FOLLOW ON NEXT PAGE
REMAINDER OF THIS PAGE BLANK

IN WITNESS WHEREOF, Borrower and Lender have executed and delivered this Amendment on the dates shown adjacent to their respective signatures below, effective as of the Amendment Date.

BORROWER:

WESTRIM, INC.

By: _____
Name: _____
Title: _____
Date: _____

LENDER:

CORE BUSINESS FUNDING, LLC

By: _____
Name: _____
Title: _____
Date: _____

SEVENTH AMENDMENT TO LOAN AND SECURITY AGREEMENT, Page 5
73306.000005 EMF_US 29298320v2

## CONSENT AND REAFFIRMATION

Reference is made to the foregoing Seventh Amendment to Loan and Security Agreement (the "Seventh Amendment") dated as of December 28, 2009, among Westrim, Inc. and Core Business Funding, LLC, as assignee of Core Business Credit, LLC, pursuant to which the Loan Agreement, as defined therein (the "Loan Agreement") is amended as provided therein. Terms defined in the Seventh Amendment, where used in this Consent and Reaffirmation and not otherwise defined herein, shall have the same meanings as are prescribed by the Seventh Amendment.

The undersigned hereby (a) consents to the execution, delivery and performance of the Seventh Amendment, (b) reaffirms its obligations under the Guaranty Agreement (the "Parent Guaranty") dated as of September 3, 2008, and the Security Agreement (the "Parent Security Agreement") dated as of September 3, 2008, each executed by the undersigned in connection therewith, and (c) acknowledges and agrees that the Parent Guaranty and the Parent Security Agreement each remains in full force and effect, free of any defense, offset or counterclaim, and is hereby ratified and confirmed as being and continuing in full force and effect, in each case for the benefit of Lender as assignee of CBC.

CREATIVITY CRAFTS, INC.

By: _____

Name: Fred Gysi

Title: CEO

## EIGHTH AMENDMENT TO LOAN AND SECURITY AGREEMENT

THIS EIGHTH AMENDMENT TO LOAN AND SECURITY AGREEMENT ("Amendment"), effective as of January 11, 2010 (the "Amendment Date"), is among WESTRIM, INC. ("Borrower") and CORE BUSINESS FUNDING, LLC ("Lender"), assignee of Core Business Credit, LLC ("CBC"), as follows:

### RECITALS:

A.    Borrower and Lender, as assignee of CBC, are parties to the certain Loan and Security Agreement dated as of September 3, 2008, as amended by the First Amendment to Loan and Security Agreement dated as of November 24, 2008, the Second Amendment to Loan and Security Agreement dated as of December 1, 2008, the Forbearance and Third Amendment to Loan and Security Agreement dated as of January 12, 2009, the Fourth Amendment to Loan and Security Agreement dated as of April 20, 2009, the Fifth Amendment to Loan and Security Agreement dated as of August 1, 2009, the Sixth Amendment to Loan and Security Agreement dated as of September 10, 2009 and the Seventh Amendment to Loan and Security Agreement dated as of December 28, 2009 (all of the foregoing, collectively, the "Loan Agreement").

B.    Borrower and Lender have agreed to amend certain provisions of the Loan Agreement as provided hereinbelow.

NOW THEREFORE, in consideration of the premises herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

### ARTICLE 1
### Definitions

Section 1.1    Definitions.  Terms defined by the Loan Amendment and not otherwise defined herein shall have the same meanings as are prescribed by the Loan Agreement.

### ARTICLE 2
### Amendment

Section 2.1    Amendment to Definition of "Borrowing Base."  Effective as of the Amendment Date, the definition of "Borrowing Base" in Section 1.1 of the Loan Agreement is hereby amended and restated to read as follows:

"Borrowing Base" means, as of any day of determination, an amount equal to:

(a)    the lesser of:

    (i)    the sum of

        (x) the AR Advance Percentage of the Net Amount of Eligible Accounts plus

        (y) (A) on any day prior to June 1, 2010, with respect to Eligible Inventory, 45.0%, or (B) on any day on or after June 1, 2010, the

lesser of the Inventory Advance Percentage of the Net Amount of Eligible Inventory or 85.0% of NOLV of Eligible Inventory, in each case determined as of such day, provided, that (1) the amount includable under this clause (y) may not at any time exceed $10,000,000 and (2) the amount of Qualified In-Transit Inventory includable in this clause (y) may not at any time exceed $3,000,000, or

(ii)     the Revolving Credit Limit; minus

(b)     the aggregate amount of reserves implemented by Lender pursuant to Section 2.1, in each case determined as of such day.

Section 2.2     Amendment to Section 10.12.     Effective as of the Amendment Date, Section 10.12 of the Loan Agreement is amended and restated to read as follows:

Section 10.12     Minimum Availability.     Borrower will maintain minimum Availability, after giving effect to the Revolving Loans, the refinancing of indebtedness for money borrowed as provided by Section 11.3, the payment of all fees, taxes and Lender Expenses payable by Borrower under this Agreement, in an amount equal to or greater than (a) $200,000 on any day before April 19, 2009, (b) $300,000 on any day on and after April 19, 2009 and before October 31, 2009, (c) $500,000 on any day on and after October 31, 2009 and before December 28, 2009, (d) $200,000 on any day on or after December 28, 2009 and before June 1, 2010 and (e) $500,000 on any day on or after June 1, 2010. ·

Section 2.3     Amendment to Section 11.16(f).     Effective as of the Amendment Date, subsection (f) of Section 11.16 of the Loan Agreement is amended and restated to read as follows:

(f)     Net Income, determined for Borrower as of the last day of each Fiscal Month on and after May 31, 2010, calculated for the preceding twelve Fiscal Months, shall be greater than $0.

### ARTICLE 3
### Ratifications, Representations and Warranties

Section 3.1     Ratifications.     The terms and provisions set forth in this Amendment shall modify and supersede all inconsistent terms and provisions set forth in the Loan Agreement and, except as expressly modified and superseded by this Amendment, the terms and provisions of the· Loan Agreement and the other Loan Documents are ratified and confirmed and shall continue in full force and effect. Borrower and Lender agree that the Loan Agreement as amended hereby and the other Loan Documents shall continue to be legal, valid, binding, and enforceable in accordance with their respective terms.

Section 3.2     Representations and Warranties.     Borrower hereby represents and warrants to Lender that (a) the execution, delivery, and performance of this Amendment and any and all other Loan Documents executed and/or delivered in connection herewith have been authorized by all requisite action on the part of Borrower and will not violate the governing documents of Borrower, (b) the representations and warranties contained in the Loan Agreement, as amended hereby, and the other Loan Documents are true and correct on and as of the date hereof as though made on and as of the date· hereof (except to the

EIGHTH AMENDMENT TO LOAN AND SECURITY AGREEMENT, Page 2
73306.000005 EMF_US 29394105v5

extent that such representations and warranties were expressly made only in reference to a specific date, in which case such representations and warranties are true and correct as of such date), (c) no Default or Event of Default has occurred and is continuing, and (d) Borrower is in full compliance with all covenants and agreements contained in the Loan Agreement, as amended hereby, and the other Loan Documents.

### ARTICLE 4
#### Other Agreements

Section 4.1    Amendment Fee.  Subject in all respects to the terms of the Loan Agreement, including without limitation Section 5.5 thereof, in consideration of the benefits to Borrower of this Amendment and the Loan Agreement, Borrower agrees to pay to Lender an amendment fee in the amount of $75,000, which amount shall be deemed earned upon the effectiveness of this Amendment and payable (in each case subject to the terms of the Loan Agreement as aforesaid) on the earlier of (a) July 31, 2010 or (b) the effective date, if any, of the sale of a material portion of the assets or business of Borrower's "bead" line of business (provided, that nothing herein constitutes a consent by Lender to any such sale or impairs any requirements of the Loan Agreement).

Section 4.2    Success Fee.  Subject in all respects to the terms of the Loan Agreement, including without limitation Section 5.5 thereof, in consideration of the benefits to Borrower of this Amendment and the Loan Agreement, Borrower agrees to pay to Lender a success fee in the amount of $100,000, which amount shall be deemed earned upon the effectiveness of this Amendment and payable (in each case subject to the terms of the Loan Agreement as aforesaid) in five equal installments of $20,000 each on September 1, 2010, October 1, 2010, November 1, 2010, December 1, 2010 and January 1, 2011, respectively, provided that notwithstanding the foregoing, the remaining unpaid balance of such fee shall be due and payable in full on the effective date, if any (if earlier than January 1, 2011), of the sale of a material portion of the assets or business of Borrower's "bead" line of business (provided further, that nothing herein constitutes a consent by Lender to any such sale or impairs any requirements of the Loan Agreement).

Section 4.3    Controlling Limitation.  Without limiting the application of the terms of Section 5.5 of the Loan Agreement to any other provision of the Loan Documents, Lender and Borrower expressly agree that the undertakings of Borrower and the rights of Lender under Section 4.1 and Section 4.2 in each case are subject to and qualified in their entirety by the terms of Section 5.5 of the Loan Agreement.

Section 4.4    Survival of Representations and Warranties.  All representations and warranties made in this Amendment or any other Loan Document delivered in connection with this Amendment shall survive the execution and delivery of this Amendment.

Section 4.5    Reference to Loan Agreement.  Each of the Loan Documents, including the Loan Agreement and any and all other agreements, documents, or instruments now or hereafter executed and delivered pursuant to the terms hereof or pursuant to the terms of the Loan Agreement as amended hereby, are hereby amended so that any reference in such Loan Documents to the Loan Agreement shall mean a reference to the Loan Agreement as amended hereby.

Section 4.6    Loan Document.  This Amendment is a Loan Document.

Exhibit "2" - 215

IN WITNESS WHEREOF, Borrower and Lender have executed and delivered this Amendment on the dates shown adjacent to their respective signatures below, effective as of the Amendment Date.

BORROWER:

WESTRIM, INC.

By: _____
Name: _Fred Gysi_____
Title: _CFO_____
Date: _1/19/10_____

LENDER:

CORE BUSINESS FUNDING, LLC

By: _____
Name: _Greg Gentes_____
Title: _Sr. Vice President_____
Date: _01-19-2010_____

EIGHTH AMENDMENT TO LOAN AND SECURITY AGREEMENT, Page 5
73306.000005 EMF_US 29394105v5

## CONSENT AND REAFFIRMATION

Reference is made to the foregoing Eighth Amendment to Loan and Security Agreement (the "Eighth Amendment") dated as of January 11, 2010, among Westrim, Inc. and Core Business Funding, LLC, as assignee of Core Business Credit, LLC, pursuant to which the Loan Agreement, as defined therein (the "Loan Agreement") is amended as provided therein. Terms defined in the Eighth Amendment, where used in this Consent and Reaffirmation and not otherwise defined herein, shall have the same meanings as are prescribed by the Eighth Amendment.

The undersigned hereby (a) consents to the execution, delivery and performance of the Eighth Amendment, (b) reaffirms its obligations under the Guaranty Agreement (the "Parent Guaranty") dated as of September 3, 2008, and the Security Agreement (the "Parent Security Agreement") dated as of September 3, 2008, each executed by the undersigned in connection therewith, and (c) acknowledges and agrees that the Parent Guaranty and the Parent Security Agreement each remains in full force and effect, free of any defense, offset or counterclaim, and is hereby ratified and confirmed as being and continuing in full force and effect, in each case for the benefit of Lender as assignee of CBC.

CREATIVITY CRAFTS, INC.

By: _____
Name: _____
Title: _____

# EXHIBIT 3

1   DAVID M. POITRAS P.C. (CA Bar No. 141309)
    ALEXIS M. McGINNESS (CA Bar No. 241449)
2   JEFFER MANGELS BUTLER & MITCHELL LLP
    1900 Avenue of the Stars, Seventh Floor
3   Los Angeles, California  90067-4308
    Telephone:     (310) 203-8080
4   Facsimile:      (310) 712-8571
    Email:          dpoitras@jmbm.com

5

6   Counsel for Westrim, Inc.,
    Debtor and Debtor-in-Possession

7

8             UNITED STATES BANKRUPTCY COURT
               CENTRAL DISTRICT OF CALIFORNIA
9           SAN FERNANDO VALLEY DIVISION

10  In re                                      CASE NO.     1:11-bk-15313-GM

11  WESTRIM, INC. dba WESTRIM CRAFTS, a        Chapter 11
    Delaware corporation.

12             Debtor.           **INTERIM ORDER (A) AUTHORIZING
                         POSTPETITION FINANCING AND
13                        GRANTING SECURITY INTERESTS AND
                        SUPERPRIORITY ADMINISTRATIVE
14                        EXPENSE STATUS PURSUANT TO 11
                        U.S.C. §§ 361, 362, AND 364; (B)
15                        AUTHORIZING USE OF CASH
                        COLLATERAL; (C) MODIFYING THE
16                        AUTOMATIC STAY PURSUANT TO 11
                        U.S.C. § 362; (D) GRANTING ADEQUATE
17                        PROTECTION PURSUANT TO 11 U.S.C.
                        §§ 361, 362, 363, AND 364; AND (E)
18                        SCHEDULING INTERIM AND FINAL
                        HEARINGS PURSUANT TO
19                        BANKRUPTCY RULE 4001**

20                        <u>**Interim Hearing**</u>:

21                        Date:      May 3, 2011
                        Time:      10:00 a.m.
22                        Ctrm:      303
                                21041 Burbank Blvd.
23                                Woodland Hills, CA 91367

24

25

26

27

28

Upon the motion (the "Motion") of Westrim, Inc., debtor and debtor-in-possession (the "Debtor") in the above captioned bankruptcy case (the "Case"), pursuant to sections 105, 362, 363, 364(c), 364(d)(1), and 364(e) of title 11 of the United States Code (the "Bankruptcy Code"),[1] and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), seeking, among other things:

1)    Pursuant to Bankruptcy Rule 4001, that an interim hearing (the "Interim Hearing") on the Motion be held before this Court to consider entry of this interim order (the "Interim Order");

2)    That this Court schedule a final hearing (the "Final Hearing"), to be held as soon after 15 days after entry of the Interim Order as practical, to consider entry of a final order in form and substance acceptable to Newstar Business Credit, LLC ("Newstar") authorizing borrowings under the Newstar Loan Agreement (defined below) and the DIP Credit Facility on a final basis;

3)    Authorization for the Debtor to obtain post-petition financing (the "Financing" or "DIP Financing") under the Newstar Loan Agreement, up to the amount forecasted in the budget provided by the Debtor to Newstar (the "Budget") subject to the terms and conditions set forth in the Loan and Security Agreement by and between Core Business Credit, LLC and the Debtor dated as of September 3, 2008, as amended by the First Amendment to Loan and Security Agreement dated as of November 24, 2008, the Second Amendment to Loan and Security Agreement dated as of December 1, 2008, the Forbearance and Third Amendment to Loan and Security Agreement dated as of January 12, 2009, the Fourth Amendment to Loan and Security

---

[1] Unless otherwise indicated herein, all chapter, section and rule references in this Motion are to the Bankruptcy Code, 11 U.S.C. §§101-1330, the Federal Rules of Bankruptcy Procedure, Rules 1001-9036 ("FRBP") and the Local Bankruptcy Rules for the Central District of California ("LBR").

Exhibit "3" - 219

Agreement dated as of April 20, 2009, the Fifth Amendment to Loan and Security Agreement dated as of August 1, 2009, the Sixth Amendment to Loan and Security Agreement dated as of September 10, 2009, the Seventh Amendment to Loan and Security Agreement dated as of December 28, 2009, the Eighth Amendment to Loan and Security Agreement dated as of January 11, 2010, and the Ninth Amendment to Loan and Security Agreement dated as of January 20, 2011 (collectively, the "Newstar Loan Agreement") and pursuant to the DIP Credit Facility.[2] The Budget is attached to the Motion and to this Interim Order as Exhibit 1. A copy of the Newstar Loan Agreement is attached to the Motion as Exhibit 2;

   4)     Authorization for the Debtor to execute and enter into such documents as may be appropriate or desirable in connection with the DIP Credit Facility and to perform such other and further acts as may be required in connection with the Newstar Loan Agreement and the DIP Credit Facility;

   5)     Authorization for the Debtor to a) grant the liens and security interests described herein to and for the benefit of Newstar; and b) perform its obligations under the Newstar Loan Agreement and the DIP Credit Facility;

   6)     Authorization for the Debtor to, effective upon entry of the Final Order granting such relief, to cross-collateralize the Pre-Petition Debt and any and all other obligations under the Newstar Loan Agreement with the DIP Credit Facility and merge the pre-petition credit facility provided by Newstar into the DIP Credit Facility;

   7)     Authorization for the Debtor to use Cash Collateral (as such term is defined in the Bankruptcy Code) to make payments to Newstar under the DIP Credit Documents, including without limitation, in respect of Pre-Petition Debt;

---

[2] The term "DIP Credit Facility" refers to the mechanism under which funds will be advanced by Newstar on a revolving basis to the Debtor in accordance with the terms of this Interim Order and the DIP Credit Documents (as

Exhibit "3" - 220

8)      The granting of Super-priority Claims (defined below) to Newstar payable from, and having recourse to, all pre-petition and post-petition property of the Debtor's estate and all proceeds thereof; and

9)      Effective upon entry of the Final Order granting such relief, the limitation of the Debtor's and its estate's right to surcharge against Pre-Petition Collateral or DIP Collateral pursuant to sections 506(c) and/or 552(b) of the Bankruptcy Code.

Under the circumstances and in accordance with Rules 4001(b) and (c), due and appropriate notice of the Motion, the relief requested therein, and the Interim Hearing having been provided by the Debtor to Newstar, to the United States Trustee for the Central District of California, to creditors, and to parties in interest;

The Interim Hearing having been held by this Court on May 3, 2011;

Upon the record made by the Debtor at the Interim Hearing, and after due deliberation and consideration, and sufficient cause appearing therefore;

**IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED,** that:

1.      *Jurisdiction.* This Court has core jurisdiction over the Case, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      *Notice.* Under the circumstances, the notice given by the Debtor of the Motion and the Interim Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001(b) and (c) and no other notice need be given.

3.      *Findings Regarding the Pre-Petition Debt and Pre-Petition Liens.*

a)      The Debtor has acknowledged and agreed that in accordance with the terms of the Newstar Loan Agreement, (i) it is truly and justly indebted to Newstar, as assignee

defined below).

4

of Core Business Credit, LLC, without defense, counterclaim or offset of any kind, and that, as of the Petition Date, the principal amount of loans, advances and other indebtedness owed to Newstar by the Debtor under and pursuant to the Newstar Loan Agreement as of the time immediately prior to the filing of the petition for relief herein is approx. $5,742,686, plus interest accrued and accruing thereon and fees, costs, reasonable out-of-pocket expenses incurred (including reasonable fees, charges and disbursements of counsel and appraisers) and any other charges accrued and accruing with respect thereto as provided in the Newstar Loan Agreement (collectively, the "Pre-Petition Debt"); (ii) the Pre-Petition Debt is secured pursuant to the Newstar Loan Agreement by all of Debtor's right, title and interest in and to all of the following, whether owned or acquired: all Accounts, Inventory (including, without limitation, Inventory in transit), Equipment, General Intangibles, Chattel Paper, Letter of Credit Rights, Proprietary Rights, Instruments, Documents and documents of title, Investment Property, Deposit Accounts, Commercial Tort Claims, money, cash, cash equivalents, securities and other personal property of any kind at any time held directly or indirectly by Newstar or any affiliate of Newstar, all books and records, whether in tangible or intangible form, all other assets, if any, and all accessions to, substitutions for and replacements, products and proceeds of any of the foregoing (collectively, the "Pre-Petition Collateral"); and (iii) on the Petition Date at the time of the commencement of this Case, Newstar asserts that the value of the Pre-Petition Collateral exceeded the aggregate amount of Pre-Petition Debt and that Newstar is over-secured.

b)      The Debtor has further acknowledged and agreed that: (i) the Newstar Loan Agreement constitutes a valid, binding and enforceable agreement and obligation of the Debtor; (ii) the security granted for the benefit of Newstar pursuant to the Newstar Loan Agreement are valid, binding, perfected, enforceable, non-avoidable and not subject to

5

subordination (the "Pre-Petition Liens"); (iii) all of the Pre-Petition Debt under the Newstar Loan Agreement constitutes allowable claims against the Debtor and is valid, enforceable, non-avoidable and not subject to subordination; and (iv) the Debtor does not possess and will not assert any claim, counterclaim, setoff or defense of any kind or nature that would in any way affect the validity, enforceability, priority or non-avoidability of any of the Pre-Petition Debt owed Newstar and/or Newstar's security interests in, or liens upon, the Pre-Petition Collateral, or which would in any way reduce or affect the absolute and unconditional obligation of the Debtor to pay Newstar all of the Pre-Petition Debt; provided, however, that the provisions of this paragraph bind the Debtor only and do not bind the Debtor's estate or third parties.

    4.    *Findings Regarding the Financing.*

        a)    Good cause has been shown for the entry of this Interim Order.

        b)    The Debtor has an immediate need to obtain the Financing and use Cash Collateral in order to permit, among other things, the orderly continuation of the operation of its business, to maintain business relationships with vendors, suppliers, and customers, to make payroll, and to satisfy other working capital and operational needs. The access of the Debtor to sufficient working capital and liquidity through incurrence of new indebtedness for borrowed money, the use of Cash Collateral to pay Pre-Petition Debt, and other financial accommodations is vital to the preservation and maintenance of the going concern value of the Debtor, which is essential in facilitating the sale of the Debtor's assets pursuant to that certain Asset Sale and Purchase Agreement (the "APA") by and among Westrim, Inc., as Seller, and Blue Moon Beads Acquisition Corp., as Purchaser.

        c)    The "DIP Credit Documents" shall mean and include the Newstar Loan Agreement together with the Interim Order until entry of a Final Order, and thereafter the Final

Exhibit "3" - 223

Order, as well as any additional documents reasonably requested by Newstar to effectuate the terms of the Interim Order and/or Final Order.

      d)    The Debtor is unable to obtain financing on more favorable terms from sources other than Newstar under the DIP Credit Documents and is unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtor is also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code without the Debtor granting to Newstar the DIP Liens and the Super-priority Claims (each defined below) under the terms and conditions set forth in the DIP Credit Documents. The terms of the Financing and the use of Cash Collateral as provided by the DIP Credit Documents appear to be fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and constitute reasonably equivalent value and fair consideration.

      e)    The Financing has been negotiated in good faith and at arm's length between the Debtor and Newstar, and all of the Debtor's obligations and indebtedness arising under, in respect of, or in connection with the Financing and the DIP Credit Documents, including, without limitation, all loans made to the Debtor pursuant to the DIP Credit Documents (the "DIP Obligations"), shall be deemed to have been extended in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified on appeal or otherwise.

      f)    The Debtor has requested entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2). Absent granting the relief sought by this Interim

Exhibit "3" - 224

Order, the Debtor's estate will be immediately and irreparably harmed. Consummation of the Financing and the use of Cash Collateral in accordance with this Interim Order and the DIP Credit Documents are therefore in the best interest of the Debtor's estate.

5.    *Approval of the Motion.* The Motion is granted in all respects on an interim basis. The failure to specifically describe or include any particular provision of the DIP Credit Documents in this Interim Order shall not diminish or impair the effectiveness of such provision in the DIP Credit Documents.

6.    *Authorization of the Financing and the DIP Credit Documents.*

a)    The DIP Credit Documents and the Financing are approved as set forth in this Interim Order solely to the extent necessary to implement the terms and conditions of this Interim Order. The Debtor is hereby authorized to enter and execute the DIP Credit Documents. The Debtor is hereby authorized to borrow money under the Newstar Loan Agreement pursuant to the DIP Credit Documents, up to the amount forecasted in the Budget, subject to the limitations of borrowings under the DIP Credit Documents, which shall be used solely for purposes permitted under the DIP Credit Documents and the Budget, including, without limitation, to provide working capital for the Debtor, and to pay interest, fees and expenses in accordance with the DIP Credit Documents.

b)    In furtherance of the foregoing, and without further approval of this Court, the Debtor is expressly authorized and directed on an interim basis to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages, and financing statements), to perform all obligations thereunder and to pay all fees that may be reasonably required or necessary for the

Exhibit "3" - 225

Debtor's performance of its obligations under the DIP Credit Facility and Financing, including, without limitation:

    i.   The execution, delivery and performance of such documents which Newstar reasonably requests as necessary or desirable to effectuate, evidence, document or perfect the liens related to th Financing (provided, that Newstar shall not be required to obtain any such additional documents and any delay in obtaining or failure to obtain any such additional documents shall not limit or impair Newstar's rights as acknowledged and granted under the DIP Credit Documents,

    ii.   The non-refundable payment to Newstar of the following fees: (a) a commitment fee of $25,000; and (b) fees enumerated in the Newstar Loan Agreement,

    iii.   The performance of all other acts required under or in connection with the DIP Credit Documents, and

    c)   Upon execution and delivery of the DIP Credit Documents and the entry of the Interim Order, the DIP Credit Documents shall constitute valid and binding obligations of the Debtor, enforceable against the Debtor in accordance with the terms of the DIP Credit Documents. No obligation, payment, transfer or grant of security under the DIP Credit Documents or this Order shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under section 502(d) of the Bankruptcy Code) or subject to any defense, reduction, setoff, recoupment or counterclaim.

Exhibit "3" - 226

7.    *DIP Credit Facility Terms.*  Subject to and effective upon entry of the Final Order granting such relief, the DIP Credit Facility and total post-petition financing will be a continuation of the pre-petition financing provided to the Debtor by Newstar and will be subject to all of the same provisions as stated in the Newstar Loan Agreement, except as otherwise provided in the DIP Credit Documents.

a)    Budget.  Attached to the Motion and to this Interim Order is a 6-week budget (previously referred as the "Budget") that is acceptable to Newstar.  The Debtor may only use the proceeds of Financing and the DIP Credit Facility in accordance with the Budget.  The credit limit under the DIP Credit Facility is set at $7.0 million, subject further to the caveat that draws against the DIP Credit Facility is may not exceed those forecasted in the Budget.  The Debtor shall promptly comply with any reasonable request of any party in interest for additional information regarding the components of any line item contained in the Budget.

b)    Default and Termination Provisions.  Defaults and Events of Default under the DIP Credit Facility and with respect to all Financing shall be as set forth in the Newstar Loan Agreement except that the Events of Default described in subsections 12.1(c)-(e) of the Loan and Security Agreement dated September 3, 2008, as amended, shall not be applicable during the Case so long as it is a chapter 11 case; and provided that each of the following shall constitute an additional Event of Default:

i.    The entry of an order dismissing the Case or converting the Case to one under chapter 7 of the Bankruptcy Code;

ii.    Debtor's failure for any one week to achieve total sales equal to or greater than 90 percent of the total sales projected for such week in the Budget;

Exhibit "3" - 227

iii.   Debtor's total cumulative cash collections at any time is less than 90 percent of total cash collections projected for such week in the Budget;

iv.   Debtor's total cumulative cash expenses at any time exceed 100 percent of the total expenses projected in the Budget; and

v.   Failure to close the sale of the Debtor's assets pursuant to the APA by June 3, 2011.

8.   *Super-priority Claims.* Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed claims against the Debtor with priority over any and all administrative expenses and diminution claims (including all claims for adequate protection under 507(b) of the Bankruptcy Code), and all other claims against the Debtor, except to the extent of the Carve-Out (as defined below), now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code (the "Super-priority Claims"), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which allowed claims shall be payable from and have recourse to all pre- and post-petition property of the Debtor and all proceeds thereof.

9.   *DIP Liens.* As security for the Financing and the DIP Obligations, effective and perfected upon the date this Interim Order is entered (and effective upon the date of the Final Order, also securing all Pre-Petition Debt to Newstar), and without the necessity of the execution, recordation of filings by the Debtor of mortgages, security agreements, control

Exhibit "3" - 228

agreements, pledge agreements, financing statements, or other similar documents, Newstar is hereby granted security interests in and liens on all property of the Debtor and its estate identified in clause (a) and clause (b) below (collectively referred to as the "DIP Collateral"), (all such liens and security interests granted to Newstar, pursuant to this Interim Order and the DIP Credit Documents, the "DIP Liens"), subject only to the Carve-Out (as defined below):

a)    Pursuant to section 364(d) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully-perfected first priority senior security interests in and liens upon all pre- and post-petition property of the Debtor, whether existing on the Petition Date or thereafter acquired, all Accounts, Inventory (including, without limitation, Inventory in transit), Equipment, General Intangibles, Chattel Paper, Letter of Credit Rights, Proprietary Rights, Instruments, Documents and documents of title, Investment Property, Deposit Accounts, Commercial Tort Claims, causes of action (excluding causes of action under sections 542, 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code and any proceeds thereof (collectively, the "Avoidance Actions")) money, cash, cash equivalents, securities and other personal property of any kind at any time held directly or indirectly by Newstar or any affiliate of Newstar, all books and records, whether in tangible or intangible form, all other assets, if any, and all accessions to, substitutions for and replacements, products and proceeds of any of the foregoing. Newstar's liens and security interests shall continue in full force and effect in all DIP Collateral until all Pre-Petition Debt and DIP Obligations have been fully paid and all commitments of Newstar under the DIP Credit Documents have been terminated.

b)    Pursuant to sections 364(c)(2) and (c)(3) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully perfected (i) first priority senior security interests in and liens upon all DIP Collateral that is not otherwise subject to a lien, and (ii) junior security

12

interests in and liens upon all DIP Collateral that is subject to a lien.  Newstar's liens and security interests shall continue in full force and effect until all Pre-Petition Debt and DIP Obligations have been fully paid and all commitments of Newstar under the DIP Credit Documents have been terminated.

c)      The Pre-Petition Liens and the DIP Liens and Super-priority Claims granted herein to Newstar shall be subject and subordinate only to the payment of a carve-out (the "Carve-Out") in an amount not to exceed $135,000 for the payment of allowed but unpaid fees of the Debtor's professionals approved by the Court  pursuant to sections 327 or 328 of the Bankruptcy Code.

10.    *Protection of Newstar's Rights.*

a)      Subject to and effective upon entry of the Final Order granting such relief, all Pre-Petition Debt and DIP Obligations (both pre- and post-petition) will be secured by all Pre-Petition Collateral and DIP Collateral and all collections and proceeds of both Pre-Petition Collateral and DIP Collateral shall be applied to the amounts due under the Newstar Loan Agreement (both pre- and post-petition) including the Pre-Petition Debt, Financing, and DIP Credit Facility, and the pre-petition credit facility provided by Newstar under the Newstar Loan Agreement shall be merged into the DIP Credit Facility.

b)      The Financing will be a continuation of the pre-petition financing provided by Newstar and will have all of the same provisions as stated in the Newstar Loan Agreement, except as otherwise provided herein.

c)      The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit Newstar to continue to require that all proceeds of Pre-Petition Collateral and DIP Collateral be deposited to an account controlled by

13

Exhibit "3" - 230

Newstar and to permit Newstar to apply the proceeds of that collateral to Pre-Petition Debt and/or Financing.

        d)      The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit Newstar to exercise (i) immediately upon the occurrence of an Event of Default or the Termination Date, its right to cease funding under the DIP Credit Facility; (ii) and (ii) upon the occurrence and during the continuance of an Event of Default or the Termination Date and, in any case, subject to its obtaining an order for relief from or modification of the stay upon the giving of five (5) days' prior written notice (or such shorter notice as is approved by the Court) to the Debtor, counsel to the Creditors' Committee (or to the 20 largest unsecured creditors if no official Creditors' Committee has been appointed), the United States Trustee for the Central District of California, and those additional parties, if any, who have filed a request for all notices served in this case, all other rights and remedies, including, without limitation, any and all rights and remedies against the DIP Collateral and Pre-Petition Collateral provided for in the DIP Credit Documents (including, without limitation, the right to setoff monies of the Debtor in accounts maintained with or controlled by Newstar). In any hearing regarding any exercise of rights or remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and the Debtor hereby waives its right to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of Newstar set forth in this Interim Order or the DIP Credit Documents. In no event shall Newstar be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or Pre-Petition Collateral.

11.    *Limitation on Charging Expenses against Collateral.*    Subject to and effective upon entry of the Final Order granting such relief, no expenses of administration of the Case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral or Pre-Petition Collateral securing the Pre-Petition Debt or DIP Obligations pursuant to section 506(c) and/or 552(b) of the Bankruptcy Code or any similar principle of law.

12.    *Termination of Right to Use Cash Collateral and DIP Credit Facility.*    The Debtor's right to use Cash Collateral hereunder and the DIP Credit Facility shall terminate without further order of this Court (i) if there is an Event of a Default under the DIP Credit Facility, or (ii) if a trustee under chapter 7 or 11 of the Bankruptcy Code, a responsible officer, or an examiner with enlarged powers relating to the operations of the business (powers beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) Code shall be appointed in the chapter 11 case, or (iii) at maturity on June 3, 2011.

13.    *Accrued Deferred Time Off Compensation for Debtor's Employees.*    Provided that (i) the APA has not terminated; (ii) the Debtor is continuing to pursue a sale of its assets pursuant to the terms of the APA (including a sale to an alternative bidder) (the "Sale"), (iii) an Event of Default has not occurred under the DIP Loan; and (iv) the Debtor terminates the employment of any of its employees (each an "Involuntarily Terminated Employee") prior to the closing of the Sale, the Debtor is authorized to pay as expenses in accordance with forecasts in the Budget up to 50 percent of accrued deferred time off compensation ("DTO") to any such Involuntarily Terminated Employee. The foregoing, however, does not provide the Debtor with authority to pay the DTO to any employee who voluntarily terminates his/her employment (each a "Voluntarily Terminated Employee") prior to the closing of the Sale. In the event the Debtor

15

closes the Sale, the Debtor is authorized to pay up to $194,000, less any amounts previously paid to Involuntarily Terminated Employees for DTO, for (i) any DTO owing to any employee terminated as a result or consequence of the Sale; (ii) any DTO owing to any Involuntarily Terminated Employee terminated prior to the closing of the Sale and (iii) any DTO owing to any Voluntarily Terminated Employee.

14.    *Perfection of DIP Liens.*

a)    Newstar is hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction or take any other action, including the making of notations on certificates of title, in order to validate and perfect the liens and security interests granted to it hereunder. Whether or not Newstar shall, in its sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments or otherwise confirm perfection of the liens and security interests granted hereunder, including the making of notations on certificates of title, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination at the time and on the date of entry of this Interim Order. Upon the request of Newstar, the Debtor, without any further consent of any party, is authorized to take, execute and deliver such instruments (without representation or warranty of any kind) to enable Newstar to further validate, perfect, preserve and enforce the DIP Liens.

b)    A certified copy of this Interim Order may, in the discretion of Newstar, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording.

Exhibit "3" - 233

c)    Effective upon the entry of a Final Order, any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties, or (ii) the payment of any fees or obligations to any governmental entity, in order for the Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest or other post petition collateral related thereto, shall be deemed to have no force and effect with respect to the transactions granting post petition liens in favor of Newstar in accordance with the terms of the DIP Credit Documents or this Interim Order.

15.    *Preservation of Rights Granted under the Interim Order.*

a)    Except to the extent of the Carve-Out, no claim or lien having a priority superior to or *pari passu* with those granted by this Interim Order to Newstar, shall be granted or allowed while any portion of the Pre-Petition Debt, Financing, or the DIP Obligations remain outstanding or while Newstar has any commitment under the DIP Credit Documents, and the DIP Liens shall not be (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtor's estate under section 551 of the Bankruptcy Code or (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise (except to the extent of the Carve-Out).

b)    Unless (i) all DIP Obligations and Pre-Petition Debt shall have been paid in full, and (ii) the commitments under the DIP Credit Documents have terminated (all such actions, collectively, the "DIP Pay-Out"), the Debtor shall not seek, and it shall constitute an Event of Default and a termination of the DIP Credit Facility and right to use Cash Collateral if the Debtor seeks, or if there is entered (i) any modifications or extensions of this Interim Order without the prior written consent of Newstar, and no such consent shall be implied by any other action, inaction or acquiescence by Newstar, or (ii) an order dismissing the Case.  If an order

17

1   dismissing the Case under section 1112 of the Bankruptcy Code or otherwise is at any time

2   entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy

3   Code) that (1) the Super-priority Claims and DIP Liens granted to Newstar pursuant to this

4   Interim Order shall continue in full force and effect and shall maintain their priorities as provided

5   in this Interim Order until the DIP Pay-Out shall have occurred (and that such Super-priority

6   Claims and DIP Liens shall, notwithstanding such dismissal, remain binding on all parties in

7   interest, except to the extent of the Carve-Out) and (2) this Court shall retain jurisdiction,

8

9   notwithstanding such dismissal, for the purposes of enforcing the claims, liens, and security

10   interests referred to in (1) above.

11          c)      If any or all of the provisions of this Interim Order are hereafter reversed,

12   modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (i) the

13   validity of any DIP Obligations incurred prior to the actual receipt of written notice by Newstar,

14   of the effective date of such reversal, stay, modification or vacation, or (ii) the validity or

15

16   enforceability of any security interest, lien or priority authorized or created hereby or pursuant to

17   the DIP Credit Documents with respect to any DIP Obligations.  Not withstanding any such

18   reversal, stay, modification or vacation, any DIP Obligations incurred by the Debtor to Newstar

19   prior to the actual receipt of written notice by Newstar of the effective date of such reversal, stay,

20   modification or vacation shall be governed in all respects by the original provisions of this

21

22   Interim Order, and Newstar shall be entitled to all the rights, remedies, privileges and benefits

23   granted in section 364(e) of the Bankruptcy Code, this Interim Order and pursuant to the DIP

24   Credit Documents with respect to all DIP Obligations.

25          d)      Except as expressly provided in this Interim Order or in the DIP Credit

26   Documents, the Carve-Out, the DIP Liens and the Super-priority Claims and all other rights and

27

28

18

Exhibit "3" - 235

remedies of Newstar granted by the provisions of this Interim Order and the DIP Credit Documents shall survive, and shall not be modified, impaired or discharged by the entry of an order converting the Case to one under chapter 7, dismissing the Case, or by any other act or omission, nor shall the Carve-Out, the DIP Liens, the Super-priority Claims or any of the other rights and remedies of Newstar granted by the provisions of this Interim Order and the DIP Credit Documents be modified, impaired or discharged by the entry of an order confirming a plan of reorganization in the Case and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtor has waived any discharge as to any remaining DIP Obligations. The terms and provisions of this Interim Order and the DIP Credit Documents shall continue in the Case, in any successor case if the Case ceases, or in any superseding chapter 7 case under the Bankruptcy Code, and the Carve-Out, the DIP Liens, the Super-priority Claims and all other rights and remedies of Newstar granted by the provisions of this Interim Order and the DIP Credit Documents shall continue in full force and effect until the DIP Obligations are paid in full.

16.   *Limitation on Use of Financing Proceeds and Collateral / Bar Date.*

a)   Notwithstanding anything herein or in any other order by this Court to the contrary, no borrowings, letters of credit, Cash Collateral, DIP Collateral, Pre-Petition Collateral, or any Carve Out may be used to (i) object, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due under the DIP Credit Documents, the Newstar Loan Agreement, or the liens or claims granted under this Order or the DIP Credit Documents or Newstar Loan Agreement, (ii) assert any action for preferences, fraudulent conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests, or defenses against Newstar or its affiliates, representatives, attorneys or advisors, (iii) prevent, hinder or otherwise delay Newstar's assertion, enforcement or

Exhibit "3" - 236

realization on the Cash Collateral, the DIP Collateral, or the Pre-Petition Collateral in accordance with the DIP Credit Documents or this Interim Order, (iv) seek to modify any of the rights granted to Newstar, or under the DIP Credit Documents, in the Case without such parties' prior written consent or (v) pay any amount on account of claims arising prior to the filing of the petition for relief herein unless such payments on account of such pre-petition claims are (a) approved by an Order of this Court and (b) in accordance with the Budget or (c) otherwise made to Newstar as approved by Newstar in its sole discretion.

b)    Any party in interest and any Creditors' Committee appointed pursuant to 11 U.S.C. § 1102, which has obtained the requisite authorization, shall have sixty (60) days from the date of entry of this Interim Order to file, on behalf of the Debtor's estate, and to serve upon counsel for Newstar, objections or complaints respecting the validity, extent, priority, avoidability or enforceability of the Pre-Petition Debt or the Pre-Petition Liens and security interests (each a "Challenge"). In the event (i) a Challenge is not filed and properly served within the 60-day period described above, or (ii) a final order is entered denying all such Challenges, then the Debtor, any Creditors' Committee and any other party in interest, including any subsequent chapter 11 or chapter 7 trustee shall thereafter be forever barred from bringing any Challenge, and the Pre-Petition Debt and the liens and security interests of Newstar shall be deemed valid, enforceable, perfected, unavoidable and not subject to subordination, and the repayment of the Pre-Petition Debt and final and indefeasible, for all purposes in this chapter 11 case and any subsequent chapter 7 case; *provided, however*, the foregoing shall not in any way prejudice the rights of Newstar to pursue and recover any fees, expenses, interest, or costs contemplated in this Interim Order.

Exhibit "3" - 237

17.   *Proof of Claim.*  Notwithstanding any claims bar or similar order of this Court, Newstar shall not be required to file in this case or any succeeding chapter 7 case for claims arising under the Newstar Loan Agreement.

18.   *Effect of Entry of Order.*  Entry of this Interim Order shall be without prejudice to any and all rights, remedies, claims and causes of action which Newstar may have against the Debtor or third parties, and without prejudice to the right of Newstar to seek relief from the automatic stay in effect pursuant to Bankruptcy Code section 362, or any other relief in the Case, and the right of the Debtor to oppose any such relief.

19.   *Order Governs.*  In the event of any conflict between the provisions of this Interim Order and any other DIP Credit Documents, the provisions of this Interim Order shall govern.

20.   *Binding Effect: Successors and Assigns.*  The DIP Credit Documents and the provisions of this Interim Order, including all findings herein which findings are made on an interim basis, shall be binding on all DIP Obligations made pursuant to this Interim Order, upon all parties in interest in the Case, including, without limitation, Newstar, any official committee appointed in the Case, and the Debtor and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of the Debtor) and shall inure to the benefit of Newstar and the Debtor and their respective successors and assigns, provided, however, that Newstar shall have no obligation to extend any financing to any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estate of the Debtor. In determining to make any loan under the DIP Credit Facility, in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Credit Documents, Newstar shall not be deemed to be in control of the operations of the Debtor or to be acting as a

21

Exhibit "3" - 238

"responsible person" or "owner or operator" with respect to the operation or management of the Debtor (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 *et seq.* as amended, or any similar federal or state statute).

21.  *Final Hearing.* The Final Hearing is scheduled for _____ __, 2011 at ____ _.m. before this Court.

22.  The Debtor shall promptly mail copies of this Interim Order (which shall constitute adequate notice of the Final Hearing, including, without limitation, notice that the Debtor will seek approval at the Final Hearing of a waiver of rights under sections 506(c) and 552(b) of the Bankruptcy Code) to the parties having been given notice of the Interim Hearing, and to any other party that has filed a request for notices with this Court and to any official committee after the same has been appointed, or its counsel, if the same shall have been appointed.  Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections, which objections shall be served upon counsel for the Debtor, counsel for Newstar, and the Office of the United States Trustee for the Central District of California, and shall be filed with the Clerk of the United States Bankruptcy Court, Central District of California, in each case to allow actual receipt by the foregoing no later than 5:00 p.m. Pacific Time on _____ __, 2011.

# # #

Exhibit "3" - 239

NOTE: When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I.
Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
1900 Avenue of the Stars, 7th Floor, Los Angeles, CA 90067

A true and correct copy of the foregoing document described as *NOTICE OF DEBTOR'S EMERGENCY MOTION AND DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (A) AUTHORIZING POSTPETITION FINANCING AND GRANTING SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT TO 11 U.S.C. §§ 361, 362, AND 364; (B) AUTHORIZING USE OF CASH COLLATERAL; (C) MODIFYING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362; (D) GRANTING ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§ 361, 362, 363, AND 364; AND (E) SCHEDULING INTERIM AND FINAL HEARINGS PURSUANT TO BANKRUPTCY RULE 4001; DECLARATION OF CHRISTOPHER M. McLAIN IN SUPPORT THEREOF*
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On *Fill in Date Document is Filed*, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☐ Service information continued on attached page

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served):
On *Fill in Date Document is Filed*, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on *Fill in Date Document is Filed*, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____     _____     _____
*Date*                          *Type Name*                                *Signature*

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

August 2010

**F 9013-3.1.PROOF.SERVICE**
Exhibit "3" - 240

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 1900 Avenue of the Stars, 7th Floor, Los Angeles, CA 90067

A true and correct copy of the foregoing document described as ***Notice Of Debtor's Emergency Motion And Debtor's Emergency Motion For Interim And Final Orders (A) Authorizing Postpetition Financing And Granting Security Interests And Superpriority Administrative Expense Status Pursuant To 11 U.S.C. §§ 361, 362, And 364; (B) Authorizing Use Of Cash Collateral; (C) Modifying The Automatic Stay Pursuant To 11 U.S.C. § 362; (D) Granting Adequate Protection Pursuant To 11 U.S.C. §§ 361, 362, 363, And 364; And (E) Scheduling Interim And Final Hearings Pursuant To Bankruptcy Rule 4001; Declaration Of Ronald B. Cooper In Support Thereof*** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On ***April 29, 2011***, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒  Service information continued on attached page

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On ***April 29, 2011,*** I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒  Service information continued on attached page

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on ***April 29, 2011,*** I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

☒  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| | | |
|---|---|---|
| April 29, 2011 | Claudean Brandon | *signature* |
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

August 2010

**F 9013-3.1.PROOF.SERVICE**

## *ADDITIONAL SERVICE INFORMATION:*

### I. <u>TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")</u> –

- Alexis M McGinness   amm@jmbm.com, cb7@jmbm.com
- David M Poitras   dpoitras@jmbm.com
- United States Trustee (SV)
  ustpregion16.wh.ecf@usdoj.gov

### II. <u>SERVED BY OVERNIGHT MAIL</u>

Honorable Geraldine Mund
United States Bankruptcy Court - Central District of California
21041 Burbank Boulevard, Suite 342
Woodland Hills, CA 91367

WESTRIM , INC., dba WESTRIM CRAFTS,
a Delaware corporation

LIST OF 20 LARGEST UNSECURED CREDITORS

American Express-CPC/091678
CPC Remittance Processing
PO Box 329000
Weston, FL 33332-9000

Grant Thornton, LLP
PO Box 51552
Los Angeles, CA 90051-5852
Attn: Daryl Ohland

VIF Valencia Gateway, LLC
c/o CB Richard Ellis
500 Citadel Drive
Commerce, CA 90040
Attn: Dee Eckman

<u>Agent for Bridge Lenders</u>
Ron Cooper
11222 Brooks Road
Windsor, CA 95492

SECURED CREDITORS

7768454v1

*ADDITIONAL SERVICE INFORMATION:*

III. **SERVED BY EMAIL**

WESTRIM , INC., dba WESTRIM CRAFTS,
a Delaware corporation

LIST OF 20 LARGEST UNSECURED CREDITORS

AMB Property Corp.
PRJT# PVANNUY03/Leade ID LWESTCR01
PO Box 6156 .
Hicksville, NY 11802-6156
Attn: Kari Hughes
Email: khughes@amb.com -

Anthem Blue Cross
PO Box 5812
Los Angeles, CA 90074-5812
Attn: Ruth Estrada
Email: Ruth.Estrada@anthem.com

Asian Craft Inc.
8th Fl, No 97 Sec 2, Nan King E Rd
Taipei, Taiwan
Attn: Donald Chen
Email: Donald@asiancraft.com.tw

Aurient International Corp.
8F-3 105 Chang An West Road
Taipei, Taiwan
Attn: Edmund Wu / Melody Hsiao
Email: Edmund@aurient.com.tw; Hsiao@aurient.com.tw

Banaras Beads Limited
A-1 Industrial Estate
Varanasi-221 106 India
Attn: Siddarth Gupta
Email: siddarth@banarasbeads.com

Bureau Veritas
Consumer Products Services, Inc.
14624 Collection Center Drive
Chicago, IL 60693
Attn: Teresa Keller
Email: teresa.keller@us.bureauveritas.com

Bureau Veritas Hong Kong Ltd
14630 Collection Center Drive
Chicago, IL 60693
Attn: Effie Lu
Email: effie.lu@cn.bureauveritas.com

CSA Canadian Sales Agency Inc.
#1 Valleybrook Drive
Toronto, ON M3B 2S7
Attn: Michelle Callahan
Email: michelle@csatransportation.com

Dumont Promotional Images Inc.
12947 Chadron Avenue
Hawthorne, CA 90250
Attn: Lisa Machado
Email: lisa@cssales.com

Edwards Properties
PO Box 1549
Springdale, AR 72765
Attn: Joe Edwards
Email: peggy@edcspringdale.com

7768454v1

*ADDITIONAL SERVICE INFORMATION:*

## III. **SERVED BY EMAIL**

Kelly Lowry & Kelley LLP
6320 Canoga Ave #1650
Woodland Hills, CA 91367
Attn: John Kelly
Email: johnk@KLKPatentLaw.com

Miller Starr & Regalia
Dept 05115 POB 39000
San Francisco, CA 94139-5115
Attn: Lance Anderson
Email: LHA@msrlega.com

Silverwings Unique, Inc.
451 North Oak Street
Inglewood, CA 90302
Attn: Albert Chen
Email: albertc@suilax.com

Tru-Blu Industries LLC
PO Box 793
Niles, MI 49120
Attn: Bob Demmet
Email: trublu@qtm.net

SECURED CREDITORS

Attorneys For Acquisition Corp.
Paul Hastings Janofsky & Walker LLP
Jennifer B. Hildebrandt
515 South Flower St, 25th Fl
Los Angeles, CA 90071
Email: jenniferhildebrandt@paulhastings.com

Kwan Hing Fareast Prod Fty Ltd
Stg2 Blk A 6thF
Wah Fung Id Bldg Ct
Kwai Chung, Hong Kong
Attn: Michelle-Kwan Hing
Email: michelle@kwanhing.net

Nord Race Paper Intl Ltd
Unit 12 15/F Wah Wai Centre
38-40 Au Pui Wan St
New Territories, Hong Kong
Attn: Peter Pang
Email: peterpang@nordrace.com

Tin Hung Products Factory HK
223 G/F, Yu Chau Street
Sham Shui Po, Hong Kong
Attn: Tin Fu-Lap Yeung Yuk
Email: lap@tinfultd.com

Miller Starr & Regalia
300 Hamilton Avenue, Third Floor
Palo Alto, CA 94301
Attn: Lance Anderson
Email: LHA@msrlega.com

Attorneys For Acquisition Corp.
Paul Hastings Janofsky & Walker LLP
Amit Mehta
191 North Wacker Drive, 30th Fl
Chicago, IL 60606
Email: amitmehta@paulhastings.com

Attorneys For Newstar Business Cred
Hunton & Williams LLP
Gregory G. Hesse
1445 Ross Avenue, Ste 3700
Dallas, TX 75202
Email: ghesse@hunton.com

7768454v1