1

DAVID M. POITRAS P.C. (CA Bar No. 141309)
ALEXIS M. McGINNESS (CA Bar No. 241449)

2

JEFFER MANGELS BUTLER & MITCHELL LLP
1900 Avenue of the Stars, Seventh Floor

3

Los Angeles, California  90067-4308
Telephone:     (310) 203-8080

4

Facsimile:     (310) 712-8571
Email:         dpoitras@jmbm.com

5

6

Counsel for Westrim, Inc.,
Debtor and Debtor-in-Possession

7

8

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

9

**SAN FERNANDO VALLEY DIVISION**

10

In re

CASE NO.     1:11-bk-15313-GM

11

WESTRIM, INC. dba WESTRIM CRAFTS, a
Delaware corporation.

Chapter 11

12

13

Debtor.

**MOTION FOR ORDER AUTHORIZING:
(A) SALE OF CERTAIN ASSETS OF THE
ESTATE, FREE AND CLEAR OF ALL**

14

**LIENS, CLAIMS, ENCUMBRANCES AND
INTERESTS; (B) ASSUMPTION AND**

15

**ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES;**

16

**AND (C) RELATED RELIEF;
MEMORANDUM OF POINTS AND**

17

**AUTHORITIES; DECLARATION OF
CHRISTOPHER M. MCLAIN IN SUPPORT**

18

**THEREOF**

19

**Hearing**:

20

Date:        May 25, 2011
Time:        10:30 a.m.

21

Ctrm:        Ctrm. 303

22

21041 Burbank Blvd.
Woodland Hills, CA 91367

23

Judge:       Hon. Geraldine Mund

24

25

26

**TO THE HONORABLE GERALDINE MUND, UNITED STATES BANKRUPTCY JUDGE,**

27

**AND INTERESTED PARTIES:**

28

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ..................................................................................................2

II.    FACTS AND PROCEDURAL HISTORY .........................................................4

    A.    The Chapter 11 Filing.................................................................................4

    B.    Debtor's Business Operations ...................................................................4

    C.    Secured Claims Against Debtor's Assets..................................................5

    D.    Unsecured Claims.......................................................................................6

    E.    The Assets of the Estate .............................................................................6

        1.    Receivables .....................................................................................6

        2.    Inventory ........................................................................................6

        3.    Equipment ......................................................................................7

    F.    The Cause of the Chapter 11 Filings ........................................................7

    G.    The Assets....................................................................................................8

    H.    Executory Contracts and Unexpired Leases to be Assumed and Assigned...............9

    I.    Payment of DTO........................................................................................10

    J.    The Sale Hearing and Auction.................................................................10

III.    POINTS AND AUTHORITIES ........................................................................11

    A.    The Sale of the Assets is in the Best Interest of the Estates and There is a Sound Business Justification for the Sale Being Presented to this Court...............11

    B.    The Statutory Standard ...........................................................................12

    C.    Debtor Has Provided Adequate Protection to Those Parties Which Assert an Interest in the Assets of The Estate Which Are to be Sold Free and Clear of Liens ........................................................................................................12

    D.    Assumption and Assignment of the Designated Executory Contracts, Licenses and Leases is Appropriate Under the Circumstances .................13

    E.    The Purchaser Will Be Qualified to Acquire the Assets and is Entitled to Good Faith Purchaser Status Pursuant to Section 363(m) of the Bankruptcy Code ..........................................................................................................14

IV.    CONCLUSION...................................................................................................15

DECLARATION OF CHRISTOPHER M. MCLAIN .......................................................16

# TABLE OF AUTHORITIES

1

Page(s)

2

**CASES**

3

*In re the Canyon Partnership,*

4
    55 B.R. 520 (Bankr. S.D. Cal. 1985) .................................................................11

5

*In re Chateaugay Corp.,*

6
    973 F.2d 141 (2d Cir. 1992) ...........................................................................11

7
*Community Thrift & Loan v. Suchy (In re Suchy),*
    786 F.2d 900 (9th Cir. 1985) ..................................................................14, 15

8

9
*In re Continental Airlines, Inc.,*
    780 F.2d 1223 (5th Cir. 1986) ......................................................................11

10

11
*In re Equity Funding Corp.,*
    492 F.2d 793 (9th Cir. 1974) .........................................................................11

12

13
*In re Evelyn Byrnes, Inc.,*
    32 B.R. 825 (Bankr. S.D.N.Y. 1983) .............................................................13

14
*In re Lionel Corp.,*
15
    722 F.2d 1063 (2d Cir. 1983) .......................................................................11

16
*In re M Capital Corporation,*
    290 B.R. 743 (BAP 9th Cir. 2003) ...............................................................14

17

18
*In re Mann,*
    907 F.2d 923 (9th Cir. 1990) .......................................................................14

19

20
*In re The Huntington Ltd.,*
    654 F.2d 578 (9th Cir. 1981) ........................................................................11

21
*In the Matter of Circus Time, Inc.,*
22
    5 B.R. 1 (Bankr.D.Me. 1979) .......................................................................12

23
*Onouli-Kona,*
    846 F.2d at 1172 ...................................................................................14, 15

24

25
*In re Technology Hifi, Inc.,*
    49 B.R. 876 (Bankr. D. Mass. 1985) .............................................................13

26
*Van Huffel v. Harkelrode,*
    284 U.S. 225, 52 S. Ct. 115 (1931)...............................................................12

27

28

PRINTED ON

RECYCLED PAPER

7739976v4

# TABLE OF AUTHORITIES
## (Cont'd)

Page(s)

*In re Walter,*
    83 B.R. 14 (Bankr. 9th Cir. 1988) ........................................................................11

*In re Wilde Horse Enterprises, Inc.,*
    136 B.R. 830, 841 (Bankr. C.D. Cal. 1991) ..........................................................11

**CODES AND STATUTES**

11 U.S.C.
        § 101-1330 .......................................................................................................2
        § 363… ............................................................................................................12
        § 363(b) ........................................................................................................ 11-12
        § 363(f) ......................................................................................................12, 14
        § 365(f)(2) ..................................................................................................4, 13
        § 365…. ............................................................................................................2
        § 363(m) ..........................................................................................................4

Federal Rules of Bankruptcy Procedure
        Rules 1001-9036 ..........................................................................................2, 4

PRINTED ON

RECYCLED PAPER

7739976v4

# I.

# INTRODUCTION

Westrim, Inc. dba Westrim Crafts, a Delaware corporation, debtor and debtor-in-possession in this chapter 11 case (hereinafter "Westrim" or "Debtor"),[1] hereby moves the Court, pursuant to sections 363(b) and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"),[2] for an order authorizing it to sell a substantial portion of its assets consisting of inventory, intellectual property, general intangibles, goodwill, customer lists and certain other assets and to assume and assign specified executory contracts and unexpired leases (the "Sale Motion") to Blue Moon Beads Acquisition Corp. (hereinafter "Purchaser" or "Acquisition Corp.") pursuant to that certain Asset Sale and Purchase Agreement (the "Sale Agreement") dated as of May 2, 2011 between Debtor and Acquisition Corp.  A copy of the Sale Agreement is attached to this Motion as Exhibit 1.  If the proposed sale is approved, Acquisition Corp. (or the "Successful Bidder" as defined below) will acquire a substantial portion of Debtor's assets consisting of inventory, intellectual property, general intangibles, goodwill, customer lists and certain other defined assets (hereinafter the "Assets"), excepting, without limitation, cash, accounts receivable, certain furniture, fixtures and equipment, Debtor's corporate minute books, contracts and leases that are not designated for assumption and assignment, bankruptcy avoidance claims (excepting only avoidance actions against suppliers, vendors and customers of Debtor which have or will have the same relationships with Purchaser on and after the Closing) and certain designated inventory (hereinafter the "Excluded Assets"). The proposed sale to Acquisition Corp. is subject to overbid at the hearing on the Sale Motion (the "Sale Hearing").

As set forth in the Sale Agreement, Debtor proposes to sell the Assets to Acquisition Corp. (or an overbidder) for approximately $2.5 million cash at Closing, plus an additional payment of

---

[1]      Westrim is a wholly owned subsidiary of Creativity Crafts, Inc., a Delaware corporation ("Creativity").  Creativity's stock is privately held and not publicly traded.

[2]      Unless otherwise indicated herein, all chapter, section and rule references in this Motion are to the Bankruptcy Code, 11 U.S.C. §§101-1330, the Federal Rules of Bankruptcy Procedure, Rules 1001-9036 ("FRBP") and the Local Bankruptcy Rules for the Central District of California ("LBR").

$250,000 in March 2012, plus payments, if earned, totaling in excess of $12,500,000 based on the achievement of certain sales and net product margins by Acquisition Corp. following the closing (as described in the Acquisition Corp. Sale Agreement)(the "Earn Out") (collectively, the "Purchase Price").  As set forth in the Declaration of Christopher M. McLain filed in support of this Motion, Debtor believes that the proposed purchase price for the Assets is fair and reasonable under the circumstances presented.  In the absence of new capital or a sale (such as that proposed by this Motion), Debtor's business will be forced to close, permanently.  In such event, material going concern value, in addition to approximately 70 jobs will be lost, unnecessarily.  Debtor's board of directors has determined that the sale proposed herein is beneficial to Debtor and this bankruptcy estate.  Based upon information and belief, Debtor believes that there may be overbidding at the Sale Hearing.  Through this process, the Court and interested parties will be assured that the Assets will be sold for the highest and best price possible.

Specifically, Debtor moves the Court for the entry of an order authorizing, among other things:

A.  A sale of the Assets to Acquisition Corp. in exchange for the Purchase Price;

B.  A sale of the Assets to such other entity as the Court determines has made a higher or better offer than that of Acquisition Corp.;[3]

C.  The sale of the Assets free and clear of all liens, claims, encumbrances and other interests of all persons, with all liens, claims, encumbrances and interests to attach to the proceeds of sale with the same force, effect, validity and priority as existed on the date of sale;

D.  Payment to Newstar Business Credit, LLC ("NEWSTAR"), the senior secured lender, on account of its allowed pre and postpetition secured claims, from the net sale proceeds;

E.  The assumption and assignment of designated contracts, licenses and leases set forth in Exhibit 3 (or later identified prior to the Sale Hearing) to the purchaser of the Assets and a finding that the only adequate assurance of future performance required from such purchaser of the

---

[3]  The bidding procedures are described and set forth in the Order Establishing Bidding Procedures for the Sale of Substantially All of the Estate's Assets (the "Bidding Procedures Order").  A true and complete copy of the Bid Procedures Order is attached to this Motion as Exhibit 2.

PRINTED ON

RECYCLED PAPER

7739976v4

1    Assets under Bankruptcy Code § 365(f)(2) is such purchaser's promise to perform the obligations

2    under the designated contracts, licenses and leases;

3            F.   A finding that Acquisition Corp. (or the Successful Bidder) is a "good faith"

4    purchaser, entitled to all of the protections and benefits of Bankruptcy Code § 363(m);

5            G.   A waiver of the 14-day stay provided in FRBP 6004(h); and

6            H.   Debtor and/or the other parties to the sale to take such actions as are necessary

7    and  appropriate  to  consummate  the  sale  and  conveyance  of  the  Assets  (including,  without

8    limitation, Debtor's entry into, and performance of its obligations under, the Ancillary Agreements

9    (as defined in the Sale Agreement) (including the Transition Services Agreement)(as also defined in

10   the Sale Agreement).

11           As demonstrated below, the foregoing relief is in the best interests of Debtor and this

12   bankruptcy estate.

## II.

## FACTS AND PROCEDURAL HISTORY

### A.    The Chapter 11 Filing

16           On April 29, 2011 (the "Petition Date"), Debtor filed a voluntary petition for relief

17   under chapter 11 of title 11 of the Bankruptcy Code.

18           As of the date of this Motion, no trustee or creditors' committee has been appointed

19   in this case.  Debtor remains in possession and control of its assets as a debtor-in-possession.

### B.    Debtor's Business Operations

21           Westrim is a Delaware corporation and a wholly owned subsidiary of Creativity and

22   is based in Van Nuys, California.  Westrim currently employs approximately 70 people.  Creativity

23   is a privately held Delaware corporation and is also based in Van Nuys, California.  Other than its

24   stock interest in Debtor, Creativity does not have any material assets nor any of the Assets to be

25   acquired by Acquisition Corp.  Similarly, other than various guaranty obligations for which Debtor

26   is the primary obligor, Creativity does not have any significant debt.

27           Debtor  had  its  beginnings  in  Los  Angeles  during  the  early  1950's  as  Western

28   Trimmings, when Albert Deitsch started a costumes and props design and supply business catering

1    to the movie industry.  Westrim, headed by Gary Deitsch, evolved into a basic crafts business in the

2    1960's wholesaling product to hobby stores and sewing retailers.  Design of product was done in

3    Southern California but virtually all production has been done in Asia since the 1970's, with the

4    product being distributed nationwide from Westrim's Southern California distribution facility.  By

5    the early 2000's, the independent hobby and sewing stores had been replaced by the national chains

6    of hobby and mass merchandise stores such as Michaels, JoAnn Stores, A.C Moore, Wal-Mart and

7    Target.  The Company grew to meet the needs of these large chains with evolving consumer trends

8    and increasing volume.  Scrapbooking became very popular and Debtor moved its focus toward that

9    sector, retaining the basic crafts business.  The costume jewelry making business became

10   increasingly popular and in 2002, Westrim acquired Blue Moon Beads.  As the popularity of

11   scrapbooking declined, Debtor sold off its various units and the Blue Moon Beads unit is left as the

12   most popular national "premium" brand for high quality beads and fashion-conscious jewelry

13   making components.  It is the Blue Moon Beads unit (and the assets contained in that unit) that is

14   the subject of this Motion.  In short, the Assets subject to the Sale Agreement include substantially

15   all of Debtor's assets relating to the Blue Moons Beads unit, including inventory, intellectual

16   property, general intangibles, customer lists and goodwill.

17          **C.      Secured Claims Against Debtor's Assets**

18          NEWSTAR is Debtor's senior secured lender.  Debtor has investigated and believes

19   that NEWSTAR has a perfected and unavoidable security interest in all of the Assets subject to the

20   Motion and substantially all of Debtor's other assets.  Debtor projects that as of the projected

21   Closing Date, NEWSTAR will be owed approximately $6.2 million.  The debt owed to NEWSTAR

22   is secured by all assets of both Debtor and Creativity.  Debtor is hopeful that the NEWSTAR debt

23   will be paid in full through a combination of the cash to be paid at Closing of the asset sale

24   proposed herein, the collection of Debtor's remaining accounts receivable (which are not part of the

25   Assets being sold under the transaction described in this Motion), other assets not included in the

26   transaction described in this Motion, such as inventory and intellectual property not related to the

27   Blue Moons Bead unit, furniture, fixtures and equipment, and the Earn Out.

28

PRINTED ON
RECYCLED PAPER

7739976v4

1       As of the Petition Date, a group of fourteen individuals/entities (the "Bridge

2  Lenders") assert a claim against Debtor in the amount of approximately $1,025,000 plus accrued

3  interest and costs (the "Bridge Loan").  The Bridge Lenders are comprised of a group of

4  shareholders of Creativity.  The Bridge Lenders provided the Bridge Loan to Debtor in June 2010 to

5  fund certain operating shortfalls and to otherwise get Debtor to the "finish line" to complete a out-

6  of-court going concern sale of Debtor's then (and still) remaining assets.  At that point in time,

7  Debtor and the Bridge Lenders reasonably believed that the value of the company in a sale would be

8  sufficient to pay creditors in full and provide a return to equity.  The Bridge Lenders' debt is

9  secured by a junior security interest in substantially all of Debtor's assets.  The Bridge Loan is

10  subordinate to the NEWSTAR loan.

11       NEWSTAR and the Bridge Lenders are the only parties that Debtor is aware of that

12  assert a perfected security interest in the Assets which are the subject of this Motion.

**D.**    **Unsecured Claims**

14       In addition to the secured claims described above, there are general unsecured trade

15  claims of approximately $10.7 million in this case, including projected landlord claims of

16  approximately $4.9 million.

**E.**    **The Assets of the Estate**

18       Debtor's principal assets are accounts receivable, inventory and equipment, all of

19  which appear to be subject to the security interests described above.

**1.**    **Receivables**

21       As of April 22, 2011, the face amount of Debtor's outstanding accounts receivable

22  was approximately $2,207,000.00.  Based upon past history, Debtor believes that as part of a going

23  concern, the current receivables are collectible with a reserve of approximately  $432,000.00.

**2.**    **Inventory**

25       Debtor's inventory consists of finished goods, raw materials and packaging materials.

26  As of April 22, 2011, the value of Debtor's inventory subject to the pending sale, calculated as the

27  value of Debtor's cost of such inventory, was approximately $3,000,000.00.  As of April 22, 2011,

28

PRINTED ON

RECYCLED PAPER

7739976v4

1    the value of Debtor's inventory not subject to the pending sale, again calculated at Debtor's cost of

2    such inventory, was approximately $2,000,000.00.

3          **3.**    **Equipment**

4          Debtor owns certain furniture, fixtures and equipment, the non-depreciated book

5    value of which was approximately $2.5 million as of December 31, 2010.  Approximately 10% of

6    these assets are subject to the pending sale and the remainder will remain with the Debtor and will

7    be liquidated separately.

8          If the Sale Motion is denied and Debtor is forced to liquidate, there is a possibility

9    that there will be a deficiency on NEWSTAR's prepetition debt and that Bridge Lenders and

10    unsecured creditors will receive nothing.  If the Sale Motion is approved and the sale closes, Debtor

11    reasonably believes that NEWSTAR will be paid in full over time, it is possible that the Bridge

12    Lenders will be paid over time, and there is a reasonable possibility that there will be additional

13    funds available for other creditors from the Earn Out.

14          **F.**    **The Cause of the Chapter 11 Filings**

15          Westrim acquired several craft companies between 2000 and 2006, with the intent of

16    leveraging a common "back office" infrastructure (warehousing, accounting, IT, HR) to provide

17    cost leverage and strengthen its relationships with key retail customers, including Michaels, JoAnn's

18    and Wal-Mart.  Significant losses in product placement due to changes in retailer strategy and

19    increased competition resulted in a decline in revenue from approximately $125 million in 2005 to

20    $30 million in 2010.  Westrim's current revenue and margins are not sufficient to pay its

21    infrastructure costs on an ongoing basis.  In May 2010, Westrim sold the assets of its scrapbooking,

22    paper crafting, wall décor, craft storage and general crafts business to ANW Crestwood.  In June

23    2010, Westrim engaged investment banker Stifel-Nicolaus to market the assets of the Blue Moon

24    Beads unit, with the intent of paying all debts and returning any remaining capital to the

25    shareholders once the sale was complete.

26          Stifel Nicolaus assisted in preparation of a Confidential Memorandum regarding a

27    proposed sale of the Blue Moon Beads unit.  After contacting over 100 potential purchasers,

28    identified by Stiffel Nicolaus and Debtor as the most likely candidates to acquire the Blue Moon

1    Beads unit, the Confidential Memorandum was sent in August 2010 to 40 parties who had requested

2    the material.  Subsequent discussions were had with each of these parties, and eventually 6 parties

3    attended an on-site presentation in September and October 2010.  Eventual negotiations with the 6

4    parties resulted in the receipt of 3 proposals in November and December 2010.  After discussions

5    with the investment banker, the proposal received from Acquisition Corp. was determined to be the

6    most viable proposal.

7         Faced with the imminent prospect of a forced liquidation, in the exercise of its

8    fiduciary duty, Debtor's board of directors determined to file this chapter 11 case to preserve and

9    protect Debtor's assets for the benefit of all creditors, Debtor's employees, and to preserve the

10   business as close to a going concern as possible under the circumstances presented, to allow for a

11   sale of Debtor's assets for the benefit of all concerned, under the protection of the Bankruptcy

12   Court.

13        Based upon the foregoing, Debtor has, both prepetition and by this Motion, sought to

14   market and sell the Assets to obtain the highest and best value for them.  Debtor believes that the

15   proposed sale is preferable to a forced piecemeal liquidation.  The sale will preserve jobs and much

16   of the core business associated with the Blue Moon Beads unit.   In addition, because the

17   contemplated sale is expressly subject to overbids and an auction process, Debtor believes that the

18   sale will ensure that the maximum possible value is generated for the Assets.

19        **G.**    **The Assets**

20        The Assets to be acquired pursuant to the Sale Agreement and the Sale Motion

21   include the following assets but only those related to the Blue Moon Beads unit: inventory,

22   furniture, fixtures, equipment, licenses, permits, designated personal property leases, designated

23   license agreements, designated contract rights, general intangibles, and intellectual property,

24   customer lists, copies of books and records and certain other specific assets.

25        The Assets to be acquired do not include Debtor's cash, corporate minute books,

26   accounts receivable, license agreements, leases and contract rights not designated by the Purchaser,

27   inventory not related to the Blue Moon Beads unit, and  claims and causes of action (excepting only

28

PRINTED ON

RECYCLED PAPER

7739976v4

1    Avoidance Actions against the suppliers, vendors and customers of Debtor which have the same

2    relationships with Purchaser on and after the Closing).

3            On or about April 8, 2011, Debtor and Acquisition Corp.'s parent company (the

4    "Licensee") entered into an Exclusive License Agreement (the "Exclusive License") pursuant to

5    which Debtor granted to the Licensee an exclusive license to make and sell to Michaels certain

6    products under the "Blue Moon" brand (the "Licensed Products").   The Exclusive License is

7    attached as Exhibit 4 to the Motion and the McLain declaration.   The Licensee is required to pay to

8    Debtor a royalty equal to 7% of gross sales to Michaels of the Licensed Products.   The Exclusive

9    License was entered into in good faith and on an arm's length basis (with substantial give and take

10   between the parties) in order to ensure that Michaels will continue to purchase the Licensed

11   Products.   Pursuant to the Sale Agreement, Debtor and Acquisition Corp. have agreed that

12   Acquisition Corp. on behalf of the Licensee, can offset any payments due to Debtor under the

13   Exclusive License against any of the Breakup Fee due from the Seller.

14           If Acquisition Corp. is the Successful Bidder, it will make a decision on the

15   disposition of the License Agreement prior to Closing.   If another party is the Successful Bidder,

16   Debtor will notify the Court and parties in interest prior to the Sale Hearing as to the proposed

17   disposition of the License Agreement.

18        **H.    Executory Contracts and Unexpired Leases to be Assumed and Assigned**

19           Exhibit 3 to this Motion designates the executory contracts, agreements and

20   unexpired leases that Debtor will seek approval to assume and assign to Purchaser.[4]   Between the

21   time that the Sale Motion is filed and the Sale Hearing, Debtor will seek to resolve any cure claims

22   and obtain the consent of each of the nondebtor parties to the assumption and assignments

23   proposed.   Notwithstanding any agreement being designated for assumption on Exhibit 3, Debtor

24   expressly reserves the right to reject each of the agreements designated in Exhibit 3 at or prior to the

25   Sale Hearing.   Debtor shall pay any cure costs from the proceeds of the Sale.

26   _____

27       [4]      Debtor reserves the right to amend Exhibit 3 with notice to the applicable non-debtor parties to such
     executory contracts and unexpired leases.

28

PRINTED ON
RECYCLED PAPER

7739976v4

## I.    Payment of DTO

In the event the Debtor closes the Sale, the Debtor is authorized to pay, from the proceeds of the Sale, up to $194,000, less any amounts previously paid to Involuntarily Terminated Employees for accrued deferred time off compensation ("DTO"), for (i) any DTO owing to any employee terminated as a result or consequence of the Sale; (ii) any DTO owing to any Involuntarily Terminated Employee terminated prior to the closing of the Sale; and (iii) any DTO owing to any employee who voluntarily terminates his/her employment ("Voluntarily Terminated Employee").   Payment of any DTO will come from NEWSTAR's collateral pursuant to an agreement between Debtor and NEWSTAR, and such funds would not otherwise be available absent such agreement.   In the event a Closing occurs and this obligation is triggered, at least one individual will be entitled to be paid more than the $11,725 priority provided in Section 507(a)(4) of the Bankruptcy Code.   Because this payment is essentially coming from the senior secured lender and would not otherwise be available to the estate in the absence of such agreement, Debtor submits that such payment does not run afoul of the prior scheme set out in the Bankruptcy Code.

## J.    The Sale Hearing and Auction

As set forth above, Debtor believes that the proposed sale of the Assets is in the best interest of the bankruptcy estate.   To ensure that the estate receives the maximum possible consideration from the sale transaction, Debtor intends to subject the Assets to competitive bidding through an auction at the Sale Hearing, as conducted pursuant to the procedures established by the Sale Procedures Order, in the event that one or more qualifying initial bids for the Assets are timely submitted.

Interested parties should refer to Exhibit 2 for the proposed bid/auction procedures and interested parties will also receive a separate notice setting forth the bid/auction procedures ultimately approved by the Bankruptcy Court.

PRINTED ON
RECYCLED PAPER

7739976v4

## III.

## POINTS AND AUTHORITIES

**A.    The Sale of the Assets is in the Best Interest of the Estates and There is a Sound Business Justification for the Sale Being Presented to this Court**

The Ninth Circuit has ruled in cases under the Bankruptcy Code that a sale of a debtor's property outside the ordinary course of business should be approved if it is in the best interests of the estate and its creditors.  In re The Huntington Ltd., 654 F.2d 578, 589 (9th Cir. 1981); In re Equity Funding Corp., 492 F.2d 793, 794 (9th Cir. 1974).  Whether a sale is in the best interests of the estate and of the creditors of the estate continues to be one of the significant factors under the Bankruptcy Code.  See, In re the Canyon Partnership, 55 B.R. 520 (Bankr. S.D. Cal. 1985).

In addition to the requirement that the sale be in the best interests of the estate and the creditors of the estate, the Bankruptcy Appellate Panel of the Ninth Circuit as well as the Second Circuit and the Fifth Circuit Court of Appeals have held that in order for a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity security holders, a motion to sell assets of the estate outside of the ordinary course of business must articulate a sound business justification for the use, sale or lease of the property outside the ordinary course of business.  In re Walter, 83 B.R. 14 (Bankr. 9th Cir. 1988); see also, In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983); In re Continental Airlines, Inc., 780 F.2d 1223 (5th Cir. 1986) and In re Wilde Horse Enterprises, Inc., 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991).

In the present case, the relief requested is in the best interests of creditors and the estate because Debtor needs a significant capital infusion to continue operating (which it cannot obtain) and because the value of the Assets will necessarily be lost and dissipated absent a prompt sale.  The protection of the value of a debtor's assets is a valid business justification for the sale of assets under § 363(b).  See, In re Chateaugay Corp., 973 F.2d 141 (2d Cir. 1992) (approving the sale of substantially all of the assets of one of the debtor's subsidiaries over the objections of the creditors' committee.  The court upheld the lower court's finding that further delay would create a risk that the assets would be sold later, and for less).  Id. at 149.  Moreover, based upon the evidence

1    presented, Debtor believes that it is clear that the estate is receiving fair and adequate value for the

2    Assets.

3    **B.    The Statutory Standard**

4    The power of the bankruptcy court to authorize sales of estate property free and clear

5    of liens has long been recognized. Van Huffel v. Harkelrode, 284 U.S. 225, 52 S.Ct. 115 (1931).

6    Section 363(f) provides that a debtor-in-possession may sell property of the estate pursuant to §§

7    363(b) and (c)), free and clear of any such interest in such property of an entity other than the estate,

8    if any one of the five requirements of § 363(f) are met.[5] In the Matter of Circus Time, Inc., 5 B.R. 1

9    (Bankr.D.Me. 1979).

10    1.    NEWSTAR and the Bridge Lenders consent to the sale proposed in the Sale

11    Agreement free and clear of liens, claims, encumbrances and other interests. Debtor is not aware of

12    any other party that asserts a perfected security interest in the Assets to be sold pursuant to the Sale

13    Agreement.

14    Therefore, Debtor has satisfied § 363(f)(2) and Debtor is entitled to the relief

15    requested as a matter of law.

16    **C.    Debtor Has Provided Adequate Protection to Those Parties Which**

17    **Assert an Interest in the Assets of The Estate Which Are to be Sold Free**

18    **and Clear of Liens**

19    11 U.S.C. § 363(e) provides that sales of property under § 363 are predicated upon

20    the estate providing the entity with an interest in the Assets to be sold with adequate protection for

21    said interest. By the Sale Motion, the liens asserted by NEWSTAR and the Bridge Lenders in the

22    Assets to be sold will attach to the net proceeds of sale, in the same order and priority as said

23

---

24    [5] 11 U.S.C. §363(f) provides that: the trustee may sell property under subsection (b) or (c) of this section free
and clear of any interest in such property of an entity other than the estate, only if - -
25    (1) applicable non-bankruptcy law permits sale of such property free and clear of such interest;
(2) such entity consents;
26    (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value
of all liens on such property;
27    (4) such interest is in bona fide dispute; or
(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such
28    interest.

PRINTED ON

RECYCLED PAPER

7739976v4

1    interest(s) existed on the date the sale is approved or consummated.  At Closing, the net sale

2    proceeds will be paid over to NEWSTAR up to the amount of and on account of its claim secured

3    by its senior lien against such Assets.

4        **D.**    **Assumption and Assignment of the Designated Executory Contracts,**

5    **Licenses and Leases is Appropriate Under the Circumstances**

6        Section 365(f) of the Bankruptcy Code provides that a debtor-in-possession "may

7    assign an executory contract or unexpired lease of the debtor only if -- (A) the [debtor-in-

8    possession] assumes such contract or lease . . . ; and (B) adequate assurance of future performance

9    by the assignees of such contract or lease is provided . . . ."  11 U.S.C. § 365(f)(2).  Section 365(b)

10   in turn, provides that "[i]f there has been a default in an executory contract or unexpired lease of the

11   debtor, the [debtor-in-possession] may not assume such contract or lease unless, at the time of

12   assumption . . . ., the [debtor-in-possession] . . . (A) cures, or provides adequate assurance that the

13   [debtor-in-possession] will promptly cure, such default."  11 U.S.C. § 365(b).

14       With respect to any contracts, licenses and leases that Debtor seeks authority to

15   assume and assign, the nondebtor parties to such agreements will have the opportunity to object to

16   the proposed assumption and assignment to Purchaser.  Acquisition Corp.'s financial capability and

17   willingness to perform the various obligations arising under the agreements to be assumed and

18   assigned to it constitute sufficient "adequate assurance of future performance" to justify the

19   proposed assumption and assignment of the contracts, licenses and agreements at issue.  See, e.g., In

20   re Tech Hifi, Inc., 49 B.R. 876, 879 (Bankr. D. Mass. 1985)("Adequate assurance of future

21   performance with respect to the source of rent to be paid means that the proposed assignee has the

22   ability to satisfy the financial obligations imposed by the lease.  An absolute guaranty, such as a

23   letter of credit, is not required to meet this standard.")(citation omitted); In re Evelyn Byrnes, Inc.,

24   32 B.R. 825, 828-29 (Bankr. S.D.N.Y. 1983)("The term 'adequate assurance' of future performance

25   are not words of art; the legislative history of the Code shows that they were intended to be given a

26   practical, pragmatic construction.  As such, its primary focus centers on the assignee's ability to

27   satisfy the financial obligations imposed by the lease.")(citations omitted).

28

1

2

3

### E.      The Purchaser Will Be Qualified to Acquire the Assets and is Entitled to Good Faith Purchaser Status Pursuant to Section 363(m) of the Bankruptcy Code

4    Debtor requests as part of the approval of the proposed sale transaction, that the

5    Court find that Acquisition Corp. (or an overbidder if it so qualifies and proper evidence is

6    submitted to the Court regarding such party), is qualified to acquire the Assets and will do so in

7    good faith within the meaning of § 363(m) of the Bankruptcy Code and, in connection therewith,

8    that such acquiring entity is the assign of Debtor.   Debtor has no preexisting relationship with

9    Acquisition Corp. other than the Exclusive License granted to the Licensee, which was entered into

10    in good faith and on an arm's length basis in order to ensure that Michaels (a significant customer of

11    Debtor) continues to purchase the Licensed Product.   Acquisition Corp. is not attempting to gain

12    advantage over other bidders.

13    "Typically, lack of good faith is shown by fraud, collusion between the purchaser

14    and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."  In

15    re M Capital Corporation, 290 B.R. 743, 746 (BAP 9th Cir. 2003).

16    Section 363(m) provides that "[t]he reversal or modification on appeal of an

17    authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect

18    the validity of a sale or lease under such authorization to an entity that purchased or leased such

19    property in good faith . . . ." 11 U.S.C. § 363(m).  Under section 363(m) "[a]n appeal of a

20    bankruptcy court's ruling on a foreclosure action [or sale] generally cannot affect the rights of a

21    good faith purchaser of the foreclosed property, unless the debtor [or other complaining party] stays

22    the foreclosure [or other] sale pending an appeal."  In re Mann, 907 F.2d 923, 926 (9th Cir. 1990).

23    "[T]he primary goal of the mootness rule [embodied in § 363(m) 'is to protect the interest of a good

24    faith purchaser . . . of the property,' thereby assuring finality of sales." Onouli-Kona, 846 F.2d at

25    1172 (quoting Community Thrift & Loan v. Suchy (In re Suchy), 786 F.2d 900, 901-02 (9th Cir.

26    1985)).  That goal is important in this case because any buyer needs assurance that its purchase of

27    the assets will not be subject to future attack by objecting creditors or disgruntled bidders.

28

1      Section 363(m) protection is appropriate in this case because the proposed sale

2   transaction is or will be the product of arms-length, good faith negotiations between Debtors and the

3   Buyer.  See, Onouli-Kona, 846 F.2d at 1173 (a lack of good faith within the meaning of section

4   363(m) requires "fraud, collusion, . . . or an attempt to take grossly unfair advantage of other

5   bidders")(quoting Suchy, 786 F.2d at 902)).

6                                           **IV.**

7                                    <u>**CONCLUSION**</u>

8      For the reasons and based upon the arguments and authorities set forth above, Debtor

9   respectfully requests that the Court enter its order authorizing a sale of the Assets on the terms and

10  conditions set forth herein and in the Sale Agreement and for all other and further appropriate relief.

11  Dated: May 4, 2011                        Respectfully Submitted,

12                                            JEFFER MANGELS BUTLER & MITCHELL LLP

13                                            By:  ___*/s/ David M. Poitras*_____

14                                                 DAVID M. POITRAS, P.C.
                                                   Counsel for Westrim, Inc.,
15                                                 Debtor and Debtor-in-Possession

16

17

18

19

20

21

22

23

24

25

26

27

28

PRINTED ON

RECYCLED PAPER

7739976v4

- 15 -

## DECLARATION OF CHRISTOPHER M. MCLAIN

I, Christopher M. McLain:

1.      I am a senior vice president of Debtor.  I am authorized to make this declaration on behalf of Debtor.

2.      I am familiar with each of the facts stated herein, and they are stated of my own personal knowledge.  If called as a witness, I could and would competently testify with respect to the matters set forth herein.

3.      I have read and assisted in preparation of the motion in support of which this declaration is being submitted to the Court.  Capitalized terms used in this declaration have the same meaning as such terms are given in the Motion.

4.      Each of the facts set forth herein are true and correct, to the best of my actual knowledge, information and belief.

5.      Certain of the facts set forth in this declaration are based upon Debtor's business records.  The documents and papers which comprise the business records of Debtor are maintained by persons whose duty it is to keep such records accurately and correctly.  Said records are created by employees of Debtor by making a written record of each transaction or occurrence which relates to such events at or shortly after the time of such transaction or occurrence.  I have reviewed certain of Debtor's records prior to making this declaration.

6.      A copy of the Sale Agreement with Acquisition Corp. (without Schedules) is attached to this declaration and the Sale Motion as Exhibit 1.

7.      A copy of the Bid Procedures Order is attached to this declaration and the Sale Motion as Exhibit 2.

8.      As set forth in the Sale Agreement, Debtor proposes to sell the Assets to Acquisition Corp. (or an overbidder) for approximately $2.5 million cash at Closing, plus an additional payment of $250,000 in March 2012, plus payments, if earned, totaling in excess of $12,500,000 based on the achievement of certain sales and net product margins by Acquisition Corp. following the closing (as described in the Acquisition Corp. Sale Agreement)(the "Earn Out") (collectively, the "Purchase Price").

9.    Debtor believes, based upon the marketing process undertaken, that the proposed purchase price for the Assets is fair and reasonable under the circumstances presented.

10.    In the absence of new capital or a going concern sale (such as that proposed by the Motion), Debtor's business will be forced to close permanently.

11.    In such event, material going concern value, in addition to approximately 70 jobs will be lost, unnecessarily.

12.    Westrim is a Delaware corporation and a wholly owned subsidiary of Creativity and is based in Van Nuys, California.  Westrim currently employs approximately 70 people.  Creativity is a privately held Delaware corporation and is also based in Van Nuys, California.  Other than its stock interest in Debtor, Creativity does not have any material assets and no Assets being acquired by Acquisition Corp.  Similarly, other than various guaranty obligations for which Debtor is the primary obligor, Creativity does not have any significant debt.

13.    NEWSTAR is Debtor's senior secured lender.  Debtor has investigated and believes that NEWSTAR has a perfected and unavoidable security interest in all of the Assets subject to the Motion and substantially all of Debtor's other assets.  Debtor projects that as of the projected Closing Date, NEWSTAR will be owed approximately $6.2 million.  The debt owed to NEWSTAR is secured by all assets of both Debtor and Creativity.

14.    As of the Petition Date, a group of fourteen individuals/entities (the "Bridge Lenders") assert a claim against  Debtor in the amount of approximately $1,025,000 plus accrued interest and costs (the "Bridge Loan").  The Bridge Lenders are comprised of a group of shareholders of Creativity.  I am one of the Bridge Lenders.  The Bridge Lenders provided the Bridge Loan to Debtor in June 2010 to fund certain operating shortfalls and to otherwise get Debtor to the "finish line" to complete a out-of-court going concern sale of Debtor's then (and still) remaining assets.  At that point in time, Debtor and the Bridge Lenders reasonably believed that the value of the company in a sale would be sufficient to pay creditors in full and provide a return to equity.  The Bridge Lenders' debt is secured by a junior security interest in substantially all of Debtor's assets.  The Bridge Loan is subordinate to the NEWSTAR loan.

15.    NEWSTAR and the Bridge Lenders are the only parties that Debtor is aware of that assert a perfected security interest in the Assets which are the subject of this Motion.

16.    In addition to the secured claims described above, there are general unsecured trade claims of approximately $10.7 million in these cases, including projected landlord claims of approximately $4.9 million.

17.    Debtor's principal assets are accounts receivable, inventory and equipment, all of which appear to be subject to the security interests described above.

18.    As of April 22, 2011, the face amount of Debtor's outstanding accounts receivable was approximately $2,207,000.00.  Based upon past history, Debtor believes that as part of a going concern, the current receivables are collectible with a reserve of approximately $432,000.00.

19.    Debtor's inventory consists of finished goods, raw materials and packaging materials.  As of April 22, 2011, the value of Debtor's inventory subject to the pending sale, calculated as the value of Debtor's cost of such inventory, was approximately $3,000,000.00.  As of April 22, 2011, the value of Debtor's inventory not subject to the pending sale, again calculated at Debtor's cost of such inventory, was approximately $2,000,000.00.

20.    Debtor owns certain furniture, fixtures and equipment, the non-depreciated book value of which was approximately $2.5 million as of December 31, 2010.  Approximately 10% of these assets are subject to the pending sale and the remainder will remain with the Debtor and will be liquidated separately.

21.    The assets to be acquired pursuant to the Sale Agreement and the Sale Motion include the following assets but only those related to the Blue Moon Beads unit: inventory, designated personal property leases, designated license agreements, designated contract rights, general intangibles, intellectual property, customer lists and books and records.

22.    The Assets do not include Debtor's cash, corporate minute books, accounts receivable, license agreements, leases and contract rights not designated by the Purchaser, inventory not related to the Blue Moon Beads unit, and  claims and causes of action (excepting only

1    Avoidance Actions against the suppliers, vendors and customers of Debtor which have the same

2    relationships with Purchaser on and after the Closing).

3        23.    Westrim acquired several craft companies between 2000 and 2006, with the

4    intent of leveraging a common "back office" infrastructure (warehousing, accounting, IT, HR) to

5    provide cost leverage and strengthen its relationships with key retail customers, including Michaels,

6    JoAnn's and Wal-Mart.  Significant losses in product placement due to changes in retailer strategy

7    and increased competition resulted in a decline in revenue from approximately $125 million in 2005

8    to $30 million in 2010.   Westrim's current revenue and margins are not sufficient to pay its

9    infrastructure costs on an ongoing basis.  In May, 2010 Westrim sold the assets of its scrapbooking,

10   paper crafting, wall décor, craft storage and general crafts business to ANW Crestwood.  In June

11   2010, Westrim engaged investment banker Stifel-Nicolaus to market the assets of the Blue Moon

12   Beads unit, with the intent of paying all debts and returning any remaining capital to the

13   shareholders once the sale was complete.

14       24.    Stifel Nicolaus assisted in preparation of a Confidential Memorandum

15   regarding a proposed sale of the Blue Moon Beads unit.  After contacting over 100 potential

16   purchasers, identified by Stiffel Nicolaus and Debtor as the most likely candidates to acquire the

17   Blue Moon Beads unit, the Confidential Memorandum was sent in August 2010 to 40 parties who

18   had requested the material.  Subsequent discussions were had with each of these parties, and

19   eventually 6 parties attended an on-site presentation in September and October 2010.  Eventual

20   negotiations with the 6 parties resulted in the receipt of 3 proposals in November and December

21   2010.  After discussions with the investment banker, the proposal received from Acquisition Corp.

22   was determined to be the only viable proposal.  Debtor provided additional information as requested

23   by Acquisition Corp., and subsequent negotiations resulted in the Sale Agreement and the sale

24   transaction proposed herein.  Upon the conclusion of the sale process, the offer set forth in the Sale

25   Agreement provides the highest potential value to Debtor.

26       25.    Faced with the imminent prospect of a forced liquidation, in the exercise of

27   its fiduciary duty, Debtor's board of directors determined to file this chapter 11 case to preserve and

28   protect Debtor's assets for the benefit of all creditors, Debtor's employees, and to preserve the

1   business as close to a going concern as possible under the circumstances presented, to allow for a

2   sale of Debtor's assets for the benefit of all concerned, under the protection of the Bankruptcy

3   Court.

4        26.    Based upon the foregoing, Debtor has, both prepetition and by this Motion,

5   sought to market and sell the Assets to obtain the highest and best value for them.  Debtor believes

6   that the proposed sale is preferable to a forced piecemeal liquidation.  The sale will preserve jobs

7   and much of the Westrim business associated with the Blue Moon Beads unit.  In addition, because

8   the contemplated sale is expressly subject to overbids and an auction process, Debtor believes that

9   the sale will ensure that the maximum possible value is generated for the Assets.

10        27.    Debtor is using its best efforts to timely provide copies of the Notice of the

11   Sale Motion and the Sale Motion to all parties that have expressed an interest in writing to acquire

12   Debtor or its assets.

13        28.    Exhibit 3 to the Motion designates the executory contracts, license

14   agreements and unexpired leases that Debtor will seek approval to assume and assign.

15        29.    Between the time that the Sale Motion is filed and the Sale Hearing, Debtor

16   will seek to resolve any of the cure claims and obtain the consent of each of the nondebtor parties to

17   the assumption and assignments proposed.

18        30.    Debtor reserves the right to reject any of the contracts or leases set forth on

19   Exhibit 3 prior to the hearing on the Motion.

20        31.    Attached as Exhibit 4 is a true and correct copy of the Exclusive License

21   Agreement dated as of April 8, 2011 by and between Debtor and DCWV Acquisition Corp. (the

22   "Licensee") (Blue Moon Bead Acquisition Corp.'s parent company) (the "Exclusive License").  The

23   Exclusive License was entered into by Debtor and Licensee in good faith and on an arm's length

24   basis (with substantial give and take between the parties) to ensure that Michaels (a significant

25   customer of Debtor) will continue to purchase the products licensed pursuant to the Exclusive

26   License.

27

28

PRINTED ON

RECYCLED PAPER

32.    I am informed and believe that NEWSTAR and the Bridge Lenders consent to the sale proposed in the Sale Agreement free and clear of liens, claims, interests and encumbrances. Debtor is not aware of any other party that asserts a perfected security interest in the Assets to be sold pursuant to the Sale Agreement.

33.    Debtor has no pre-existing relationship with Acquisition Corp. or any of its principals or affiliates other than in connection with the Exclusive License. There was no fraud or collusion regarding the sale process or the Sale Agreement. The Sale Agreement and the Exclusive License were negotiated at arms-length between the parties, and were subject to substantial give and take between them.

34.    As set forth throughout the Motion and this declaration, Debtor believes that the sale transaction proposed in the Motion is in the best interest of this bankruptcy estate.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration was executed this 4th day of May 2011, at Orinda, California.

CHRISTOPHER M. McLAIN

PRINTED ON
RECYCLED PAPER

7939976v4

# EXHIBIT 1

**Execution Copy**

ASSET SALE AND PURCHASE AGREEMENT

BY AND AMONG

WESTRIM, INC.,

AS SELLER,

AND

BLUE MOON BEADS ACQUISITION CORP.,

AS PURCHASER

May 2, 2011

Error! Unknown document
property name.

Exhibit 1 - 22

# TABLE OF CONTENTS

SECTION 1.        DEFINITIONS ........................................................................1

SECTION 2.        PURCHASE AND SALE OF THE PURCHASED ASSETS.....................6
   Section 2.1.    Purchased Assets...........................................................6
   Section 2.2.    Sale at Closing Date.......................................................9
   Section 2.3.    Assumption of Assumed Liabilities; Exclusion of Excluded
                   Liabilities ..................................................................9
   Section 2.4.    Disclosure Schedule Updates; Cure Costs.........................10

SECTION 3.        PURCHASE PRICE ...............................................................10
   Section 3.1.    Purchase Price.............................................................10
   Section 3.2.    Allocation of Purchase Price...........................................11
   Section 3.3.    Earn Out Payments.......................................................11
   Section 3.4.    Purchase Price Deposit .................................................12
   Section 3.5.    Purchase Price Adjustment ............................................13

SECTION 4.        CLOSING. .........................................................................14
   Section 4.1.    Closing .......................................................................14
   Section 4.2.    Deliveries at Closing.....................................................14

SECTION 5.        REPRESENTATIONS AND WARRANTIES OF SELLER.................14
   Section 5.1.    Corporate Organization..................................................14
   Section 5.2.    Qualification to Do Business ...........................................14
   Section 5.3.    Authorization and Validity of Agreement ...........................15
   Section 5.4.    No Conflict or Violation .................................................15
   Section 5.5.    Consents and Approvals ................................................15
   Section 5.6.    Good Title; Sufficiency of Assets.....................................15
   Section 5.7.    Absence of Certain Changes or Events..............................16
   Section 5.8.    Real Property. ..............................................................17
   Section 5.9.    Intellectual Property......................................................17
   Section 5.10.   Permits ......................................................................17
   Section 5.11.   Compliance with Law ....................................................18
   Section 5.12.   Material Contracts........................................................18
   Section 5.13.   Tax Matters ................................................................19
   Section 5.14.   Seller Plans; Employees................................................19
   Section 5.15.   Affiliate Relationships ...................................................20
   Section 5.16.   Financial Statements; Inventory .....................................20

SECTION 6.        REPRESENTATIONS AND WARRANTIES OF PURCHASER...........21
   Section 6.1.    Formation....................................................................21
   Section 6.2.    Authorization and Validity of Agreement ...........................21
   Section 6.3.    No Conflict or Violation ..................................................21
   Section 6.4.    Consents and Approvals ................................................21

LEGAL_US_E # 92480913.14
Error! Unknown document
property name.

Exhibit 1 - 23

SECTION 7.          COVENANTS OF SELLER.........................................................21
    Section 7.1.    Conduct of Business Before the Closing Date...........................21
    Section 7.2.    Consents and Approvals.............................................................23
    Section 7.3.    Access to Properties and Records...........................................23
    Section 7.4.    Notices of Certain Events ........................................................23
    Section 7.5.    Name Change...............................................................................24
    Section 7.6.    Budgets; License Agreement ...................................................24

SECTION 8.          COVENANTS OF PURCHASER.............................................24
    Section 8.1.    Actions Before Closing Date .....................................................24
    Section 8.2.    Consents and Approvals ............................................................24

SECTION 9.          COVENANTS OF SELLER AND PURCHASER .....................25
    Section 9.1.    Retained Jurisdiction...................................................................25
    Section 9.2.    Assignability of Certain Contracts.............................................25
    Section 9.3.    Further Agreements ....................................................................25

SECTION 10.         EMPLOYEES ...............................................................................26
    Section 10.1.   Offers of Employment ...............................................................26
    Section 10.2.   Terms of Employment of Transferred Employees.....................26
    Section 10.3.   WARN Act Liability.....................................................................27

SECTION 11.         CONDITIONS    PRECEDENT    TO    PERFORMANCE    BY
                    SELLER...........................................................................................27
    Section 11.1.   Representations and Warranties of Purchaser........................27
    Section 11.2.   Performance of the Obligations of Purchaser .........................27
    Section 11.3.   Consents and Approvals ............................................................27
    Section 11.4.   No Violation of Orders ...............................................................27
    Section 11.5.   Delivery of Ancillary Agreements.............................................27
    Section 11.6.   Resolutions; Secretary's Certificate........................................27

SECTION 12.         CONDITIONS    PRECEDENT    TO    PERFORMANCE    BY
                    PURCHASER....................................................................................28
    Section 12.1.   Representations and Warranties of Seller ...............................28
    Section 12.2.   Performance of the Obligations of Seller..................................28
    Section 12.3.   Consents and Approvals ............................................................28
    Section 12.4.   No Violation of Orders ...............................................................28
    Section 12.5.   Delivery of Ancillary Agreements.............................................28
    Section 12.6.   No Material Adverse Effect ........................................................28
    Section 12.7.   Resolutions; Secretary's Certificate........................................29
    Section 12.8.   Permits .........................................................................................29
    Section 12.9.   Completion of Due Diligence of Customers and Suppliers......29
    Section 12.10.  Transition Services......................................................................29
    Section 12.11.  Completion of Legal Due Diligence ..........................................29

SECTION 13.         CONDITIONS  PRECEDENT  TO  PERFORMANCE  BY  THE
                    PURCHASER AND THE SELLER. ................................................29

LEGAL_US_E # 92480913.14
Error! Unknown document
property name.

Exhibit 1 - 24

Section 13.1.        29

SECTION 14.        BANKRUPTCY PROCEDURES. ................................................30
  Section 14.1.    Bankruptcy Court Approval of Purchaser as Stalking Horse ..................30
  Section 14.2.    Motions and Notices Regarding Sale of Acquired Assets and
                   Assumption and Assignment of Seller Contracts .....................................30
  Section 14.3.    Requests for Information ........................................................................31
  Section 14.4.    Breakup Fee ............................................................................................31
  Section 14.5.    Certain Bankruptcy Undertakings by Seller. .........................................31

SECTION 15.        TERMINATION. ......................................................................................32
  Section 15.1.    Conditions of Termination .....................................................................32
  Section 15.2.    Effect of Termination .............................................................................33

SECTION 16.        MISCELLANEOUS. ................................................................................33
  Section 16.1.    Successors and Assigns ...........................................................................34
  Section 16.2.    Governing Law, Jurisdiction ..................................................................34
  Section 16.3.    Expenses .................................................................................................34
  Section 16.4.    Broker's and Finder's Fees .....................................................................34
  Section 16.5.    Severability .............................................................................................34
  Section 16.6.    Notices ....................................................................................................34
  Section 16.7.    Amendments; Waivers ...........................................................................35
  Section 16.8.    Public Announcements ..........................................................................35
  Section 16.9.    Entire Agreement ...................................................................................36
  Section 16.10.   Parties in Interest ...................................................................................36
  Section 16.11.   Section and Paragraph Headings ...........................................................36
  Section 16.12.   Construction ...........................................................................................36
  Section 16.13.   Counterparts ...........................................................................................36
  Section 16.14.   Survival ...................................................................................................36

LEGAL_US_E # 92480913.14

Error! Unknown document
property name.

Exhibit 1 - 25

## ASSET SALE AND PURCHASE AGREEMENT

This Asset Sale and Purchase Agreement (the **"Agreement"**) is dated as of May 2, 2011 (the **"Execution Date"**), by and among Westrim, Inc., a Delaware corporation (the **"Seller"**), and Blue Moon Beads Acquisition Corp., a Delaware corporation (**"Purchaser"**).

### PREAMBLE

A.    Seller is engaged in the design, marketing, and distribution of jewelry products, including, but not limited to, beads, pendants, charms, necklaces and bracelets through numerous trade names and trade styles, including, but not limited to Blue Moon, Westrim, Jewelry Shop, Natural Elegance, Lost & Found, global Nomad, and Enchanted Planet (the **"Business"**).

B.    On the Filing Date, Seller has filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Central District of California, San Fernando Valley Division (the **"Bankruptcy Court"**) and was assigned case number 1:11-bk-15313-GM (the **"Bankruptcy Case"**).

C.    Seller currently wishes to sell, transfer, convey, assign and deliver the Purchased Assets to Purchaser, in accordance with Sections 363(f) and 365 and other applicable provisions of the Bankruptcy Code (the **"Sale of Assets"**).  Within five (5) Business Days of the Filing Date, Seller will file the Motions referred to in Section 14.

D.    Seller proposes to complete the Sale of Assets to Purchaser pursuant to this Agreement and in accordance with the Sale Order to be entered by the Bankruptcy Court.

E.    Therefore, the parties, intending to be legally bound, hereby agree as follows:

SECTION 1.    <u>DEFINITIONS</u>.

As used in this Agreement, the following terms have the following meanings:

**"Affiliate"** means any Person that, directly or indirectly, controls, is controlled by, or is under common control with, the subject party.  For purposes of the preceding sentence, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power (i) to vote more than 20% of the securities having ordinary voting power for the election of directors or managers of the controlled Person, or (ii) to direct or cause the direction of management and policies of the controlled Person, whether through the ownership of voting securities or by Contract or otherwise.

**"Agreement"** means this Agreement, as amended and in effect from time to time.

**"Allocation Statement"** has the meaning set forth in Section 3.2.

**"Ancillary Agreements"** means collectively the Bill of Sale, the Trademark Assignments, the Domain Name Assignments, the Assignment and Assumption Agreement, the

Transition Services Agreement and the other agreements, documents and instruments to be executed in connection with the Closing.

"**Assignment and Assumption Agreement**" has the meaning set forth in Section 2.3(a).

"**Assumed Contracts**" has the meaning set forth in Section 2.1(a)(ii).

"**Assumed Liabilities**" has the meaning set forth in Section 2.3(a).

"**Avoidance Actions**" has the meaning set forth in Section 2.1(b)(v).

"**Bankruptcy Case**" has the meaning set forth in Paragraph B of the Preamble.

"**Bankruptcy Code**" means the United States Bankruptcy Code, 11 U.S.C. Section 101, et seq., as amended, or any successor thereto, and any rules and regulations promulgated thereunder (including the Federal Rules of Bankruptcy Procedure).

"**Bankruptcy Court**" has the meaning set forth in Paragraph B of the Preamble.

"**Bankruptcy Rules**" means the Local Bankruptcy Rules for the United States Bankruptcy Court for the Central District of California.

"**Bid Deadline**" has the meaning set forth in the Bid Procedures Order.

"**Bidding Procedures**" means certain procedures providing buyer protections for the benefit of Purchaser and governing any potential overbid for the Purchased Assets, which procedures shall (a) be in form and substance acceptable to Purchaser, (b) be consistent with this Agreement, (c) designate the Purchaser as a "Stalking Horse Purchaser" for the Purchased Assets, (d) include, without limitation, the Breakup Fee and other protections for the Purchaser as Stalking Horse Purchaser, (e) allow the Purchaser to bid the Breakup Fee, (f) provide for an initial minimum overbid by another qualified bidder in an amount equal to the Breakup Fee plus $75,000 and (g) provide for bid increments of $75,000.

"**Bid Procedures Order**" means an order of the Bankruptcy Court approving the Bidding Procedures, which order shall be in form and substance acceptable to Purchaser.

"**Bill of Sale**" has the meaning set forth in Section 2.2.

"**Breakup Fee**" has the meaning set forth in Section 14.4.

"**Bridge Lenders**" means those certain lenders who advanced approximately $1,025,000 to Seller, which advances are secured by substantially all of Seller's assets, junior to the Liens in favor of Lender.

"**Business**" has the meaning set forth in Paragraph A of the Preamble.

"**Business Days**" means days other than Saturdays, Sundays and days on which banks in California are authorized or obligated by law to be closed.

LEGAL_US_E # 92480913.14
Error! Unknown document
property name.

Exhibit 1 - 27

"**Cash**" shall mean all cash and cash.

"**Cash Purchase Price**" has the meaning set forth in Section 3.1.

"**Class I Inventory**" has the meaning set forth in Section 3.5(a).

"**Class II Inventory**" has the meaning set forth in Section 3.5(a).

"**Closing**" has the meaning set forth in Section 4.1.

"**Closing Date**" has the meaning set forth in Section 4.1.

"**COBRA**" means the provisions of the Code, ERISA and the Public Health Service Act enacted by Sections 10001 through 10003 of the Consolidated Omnibus Budget Reconciliation Act of 1985 (P.L. 99-272), including any subsequent amendments to such provisions.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Contract**" means any written or oral contract, service order, employment agreement, consulting agreement, collective bargaining agreement with any labor union, indenture, note, bond, lease, license, commitment or instrument or other agreement, arrangement or commitment that is binding upon a Person or its property, including without limitation any construction contracts or subcontracts, engineering contracts, architect contracts, option agreements and management agreements.

"**Cure Costs**" has the meaning set forth in Section 2.3(b).

"**Cure Obligees**" has the meaning set forth in Section 14.2(b).

"**Deposit Amount**" has the meaning set forth in Section 3.4.

"**DIP Financing**" means the Bankruptcy Court approved Debtor-in-Possession financing provided by Lender to Seller.

"**DIP Order**" has the meaning set forth in Section 14.4(b).

"**Disclosure Letter**" has the meaning set forth in Section 5.

"**Disclosure Schedule**" means any numbered schedule referenced herein or delivered herewith.

"**Dollars**" and "**$**" mean United States dollars.

"**Domain Name Assignments**" has the meaning set forth in Section 2.2.

"**Employees**" has the meaning set forth in Section 5.14(b).

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

3

Error! Unknown document
property name.

Exhibit 1 - 28

"**Excluded Assets**" has the meaning set forth in Section 2.1(b).

"**Excluded Liabilities**" has the meaning set forth in Section 2.3(c).

"**Execution Date**" means the date of execution of this Agreement.

"**Filing Date**" means April 29, 2011.

"**Final Order**" means an order of the Bankruptcy Court (a) that has not been reversed, vacated or stayed, and the time to file an appeal or a motion to reconsider has expired and is not stayed or (b) with respect to which any appeal has been finally decided and no further appeal or petition for certiorari can be taken or granted. A Final Order shall also consist of an order as to which an appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been filed, or the time to do any of the foregoing has not yet expired, but as to which the parties, in their sole and absolute discretion, jointly elect in writing to proceed with the Closing.

"**Financial Statements**" has the meaning set forth in Section 5.16.

"**Fixed Assets**" has the meaning set forth in Section 2.1(a)(i).

"**GAAP**" means U.S. generally accepted accounting principals, applied on a consistent basis for the periods covered thereby.

"**Intellectual Property**" has the meaning set forth in Section 2.1(a)(vi).

"**Inventory**" means all active sku inventory acquired for sale or distribution for the skus which shall be set forth on <u>Exhibit A</u> (which shall be completed and agreed to by Seller and Purchaser within five (5) days after the date of this Agreement), and any related merchandise, work-in-process, raw materials and packaging required to complete such active sku inventory; <u>provided</u> Inventory shall include (i) all fully prepaid Inventory owned by Seller but not yet delivered to Seller and (ii) any additional skus acquired with respect to the Business prior to the Closing with respect to sales to be made after the Closing as set forth on the Inventory Statement.

"**Inventory Budget**" has the meaning set forth in Section 7.6(b).

"**Inventory Statement**" has the meaning set forth in Section 3.5(a).

"**Knowledge of Seller**" means the knowledge of all officers and directors of Seller, following reasonable and due inquiry.

"**Leases**" has the meaning set forth in Section 5.8(b).

"**Lender**" means Newstar Business Credit, LLC.

"**License Agreement**" means that certain Exclusive License Agreement by and between the Parent and the Seller, dated as of April 8, 2011 (as amended from time to time).

LEGAL_US_E # 92480913.14

Error! Unknown document
property name.

Exhibit 1 - 29

"**Lien**" means any mortgage, pledge, charge, security interest, encumbrance, lien (statutory or other), conditional sale agreement or other legally cognizable security interest of any kind.

"**Material Adverse Effect**" means (i) with reference to Seller, a circumstance, state of facts, event, consequence or result that, individually or in the aggregate, materially and adversely affects the Purchased Assets, the Business, results of operations or prospects with regards to any of its material customers (e.g. Jo-Ann Fabrics and Craft Stores, Meijer, Wal-Mart and Wal-Mart Canada), or materially impairs or delays Seller's ability to effect the Closing, or (ii) with reference to Purchaser, a circumstance, state of facts, event, consequence or result that, individually or in the aggregate, materially impairs or delays Purchaser's ability to effect the Closing.

"**Material Contract**" has the meaning set forth in Section 5.12(a).

"**Operating Budget**" has the meaning set forth in Section 7.6(a).

"**Parent**" means DCWV Acquisition Corporation, a Delaware corporation and the parent entity of the Purchaser.

"**Permits**" has the meaning set forth in Section 5.10.

"**Permitted Liens**" has the meaning set forth in Section 5.6(a).

"**Person**" means any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust or unincorporated organization.

"**Proposed Cure Notice**" has the meaning set forth in Section 14.2(b).

"**Purchase Price**" has the meaning set forth in Section 3.1, as the same may be adjusted pursuant to Section 3.5.

"**Purchased Assets**" has the meaning set forth in Section 2.1(a).

"**Purchaser**" has the meaning set forth in the introductory paragraph of this Agreement.

"**Records**" has the meaning set forth in Section 2.1(a)(iii).

"**Rejected Contracts**" has the meaning set forth in Section 2.1(a).

"**Sale of Assets**" has the meaning set forth in Paragraph C of the Preamble.

"**Sale and Bidding Procedures Motion**" means one or more motions to be filed with the Bankruptcy Court within five (5) Business Days after the Filing Date seeking entry of the Sale Order and the Bid Procedures Order, which is intended to give sufficient notice to all persons required in accordance with the requirements of the Bankruptcy Code, the Bankruptcy Rules and the terms and conditions of this Agreement and the provisions of the Bidding Procedure Order and the Sale Order, in form and substance acceptable to Purchaser.

5

Exhibit 1 - 30

"**Sale Order**" means an order of the Bankruptcy Court approving the Sale of Assets to the Purchaser pursuant to the terms of this Agreement, which order shall, without limitation, (a) be in form and substance acceptable to Purchaser, (b) approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code: (i) the execution, delivery and performance by Seller of this Agreement, (ii) the sale of the Purchased Assets to the Purchaser on the terms set forth herein and free and clear of all Liens (other than Liens included in the Assumed Liabilities and Permitted Liens), and (iii) the performance by Seller of its obligations under this Agreement; (c) authorize and empower Seller to assume and assign to the Purchaser the Assumed Contracts; and (d) find that Purchaser is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code, not a successor to Seller and grant the Purchaser the protections of Section 363(m) of the Bankruptcy Code.

"**Schedule**" has the meaning set forth in Section 5.

"**Seller**" has the meaning set forth in the introductory paragraph to this Agreement.

"**Seller Plans**" has the meaning set forth in Section 5.14.

"**Stub Year**" the period between January 1, 2011 through the day immediately preceding the Closing Date.

"**Subordinated Promissory Note**" means a promissory note: (i) with a five (5) year term, (ii) 7% annual payment-in-kind interest (compounded annually), (iii) contractually subordinated only to the Purchaser's lenders and (iv) payable in full (after such note is issued) prior to any cash dividends payable to the stockholders of the Parent in connection with their equity ownership of the Parent.

"**Taxes**" means all taxes however denominated, including any interest, penalties or additions to tax that may become payable in respect thereof, imposed by any governmental body, which taxes shall include, without limiting the generality of the foregoing, all income taxes, payroll and employee withholding taxes, unemployment insurance, social security, sales and use taxes, excise taxes, franchise taxes, gross receipts taxes, occupation taxes, real and personal property taxes, stamp taxes, transfer taxes, workmen's compensation taxes and other obligations of the same or a similar nature, whether arising before, on or after the Closing; and "**Tax**" shall mean any one of them.

"**Tax Returns**" means any return, report, information return or other document (including any related or supporting information) filed or required to be filed with any governmental body in connection with the determination, assessment, collection or administration of any Taxes.

"**Trademark Assignments**" has the meaning set forth in Section 2.2.

"**Transferred Employees**" has the meaning set forth in Section 10.1.

SECTION 2.  PURCHASE AND SALE OF THE PURCHASED ASSETS.

Section 2.1.  Purchased Assets.

LEGAL_US_E # 92480913.14
Error! Unknown document
property name.

6

Exhibit 1 - 31

(a)    Subject to the terms and upon the conditions set forth herein, Seller shall sell, convey, transfer, assign and deliver to Purchaser, and Purchaser shall purchase and acquire from Seller, on the Closing Date, all legal and beneficial right, title and interest of Seller in and to any and all assets of every kind and description, whether tangible or intangible, real, personal or mixed, wherever situated, owned, held or used by Seller in the Business or in which Seller has any right, title or interest that is owned, directly or indirectly, leased or otherwise held by Seller in connection with the Business, in each case solely to the extent referenced below and excluding any and all of the Excluded Assets and provided that executory Contracts and leases will only include those that are to be assigned to or assumed by Purchaser as listed on Schedule 2.1(a)(ii) (any other executory Contracts and leases (including, without limitation, those listed on Schedule 2.1(a)), the **"Rejected Contracts"**) (collectively, the **"Purchased Assets"**).    The Purchased Assets shall be sold, transferred, assigned and delivered free and clear of any Liens, and shall specifically include, without limitation, Seller's legal and beneficial right, title and interest in and to the following to the extent used in, or related to, the Business:

(i)    all Inventory, the skus for which are set forth on Exhibit A;

(ii)    all executory Contracts (other than Rejected Contracts) identified by the parties for assignment to Purchaser on Schedule 2.1(a)(ii) (collectively, the "Assumed Contracts"), which may include if related to the Business: (A) the License Agreement and other license agreements to which Seller is a party and that provide Seller with rights to technology, products and/or trademarks, or by which Seller grants rights to third parties for Intellectual Property, (B) all purchase orders, Contracts or other commitments of Seller to suppliers and vendors of goods and services for materials, supplies or other items, specifically excluding the Vendor Terms Agreement and the Supplier Terms Agreement, and any side letters related thereto, (C) all sales orders, Contracts or other similar commitments of Seller, (D) all confidentiality agreements, non-competition, assignment of inventions and similar agreements to which Seller is a party, (E) all rights of Seller to the rebates, indemnities, warranties and licenses received from lessors, manufacturers and sellers of the Purchased Assets and (F) other executory Contracts and unexpired leases and each other Contract or arrangement designated as an Assumed Contract by Purchaser; provided that the Purchaser shall acquire all assets, deposits and prepaid expenses relating to any Assumed Contract;

(iii)    copies of all financial books, accounting records, files, lists, publications, and other records and data of Seller related to the Business, regardless of the medium on which such information is stored or maintained (the **"Records"**);

(iv)    all goodwill of Seller relating to the Business;

(v)    all customer lists used by the Business;

7

Exhibit 1 - 32

(vi)    as used in the Business, all registered trademarks or service marks and all trademark and service mark applications, all common law trademarks, trade names, trade dress and logos, all copyrights (including copyrighted content on internet sites to the extent related to the Business), all domain names, websites, and extensions thereof, all know-how, trade secrets and other confidential information, inventions, ideas, discoveries, patent applications and granted patents (including any and all continuations, continuations-in-part, additions and divisions thereof, and any and all patents issuing from the patent applications, and any reissues, reexaminations, renewals, extensions, and substitutions of any of the patents), and all industrial designs, owned by Seller or any Affiliate of Seller in the Business (the "**Intellectual Property**"), and any registrations and applications therefor, and all databases, design databases, schematics and data collections and all rights therein owned by Seller or any Affiliate of Seller;

(vii)    all claims, rights and causes of action relating to the Purchased Assets; and

(viii)    after completion of the services under the Transition Services Agreement, the telephone and facsimile numbers currently used in connection with the Business.

(b)    The Purchased Assets shall not include any of Seller's right, title or interest in or to any of the other assets of the Seller, including, without limitation, the following assets (collectively, the "**Excluded Assets**"):

(i)    any of Seller's Cash on hand, and all bank accounts and lockbox arrangements benefiting the Business;

(ii)    any Rejected Contracts and all Contracts and agreements that are rejected or are subject to a motion to reject by Seller in Bankruptcy Court;

(iii)    any corporate minute books, organizational documents, stock ledgers and other corporate books and records, any original accounting records relating to the Business or any other business of Seller or its Affiliates;

(iv)    all of Seller's deposits with carriers, lessors and other vendors (except with respect to any Assumed Contracts);

(v)    all claims and causes of action under Sections 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code, and any other claims or causes of action belonging to Seller or its estate (collectively, "**Avoidance Actions**"), other than those relating to the Purchased Assets;

(vi)    all Seller Plans (except to the extent set forth on Schedule 2.1(a)(iii));

(vii)    any refunds and claims for refunds of Taxes accrued or accruing as of the Closing Date;

LEGAL_US_E # 92480913.14

Error! Unknown document
property name.

Exhibit 1 - 33

(viii)    all accounts receivable, whether or not relating to the Business, and all notes and other receivables;

(ix)    all insurance contracts and any rights or claims thereunder, whether or not pertaining to the Business; and

(x)    Seller's rights under this Agreement and the Ancillary Agreements.

Section 2.2.    Sale at Closing Date. The sale, transfer, assignment and delivery by Seller of the Purchased Assets to Purchaser, as herein provided, shall be effected on the Closing Date by the due execution and delivery (notarized where necessary) of a bill of sale ("**Bill of Sale**"), trademark assignments ("**Trademark Assignments**"), and domain name assignments ("**Domain Name Assignments**"), pursuant to customary forms. Further, on the Closing Date, Seller, on the one hand, and Purchaser, on the other hand, shall each deliver to the other such other documents, estoppels or instruments of sale, assignment or transfer as are customary in transactions such as the transactions contemplated by this Agreement and as the other shall reasonably request.

Section 2.3.    Assumption of Assumed Liabilities; Exclusion of Excluded Liabilities.

(a)    Assumed Liabilities. On the Closing Date, Purchaser shall assume and agree to pay, perform and discharge when due only the liabilities and obligations of Seller under the Assumed Contracts (excluding any liabilities or obligations arising out of any breach by Seller of the terms thereof, violations of law and further excluding any Cure Costs), but only to the extent such liabilities and obligations first arise and are related to periods subsequent to the Closing Date (the liabilities so assumed, collectively, the "**Assumed Liabilities**"). Purchaser expressly assumes no other liabilities of Seller or the Business. The assumption of the Assumed Liabilities shall be effected on the Closing Date pursuant to an Assignment and Assumption Agreement in customary form (the "**Assignment and Assumption Agreement**").

(b)    Amounts Due Under Executory Contracts and Unexpired Leases; Cure Costs. Seller shall pay from the Purchase Price, up to a total of $10,000, all cure costs, compensation and expenses required to be paid in connection with the assumption and assignment of any Assumed Contract as set forth in Section 365 of the Bankruptcy Code ("**Cure Costs**").

(c)    Excluded Liabilities. Except as otherwise expressly assumed by Purchaser pursuant to Section 2.3(a) hereof, Purchaser shall not assume or pay, perform or discharge, nor shall Purchaser be responsible, directly or indirectly, for any debts, liabilities, obligations, accounts or trade payables, Contracts (including liabilities for breach of contract and any Cure Costs), liabilities relating to Taxes, environmental laws, hazard materials or ERISA, liabilities related to any Seller Plans, bulk sales liabilities, transfer Taxes, violation of law, torts, and legal proceedings relating to any Excluded Assets, or any other liability of Seller or any of its Affiliates that is not an Assumed Liability (all such debts, obligations, payables, Contracts or liabilities being herein

9

Exhibit 1 - 34

referred to as the "**Excluded Liabilities**"). All such Excluded Liabilities shall remain liabilities of Seller and Seller shall hold harmless Purchaser from the same.

(d) <u>Consent to Assumption</u>. Seller will timely file appropriate motions and/or take such other actions as may be necessary or appropriate, or that may be requested by Purchaser, to obtain an order from the Bankruptcy Court (which may be the Sale Order) authorizing Seller to assume and assign the Assumed Contracts to Purchaser and finding that the Purchaser's promise to perform the obligations under the Assumed Contracts constitutes the only required adequate assurance of future performance with respect to the Assumed Contracts pursuant to Section 365(f)(2) of the Bankruptcy Code.

Section 2.4. <u>Disclosure Schedule Updates; Cure Costs</u>. Notwithstanding anything in this Agreement to the contrary, subject to the consent of the Lender, the parties hereto may revise any schedule or exhibit setting forth the Purchased Assets and the Excluded Assets to (i) include in the definition of Purchased Assets (pursuant to the applicable schedule or exhibit) and to exclude from the definition of Excluded Assets any Contract or asset of Seller not previously included in the Purchased Assets, at any time on or prior to the fifth (5th) Business Day prior to the Closing Date and require Seller to give notice to, or obtain consent from, the parties to any such Contract and (ii) to exclude from the definition of Purchased Assets (pursuant to the applicable schedule or exhibit) and to include in the definition of Excluded Assets, any Assumed Contract or other asset of Seller previously included in the Purchased Assets and not otherwise included in the definition of Excluded Assets, at any time on or prior to the fifth (5th) Business Day prior to the Closing Date; provided, that from and after May 20, 2011, Purchaser may not, without Seller's written consent, add into the definition of Purchased Assets any additional Contract listed on a Schedule hereto as of the date hereof that Seller reasonably determines would require Seller to pay material Cure Costs as part of any assumption and assignment of such Contract (unless Purchaser agrees to pay for such Cure Cost related thereto). If any Contract is added to (or excluded from) the Purchased Assets as permitted by this Section 2.4, Seller shall promptly take such steps as are reasonably necessary, including, if applicable, payment or adequate assurance of payment of all Cure Costs and prompt delivery of notice to the non-debtor counterparty and obtaining approval of the Bankruptcy Court, to cause such Contracts to be assumed by Seller, and assigned to Purchaser, on the Closing Date (or excluded under the Sale Order and this Agreement).

## SECTION 3. PURCHASE PRICE.

Section 3.1. <u>Purchase Price</u>. In consideration of the sale and transfer of the Purchased Assets, Purchaser shall, at the Closing (except as otherwise noted), pay, deliver or assume (collectively, the "**Purchase Price**") the following for the benefit of the Seller: (i) Two Million Five Hundred Thousand Dollars ($2,500,000), <u>plus</u> the Inventory Adjustment (which may be a negative number) (collectively, the "**Cash Purchase Price**"), in cash or by wire transfer of immediately available funds, as the same may be adjusted pursuant to the terms of Section 3.5, (ii) the Earn Out Payments pursuant to the terms of Section 3.3, if any, (iii) the assumption of Assumed Liabilities and (iv) an additional payment of $250,000 on March 31, 2012. Notwithstanding the foregoing, the Purchaser shall receive a full credit against the Cash Purchase Price in the amount of the Deposit delivered to the Seller pursuant to Section 3.4(a) below.

LEGAL_US_E # 92480913.14

Error! Unknown document
property name.

Exhibit 1 - 35

Section 3.2.    <u>Allocation of Purchase Price</u>.  Purchaser and Seller agree to allocate the Purchase Price for all Tax purposes in accordance with an allocation statement to be prepared by Purchaser and presented to Seller not less than five (5) days prior to the Closing Date (the "**Allocation Statement**"), which Allocation Statement shall be prepared in accordance with Section 1060 of the Code, including the regulations promulgated thereunder, and shall be acceptable to Seller in its reasonable discretion.  All Tax Returns, including IRS Form 8594, shall be filed consistent with such Allocation Statement.  Neither Purchaser nor Seller shall voluntarily take a position on any Tax Return or before any governmental agency charged with the collection of any such Tax that is any manner inconsistent with the terms of such Allocation Statement.

Section 3.3.    <u>Earn Out Payments</u>.

(a)    <u>Earn Out Payments</u>.  The Purchaser shall pay to the Seller additional amounts (the "**Earn Out Payments**") for the fiscal year ending December 31, 2011 (the "**First Earn Out Period**") and collectively for the fiscal years ending December 31, 2011 and December 31, 2012 (the "**Second Earn Out Period**" and collectively with the First Earn Out Period, the "**Earn Out Periods**") if the Purchaser's Net Product Margin for each Earn Out Period is within the range set forth in the table below (each, an "**NPM Range**"):

| For the year ended December 31, 2011 | NPM Range | Earn Out Payment |
|---|---|---|
| | $10,300,000 to $10,800,000 | $500,000 |
| | Above $10,800,000.01 | $1,000,000 |

| Collectively for the years ended December 31, 2011 and 2012 | NPM Range (NPM must exceed $22,000,000 collectively for the two years) | Earn Out Payment |
|---|---|---|
| | $22,000,000 to $24,000,000 | 0.75 x the actual Net Product Margin in excess of $22,000,000 (for a payment of up to $1,500,000) |
| | $24,000,000.01 to $26,000,000 | $1.5 million plus 1.5 x the actual Net Product Margin in excess of $24,000,000 (for a payment of up to $4,500,000) |
| | $26,000,000.01 to $30,000,000 | $4.5 million plus 1.75 x the actual Net Product Margin in excess of $26,000,000 (for a |

LEGAL_US_E # 92480913.14
Error! Unknown document
property name.

Exhibit 1 - 36

| | | payment of up to $11,500,000) |
|---|---|---|
| | Above $30,000,000.01 | $11.5 million plus 1.25 x the actual Net Product Margin over $30,000,000 |

The Earn Out Payments shall be calculated based upon the following definitions as they have been used in the Seller's internally reported financials to the extent in accordance with GAAP and if not GAAP, then in accordance with GAAP. **"Net Sales"** means the Purchaser's (and for the Stub Year, the Seller's) total revenue with respect to the Business, including any revenue for sales of jewelry products under any brand names and any revenue for sales of any product under the Blue Moon brand name for the applicable period, less customer discounts, allowances and returns, an illustrative example of which is set forth on Exhibit B attached hereto; provided that no discounted sales to discount retailers or liquidators or sales outside the ordinary course of business (including sales to any liquidators) shall be included for purposes of determining the applicable revenue. **"Total Product Costs"** means the verifiable standard product cost (which includes duties and freight in costs) of the products sold to create the Net Sales, plus the product purchase price variance, duty variance, freight in variance, freight out expenses, and "other" product costs for the applicable period with respect to such Net Sales (an illustrative example of which is set forth on Exhibit C attached hereto). **"Net Product Margin"** means Net Sales less Total Product Costs for the applicable period.

(b)     The Earn Out Payment (if earned) for the First Earn Out Period shall be paid by March 30, 2012 and shall only be a payment of either $500,000 or $1,000,000. The Earn Out Payment (if earned) for the Second Earn Out Period shall be paid by May 31, 2013 and shall be based on the final Net Product Margin in the corresponding NPM Range set forth above (e.g., if the Net Product Margin is $28,000,000, such Earn Out Payment will be $8,000,000 and if the Net Product Margin is $31,000,000, such Earn Out Payment will be $12,750,000).   The Earn Out Payments will each be based on the Purchaser's internally prepared financial statements, prepared in accordance with GAAP (or audited financial statements, if available); provided that the Seller's Stub Year Net Product Margin financial statements will be estimated and attached hereto as Exhibit D on the Closing Date and the Seller shall deliver an updated calculation of the Stub Year Net Product Margin within ten (10) Business Days after Closing which will be subject to the review and written consent of the Purchaser.

(c)     The Purchaser shall pay to Seller (i) the Earn Out Payment for the First Earn Out Period, if any, in cash (by wire transfer of immediately available funds) and (ii) the Earn Out Payment for the Second Earn Out Period, if any: (1) 50% in cash (by wire transfer of immediately available funds) and (2) 50% pursuant to the issuance of a Subordinated Promissory Note.

Section 3.4.    Purchase Price Deposit.  Within one (1) Business Day following entry of the Bid Procedures Order, Purchaser shall immediately deliver to Seller's legal counsel (or another mutually satisfactory agent) the aggregate sum of Eighty-Two Thousand Five Hundred Dollars ($82,500) by wire transfer of immediately available funds or certified check (the

LEGAL_US_E # 92480913.14

Error! Unknown document
property name.

Exhibit 1 - 37

"**Deposit Amount**"), to be governed by a mutually agreed escrow agreement providing as follows:

    (a)    If the Closing occurs, the Deposit Amount shall be applied in partial satisfaction of the cash portion of the Purchase Price owing by Purchaser to Seller at the Closing pursuant to Section 3.1 and any interest thereon shall be returned to Purchaser;

    (b)    If this Agreement is validly terminated by Seller pursuant to Section 15.1(b)(i) or by Purchaser pursuant to Section 15(e)(ii), the Deposit Amount, together with all accrued investment income thereon, if any, shall be delivered to Seller, and delivery of the Deposit Amount, together with such accrued interest, shall be Seller's sole remedy for, and Seller shall not be entitled to any other damages (or injunctive relief) related to or arising from, any such termination and the Deposit Amount shall be considered liquidated damages for the benefit of Seller; or

    (c)    If this Agreement is validly terminated for any other reason (including, without limitation, by Seller in accordance with Section 15.1(b)(ii)), the Deposit Amount, together with all accrued investment income thereon, if any, shall be immediately returned to Purchaser.

    (d)    The parties acknowledge and agree that the financing under the DIP Financing will not be funded until receipt of the Deposit Amount by the Seller's agent.

Section 3.5.    <u>Purchase Price Adjustment</u>.

    (a)    Within two Business Days prior to the Closing Date, Purchaser and Seller shall have jointly performed a physical inventory of all of the Inventory (the "**Physical Inventory Review**") and shall jointly prepare a statement of the Seller's Inventory included in Purchased Assets as of such date which will be updated as of the opening of business on the Closing Date (the "**Inventory Statement**").    The Inventory Statement shall set forth for such Inventory: (i) the verifiable standard product cost of all Inventory owned by Seller as of the applicable date that is reasonably expected to be sold within the first six (6) months after the Closing Date as determined by mutual agreement of the Seller and the Purchaser based on projected sales of the Seller's customers (the "**Class I Inventory**") and (ii) the verifiable standard product cost of all Inventory owned by the Seller as of the applicable date that is reasonably expected to be sold after the first six (6) months but prior to the end of the first 12 months after the Closing Date as determined by the mutual agreement of the Seller and the Purchaser based on the projected sales of the Seller's customers (the "**Class II Inventory**").    The Inventory Statement shall be determined in accordance with verifiable standard product cost (which includes invoice, freight and duty costs) and shall only count the Inventory included in the Purchased Assets.  The Seller shall give Purchaser reasonable access to their books and records, location and personnel and shall reasonably cooperate with Purchaser in connection with physical inventory and the preparation of the Inventory Statement.

    (b)    The inventory adjustment (the "**Inventory Adjustment**") shall be calculated as follows: (i)(A)  the verifiable standard product cost of the Class I Inventory

LEGAL_US_E # 92480913.14
Error! Unknown document
property name.

Exhibit 1 - 38

(as set forth on the Inventory Statement as of the Closing Date), <u>plus</u> (B) 50% of the verifiable standard product cost of the Class II Inventory (as set forth on the Inventory Statement as of the Closing Date) and <u>minus</u> (C) dollar for dollar the amount of any Assumed Liabilities with respect to such Inventory, if any and <u>minus</u> (ii) $2,500,000.

(c)   With respect to the deposit with the supplier as listed on <u>Schedule 5.12</u>, to the extent such deposit has not been returned to Seller prior to Closing but for which Inventory will be received by Purchaser after the Closing in the amount of the remaining deposit, Purchaser shall, in connection with the Closing, pay the amount of the deposit to Seller in exchange for the right to receive such Inventory (and such amount shall not be included in the Inventory Adjustment).

SECTION 4.   <u>CLOSING.</u>

Section 4.1.   <u>Closing.</u>   Subject to the satisfaction of the conditions set forth in Sections 11, 12, and 13 hereof or the waiver thereof by the party entitled to waive the applicable condition, the closing of the sale and purchase of the Purchased Assets and of the other transactions contemplated hereby (the "**Closing**") shall take place within fifteen (15) days after the date on which the Bankruptcy Court enters the Sale Order (which shall be final and non-appealable unless waived by the Purchaser (and which waiver may include a waiver of the 15 day period referenced above)), but in no event shall the Closing occur (subject to the conditions herein) after June 3, 2011 without the written consent of Purchaser.  The Closing shall take place at the offices of Paul, Hastings, Janofsky & Walker, LLP in Los Angeles, CA, or at such other place as may be mutually agreed to by the parties hereto.  The term "**Closing Date,**" as used in this Agreement, shall mean the date on which such Closing takes place and the Closing shall be deemed effective as of the opening of business on the Closing Date.

Section 4.2.   <u>Deliveries at Closing.</u>   At the Closing, the parties shall deliver to each other the Ancillary Agreements and Purchaser shall deliver to Seller the Purchase Price.

SECTION 5.   <u>REPRESENTATIONS AND WARRANTIES OF SELLER.</u>

Except as set forth on the corresponding numbered sections or otherwise readily apparent on its face in another section (each, a "**Schedule**") of the disclosure letter delivered by Seller to Purchaser immediately prior to the Execution Date (the "**Disclosure Letter**"), Seller hereby represents and warrants as true and correct to Purchaser as follows on and as of the Execution Date and on and as of the Closing Date:

Section 5.1.   <u>Corporate Organization.</u>   Seller is a corporation duly organized, validly existing and in good standing under the laws of Delaware and has all requisite corporate power and authority to own its properties and assets and to conduct the Business as now conducted and to perform its obligations hereunder and under any Ancillary Agreement to which it is or will be a party.

Section 5.2.   <u>Qualification to Do Business.</u>   Seller is duly qualified and/or licensed to transact business in all jurisdictions where the conduct of its Business or the ownership of the Purchased Assets make such qualification and/or licensing necessary, which jurisdictions are set

14

Exhibit 1 - 39

forth on <u>Schedule 5.2</u>, except to the extent the failure to do so could not reasonably be expected to result in a Material Adverse Effect.

Section 5.3.    <u>Authorization and Validity of Agreement</u>.    (a) Seller has all requisite corporate power and authority to enter into this Agreement and each of the Ancillary Agreements to which it is a party and to carry out its obligations hereunder and thereunder, and (b) the execution and delivery of this Agreement and the Ancillary Agreements to which Seller is a party and the performance of its obligations hereunder and thereunder have been duly authorized by all necessary corporate action by the Board of Directors of Seller, and no other corporate proceeding on the part of Seller will be necessary to authorize such execution, delivery and performance. This Agreement has been, and as of the Closing Date each Ancillary Agreement to which Seller is a party will be, duly executed by Seller and constitutes, or as of the Closing Date will constitute, the valid and binding obligation of Seller, enforceable against it in accordance with its terms, except as enforceability may be limited by applicable law.

Section 5.4.    <u>No Conflict or Violation</u>. Subject to the approval of the Bankruptcy Court pursuant to the Sale Order, the execution, delivery and performance by Seller of this Agreement and of the Ancillary Agreements to which it is a party and the consummation of the transactions contemplated hereby and thereby: (a) do not and will not violate or conflict with any provision of the Certificate of Incorporation or Bylaws of Seller, (b) do not and will not violate any provision of law or any order, judgment or decree of any court or other governmental or regulatory authority, (c) do not and will not violate or result in a breach of (with due notice or lapse of time or both), conflict with, or result in any violation of or default (with due notice or lapse of time or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to loss of a material benefit under, or give rise to any obligation of Seller or Purchaser to make any payment under any provision, in each case under any Assumed Contract or Permit, (d) will not result in the creation or imposition of any Lien (other than Permitted Liens) upon any of the Purchased Assets, and (e) will not result in the cancellation, modification, revocation or suspension of any material Contract or Permit.

Section 5.5.    <u>Consents and Approvals</u>. <u>Schedule 5.5</u> sets forth a true and complete list of each consent, waiver, authorization or approval of (a) any governmental or regulatory authority, domestic or foreign, and each declaration to or filing or registration with any such governmental or regulatory authority, and (b) any Person under any Material Contract or Permit, in each case that is required in connection with the execution and delivery of this Agreement by Seller or the performance by Seller of its obligations hereunder and under any Ancillary Agreement and the consummation of the transactions contemplated hereby and thereby.

Section 5.6.    <u>Good Title; Sufficiency of Assets</u>.

(a)    Except as set forth on <u>Schedule 5.6(a)</u>, Seller has good and marketable title in and to the Purchased Assets owned by Seller, and Seller has (and will have and will convey to Purchaser at the Closing) valid and enforceable leasehold interests in the Purchased Assets leased by Seller, in each case free and clear of any Liens other than Permitted Liens. As used in this Agreement, the term **"Permitted Liens"** means (i) Liens for Taxes not yet payable; and (ii) Liens in favor of the Lender and the Bridge Lenders.

LEGAL_US_E # 92480913.14
Error! Unknown document property name.

Exhibit 1 - 40

No assets of the Seller included, or intended to be included, in the Purchased Assets are owned by any Affiliate of Seller.

(b)    The Purchased Assets have been maintained in accordance with Seller's standard practices and manufacturers' recommendations, and Seller has not deferred any reasonable maintenance or repairs of any of the Purchased Assets. The Purchased Assets are in good operating condition, reasonable wear and tear excepted, suitable for the purposes for which they have been used by Seller.

(c)    Except for the Excluded Assets, the Purchased Assets will be sufficient in all material respects for the continued conduct of the Business at and after the Closing in substantially the same manner as conducted prior to the Closing by Seller.

Section 5.7.    Absence of Certain Changes or Events.

(a)    Except as set forth on Schedule 5.7, since December 31, 2010, Seller has not:

(i)    suffered any material uninsured loss, damage, destruction or other casualty to the Purchased Assets;

(ii)    sold, leased, transferred or assigned any material assets, tangible or intangible, other than the disposition of obsolete or immaterial assets not necessary for the conduct of the Business by Seller or the sale of Inventory in the ordinary course of business;

(iii)    accelerated, terminated, modified, amended, or cancelled any Assumed Contract, or waived, released or assigned any material rights or claims thereunder, in each case, in a manner adverse to Seller (and, to the Knowledge of Seller, no other party to any such Assumed Contract has accelerated, terminated, modified, amended, or cancelled such Assumed Contract, or waived, released or assigned any rights or claims thereunder);

(iv)    imposed or created any Liens (other than Permitted Liens) upon any of the Purchased Assets, tangible or intangible, that would be binding on the Purchaser;

(v)    granted any bonus opportunity or any increase in any type of compensation or benefits, including severance or termination pay, to any of its current or former directors, Employees or consultants, except for increases in base compensation in the ordinary course of business;

(vi)    paid any bonus, except for bonuses paid or accrued in the ordinary course of business; or

(vii)    received any written notice of any proposed cancellation or termination of any Assumed Contract.

16

Exhibit 1 - 41

Section 5.8.    Real Property.

(a)    Schedule 5.8(a) sets forth the street addresses of each parcel of leased real property that is used in the Business. Except for the locations listed on Schedule 5.8(a), Seller does not lease any real property used in the Business.

(b)    Except as set forth on Schedule 5.8(b): (i) Seller has delivered to Purchaser true and complete copies of the leases with respect to the leased real property that is used in the Business (the "Leases"), and the Leases are each in full force and effect; and (ii) neither Seller nor, to the Knowledge of Seller, the respective landlords are in breach or default under any Lease that has not been cured or waived, and, to the Knowledge of Seller, no event has occurred or circumstance exists that, with the delivery of notice, the passage of time or both, would constitute such a breach or default, or permit the termination, modification or acceleration of rent under any Lease.

Section 5.9.    Intellectual Property.

(a)    Schedule 5.9(a) sets forth a complete and correct listing of all (to the extent relating to the Business): (i) registered trademarks and service marks and applications therefor, (ii) patent applications and granted patents, (iii) domain names, and (iv) any other Intellectual Property, in each case that are owned or used by Seller and forming part of the Purchased Assets. Except as described on Schedule 5.9(a), all Intellectual Property listed therein is owned by Seller free and clear of all Liens (other than Permitted Liens) and is not the subject of any pending or, to the Knowledge of Seller, threatened challenge. Except as described in Schedule 5.9(a), there are no unresolved claims made and there has not been communicated to Seller the threat of any claim that the use of such Intellectual Property is in violation or infringement of any service mark, patent, trademark, trade name, trademark or trade name registration, copyright or copyright registration of any other Person. Except for the License Agreement and as set forth on Schedule 5.9(a), Seller has not granted any license to any of such Intellectual Property and Seller has no legal obligation to grant any such license.

(b)    Schedule 5.9(b) lists all licenses to Intellectual Property received by Seller with respect to the Business. Except as set forth in Schedule 5.9(b), Seller is under no obligation to pay any royalties or similar payments in connection with any Intellectual Property licensed to any of their Affiliates or to any third party.

Section 5.10.    Permits.    Schedule 5.10 sets forth a true and complete list of all material licenses, permits, franchises, authorizations and approvals issued or granted to Seller with respect to the Business by the federal government, any state or local government, any foreign national or local government, or any department, agency, board, commission, bureau or instrumentality of any of the foregoing and all pending applications therefore (collectively, the "Permits"). Each Permit has been duly obtained, is valid and in full force and effect, and is not subject to any pending or, to the Knowledge of Seller, threatened administrative or judicial proceeding to revoke, cancel, suspend or declare such Permit invalid in any respect. The Permits are sufficient and adequate to permit the continued lawful conduct of the Business in the manner currently conducted by Seller, and none of the operations of the Business is being conducted in a

LEGAL_US_E # 92480913.14
Error! Unknown document
property name.

Exhibit 1 - 42

manner that violates any of the terms or conditions under which any Permit was granted, except to the extent that the failure to do so is not material to the Business.

Section 5.11. <u>Compliance with Law</u>. Seller has owned, leased and used its properties and assets, including the Purchased Assets, and has operated the Business in compliance with all applicable laws, regulations, orders and other requirements of all courts and other governmental or regulatory authorities having jurisdiction over Seller and/or the Purchased Assets, in all material respects.

Section 5.12. <u>Material Contracts</u>.

(a)    <u>Schedule 5.12(a)</u> sets forth a true and correct list and description of each of the following Contracts (each a "**Material Contract**"), and Seller has delivered (or otherwise made available) to Purchaser or its representatives true and correct copies of all such Material Contracts in Seller's possession relating to the Business:

(i)    all    vendor,    broker,    distributor,    dealer,    manufacturer's representative, sales, distribution, vendor rebate, product purchase, sale discount, franchise, agency, sales promotion, market research, marketing consulting and advertising Contracts to which Seller is a party;

(ii)    each Contract for the employment of any officer, individual Employee or other Person on a full-time, part-time, consulting or other basis or relating to loans to officers, directors, managers or Affiliates;

(iii)    any option or preferential right to purchase any assets or property rights of the Business;

(iv)    any lease or Contract under which the Seller is lessee of or holds or operates any personal property owned by any other party, except for any lease of personal property under which the aggregate annual rental payments do not exceed One Thousand Dollars ($1,000);

(v)    any Contract or group of related Contracts with the same party or group of affiliated parties the performance of which involves consideration in the aggregate in excess of Five Thousand Dollars ($5,000);

(vi)    any assignment, license, indemnification or agreement with respect to any intangible property (including any Intellectual Property);

(vii)    any warranty agreement with respect to Seller's services rendered or its products sold or leased;

(viii)    any agreement with a term of more than six months which is not terminable by Seller upon less than thirty (30) days' notice without penalty and involves a consideration in excess of Five Thousand Dollars ($5,000) annually;

LEGAL_US_E # 92480913.14
Error! Unknown document
property name.

Exhibit 1 - 43

(ix)    all other Contracts, whether or not made in the ordinary course of business, which are material to the Purchased Assets, the conduct of the Business, or that involves consideration in excess of Five Thousand Dollars ($5,000) annually; and

(x)    all of Seller's deposits with carriers, lessors and other vendors (including those with respect to any Assumed Contracts).

(b)    Each Material Contract is valid, binding and enforceable against Seller in accordance with its terms, and is in full force and effect on the Execution Date. Except as set forth in Schedule 5.12(b), Seller has performed in all material respects the obligations required to be performed by it to date under, and is not in default or delinquent in the performance (claimed or actual) in any material respect in connection with, any Material Contract, and to the Knowledge of Seller no event has occurred which, with due notice or lapse of time or both, would constitute such a default. To the Knowledge of Seller, no other party to any Material Contract is in default in respect thereof, and no event has occurred which, with due notice or lapse of time or both, would constitute such a default. Seller has not received any written notice that any Person intends or desires to modify, waive, amend, rescind, release, cancel or terminate any Material Contract.

Section 5.13.    Tax Matters. Seller has timely filed, or prior to the Closing Date will have timely filed (taking into account all relevant extensions of time to file), all Tax Returns that are required to have been filed in connection with or relating to the Purchased Assets or the Business, and Seller has, or will have by the Closing Date (taking into account all relevant extensions of time to file), paid, accrued or otherwise adequately reserved for the payment of all Taxes required to be paid in respect of the periods covered by such returns, with the exception of all Taxes being contested in good faith by Seller, and has or will have by the Closing Date adequately reserved for the payment of all Taxes with respect to periods ended on or before the Closing Date for which Tax Returns have not yet been filed. There is no Tax Return filed by Seller, either separately or as a member of an Affiliated Group, and there are no outstanding assessments or Taxes otherwise due for any pre-closing period, that will result, on or after the Closing Date, in any Taxes or other governmental charges upon the Purchased Assets or Purchaser, whether as transferee of the Purchased Assets or otherwise. There are no Liens for Taxes on any of the Purchased Assets other than Permitted Liens and Liens set forth on Schedule 5.13. There is no pending or, to the Knowledge of Seller, threatened claim, audit, investigation, dispute or other proceeding concerning any Taxes of Seller that may result in a Lien against any of the Purchased Assets after Closing.

Section 5.14.    Seller Plans; Employees.

(a)    Except as set forth on Schedule 5.14(a), neither Seller nor any Affiliate of Seller maintains, contributes to, or is a party to, (i) any "employee benefit plan," as defined in Section 3(3) of ERISA, or (ii) any other written, unwritten, formal or informal plan or agreement involving direct or indirect compensation other than workers compensation, unemployment compensation and other government programs, under which Seller or any of its respective Affiliates has any present or future obligation or liability with respect to the Transferred Employees (collectively, the **"Seller Plans"**).

Error! Unknown document
property name.

Exhibit 1 - 44

(b)    Schedule 5.14(b) sets forth an accurate list of (a) all of the employees of the Business as of the Execution Date (collectively with employees of the Business hired by Seller after the Execution Date and prior to the Closing Date, the "**Employees**"), and (b) those Employees on disability, family medical leave, military or other leave or absence other than scheduled vacation or jury duty as of the Execution Date.

(c)    Seller is not a party to any union or collective bargaining agreements covering any of the Employees nor, to the Knowledge of Seller, are there currently any union organizing efforts by or with respect to any such Employees. Seller has not experienced any actual or threatened employee strike or employee related work stoppage, slowdown or lockout.

(d)    Seller has not taken any action in respect of the Employees that would require notice or create any liability under the Worker Adjustment and Retraining Notification Act.

Section 5.15.    Affiliate Relationships.    Except as set forth on Schedule 5.15, no (a) shareholder, officer or director of Seller, (b) entity in which any such shareholder, officer or director owns any beneficial interest (other than a publicly held corporation whose stock is traded on a national securities exchange or in the over-the-counter market and less than two percent (2%) of the stock of which is beneficially owned by such shareholders, officers or directors in the aggregate), or (c) Affiliate of any of the foregoing is a party to: (i) any Contract with, or relating to, Seller, the Business, the Purchased Assets or the Assumed Liabilities; or (ii) any property (real, personal or mixed, tangible or intangible) used by the Seller in the ownership, operation and/ or development of the Purchased Assets or the Business.

Section 5.16.    Financial Statements; Inventory.

(a)    Reference is made to: (a) the unaudited balance sheet and statements of operations, earnings and cash flows of Seller for the fiscal year ended December 31, 2010, (b) the unaudited balance sheet and statements of operations, earnings and cash flows of Seller for the fiscal month (and period) ended February 28, 2011 and (c) the pro forma financial statements for gross sales, net sales (excluding non-recurring fill rate fines), product cost, and total product costs (excluding non-recurring freight in and non-recurring freight out), with respect to the Business for the fiscal year ended December 31, 2010 (the "**Pro Formas**") (collectively with respect to clauses (a), (b) and (c), the "**Financial Statements**"). The Financial Statements have been authenticated and delivered to Purchaser. The Financial Statements: (i) have been prepared in accordance with GAAP applied on a consistent basis throughout the periods involved (other than with respect to the Pro Formas), (ii) present fairly, in all material respects, the financial condition of Seller as of such dates and the results of operations, earnings and cash flows of Seller for such periods, (iii) are consistent, in all material respects, with the books and records of Seller (which books and records are correct and complete in all material respects) and (iv) in addition with respect to the Pro Formas, are true and correct in all material respects

20

Exhibit 1 - 45

(b)    Except as set forth on the attached Schedule 5.16(b), all of the Seller's inventory consists of a quantity and quality usable and salable in the ordinary course of business consistent with past practice, is not obsolete, expired, defective or damaged, and is merchantable and fit for its intended use in all material respects, subject only to the reserves for inventory write downs or unmarketable, obsolete, defective or damaged inventory reflected in the Financial Statements, both as determined in accordance with GAAP consistently applied.

## SECTION 6.    REPRESENTATIONS AND WARRANTIES OF PURCHASER.

Purchaser hereby represents and warrants to Seller as follows on and as of the Execution Date and on and as of the Closing Date:

Section 6.1.    <u>Formation</u>.    Purchaser is a Delaware corporation duly formed, validly existing and in good standing under the laws of Delaware, and Purchaser has all corporate power and authority to own its properties and assets and to conduct its businesses as now conducted.

Section 6.2.    <u>Authorization and Validity of Agreement</u>.    Purchaser has all requisite limited liability company power and authority to enter into this Agreement and each of the Ancillary Agreements to which it is a party and to carry out its obligations hereunder and thereunder. The execution and delivery of this Agreement and each of the Ancillary Agreements to which Purchaser is a party and the performance of its obligations hereunder and thereunder have been duly authorized by all necessary action by its Board of Directors, and no other proceedings on the part of Purchaser are necessary to authorize such execution, delivery and performance. This Agreement has been, and as of the Closing Date each Ancillary Agreement to which Purchaser is a party will be, duly executed by Purchaser and constitutes (or as of the Closing Date will constitute) its valid and binding obligation, enforceable against it in accordance with its terms, except as enforceability may be limited by applicable law.

Section 6.3.    <u>No Conflict or Violation</u>.    The execution, delivery and performance by Purchaser of this Agreement and each Ancillary Agreement to which it is a party (a) do not and will not violate or conflict with any provision of its certificate of incorporation or bylaws, (b) do not and will not violate any provision of law, or any order, judgment or decree of any court or other governmental or regulatory authority, and (c) do not and will not violate or result in a breach of or constitute (with due notice or lapse of time or both) a default under any Contract or other material agreement or instrument to which Purchaser is a party or by which it is bound or to which its properties or assets is subject.

Section 6.4.    <u>Consents and Approvals</u>.    The execution, delivery and performance of this Agreement on behalf of Purchaser does not require the consent or approval of, or filing with, any government, governmental body or agency or other Person except: (i) as may be required in connection with the Bankruptcy Code, (ii) as may be required to transfer any Permits; and (iii) as may be required in connection with the assignment and assumption of the Assumed Contracts.

## SECTION 7.    COVENANTS OF SELLER.

Section 7.1.    <u>Conduct of Business Before the Closing Date</u>.    During the period from the Execution Date and continuing until the earlier of the termination of this Agreement in

accordance with Section 15 or the Closing, except (1) for any limitations on operations imposed by the Bankruptcy Court, the Bankruptcy Code or any DIP Order, (2) as otherwise expressly contemplated by this Agreement or (3) with the prior written consent of the Purchaser, Seller shall not:

(a)    make any material change in the conduct of the Business, or enter into any transaction with respect to the Business other than in the ordinary course of business consistent with past practices;

(b)    make any sale, assignment, lease, license, transfer, abandonment or other conveyance of the Purchased Assets or any part thereof or of its equity securities, except transactions pursuant to the Assumed Contracts, dispositions of inventory, consumption of personal property, or disposition of worn out or obsolete Equipment for fair or reasonable value, in each case in the ordinary course of business consistent with past practice; provided that Seller will not perform any "going out of business sales" or similar events or inventory liquidations (including dispositions of inventory below cost not otherwise permitted), other than with respect to inventory not included in the Inventory;

(c)    subject any of the Purchased Assets, or any part thereof, to any Lien or suffer such to exist other than Permitted Liens or Liens that will be released at or prior to the Closing Date;

(d)    acquire any assets, Inventory or properties related to the Business, or enter into any other transaction related to the Business, other than in the ordinary course of business consistent with past practice and in accordance with the terms of the Operating Budget and Inventory Budget;

(e)    enter into any new (or amend any existing) employee benefit plan, program or arrangement affecting the Employees or any new (or amend any existing) employment, severance or consulting agreement relating to any Employee, or grant any general or specific increase in the compensation (including salary and/or bonus compensation) of any Employees or consultants of Seller (including any such increase pursuant to any bonus, pension, profit-sharing or other plan or commitment, and whether payable in cash or personal property) or grant any increase in the compensation payable or to become payable to any Employee or consultants of Seller, outside the ordinary course of business;

(f)    knowingly take any other action that would cause any of the representations and warranties made by Seller in this Agreement not to remain true and correct in any material respect or that would cause Seller to be in material breach of any of its representations, warranties, covenants or agreements contained in this Agreement;

(g)    enter into, amend or terminate any Material Contact, or otherwise effect a material transaction inconsistent with Seller's past practices; or

(h)    issue, purchase, redeem, encumber, assign or transfer, or directly or indirectly Contract to issue, sell, purchase, redeem, encumber, assign or transfer any

LEGAL_US_E # 92480913.14
Error! Unknown document
property name.

Exhibit 1 - 47

equity interest in the Seller, or any securities exchangeable for or exercisable or convertible into equity of the Seller;

(i)    declare or pay any dividends or agree to make any other distributions, including bonuses (outside of the ordinary course of business), with respect to any equity of the Seller; or

(j)    commit to do any of the foregoing.

Without limiting the generality of the foregoing, Seller shall, until the Closing Date, operate the Business in the usual and ordinary course, comply with the terms of the DIP Financing agreement, shall maintain the Purchased Assets, including the Fixed Assets, in accordance with past practice, and in the event that Seller substitutes, disposes of or abandons any Purchased Assets in compliance with the terms of this Section 7.1, Seller will likewise replace such assets with Purchased Assets of like kind and quality to the extent necessary to ensure the continued operation of the Business in the ordinary course and consistent with past practice.

Section 7.2.    Consents and Approvals.  Seller shall use commercially reasonable efforts to obtain all consents and approvals of governmental entities and other third parties, if any, required to effect the transactions contemplated by this Agreement. Without limiting the foregoing, as soon as practicable after the Execution Date, Seller shall make or cause to be made all such further filings and submissions, and take or cause to be taken such further action, as may reasonably be required in connection therewith on a timely basis. Seller agrees to promptly provide Purchaser with copies of all final consent, approval, termination or confirmation letters provided to Seller pursuant to filings made under this Section.

Section 7.3.    Access to Properties and Records.  Seller shall afford to Purchaser, and to the accountants, counsel, benefit and insurance consultants, financing sources and other representatives of Purchaser, reasonable access throughout the period prior to the Closing Date (or the earlier termination of this Agreement pursuant to Section 15) to Seller's customers, vendors, landlords, properties, lenders, books, Records, Contracts, commitments, and personnel necessary to allow Purchaser to examine the Business, Purchased Assets and/or the Assumed Liabilities and Excluded Liabilities, during such period, and Seller shall furnish promptly to Purchaser all other information concerning the Purchased Assets, Business, and Assumed Liabilities and Excluded Liabilities as Purchaser may reasonably request. Purchaser recognizes that Seller may require that Purchaser be accompanied by a representative of Seller in connection with any proposed contact with Seller's customers, vendors and/or landlords.  In addition, Purchaser may provide for any of its (or its Affiliates') personnel, advisors and representatives to remain on site at all of the Seller's locations prior to the Closing Date during regular business hours to monitor Business operations.

Section 7.4.    Notices of Certain Events.  Seller shall promptly notify Purchaser (and deliver to Purchaser any related information) of:

(a)    any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions

LEGAL_US_E # 92480913.14
Error! Unknown document
property name.

Exhibit 1 - 48

contemplated by this Agreement, and any notice or other communication from any such Person alleging that such consent is not likely to be obtained prior to Closing;

(b)    any written communication from any governmental or regulatory agency or authority in connection with the transactions contemplated by this Agreement that would reasonably be expected to have a Material Adverse Effect;

(c)    any written objection or commencement of any proceeding, suit, charge, complaint, claim, or investigation that challenges or threatens to restrain or prohibit the transactions contemplated hereby or the entry of the approval of the Bankruptcy Court; or

(d)    any breach of representation, warranty, covenant, or agreement of Seller under this Agreement.

Section 7.5.    Name Change.  After the Closing, Seller shall discontinue the use of any tradenames used in connection with the Business and shall not subsequently change its name to or otherwise use or employ any name which includes any such words without the prior written consent of Purchaser; provided that Seller may continue to liquidate any of its existing inventory to liquidators consistent with past practice but not sell to any customers of the Purchaser after the Closing or otherwise engage in the Business.

Section 7.6.    Budgets; License Agreement.  From the date hereof through the Closing Date:

(a)    Seller shall comply with the operating budget set forth on Schedule 7.6(a) (the "**Operating Budget**"); and

(b)    Seller shall comply with the Inventory budget set forth on Schedule 7.6(b) (the "**Inventory Budget**"), which Inventory Budget covers, but is not limited to, the purchase of Inventory prior to Closing.

(c)    Seller agrees that it will notify Purchaser of any event or circumstance that may necessitate a change to either the Operating Budget or the Inventory Budget, and in no event shall Seller operate outside of either the Operating Budget or the Inventory Budget without the prior consent of Purchaser (not to be unreasonably withheld).  The Seller and Purchaser shall jointly update and modify the Operating Budget and Inventory Budget from time to time as reasonably necessary for the operation of the Business.

(d)    Seller shall comply with the License Agreement.

## SECTION 8.    COVENANTS OF PURCHASER.

Section 8.1.    Actions Before Closing Date.  Purchaser shall not take any action which shall cause it to be in material breach of any of its representations, warranties, covenants or agreements contained in this Agreement.

Section 8.2.    Consents and Approvals.  Purchaser shall use commercially reasonable efforts to obtain all consents and approvals of third parties, if any, required to be obtained by

Error! Unknown document
property name.

Exhibit 1 - 49

Purchaser to effect the transactions contemplated by this Agreement. Purchaser shall make or cause to be made all filings and submissions, and take or cause to be taken such further action, as may reasonably be required in connection therewith on a timely basis. Purchaser agrees to promptly provide Seller with notice of receipt of all final consent, approval, termination or confirmation letters provided to Purchaser pursuant to filings made under this Section.

SECTION 9.  COVENANTS OF SELLER AND PURCHASER

Section 9.1.    Retained Jurisdiction.    The Purchaser and the Seller agree that the Bankruptcy Court shall retain jurisdiction to enforce all aspects of this Agreement until such time as the Bankruptcy Case is closed, at which time jurisdiction shall be in the federal and state courts of the State of California. The parties acknowledge and agree that time is of the essence, that any failure to timely perform their obligations hereunder would constitute irreparable harm to a party and that the Bankruptcy Court may grant specific performance to the Seller or Purchaser with relief to be granted on a shortened notice with regard to all remedies for the Seller and the Purchaser.

Section 9.2.    Assignability of Certain Contracts.    To the extent that the assignment to the Purchaser of any Assumed Contract or Permit to this Agreement is not permitted without the consent or approval of a third party, including, without limitation, any governmental body, and such restriction cannot be effectively overridden or canceled by the Sale Order or other related order of the Bankruptcy Court, Seller shall, if requested by Purchaser and at the direction of Purchaser, use its reasonable best efforts to (x) provide or cause to be provided to Purchaser the benefits of any such Contract or Permit (which will not be deemed assumed by Purchaser hereunder), (y) cooperate in any arrangement, reasonable and lawful as to Seller, as Purchaser may request, which is designed to provide such benefits to Purchaser and (z) enforce for the account of Purchaser any rights of Seller arising from such Contracts and Permits, including the right to elect to terminate in accordance with the terms thereof on the advice of Purchaser.  In such case, to the extent possible (i) the beneficial interest in or to such Contracts or Permits (collectively, the "Beneficial Rights") shall in any event pass as of the Closing Date to the Purchaser under this Agreement; and (ii) pending such consent or approval, the Purchaser shall assume or discharge the Liabilities of Seller under such Beneficial Rights (to the extent such obligations are Assumed Liabilities) as agent for Seller, and Seller shall act as the Purchaser's agent in the receipt of any benefits, rights or interest received from the Beneficial Rights and shall turn over any such benefits, rights or interest promptly upon receipt.

Section 9.3.    Further Agreements.    From and after the Closing Date, Seller shall (a) promptly deliver to the Purchaser any mail or other communication received by it after the Closing Date and relating to the Purchased Assets or the Assumed Liabilities, (b) promptly transfer in immediately available funds to the Purchaser any cash, electronic credit or deposit received by Seller but solely to the extent that such cash, electronic credit or deposit are Purchased Assets or the Purchaser's property and (c) promptly forward to the Purchaser any checks or other instruments of payment that it receives but solely to the extent that such checks or other instruments are Purchased Assets or the Purchaser's property.  From and after the Closing Date, Seller shall refer all inquiries with respect to the Purchased Assets and the Assumed Liabilities to the Purchaser, and the Purchaser shall refer all inquiries with respect to the Excluded Assets and the Excluded Liabilities to Seller.  In addition, Seller agrees not to

25

Error! Unknown document property name.

Exhibit 1 - 50

bring, directly or indirectly or through the assignment to others, any claims for Avoidance Actions against the suppliers, vendors and customers of the Company which have the same relationships with the Purchaser on and after the Closing. From and after the Closing Date, Purchaser shall (a) promptly deliver to the Seller any mail or other communication received by it after the Closing Date and relating to the Excluded Assets or the Excluded Liabilities, (b) promptly transfer in immediately available funds to the Seller any cash, electronic credit or deposit received by Purchaser but solely to the extent that such cash, electronic credit or deposit are Excluded Assets or the Seller's property and (c) promptly forward to the Seller any checks or other instruments of payment that it receives but solely to the extent that such checks or other instruments are Excluded Assets or the Seller's property.

SECTION 10. <u>EMPLOYEES</u>.

Section 10.1.    Offers of Employment.  Effective as of the Closing Date, Purchaser may, in its sole and absolute discretion, offer employment to any or all Employees and for those Employees on disability, FMLA, military or other leave or absence other than vacation or jury duty. All of such Employees who accept Purchaser's offer of employment are referred to herein collectively as the **"Transferred Employees"**.

Section 10.2.    Terms of Employment of Transferred Employees.

(a)    Purchaser may, in its sole and absolute discretion, offer each Transferred Employees terms and conditions of employment, including but not limited to benefits, base compensation, retirement and savings plans, and incentive compensation.  To the extent requested by Purchaser, Seller will provide to Purchaser for each Transferred Employee such employees' credited years of service and current base salaries and any other relevant employment records requested by Purchaser; provided, however, that neither the request for nor the provision by Seller of such information will trigger any duty of Purchaser to provide any Transferred Employees with any benefits accruals. Purchaser shall honor Transferred Employees' individual years of service with Seller solely for purposes of determining eligibility of employee benefits for which he/she is eligible under Purchaser's benefit plans and policies, including, but not limited to, any future accrual for paid time off after the Closing. Transferred Employees shall be eligible for health insurance coverage immediately upon their employment with Purchaser, subject to eligibility of Purchaser's health plans. With respect to any bonuses earned by the Transferred Employees prior to the Closing Date, whether or not accrued, Seller will pay the amount thereof directly to the Transferred Employees in accordance with Seller's past practice, and Purchaser will have no responsibility to assume the obligation to pay such amounts.

(b)    COBRA.  Seller will provide the benefits, if any, required pursuant to Section 4980B of the Code or Part 6 of Title I of ERISA to the Employees, and all other Persons, who became eligible for such benefits on or prior to the Closing Date from the Seller, including but not limited to those of Seller's Employees who are not Transferred Employees.

LEGAL_US_E # 92480913.14
Error! Unknown document
property name.

Exhibit 1 - 51

Section 10.3.  WARN Act Liability.   Seller shall be solely responsible for any obligations under the WARN Act, or under any similar provision of any federal, state, provincial, regional, foreign or local law, rule or regulation that might arise on, prior to or after the Closing Date, or as a consequence of the transactions contemplated by this Agreement, including, without limitation, providing any notice of layoff or plant closing, or maintaining the Employees on Seller's payroll for any period of notice required by the WARN Act.  Seller shall retain all liabilities, if any, for any severance or termination costs relating to Employees who, prior to, on, at or after the Closing Date, experience a termination of employment by Seller as a result of the transactions contemplated by this Agreement.

SECTION 11.  CONDITIONS PRECEDENT TO PERFORMANCE BY SELLER.

The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing Date, of the following conditions, any one or more of which may be waived by Seller in its sole discretion:

Section 11.1.  Representations and Warranties of Purchaser.  All representations and warranties made by Purchaser in this Agreement shall be true and correct in all material respects (and in all respects in the case of each representation and warranty that is qualified as to materiality) on and as of the Closing Date (other than such representations and warranties that speak as of a specific date or time other than the Closing Date, which need only be true and correct in all material respects as of such date or time), and Seller shall have received a certificate dated the Closing Date and signed by the President or any Vice President of Purchaser to that effect.

Section 11.2.  Performance of the Obligations of Purchaser.  Purchaser shall have performed in all material respects all obligations required under this Agreement to be performed by Purchaser on or before the Closing Date, and Seller shall have received a certificate dated the Closing Date and signed by the President or any Vice President of Purchaser to that effect.

Section 11.3.  Consents and Approvals.  All consents, waivers, authorizations and approvals of any governmental or regulatory authority, domestic or foreign, and required in connection with the execution, delivery and performance of this Agreement, shall have been duly obtained and shall be in full force and effect on the Closing Date, including in connection with the Bankruptcy Code.

Section 11.4.  No Violation of Orders.  No preliminary or permanent injunction or other order issued by any court or other governmental or regulatory authority, domestic or foreign, nor any statute, rule, regulation, decree or executive order promulgated or enacted by any government or governmental or regulatory authority, domestic or foreign, which declares this Agreement invalid or unenforceable in any respect or which prevents the consummation of the transactions contemplated hereby shall be in effect or be threatened.

Section 11.5.  Delivery of Ancillary Agreements.  Purchaser shall have executed and delivered to Seller each of the Ancillary Agreements to which it is a party.

Section 11.6.  Resolutions; Secretary's Certificate.  Seller shall have received a copy of resolutions adopted by the Board of Directors of Purchaser authorizing the execution, delivery

27

Exhibit 1 - 52

and performance of this Agreement and the Ancillary Agreements by Purchaser, and a certificate of the Secretary of Purchaser, dated the Closing Date, certifying that such resolutions were duly adopted and are in full force and effect at such date and setting forth the incumbency of each person executing this Agreement on behalf of Purchaser.

SECTION 12. <u>CONDITIONS PRECEDENT TO PERFORMANCE BY PURCHASER.</u>

The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing Date, of the following conditions, any one or more of which may be waived by Purchaser in its sole discretion:

Section 12.1. <u>Representations and Warranties of Seller.</u>  All representations and warranties made by Seller in this Agreement shall be true and correct in all material respects (and in all respects in the case of each representation and warranty that is qualified as to materiality) on and as of the Closing Date (other than such representations and warranties that speak as of a specific date or time other than the Closing Date, which need only be true and correct in all material respects as of such date or time), and Purchaser shall have received a certificate dated the Closing Date and signed by the President or any Vice President of Seller to that effect.

Section 12.2. <u>Performance of the Obligations of Seller.</u>  Seller shall have performed in all material respects all obligations required under this Agreement to be performed by Seller on or before the Closing Date, specifically including, but not limited to, Seller's observance of, compliance with, and performance of the covenants contained in Section 7, and Purchaser shall have received a certificate dated the Closing Date and signed by the President or any Vice President of Seller to that effect.

Section 12.3. <u>Consents and Approvals.</u>  All consents, waivers, authorizations and approvals of any third parties and all governmental or regulatory authority, domestic or foreign, that are required in connection with the execution, delivery and performance of this Agreement shall have been duly obtained and shall be in full force and effect on the Closing Date, including in connection with the Bankruptcy Code, and all consents, waivers, authorizations, approvals, declarations and registrations listed on <u>Schedule 12.3</u> shall have been duly obtained and shall be in full force and effect on the Closing Date.

Section 12.4. <u>No Violation of Orders.</u>  No preliminary or permanent injunction or other order issued by any court or governmental or regulatory authority, domestic or foreign, nor any statute, rule, regulation, decree or executive order promulgated or enacted by any government or governmental or regulatory authority, which declares this Agreement invalid in any respect or prevents the consummation of the transactions contemplated hereby shall be in effect or be threatened.

Section 12.5. <u>Delivery of Ancillary Agreements.</u>  Seller shall have executed and delivered to Purchaser each of the Ancillary Agreements to which Seller is a party and the Inventory Statement shall have been consented to by the Purchaser.

Section 12.6. <u>No Material Adverse Effect.</u>  During the period from Execution Date to the Closing Date, there shall not have occurred any Material Adverse Effect.

LEGAL_US_E #.92480913.14
Error! Unknown document
property name.

Exhibit 1 - 53

Section 12.7.  <u>Resolutions; Secretary's Certificate</u>.  Purchaser shall have received a copy of resolutions adopted by the Board of Directors and the shareholder of Seller (on the date hereof) authorizing the execution, delivery and performance of this Agreement and each of the Ancillary Agreements to which Seller is a party, and a certificate of the Secretary of Seller, dated the Closing Date, certifying that such resolutions were duly adopted and are in full force and effect at such date and setting forth the incumbency of each person executing this Agreement on behalf of Seller.

Section 12.8.  <u>Permits</u>.  All of the Permits shall have been transferred or assigned to Purchaser or, to the extent that any of the such Permits are not assignable or otherwise have not been so transferred, Purchaser shall have obtained substitute licenses and permits comparable to such non-assigned Permits, in either case to the extent necessary to enable Purchaser to lawfully conduct the Business and operate the Purchased Assets in the manner currently conducted in all material respect.

Section 12.9.  <u>Completion of Due Diligence of Customers and Suppliers</u>.  Purchaser shall have completed its due diligence examination of Seller's customers and suppliers, including calls with each material customer and supplier, and the results of such examination shall be satisfactory to Purchaser in its sole and absolute discretion ("**Purchaser Customer and Supplier Review**"); provided that unless Purchaser has provided written notice to Seller of the termination of this Agreement due to the failure of this condition on the date the Breakup Fee is approved by the Bankruptcy Court, this condition shall thereafter no longer apply.

Section 12.10. <u>Transition Services</u>. The Purchaser and the Seller shall have entered into a transition services agreement, on terms reasonably satisfactory to the Purchaser (the "**Transition Services Agreement**") whereby Seller agrees to provide transition support services, including product ordering, warehousing, shipping, IT, billing and collections at Purchaser request for a period of up to 60 days after Closing. Pursuant to the Transition Services Agreement, Purchaser shall pay the actual costs incurred by the Seller for the services that are provided during the applicable period.

Section 12.11. <u>Completion of Legal Due Diligence</u>. Purchaser shall have completed its legal due diligence examination of the Business (including any contracts and leases), and the results of such examination shall be satisfactory to Purchaser in its sole and absolute discretion ("**Purchaser Legal Review**"); <u>provided</u> that unless Purchaser has provided written notice to Seller of the termination of this Agreement due to the failure of this condition on the date the Breakup Fee is approved by the Bankruptcy Court, this condition shall thereafter no longer apply.

SECTION 13. <u>CONDITIONS PRECEDENT TO PERFORMANCE BY THE PURCHASER AND THE SELLER.</u>

Section 13.1.

The respective obligations of Purchaser and Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of

29

Exhibit 1 - 54

each of the following conditions (any or all of which may be waived by Purchaser and Seller in whole or in part to the extent permitted by applicable Law):

(a)    there shall not be in effect any order by a governmental body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; and

(b)    the Bankruptcy Court shall have (i) entered the Sale Order in form and substance acceptable to Seller and Purchaser and their respective counsel approving the transactions contemplated by this Agreement, including, without limitation, the Breakup Fee and the assumption of the Assumed Contracts by Seller and the assignment of the Assumed Contracts to the Purchaser, and the Sale Order shall have become a Final Order (unless otherwise consented to by the Purchaser) and (ii) made all of the findings required by Section 363(m), Section 363(n) and Sections 365(f)(2)(B) of the Bankruptcy Code as shall be reasonably satisfactory to Purchaser.

## SECTION 14. BANKRUPTCY PROCEDURES.

Section 14.1.    Bankruptcy Court Approval of Purchaser as Stalking Horse.    Within five (5) Buiness Days of the Filing Date, Seller shall file with the Bankruptcy Court the Sale and Bidding Procedures Motion.  Seller shall use its best commercially reasonable efforts to obtain a hearing before the Bankruptcy Court regarding the entry of the Bid Procedures Order to take place as soon as practicable after the Filing Date.  Seller shall seek prompt entry of the Bid Procedures Order.

Section 14.2.    Motions and Notices Regarding Sale of Acquired Assets and Assumption and Assignment of Seller Contracts.

(a)    Sale Motion.  Seller shall use its best efforts to obtain a hearing before the Bankruptcy Court regarding the entry of the Sale Order (the "**Sale Hearing**") to take place on or before five (5) Business Days after the date hereof.  Seller shall seek prompt entry of the Sale Order.

(b)    Notice of Proposed Cures.  Seller agrees that it will promptly serve the third parties who are parties to Assumed Contracts (such third parties being "**Cure Obligees**") with written notice of proposed Cures on the Assumed Contracts (such notice being the "**Proposed Cure Notice**"), which Proposed Cure Notice shall be mutually agreed upon by Seller and Purchaser and approved by the Bid Procedures Order.  The Proposed Cure Notice shall establish a deadline reasonably in advance of the Sale Hearing by which Cure Obligees must object to respective proposed Cures or be deemed to have waived any such objection.

(c)    Filings with the Bankruptcy Court.  Seller covenants and agrees that it will provide to Purchaser a copy of any and all material filings Seller proposes to file with the Bankruptcy Court, including, but not limited to, the Sale and Bidding Procedures Motion, not less than two (2) Business Days prior to the date on which Seller intends to make each respective filing, and that Seller shall reasonably cooperate and consult with the Purchaser prior to the filing thereof.

30

Exhibit 1 - 55

Section 14.3.  <u>Requests for Information</u>.  From and after the date the Bid Procedures Order is entered, (1) if Seller supplies any information regarding the Business to a potential bidder not heretofore given to Purchaser, Seller shall further provide Purchaser with a copy of such information within 24 hours of providing that information to any other potential bidder; and (2) with respect to any bid, term sheet, or written expression of interest by any other party for any Purchased Assets, or any other reorganization proposal, submitted prior to the Bid Deadline, Seller shall provide Purchaser with prompt notice of such proposal and a copy of such proposal within 24 hours of Seller's receipt thereof.

Section 14.4.  <u>Breakup Fee</u>.  In the event of a termination of this Agreement pursuant to Sections 15.1(c)(i) or 15.1(g) of this Agreement, Seller shall immediately pay Purchaser Eighty-Two Thousand Five Hundred Dollars ($82,500) plus Purchaser's out-of-pocket expenses (not to exceed an additional One Hundred Thousand Dollars ($100,000)) (collectively, the "**Breakup Fee**"); <u>provided</u> that the expense portion of the Breakup Fee shall be immediately due upon a termination pursuant to Sections 15(e)(i) or 15(f) of this Agreement.  Such Breakup Fee shall be in addition to the return to the Purchaser of the Deposit Amount.  The Bid Procedures Order shall approve the Breakup Fee as set forth in this Section; <u>provided</u> that the Purchaser shall have the right to offset, on behalf of Parent, any payments due under the License Agreement to Seller against any of the Breakup Fee (including expense reimbursement) due from the Seller.  The obligation of Seller to pay the Breakup Fee:

(a)  shall be entitled to administrative expense claim status under Sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code;

(b)  shall not be subordinate to any other administrative expense claim against the Seller, including under any debtor-in-possession financing or cash collateral order (a "**DIP Order**"), except for the carveout of $135,000 for the payment of allowed but unpaid fees of the Seller's professionals approved by the Bankruptcy Court as set forth in the DIP Order; and

(c)  shall survive the termination of this Agreement in accordance with Section 15 hereof.

Section 14.5.  <u>Certain Bankruptcy Undertakings by Seller</u>.

(a)  Seller shall use its best efforts to effect the transactions contemplated by this Agreement in accordance with the Bid Procedures Order and the Sale Order.

(b)  Seller agrees to do such further acts and things and to execute and deliver such additional agreements and instruments as may reasonably be required, or requested by Purchaser, to consummate, evidence, confirm or obtain Bankruptcy Court approval of the sale of the Purchased Assets or any other agreement contemplated hereby and to consummate the transaction contemplated hereby.

(c)  From and after the date hereof, except as specifically set forth in this Agreement or the Bid Procedures Order, or as otherwise required by applicable law, the Bankruptcy Code, the Bankruptcy Rules, or any other order of the Bankruptcy Court, Seller shall not take any action, or fail to take any action, which action or failure to act

31

Exhibit 1 - 56

would reasonably be expected to: (i) prevent or impede the consummation of the transactions contemplated by this Agreement in accordance with the terms of this Agreement; or (ii) result in (A) the reversal, avoidance, revocation, vacating or modification of the Bid Procedure Order or Sale Order (in any manner that would reasonably be expected to materially and adversely affect Purchaser's rights hereunder) or (B) the entry of a stay pending appeal of such Order; provided however, that Seller shall not be prevented by this Section from marketing the Purchased Assets as a whole to third parties or providing information to or responding to inquiries from potential bidders for the Purchased Assets prior to the date of the auction of the Purchased Assets pursuant to the Bid Procedures Order.

(d)    Seller, at its sole cost and expense, shall defend the Bid Procedures Order, and the Sale Order in the event that Purchaser elects, in its sole discretion, to close the purchase of the Purchased Assets notwithstanding the pendency of any motion for reconsideration or appeal of such Orders.

SECTION 15. TERMINATION.

Section 15.1.    Conditions of Termination.    Notwithstanding anything to the contrary contained herein, this Agreement may be terminated at any time before the Closing Date as follows:

(a)    by mutual consent of Seller and Purchaser;

(b)    by Seller if (i) there has been a material breach by Purchaser of its representations and warranties or in the observance, or in the due and timely performance of any of the covenants or agreements contained in this Agreement on Purchaser's part to be performed, and such breach shall not have been cured within ten (10) days after written notice thereof, or (ii) any of the conditions set forth in Section 11 shall become reasonably incapable of fulfillment and are not waived (unless the failure of such conditions results primarily from Seller breaching any of its representations, warranties or covenants contained in this Agreement);

(c)    by Purchaser if (i) there has been a material breach by Seller of its representations and warranties or in the observance, or in the due and timely performance of any of the covenants or agreements contained in this Agreement on Seller's part to be performed, and such breach shall not have been cured within ten (10) days after written notice thereof, or (ii) any of the conditions set forth in Section 12 shall become reasonably incapable of fulfillment and are not waived (unless the failure of such conditions results primarily from Purchaser breaching any of its representations, warranties or covenants contained in this Agreement);

(d)    by Purchaser (provided that Purchaser is not then in material breach of any representation, warranty, covenant or agreement set forth herein) if Purchaser is not satisfied with the Purchaser Customer and Supplier Review or Purchaser Legal Review; provided that unless Purchaser has provided written notice to Seller of the termination of

Exhibit 1 - 57

this Agreement under this clause (d) as of the date the Breakup Fee is approved by the Bankruptcy Court, this termination right shall thereafter no longer apply;

(e)     by Purchaser (provided that Purchaser is not then in material breach of any representation, warranty, covenant or agreement set forth herein) if (i) a Material Adverse Effect event, condition or matter with respect to the Seller shall have occurred and be continuing at the time of such termination or (ii) a Material Adverse Effect event, condition or matter with respect to the Purchaser shall have occurred and be continuing at the time of such termination;

(f)     by Purchaser, if (i) a DIP Order is not entered by the Bankruptcy Court on or before five (5) Business Days after the date hereof, (ii) the Bid Procedures Order is not entered by the Bankruptcy Court on or before five (5) Business Days after the date hereof, (iii) the Sale Order is not entered by the Bankruptcy Court on or before May 27, 2011, (iv) the Closing has not occurred by June 3, 2011, (v) the Bankruptcy Case is converted into a case under Chapter 7 of the Bankruptcy Code or dismissed or the Seller files a plan of reorganization or liquidation that does not include the consummation of the transactions contemplated hereby with Purchaser, (vi) a Chapter 11 trustee is appointed in the Bankruptcy Case or (vii) the Seller sells, disposes or transfers any of its material assets or enters into any similar alternative transaction with respect to its assets or equity securities; or

(g)     by Purchaser or Seller, if the Purchaser is not the winning bidder at the auction in accordance with the Bidding Procedures.

(h)     .

Section 15.2.  Effect of Termination.  In the event of termination pursuant to Section 15.1, this Agreement shall become null and void and have no effect, with no liability on the part of Seller or Purchaser, or their respective Affiliates, directors, officers, managers, agents, members or stockholders, with respect to this Agreement, except as set forth in Section 3.4 or Section 14.4, this Section 15 and Section 16; provided, however, that nothing herein shall relieve any party from any liability for any willful and material breach by such party of any of its covenants or agreements set forth in this Agreement and all rights and remedies of such nonbreaching party under this Agreement in the case of such a breach, at law or in equity, shall be preserved.  Notwithstanding the foregoing, the right of the Seller to receive the Deposit shall be the sole and exclusive remedy of Seller against the Purchaser or its Affiliates, directors, officers, managers, agents, members or stockholders for any loss or damage suffered as a result of the breach by Purchaser of this Agreement and in no event will any Seller (or Person acting on behalf of Seller) seek to recover (or be entitled to obtain) any other money damages or any equitable relief or equitable remedies of any kind whatsoever or any other remedy from the Purchaser or its Affiliates, directors, officers, managers, agents, members or stockholders, regardless of whether such monetary damages or other remedies are based on a claim in law or equity, and Seller (on its own behalf and on behalf of its estate) hereby waive all such claims except in the case of fraud by the Purchaser.

SECTION 16.  MISCELLANEOUS.

LEGAL_US_E # 92480913.14

Error! Unknown document property name.

Exhibit 1 - 58

Section 16.1.  <u>Successors and Assigns</u>.  Except as otherwise provided in this Agreement, no party hereto shall assign this Agreement or any rights or obligations hereunder without the prior written consent of the other party hereto, and any such attempted assignment without such prior written consent shall be void and of no force and effect, provided that Purchaser may assign its rights hereunder to an Affiliate and to any party providing financing in connection with the transactions contemplated hereby, but no such assignment shall reduce or otherwise vitiate any of the obligations of Purchaser hereunder. This Agreement shall inure to the benefit of and shall be binding upon the successors and permitted assigns of the parties hereto.

Section 16.2.  <u>Governing Law, Jurisdiction</u>.  This Agreement shall be construed, performed and enforced in accordance with, and governed by, the internal laws of the State of Delaware, without giving effect to the principles of conflicts of laws thereof. Subject to Section 9.2, the parties hereto irrevocably elect the Bankruptcy Court as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement and the other Ancillary Agreements, and consent to the jurisdiction thereof.

Section 16.3.  <u>Expenses</u>.  Except as otherwise provided herein, including pursuant to Section 14.4, Purchaser and Seller will each pay their respective fees and expenses (including fees and expenses of legal counsel) in connection with the transactions contemplated hereby whether or not the transactions contemplated hereby are consummated, including fees to its advisors. Notwithstanding the first sentence of this Section, Seller shall bear the cost of all state and local transfer, excise, value-added or other similar Taxes, and all sales and use Taxes and all recording and filing fees that may be imposed by reason of the sale, transfer, assignment and delivery of the Purchased Assets.

Section 16.4.  <u>Broker's and Finder's Fees</u>.  Except as set forth on <u>Schedule 16.4</u>, each of the parties represents and warrants that it has not dealt with any broker or finder in connection with any of the transactions contemplated by this Agreement, and no broker or other Person is entitled to any commission or finder's fee in connection with any of these transactions.  Each party shall indemnify and hold harmless the other party for any such fees incurred by or on behalf of such party.

Section 16.5.  <u>Severability</u>.  In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement shall remain in full force and effect.

Section 16.6.  <u>Notices</u>.  All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given (a) on the date of service if served personally on the party to whom notice is to be given; (b) on the day of transmission if sent via facsimile transmission to the facsimile number given below, and telephonic confirmation of receipt is obtained promptly after completion of transmission; (c) on the day after delivery to Federal Express or similar overnight courier or the Express Mail service maintained by the United States Postal Service; or (d) on the fifth day after mailing, if mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage prepaid and properly addressed, to the party as follows:

LEGAL_US_E # 92480913.14
Error! Unknown document
property name.

Exhibit 1 - 59

If to Seller:

Ronald B. Cooper
Westrim, Inc.
7855 Hayvenhurst
Van Nuys, CA 91406
ron. cooper@creativity.com

With a copy to:

David M. Poitras P.C.
Jeffer Mangels Butler & Mitchell LLP
1900 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067
Facsimile: 310.712.8571
dpoitras@jmbm.com

If to Purchaser:

Mike Hill
c/o DCWV Acquisition Corporation
751 South 170 East
Provo, UT 84601
Facsimile:
Email: gmillet@ceinc.info

With a copy to:

Amit Mehta
Paul, Hastings, Janofsky & Walker, LLP
191 N. Wacker Drive
30th Floor
Chicago, IL 60606
Facsimile No.: 312.499.6100
Email: amitmehta@paulhastings.com

and

Neil Tuch
Kevin Van Culin
HIG Capital, LLC
One Market Spear Tower
18th Floor
San Francisco, CA 94105
Facsimile No.: 415.439.5525
Email: ntuch@higcapital.com
        kvanculin@higcapital.com

Any party may change its address for the purpose of this Section by giving the other party written notice of its new address in the manner set forth above.

Section 16.7.  Amendments; Waivers.  This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by the parties hereto, or in the case of a waiver, by the party waiving compliance.  Any waiver by any party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be nor construed as further or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

Section 16.8.  Public Announcements.  Seller agrees not to issue any press releases or make any announcements to Seller's employees, suppliers, vendors or to the general public

LEGAL_US_E # 92480913.14
Error! Unknown document
property name.

Exhibit 1 - 60

concerning this transaction without the prior written approval of Purchaser (which approval shall not be unreasonably withheld or delayed by Purchaser) unless, in the opinion of counsel to Seller, addressed to Purchaser, such press release or public announcement is required by law, in which case Seller shall give Purchaser prior notice and an opportunity to comment on the proposed disclosure.

Section 16.9.  <u>Entire Agreement</u>.  This Agreement and the Ancillary Agreements contain the entire understanding among the parties hereto with respect to the transactions contemplated hereby, and supersede and replace all prior and contemporaneous agreements and understandings, oral or written, with regard to such transactions.  All Schedules hereto and any documents and instruments delivered pursuant to any provision hereof, including the Disclosure Letter, are expressly made a part of this Agreement as fully as though completely set forth herein.

Section 16.10. <u>Parties in Interest</u>.  Nothing in this Agreement is intended to confer any rights or remedies under or by reason of this Agreement on any Persons other than Seller, Purchaser, and their respective successors and permitted assigns. Nothing in this Agreement is intended to relieve or discharge the obligations or liability of any third Persons to Seller or Purchaser.  No provision of this Agreement shall give any other third Persons any right of subrogation or action over or against Seller or Purchaser.

Section 16.11. <u>Section and Paragraph Headings</u>.  The section and paragraph headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

Section 16.12. <u>Construction</u>.  The parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.  Any reference to any federal, state, local or foreign statute shall be deemed to refer to such statute as amended and to all rules and regulations promulgated thereunder, unless the context requires otherwise.  The word "include" or "including" means include or including, without limitation.  All references in this Agreement to Sections, Exhibits and Schedules shall be deemed references to Sections of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require.

Section 16.13. <u>Counterparts</u>.   This Agreement may be executed in one or more counterparts (including by facsimile and PDF email format), each of which shall be deemed an original, but all of which shall constitute the same instrument.

Section 16.14. <u>Survival</u>.   The representations and warranties set forth herein shall terminate upon the Closing.

*[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]*

36

Exhibit 1 - 61

## SIGNATURE PAGE TO ASSET SALE AND PURCHASE AGREEMENT

SELLER:                          **Westrim, Inc.,**
                                 a Delaware corporation

                                 By: _____
                                 Name: Ronald B. Cooper
                                 Title: President and Chief Executive Officer

PURCHASER:                       **Blue Moon Beads Acquisition Corp.,**
                                 a Delaware corporation

                                 By: _____
                                 Name: _____
                                 Title: _____

LEGAL_US_E # 92480913.8

Exhibit 1 - 62

<u>SIGNATURE PAGE TO ASSET SALE AND PURCHASE AGREEMENT</u>

**SELLER:**

Westrim, Inc.,
a Delaware corporation

By:_____
Name: Ronald B. Cooper
Title: President and Chief Executive Officer

**PURCHASER:**

Blue Moon Beads Acquisition Corp.,
a Delaware corporation

By:_____
Name: MICHAEL R. HILL
Title: PRESIDENT AND CHIEF EXECUTIVE OFFICER

Exhibit 1 - 63

LIST OF EXHIBITS:

Exhibit A: Inventory

Exhibit B: Example of Customer Discounts and Allowances

Exhibit C: Example of Standard Product Costs

Exhibit D: Stub Year Net Product Margin Financial Statement

LIST OF SCHEDULES

## Exhibit B

Example:

30,000,000 units shipped to customers in 2011/2012 (60% to Wal-Mart; 40% to JoAnn)

$2.00 Average invoice price per unit shipped

15% D&A to JoAnn; 5% D&A to Wal-Mart

$0.80 Average standard cost per unit shipped

($0.70 purchase price from supplier;

$0.01 freight from supplier; $0.09 US import duty)

| | | |
|---|---|---|
| Gross Sales | $60,000,000 | Invoice value of products shipped to customers (30 million units at $2.00/unit) |
| D&A | $5,400,000 | Customer discounts, rebates and allowances based upon revenue mix and customer-specific contracts (9%) |
| Net Sales | $54,600,000 | Gross Sales less D&A |

LEGAL_US_E # 92480913.14
Error! Unknown document property name.

Exhibit 1 - 64

## Exhibit C

Total Product Cost

| | | |
|---|---|---|
| Product Cost | $24,000,000 | Standard Cost including purchase cost, import duty and freight from supplier to warehouse (30 million units at $0.80/unit) |
| Purchase Price Variance | $264,000 | Difference between standard purchase costs and actual purchase costs for items purchased (if available) or during period--typically 1.1% of standard cost |
| Freight In Variance | $840,000 | Difference between standard freight costs and actual freight costs for items purchased (if available) or during period--typically 3.5% of standard cost |
| Duty Variance | $120,000 | Difference between standard duty costs and actual duty costs for items purchased (if available) or during period--typically 0.5% of standard cost |
| Inventory Adjustments | $264,000 | Inventory shrinkage and obsolescence--typically 1.1% of standard cost |
| Direct Labor Variance | $120,000 | Rework and repackaging costs if not included in standard costs--typically 0.5% of standard cost |

LEGAL_US_E # 92480913.14
Error! Unknown document
property name.

Exhibit 1 - 65

|  | | Miscellaneous cost not included in |
|---|---|---|
| Other Costs | $120,000 | standard costs--typically 0.5% of standard cost |

__Total Product Cost__      __$25,728,000__

Net Sales (from
Exhibit B) of
$54,600,000 less
Total Product Costs
(from Exhibit C) of
$25,728,000:

Net Product Margin      $28,872,000

# EXHIBIT 2

1  DAVID M. POITRAS P.C. (CA Bar No. 141309)
   ALEXIS M. McGINNESS (CA Bar No. 241449)
2  JEFFER MANGELS BUTLER & MITCHELL LLP
   1900 Avenue of the Stars, Seventh Floor
3  Los Angeles, California 90067-4308
   Telephone:    (310) 203-8080
4  Facsimile:    (310) 712-8571
   Email:    dpoitras@jmbm.com
5
   Counsel for Westrim, Inc.,
6  Debtor and Debtor-in-Possession

FILED & ENTERED

MAY 03 2011

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY williams   DEPUTY CLERK

7
8              UNITED STATES BANKRUPTCY COURT
                 CENTRAL DISTRICT OF CALIFORNIA
9                 SAN FERNANDO VALLEY DIVISION

10  In re                                    CASE NO.    1:11-bk-15313-GM

11  WESTRIM, INC. dba WESTRIM CRAFTS,        Chapter 11
    a Delaware corporation.
12
              Debtor.
13                                           ORDER ESTABLISHING BIDDING
                                             PROCEDURES FOR THE SALE OF A
14                                           SUBSTANTIAL PORTION OF THE
                                             ESTATE'S ASSETS
15

16                                           **Hearing:**

17                                           Date:       May 3, 2011
                                             Time:       10:00 a.m.
18                                           Ctrm:       Courtroom 303
                                                         21041 Burbank Blvd.
19                                                       Woodland Hills, CA 91367

20

21        The Motion to Establish Procedures for the Sale of a Substantial Portion of the Estate's

22  Assets (the "Bid Procedures Motion"), filed by Westrim, Inc. dba Westrim Crafts, a Delaware

23  corporation, debtor and debtor-in-possession herein ("Debtor"), came on for hearing on May 3,

24  2011 at 10:00 a.m., after notice to the twenty largest creditors holding unsecured claims, all

25  creditors that assert a general security interest in Debtor's assets, parties requesting special notice,

26  the proposed Purchaser and the Office of the United States Trustee.

27

28

PRINTED ON
RECYCLED PAPER
7748800v3

Exhibit 2 - 67

1    Based on the Motion and the other pleadings on file herein, this Court finds that the notice

2    of the Motion given to creditors and the hearing thereon were appropriate in the particular

3    circumstances of this case pursuant to 11 U.S.C. § 102.

4        Any objections to the Sales Procedures Motion are overruled to the extent inconsistent with

5    this Order.

6        Based thereon and good cause appearing therefor,

7    **IT IS HEREBY ORDERED:**

8        1.    The Motion is hereby approved and granted.

9        2.    The form of Bidding Procedures described in <u>Exhibit 1</u> attached hereto are approved.

10   Capitalized terms used in this Order and not specifically defined herein shall have the meaning

11   ascribed to such terms in <u>Exhibit 1</u>.

12       3.    A hearing will be held on May 25, 2011 at 10:30 a.m. to consider a motion ("<u>Sale</u>

13   <u>Motion</u>" or "<u>Sale Hearing</u>" as applicable) to be filed by Debtor for approval to sell a substantial

14   portion of its inventory, intellectual property, general intangibles, goodwill, customer lists and

15   certain other assets (the "<u>Assets</u>") to Blue Moon Beads Acquisition Corp. ("<u>Acquisition Corp.</u>")

16   pursuant to a certain Asset Sale and Purchase Agreement (the "<u>Sale Agreement</u>"). Objections to the

17   Sale Motion must be served on Acquisition Corp. at the following address at the same time that they

18   are served on counsel for Debtor:

19           Attn: Amit Mehta, Esq.

20           Paul, Hastings, Janofsky & Walker LLP

21           191 North Wacker Drive, Thirtieth Floor

22           Chicago, Illinois 60606

23           amitmehta@paulhastings.com

24       4.    The proposed sale to Acquisition Corp. pursuant to the Sale Agreement shall be

25   subject to overbid at the Sale Hearing on the terms and conditions set forth below.

26       5.    In order to bid, unless waived by Debtor, any prospective purchaser must submit the

27   following items to Debtor on or before May 23, 2011 at Noon Pacific Time:

28

- A letter stating that the bidder's offer is irrevocable until the earlier of (x) two (2) business days after the Assets have been disposed of pursuant to these Bidding Procedures, and (y) thirty (30) days after the Sale Hearing.

- An executed copy of an asset purchase agreement: (i) acceptable in form to Debtor (the "Overbid Sale Agreement"), (ii) clearly marked to show any changes from the terms of the Acquisition Corp. Sale Agreement, and (iii) on the same or more favorable terms as the Acquisition Corp. Sale Agreement; provided, however, the purchase price in such proposed Overbid Sale Agreement must be at least $257,500 greater than the amount offered by Acquisition Corp.

- A good faith deposit (the "Good Faith Deposit") in the form of a certified check (or other form acceptable to Debtor in its sole discretion) payable to the order of Debtor (or such other party as Debtor may determine to hold such funds in escrow) in an amount equal to $250,000.

- Written evidence of a binding commitment for financing or other evidence of ability to consummate the proposed transaction satisfactory to Debtor in its sole discretion.

- Only bids on terms that are not conditioned on obtaining financing, further due diligence or other conditions less favorable to the Seller than the Acquisition Corp. will be considered. A bid received from a Qualified Overbidder that includes all of the Required Bid Documents and meets all of the above requirements is a "Qualified Bid." The Acquisition Corp. offer and any overbid by Acquisition Corp. is also a "Qualified Bid."

6.    Debtor will deliver to counsel for Acquisition Corp. a copy of any Overbid Sale Agreement that it receives from a prospective purchaser within 24 hours of its receipt.

7.    Any bidding for the Assets shall be conducted pursuant to the following rules and procedures:

a.    If any Qualified Bids are received, Debtor may conduct an auction (the "Auction") for some or all of the Assets as to which a Qualified Bid has been received. Such Auction shall take place at the United States Bankruptcy Court for the Central District of California, San Fernando Valley Division, 21041 Burbank Boulevard, Woodland Hills, California 91367, Courtroom 303 (the "Bankruptcy Court") on May 25, 2011, commencing at 10:30 a.m. Only a Qualified Overbidder who has submitted a Qualified Bid will be eligible to participate at the

1   Auction.  At such Auction, Acquisition Corp. and Qualified Overbidders will be permitted to

2   increase their bids and Acquisition Corp. will be permitted to bid its Breakup Fee. Based upon the

3   terms of the Qualified Bids received, the level of interest expressed as to the Assets and such other

4   information as Debtor determines is relevant, Debtor, in its reasonable discretion, may conduct an

5   Auction in the manner it determines will result in the highest or otherwise best offer for the Assets

6   including, but not limited to, (i) offering the Assets for bidding as an entire package, in groups of

7   less than all of the Assets, and/or individually, (ii) offering the Assets for bidding in such successive

8   rounds as Debtor determines to be appropriate, and (iii) any such additional procedural rules that it

9   determines to be reasonable under the circumstances for conducting the Auction.  Initially,

10   incremental overbids will be set at $75,000.

11         b.    Upon conclusion of an Auction, Debtor shall (i) review each Qualified Bid on

12   the basis of financial and contractual terms and the factors relevant to the sale process, including

13   those factors affecting the speed and certainty of consummating the Sale and (ii) identify the highest

14   and otherwise best offer (the "Successful Bid").  At the Sale Hearing, Debtor shall present to the

15   Court for approval the Successful Bid and any backup bids.

16         c.    Following a Sale Hearing approving the sale of one or more Assets to a

17   Successful Bidder, if such Successful Bidder fails to consummate an approved sale because of a

18   breach or failure to perform on the part of such Successful Bidder, (a) it will forfeit its Good Faith

19   Deposit to Debtor and Debtor may pursue any and all of its other options at law and in equity with

20   respect to such breach (except as set forth in the Acquisition Corp. Sale Agreement) and (b) the next

21   highest or otherwise best Qualified Bid, as disclosed at the Sale Hearing, shall be deemed to be the

22   Successful Bid and Debtor shall be authorized to effectuate such sale without further order of the

23   Bankruptcy Court or (c) Debtor may reschedule at a later date and time another auction for any or

24   all of the Assets.

25         8.    Debtor is authorized and directed to pay to Acquisition Corp. the Breakup Fee in

26   accordancewith the terms set forth in the Sale Agreement and the Bidding Procedures.  The

27   Breakup Fee was the product of arms-length negotiations and is not in amount that is substantial

28   enough to have a chilling effect on other prospective bidders.  The Breakup Fee has helped to

JMBM | Jeffer Mangels Butler & Mitchell LLP

1  preserve the value of the estate by inducing Acquisition Corp. to serve as Stalking Horse and

2  exposing Acquisition Corp.'s offer to overbid.  The Breakup Fee is entitled to administrative

3  expense claim status under Sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code and

4  (excepting only the Carve-Out for Debtor's professionals) shall not be subordinate to any other

5  administrative expense claim against Debtor, including under any debtor-in-possession financing or

6  cash collateral order.

7      9.    Acquisition Corp. is authorized to offset, on behalf of Licensee (as defined in the Bid

8  Procedures Motion), any amount that it owes to Debtor pursuant to the Exclusive License against

9  any of the Breakup Fee due from Debtor without further order of this Court.

10     10.    This Order shall take effect immediately upon entry.

11     11.    This Court retains exclusive jurisdiction to resolve any dispute arising from or

12  relating to this Order.

13

14                              # # #

15

16

17

18

19

20

21

22

23  DATED: May 3, 2011

24                              United States Bankruptcy Judge

25

26

27

28

PRINTED ON
RECYCLED PAPER

Exhibit 2 - 71

# EXHIBIT 1

Exhibit 2 - 72

## Bidding Procedures

Set forth below are the bidding procedures (the "Bidding Procedures") to be employed with respect to the prospective sale (the "Sale") of the following personal property of Westrim, Inc. ("Seller"):

(a)     Seller's legal and beneficial right, title and interest in and to the following to the extent used in, or related to, the Business:

(i)     all Inventory, the skus for which are set forth on Exhibit A;

(ii)     all executory Contracts (other than Rejected Contracts) identified by the parties for assignment to Purchaser on Schedule 2.1(a)(ii) (collectively, the "Assumed Contracts"), which may include if related to the Business: (A) the License Agreement and other license agreements to which Seller is a party and that provide Seller with rights to technology, products and/or trademarks, or by which Seller grants rights to third parties for Intellectual Property, (B) all purchase orders, Contracts or other commitments of Seller to suppliers and vendors of goods and services for materials, supplies or other items, specifically excluding the Vendor Terms Agreement and the Supplier Terms Agreement, and any side letters related thereto, (C) all sales orders, Contracts or other similar commitments of Seller, (D) all confidentiality agreements, non-competition, assignment of inventions and similar agreements to which Seller is a party, (E) all rights of Seller to the rebates, indemnities, warranties and licenses received from lessors, manufacturers and sellers of the Purchased Assets and (F) other executory Contracts and unexpired leases and each other Contract or arrangement designated as an Assumed Contract by Purchaser; provided that the Purchaser shall acquire all assets, deposits and prepaid expenses relating to any Assumed Contract;

(iii)     copies of all financial books, accounting records, files, lists, publications, and other records and data of Seller related to the Business, regardless of the medium on which such information is stored or maintained (the "Records");

(iv)     all goodwill of Seller relating to the Business;

(v)     all customer lists used by the Business;

(vi)     as used in the Business, all registered trademarks or service marks and all trademark and service mark applications, all common law trademarks, trade names, trade dress and logos, all copyrights (including copyrighted content on internet sites to the extent related to the Business), all domain names, websites, and extensions thereof, all know-how, trade secrets and other confidential information, inventions, ideas, discoveries, patent applications and granted patents (including any and all continuations, continuations-in-part, additions and divisions thereof, and any and all patents issuing from the patent applications, and any reissues, reexaminations, renewals, extensions, and substitutions of any of the

Exhibit 2 - 73

patents), and all industrial designs, owned by Seller or any Affiliate of Seller in the Business (the "Intellectual Property"), and any registrations and applications therefor, and all databases, design databases, schematics and data collections and all rights therein owned by Seller or any Affiliate of Seller;

      (vii)   all claims, rights and causes of action relating to the Purchased Assets; and

      (viii)   after completion of the services under the Transition Services Agreement, the telephone and facsimile numbers currently used in connection with the Business.

      (b)   The Purchased Assets shall not include any of Seller's right, title or interest in or to any of the other assets of the Seller, including, without limitation, the following assets (collectively, the "Excluded Assets"):

      (i)   any of Seller's Cash on hand, and all bank accounts and lockbox arrangements benefiting the Business;

      (ii)   any Rejected Contracts and all Contracts and agreements that are rejected or are subject to a motion to reject by Seller in Bankruptcy Court;

      (iii)   any corporate minute books, organizational documents, stock ledgers and other corporate books and records, any original accounting records relating to the Business or any other business of Seller or its Affiliates;

      (iv)   all of Seller's deposits with carriers, lessors and other vendors (except with respect to any Assumed Contracts);

      (v)   all claims and causes of action under Sections 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code, and any other claims or causes of action belonging to Seller or its estate (collectively, "Avoidance Actions"), other than those relating to the Purchased Assets;

      (vi)   all Seller Plans (except to the extent set forth on Schedule 2.1(a)(iii));

      (vii)   any refunds and claims for refunds of Taxes accrued or accruing as of the Closing Date;

      (viii)   all accounts receivable, whether or not relating to the Business, and all notes and other receivables;

      (ix)   all insurance contracts and any rights or claims thereunder, whether or not pertaining to the Business; and

7748144v3

Exhibit 2 - 74

(x)    Seller's rights under this Agreement and the Ancillary Agreements.

(collectively, the "Assets").

Seller will seek entry of an order, among other things, authorizing and approving the Sale to Blue Moon Beads Acquisition Corp. ("Acquisition Corp.") or to a Qualified Overbidder (as hereinafter defined) as Seller, in the exercise of its reasonable business judgment may determine to have made the highest or otherwise best offer to purchase the respective Assets (the "Successful Bidder").

### The Bidding Process

Seller shall (i) determine whether any person is a Qualified Overbidder, (ii) coordinate the efforts of Qualified Overbidders in conducting their respective due diligence investigations regarding the Assets, (iii) receive offers from Qualified Overbidders, and (iv) negotiate any offer made to purchase the Assets (collectively, the "Bidding Process"). Any person who wishes to participate in the Bidding Process must be a Qualified Overbidder. Neither Seller nor its representatives shall be obligated to furnish any information of any kind whatsoever related to the Assets to any person who is not a Qualified Overbidder. Seller shall have the right to adopt such other rules for the Bidding Process which, in its reasonable judgment, will better promote the goals of the Bidding Process and which are not inconsistent with any of the other provisions hereof or of any Bankruptcy Court order.

### Participation-Bid Requirements

Unless otherwise ordered by the Bankruptcy Court for cause shown, to participate in the Bidding Process, each person (a "Potential Bidder") must deliver (unless previously delivered) to Seller the following documents (the "Required Bid Documents"), unless Seller waives in writing any/all of these requirements:

(a)    An executed confidentiality agreement in form and substance satisfactory to Seller;

(b)    Current financial statements or other financial information of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, current financial statements or other financial information of the equity holder(s) of the Potential Bidder, or such other form of financial disclosure acceptable to Seller and its advisors, demonstrating such Potential Bidder's ability to close the proposed transaction;

(c)    A letter stating that any offer put forth by such bidder shall be irrevocable until the earlier of (x) two (2) business days after the Assets have been disposed of pursuant to these Bidding Procedures, and (y) thirty (30) days after the Sale Hearing;

(d)    An executed copy of an asset purchase agreement: (i) acceptable in form to Seller (the "Overbid Sale Agreement"), (ii) clearly marked to show any changes from the terms of the proposed Asset Sale and Purchase Agreement by and among Debtor and Blue Moon Beads Acquisition Corp., as purchaser, dated May 3, 2011 (the "Acquisition Corp. Sale

3

Agreement);" and (iii) on the same or more favorable terms as the Acquisition Corp. Sale Agreement; provided, however, the purchase price in such proposed Overbid Sale Agreement must be at least $257,500 (the Breakup Fee plus $75,000);

(e)    A good faith deposit (the "Good Faith Deposit") in the form of a certified check (or other form acceptable to Seller in its sole discretion) payable to the order of Seller (or such other party as Seller may determine to hold such funds in escrow) in an amount equal to $250,000; and

(f)    Written evidence of a binding commitment for financing or other evidence of ability to consummate the proposed transaction satisfactory to Seller in its sole discretion.

Seller will consider a bid only if the bid is on terms that are not conditioned on obtaining financing, due diligence or other conditions less favorable to the Seller than those set forth in the Acquisition Sale Agreement.

A Qualified Overbidder is a Potential Bidder that delivers the documents described in subparagraphs (a), (b), (c), (d), (e) and (f) above, whose financial information demonstrates the financial capability of the Potential Bidder to consummate the Sale, and that Seller determines is reasonably likely (based on the availability of financing, experience and other considerations) to consummate the Sale if selected as the Successful Bidder.

Within three (3) business days after a Potential Bidder delivers all of the materials required by subparagraphs (a), (b), (c), (d), (e) and (f) above, Seller shall determine, and shall notify the Potential Bidder in writing, whether the Potential Bidder is a Qualified Overbidder.

The Acquisition Corp. offer set forth in the Acquisition Corp. Sale Agreement is also a "Qualified Bid" herein. Seller will deliver to Acquisition Corp. a copy of any materials described in subparagraphs (d) and (f) above that it receives from a Potential Bidder within 24 hours of its receipt.

## Bid Protection

Acquisition Corp. shall be entitled to be paid (i) a $82,500 termination fee and be reimbursed for up to $100,000 for out-of-pocket expenses (collectively, the "Breakup Fee") if a higher or otherwise better offer from another bidder is accepted or the Seller materially breaches the Acquisition Corp. Sale Agreement or (ii) up to $100,000 for out-of-pocket expenses if Acquisition Corp. terminates the Acquisition Corp. Sale Agreement pursuant to Section 15(e)(i) or Section 15.1(f) of the Acquisition Corp. Sale Agreement. The Debtor's obligations set forth in this section shall be entitled to administrative expense claim status under Sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code and (excepting only the Carve-Out for Debtor's professionals) shall not be subordinate to any other administrative expense claim against Debtor, including under any debtor-in-possession financing or cash collateral order.

4

Exhibit 2 - 76

### Due Diligence

Seller may afford each Potential Bidder or Qualified Overbidder due diligence access to the Assets sought to be acquired. Seller will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access for such bidders. Seller shall not be obligated to furnish any due diligence information after the Bid Deadline (as defined herein). Neither Seller nor any of its affiliates (or any of their respective representatives) are obligated to furnish any information relating to the Assets to any person except to a Potential Bidder or Qualified Overbidder who makes an acceptable preliminary proposal. Bidders are advised to exercise their own discretion before relying on any information regarding the Assets provided by anyone other than Seller or its representatives.

### Bid Deadline

A Qualified Overbidder that desires to make a bid shall deliver a written copy of its bid to Jeffer Mangels Butler & Mitchell LLP, 1900 Avenue of the Stars, 7th Floor, Los Angeles, California 90067, to the attention of David M. Poitras P.C., Facsimile: (310) 712-8571; Email: dpoitras@jmbm.com, **on or before Noon Pacific Time on May 23, 2011.** Seller may extend such deadline in its sole discretion (such deadline, including such extension, the "Bid Deadline"). In addition to the above-referenced extension, Seller may extend the Bid Deadline once or successively, but it is not obligated to do so. Notwithstanding the foregoing, Seller shall not extend the deadline to any date that is later than May 24, 2011.

### "As Is, Where Is"

The sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by Seller, its agents or its bankruptcy estate except to the extent set forth in the Overbid Sale Agreement of the Successful Bidder as accepted by Seller. Except as otherwise provided in the Acquisition Corp. Sale Agreement or an Overbid Sale Agreement acceptable to Seller, all Seller's right, title and interest in and to the Assets shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon and there against (collectively, the "Interests") in accordance with Sections 363 and 365 of the Bankruptcy Code, with such Interests to attach to the net proceeds of the Sale of the Assets.

Each bidder shall be deemed to acknowledge and represent it has had an opportunity to inspect and examine the Assets and to conduct any and all due diligence regarding the Assets prior to making its offer; that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or assets in making its bid; and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in these Bidding Procedures or, as to the Successful Bidder, the Acquisition Corp. Sale Agreement or the Overbid Sale Agreement.

5

Exhibit 2 - 77

### Auction

After the Bid Deadline, Seller may conduct an auction (the "Auction") for some or all of the Assets as to which a Qualified Bid has been received. Such Auction shall take place at the United States Bankruptcy Court for the Central District of California, San Fernando Valley Division, 21041 Burbank Boulevard, Woodland Hills, California, Courtroom 303 (the "Bankruptcy Court") on May 25, 2011, commencing at 10:30 a.m. Only a Qualified Overbidder who has submitted a Qualified Bid will be eligible to participate at the Auction. At such Auction, Acquisition Corp. and Qualified Overbidders (and Acquisition Corp.) will be permitted to increase their bids and Acquisition Corp. shall be entitled to bid the Breakup Fee. Based upon the terms of the Qualified Bids received, the level of interest expressed as to the Assets and such other information as Seller determines is relevant, Seller, after reasonable efforts to consult with interested parties, in its reasonable discretion, may conduct an Auction in the manner it determines will result in the highest or otherwise best offer for the Assets including, but not limited to, (i) offering the Assets for bidding as an entire package, in groups of less than all of the Assets, and/or (ii) offering the Assets for bidding in such successive rounds as Seller determines to be appropriate, and (iii) any such additional procedural rules that it determines to be reasonable under the circumstances for conducting the Auction that are not inconsistent with any of the provisions of the Bankruptcy Code, any Bankruptcy Court Order, or these Bidding Procedures.

Upon conclusion of an Auction or, if Seller determines not to hold an Auction, then promptly following the Bid Deadline, Seller shall (i) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Sale and (ii) identify the highest and otherwise best offer (the "Successful Bid"). At the Sale Hearing, Seller shall present to the Bankruptcy Court for approval the Successful Bid and any backup bids. Seller may adopt rules for the bidding process that are not inconsistent with any of the provisions of the Bankruptcy Code, any Bankruptcy Court Order, or these Bidding Procedures.

### Acceptance of Qualified Bids

Seller presently intends to sell the Assets to Acquisition Corp. or the highest or otherwise best Qualified Overbidder. Seller's presentation to the Bankruptcy Court for approval of a particular Qualified Bid does not constitute Sellers' acceptance of such bid. Seller will be deemed to have accepted a bid only when the bid has been approved by an order of the Bankruptcy Court.

### Sale Hearing

The Sale Hearing, if required, shall take place at the Bankruptcy Court immediately following the Auction. The Sale Hearing may be adjourned or rescheduled without notice by an announcement of the adjourned date of a Sale Hearing. At such Sale Hearing, Seller shall present the Successful Bid to the Bankruptcy Court for approval.

6

Exhibit 2 - 78

Following a Sale Hearing approving the sale of one or more Assets to a Successful Bidder, if such Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, (a) it will forfeit its Good Faith Deposit to Seller and Seller may pursue any and all of its options at law and in equity with respect to such breach and (b) the next highest or otherwise best Qualified Bid, as disclosed at the Sale Hearing, shall be deemed to be the Successful Bid and Seller shall be authorized to effectuate such sale without further order of the Bankruptcy Court or (c) Seller shall reschedule at a later date and time another auction for any or both properties or assets.

### Return of Good Faith Deposit

Good Faith Deposits of all Qualified Overbidders shall be held in escrow until the earlier of (x) three (3) business days after all Assets upon which the bidder is bidding have been disposed of pursuant to these Bidding Procedures or (y) thirty-one (31) days after the Sale Hearing.

### Modifications

Seller may (a) determine, in its business judgment, which Qualified Bid, if any, is the highest or otherwise best offer; and (b) reject at any time before the entry of an order of the Bankruptcy Court approving a Qualified Bid, any bid (other than the Acquisition Corp offer set forth in the Acquisition Corp. Sale Agreement) that, in Seller's reasonable discretion is (i) inadequate or insufficient, (ii) not in conformity with the conditions of sale, or (iii) contrary to the best interests of Seller, its estate and/or its creditors. At or before the Sale Hearing, Seller may impose such other terms and conditions as it may determine to be in the best interest of Seller's bankruptcy estate, its creditors and/or other parties in interest that are not inconsistent with any of the provisions of the Bankruptcy Code, any Bankruptcy Court Order, or these Bidding Procedures.

7

7748144v3

Exhibit 2 - 79

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I.
Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

1900 Avenue of the Stars, 7th Floor, Los Angeles, CA 90067

A true and correct copy of the foregoing document described as ***ORDER ESTABLISHING BIDDING PROCEDURES FOR THE SALE OF A SUBSTANTIAL PORTION OF THE ESTATE'S ASSETS*** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On _____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☐ Service information continued on attached page

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served):
On **May 3, 2011,** I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**SERVED BY OVERNIGHT MAIL**

Honorable Geraldine Mund
United States Bankruptcy Court - Central District of California
21041 Burbank Boulevard, Suite 342
Woodland Hills, CA 91367
☐ Service information continued on attached page

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **May 3, 2011,** I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| May 3, 2011 | Monica Clemens | /s/ Monica Clemens |
|---|---|---|
| Date | Type Name | Signature |

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*                                            **F 9013-3.1.PROOF.SERVICE**

Exhibit 2 - 80

## *ADDITIONAL SERVICE INFORMATION*

III. <u>SERVED BY EMAIL</u>

<u>Agent for Bridge Lenders</u>
Ron Cooper
11222 Brooks Road
Windsor, CA 95492
Email: ron.cooper@creativityinc.com

<u>Attorneys For Acquisition Corp.</u>
Paul Hastings Janofsky & Walker LLP
Jennifer B. Hildebrandt
515 South Flower St, 25th Fl
Los Angeles, CA 90071
Email: jenniferhildebrandt@paulhastings.com

Margaux S. Ross
Office of the United States Trustee
21051 Warner Center Lane, Ste 115
Woodland Hills CA 91367
Email: margaux.ross@usdoj.gov

<u>Attorneys For Acquisition Corp.</u>
Paul Hastings Janofsky & Walker LLP
Amit Mehta
191 North Wacker Drive, 30th Fl
Chicago, IL 60606
Email: amitmehta@paulhastings.com

<u>Attorneys For Newstar Business Cred</u>
Hunton & Williams LLP
Gregory G. Hesse
1445 Ross Avenue, Ste 3700
Dallas, TX 75202
Email: ghesse@hunton.com

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

August 2010

**F 9013-3.1.PROOF.SERVICE**

Exhibit 2 - 81

**NOTE TO USERS OF THIS FORM:**
1) Attach this form to the last page of a proposed Order or Judgment. Do not file as a separate document.
2) The title of the judgment or order and all service information must be filled in by the party lodging the order.
3) **Category I.** below: The United States trustee and case trustee (if any) will always be in this category.
4) **Category II.** below: List ONLY addresses for debtor (and attorney), movant (or attorney) and person/entity (or attorney) who filed an opposition to the requested relief. <u>DO NOT</u> list an address if person/entity is listed in category I.

# NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled (*specify*) ***ORDER ESTABLISHING BIDDING PROCEDURES FOR THE SALE OF A SUBSTANTIAL PORTION OF THE ESTATE'S ASSETS*** was entered on the date indicated as ○Entered○ on the first page of this judgment or order and will be served in the manner indicated below:

**I. SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s), the foregoing document was served on the following person(s) by the court via NEF and hyperlink to the judgment or order. As of <u>*May 3, 2011*</u>, the following person(s) are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email address(es) indicated below.

- Alexis M McGinness    amm@jmbm.com, cb7@jmbm.com
- David M Poitras    dpoitras@jmbm.com
- United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov

☐ Service information continued on attached page

**II. SERVED BY THE COURT VIA U.S. MAIL:** A copy of this notice and a true copy of this judgment or order was sent by United States Mail, first class, postage prepaid, to the following person(s) and/or entity(ies) at the address(es) indicated below:

☐ Service information continued on attached page

**III. TO BE SERVED BY THE LODGING PARTY:** Within 72 hours after receipt of a copy of this judgment or order which bears an ○Entered○ stamp, the party lodging the judgment or order will serve a complete copy bearing an ○Entered○ stamp by U.S. Mail, overnight mail, facsimile transmission or email and file a proof of service of the entered order on the following person(s) and/or entity(ies) at the address(es), facsimile transmission number(s), and/or email address(es) indicated below:

☒ Service information continued on attached page

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*                    **F 9021-1.1.NOTICE.ENTERED.ORDER**

Exhibit 2 - 82

### _ADDITIONAL SERVICE INFORMATION_

III.  <u>SERVED BY EMAIL</u>

<u>Agent for Bridge Lenders</u>
Ron Cooper
11222 Brooks Road
Windsor, CA 95492
Email: ron.cooper@creativityinc.com

<u>Attorneys For Acquisition Corp.</u>
Paul Hastings Janofsky & Walker LLP
Jennifer B. Hildebrandt
515 South Flower St, 25th Fl
Los Angeles, CA 90071
Email: jenniferhildebrandt@paulhastings.com

<u>Attorneys For Acquisition Corp.</u>
Paul Hastings Janofsky & Walker LLP
Amit Mehta
191 North Wacker Drive, 30th Fl
Chicago, IL 60606
Email: amitmehta@paulhastings.com

<u>Attorneys For Newstar Business Cred</u>
Hunton & Williams LLP
Gregory G. Hesse
1445 Ross Avenue, Ste 3700
Dallas, TX 75202
Email: ghesse@hunton.com

Margaux S. Ross
Office of the United States Trustee
21051 Warner Center Lane, Ste 115
Woodland Hills CA 91367
Email: margaux.ross@usdoj.gov

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

August 2010

**F 9021-1.1.NOTICE.ENTERED.ORDER**

Exhibit 2 - 83

# EXHIBIT 3

# EXHIBIT 3

## Executory Contracts & Leases to be Assumed and Assigned as part of Sale

This is exhibit will be provided via a supplemental filing prior to the hearing to be held on May 25, 2011

Exhibit 3 - 84

# EXHIBIT 4

4/8/11

## EXCLUSIVE LICENSE AGREEMENT

THIS EXCLUSIVE LICENSE AGREEMENT ("Agreement") is entered into this 8th day of April, 2011, by and between WESTRIM, INC., a Delaware corporation (the "Licensor") and DCWV Acquisition Corporation, a Delaware corporation ("Licensee").

### RECITALS

Michaels Stores, Inc. ("Michaels") has or will request to purchase the skus of existing Blue Moon products set forth on Schedule A (attached hereto) and has agreed to purchase a program of new skus as set forth on Schedule A (attached hereto) of Licensor's products for a new program setting in Summer 2011 and running at least until Summer 2012 ("Michaels Bead Landing Summer 2011 Program") but requires assurance that the products will be available as planned through Licensee, and Licensor is willing to grant this exclusive license for this Program in exchange for the royalties agreed to herein.

### AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.      **Grant of License.**  Upon the terms and conditions hereinafter set forth, Licensor hereby grants to Licensee the exclusive, irrevocable (except as provided in Section 7 hereof), worldwide, transferable and sublicensable (as provided in Section 10 hereof) license and right to make and have made the products set forth on Schedule A (collectively, the "Licensed Products") for sale to Michaels, and to sell the Licensed Products to Michaels under the "Blue Moon" brand and intellectual property, trademarks, trade names, and related logos and symbols (collectively, the "Licensed Marks"). Licensee may also sell the Licensed Products to Michaels under the "Bead Landing" brand with permission from Michaels (and the Licensor grants to the Licensee the required intellectual property to do so). Licensed Marks does not include intellectual property owned by Michaels, Licensee or their affiliates. This license does not allow the Licensee to sell other products to Michaels under the Licensed Marks or any other customer under the Licensed Marks; it also does not allow the Licensee to sell the Licensed Products to customers other than Michaels and its affiliates provided Licensee shall have the right to liquidate inventory of any sku of the Licensed Products consistent with past custom and practice to discount retailers and suppliers thereto but not full retail stores (e.g. Jo-Ann Fabrics and Craft Stores, Meijer or Wal-Mart) for a period of up to ninety (90) days from the date that sku is discontinued at Michaels.

2.      **Sale of Inventory.**  Licensor shall sell, convey, transfer, assign and deliver to Licensee, and Licensee shall purchase from Licensor six (6) months of supply of inventory with respect to the Licensed Products to the extent currently on-hand at or in transit to Licensor's warehouse (the "Inventory"). Such Inventory shall be sold at Licensor's verifiable standard cost (which includes invoice, freight and duty costs) and shall be only of good and merchantable quality and fit for resale. The Inventory shall be sold, transferred, assigned and delivered free and clear of any liens and encumbrances. In addition to the six (6) month supply of Inventory referenced above, the Licensor and Licensee may agree to supply and purchase additional inventory in excess of the six (6) month supply and at a price as mutually agreed to by the parties.

3.      **Term.**  The term of the license hereby granted shall be effective on the date hereof and continue until the earlier of the tenth anniversary of the date hereof unless sooner terminated in accordance with the provisions hereof.

1

_RC   4/8/2011_

Exhibit 4 - 85

4.    **Consideration**. The consideration to be paid Licensor by Licensee shall be a royalty equal to seven percent (7%) of gross sales (net of product returns) to Michaels of the Licensed Products (and substantially similar products) made by Licensee during the term of the Agreement. Sales shall be calculated based on invoices for Licensed Products that are shipped to Michaels or its designee. The royalty shall be calculated and payment shall be made no later than seventy-five (75) days following shipment and invoicing to Michaels. Licensee shall provide a calculation summary with each such payment of royalties showing in reasonable detail the methodology in calculating the royalties due. No license or any other fees shall be payable by Licensee in consideration for the license granted hereunder. Licensee shall have the right to offset any payments due to Licensor under this Agreement from obligations of Licensor to Licensee under this Agreement.

5.    **Covenants of Licensee.** Licensee hereby agrees that:

(a)    Licensee shall not use the Licensed Marks in any unlawful or commercially unreasonable manner; nor shall Licensee use the Licensed Marks in any manner which could be construed to constitute a declaration, assertion, testimonial, avowal, representation, warranty, commitment, assurance, guaranty, sponsorship or other statement or obligation of any kind on the part of Licensor without the prior written consent of Licensor.

(b)    Licensee shall use the Licensed Marks in accordance with all applicable Federal, State and local laws.

(c)    Nothing contained in this Agreement shall be construed as an assignment or grant to the Licensee of any right, title or interest in or to the Licensed Marks, it being understood that all rights relating thereto are reserved by Licensor, except for the license hereunder to Licensee of the right to use and utilize the Licensed Marks only as specifically and expressly provided in this Agreement.

(d)    Licensee's use of the Licensed Marks shall inure to the benefit of Licensor; and Licensee shall not at any time acquire any rights in such Licensed Marks by virtue of any use it may make of such Licensed Marks. At the termination or expiration of this Agreement, Licensee will be deemed to have assigned, transferred and conveyed to Licensor any trade rights, equities, goodwill, titles or other rights in and to the Licensed Marks which may have been obtained by Licensee or which may have vested in Licensee in pursuance of any endeavors covered hereby; and Licensee will execute any instruments reasonably requested by Licensor to accomplish or confirm that foregoing. Any such assignment, transfer or conveyance shall be without consideration other than the mutual covenants and consideration of this Agreement.

6.    **Warranties and Indemnification.**

(a)    Licensor represents and warrants that (i) Licensor's performance under this Agreement shall not violate any agreement between Licensor and any third party; (ii) the Licensed Marks and the use of the Licensed Marks as contemplated herein, to the best of Licensor's knowledge, do not and shall not violate any applicable law or regulation or infringe any copyright, trademark, trade secret or patent; (iii) Licensor has all right, power and authority necessary to enter into this Agreement and grant the license to the Licensed Marks hereunder; (iv) Licensor shall not use nor grant any other Person any license to use the Licensed Marks during the term of this Agreement in connection with the sale, marketing or distribution of the Licensed Products to Michaels and (v) Licensor has good and valid title to the Inventory and shall deliver such Inventory to the Licensee free and clear of all liens and encumbrances.

2

*uc 4/8/2011*

Exhibit 4 - 86

(b)    Licensee represents and warrants that (i) Licensee's performance under this Agreement shall not violate any agreement between Licensee and any third party or any obligation owed by Licensee to any third party; (ii) Licensee's intended use of the Licensed Marks, to the best of Licensee's knowledge, shall not violate any applicable law or regulation; (iii) Licensee has all right, power and authority necessary to enter into this Agreement; and (iv) Licensee shall not use the Licensed Marks in any unlawful or commercially unreasonable manner, and shall not use the Licensed Marks except as specifically allowed in this Agreement.

(c)    Licensor hereby agrees to indemnify and hold harmless Licensee, and its directors, officers, employees, licensees, agents, attorneys and independent contractors, from and against any adverse consequences, arising out of or in connection with Licensor's breach of and/or failure to comply with any of its representations, warranties, duties or obligations hereunder and/or any claim of infringement related to the Licensed Marks.

(d)    Licensee hereby agree to indemnify and hold harmless Licensor and its directors, officers, employees, licensees, agents, attorneys and independent contractors, from and against any adverse consequences, arising out of or in connection with Licensee's use of the Licensed Marks as described herein, or Licensee's breach of and/or failure to comply with any of its representations, warranties, duties or obligations hereunder.

7.    **Termination.**

(a)    If either party shall violate any of its obligations under the terms of this Agreement, then the non-breaching party shall have the right to terminate this Agreement upon thirty (30) days prior written notice to the breaching party with respect to any such default, and such notice of termination shall become effective unless the breaching party shall cure the violations within thirty-day period, but if such default is not susceptible to cure within such thirty-day period, the breaching party shall not be in default if the breaching party promptly commences the cure within such thirty-day period and diligently and continuously pursues the cure to completion; provided, however that in no event shall such cure period be extended by more than thirty (30) days.

(b)    Termination of the license under the provisions of this paragraph 6 shall be without prejudice to any rights which either party may otherwise have against other.

8.    **Effect of Termination or Expiration.** Upon and after the expiration or termination of this license, all rights granted to Licensee hereunder shall forthwith revert to Licensor and Licensee shall refrain from further use of the Licensed Marks, including without limitation any reference to the Licensed Marks in connection with the purchase, sale or distribution of the Licensed Products; provided that Licensee shall have the right to liquidate any inventory on-hand or on order with use of the Licensed Marks. Subject to the preceding sentence, Licensee acknowledges that its failure to cease all use of the Licensed Marks at the termination or expiration of this Agreement will result in immediate damage to Licensor. Licensee acknowledges and admits that there is no adequate remedy at law for such failure to use of the Licensed Marks, and Licensee agrees that in the event of such failure Licensor shall be entitled to equitable relief by way of temporary and permanent injunctions and such other further relief as any court with jurisdiction may deem just and proper. Resort to any remedies referred to herein shall not be construed as waiver of any other rights and remedies to which Licensor is entitled under this Agreement or otherwise.

9.    **Notices.** All notices and statements to be given, and all payments to be made hereunder, shall be given or made at the respective addresses of the parties as set forth below unless notification of a change of address is given in writing, and the date of mailing shall be deemed the date the notice or statement is given.

3

*uc 4/8/2011*

Exhibit 4 - 87

10.    **Relationship of Parties.** It is understood and agreed by the parties hereto that this Agreement does not establish a fiduciary relationship between them, each party shall be an independent contractor, and that nothing in this Agreement is intended to constitute either party an agent, franchisor, franchisee, legal representative, subsidiary, joint venturer, partner, employee, or servant of the other for any purpose whatsoever. During the term of this Agreement, Licensee shall hold itself out to the public as an independent company using the Licensed Marks pursuant to a license from Licensor, and neither party shall have any power to obligate or bind or commit the other party in any manner whatsoever. Licensee shall be solely responsible for its performance under the license, including product sourcing (other than as set forth in Section 2 above), testing, shipping, warehousing, delivery to Michaels, billing, collections and customer/consumer service; provided that (i) Licensor shall be responsible for all Inventory sold under Section 2 and (ii) Licensor shall provide all requested transition services to allow Licensee to sell Licensed Product to Michaels pursuant to the license hereunder (including Licensor shall fulfill purchase orders directly to Michaels upon request by Licensee (at Licensee's cost) through May 31, 2011.)

11.    **Assignment/Sublicense.** Licensee shall have the right to assign all or any part of its rights or delegate all or any part of its obligations hereunder without the prior written consent of the Licensor; provided, however that no such sublicense or assignment shall relieve Licensee of any of its obligations hereunder and assignee shall be subject to the obligations hereunder. Licensor shall have the right to assign all or any part of its rights or delegate all or any part of its obligations hereunder without the prior written consent of the Licensee to a successor-in-interest to the Licensed Marks or Licensed Products; provided, however that no such assignment shall relieve Licensor of any of its obligations hereunder and assignee shall be subject to the obligations hereunder.

12.    **Counterparts.** This Agreement may be executed in any number of counterparts (including via facsimile or email PDF) and all counterparts shall be deemed to constitute a single agreement. The execution of one counterpart by any party shall have the same force and effect as if that party had signed all other counterparts. Any signature page hereof may be detached from any counterpart hereof without impairing the legal effect of any signatures thereon and may be attached to another counterpart hereof identical in form hereto but having attached to it one or more additional signature pages.

13.    **Miscellaneous.** None of the terms of this Agreement can be waived or modified except by an express agreement in writing signed by both parties. The failure of either party hereto to enforce, or the delay by either party in enforcing, any of its rights under this Agreement shall not be deemed a continuing waiver or a modification thereof. This Agreement constitutes the entire agreement between the parties with respect to the subject thereof and all prior negotiations, understandings and commitments are superseded hereby and thereby. This Agreement may be amended only by an instrument in writing by both parties. This Agreement shall be governed by and construed in accordance with the laws of the State of California.

*        *        *        *

4

uc  4/8/2011

Exhibit 4 - 88

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be duly executed as of the day and year first above written.

LICENSOR:                                    WESTRIM, INC.

                                             By: _____
                                                 Ronald B. Cooper, President
                                             7855 Hayvenhurst Ave.
                                             Van Nuys, CA 91406

LICENSEE:                                    DCWV ACQUISITION CORPORATION

                                             By: _____
                                                 Michael Hill, President
                                             Address: 751 South 170 East
                                             Provo, UT 84601

5

uec  4/9/2011

Exhibit 4 - 89

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

1900 Avenue of the Stars, Seventh Floor, Los Angeles, California  90067-4308

A true and correct copy of the foregoing document described as ***Motion For Order Authorizing: (A) Sale Of Certain Assets Of The Estate, Free And Clear Of All Liens, Claims, Encumbrances And Interests; (B) Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases; And (C) Related Relief; Memorandum Of Points And Authorities; Declaration Of Christopher M. Mclain In Support Thereof*** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On ***May 4, 2011***, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- Alexis M McGinness      amm@jmbm.com, vr@jmbm.com
- David M Poitras    dpoitras@jmbm.com
- United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov

☐ Service information continued on attached page

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On ***May 4, 2011,*** I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be</u> completed no later than 24 hours after the document is filed.

*Served By Overnight Mail:*
Hon. Geraldine Mund
United States Bankruptcy Court
21041 Burbank Boulevard, Suite 342
Woodland Hills, CA 91367

☒ Service information continued on attached page

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge <u>will be</u> completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| May 4, 2011 | Claudean Brandon | /s/ Claudean Brandon |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*                                                                                           **F 9013-3.1.PROOF.SERVICE**

**II.  <u>SERVED BY U.S. MAIL</u>:**

WESTRIM , INC., dba WESTRIM CRAFTS,
a Delaware corporation

SECURED CREDITORS

Agent for Bridge Lenders
Ron Cooper
11222 Brooks Road
Windsor, CA 95492

Attorneys For Acquisition Corp.
Paul Hastings Janofsky & Walker LLP
Amit Mehta
191 North Wacker Drive, 30th Fl
Chicago, IL 60606

Attorneys For Acquisition Corp.
Paul Hastings Janofsky & Walker LLP
Jennifer B. Hildebrandt
515 South Flower St, 25th Fl
Los Angeles, CA 90071

Attorneys For Newstar Business Cred
Hunton & Williams LLP
Gregory G. Hesse
1445 Ross Avenue, Ste 3700
Dallas, TX 75202
Email: ghesse@hunton.com
Tel: (214) 468-3335


LIST OF 20 LARGEST UNSECURED CREDITORS

AMB Property Corp.
PRJT# PVANNUY03/Leade ID LWESTCR01
PO Box 6156
Hicksville, NY 11802-6156
Attn: Kari Hughes

American Express-CPC/091678
CPC Remittance Processing
PO Box 329000
Weston, FL 33332-9000

Anthem Blue Cross
PO Box 5812
Los Angeles, CA 90074-5812
Attn:  Ruth Estrada

Asian Craft Inc.
8th Fl, No 97 Sec 2, Nan King E Rd
Taipei, Taiwan
Attn: Donald Chen

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*

**F 9013-3.1.PROOF.SERVICE**

Aurient International Corp.
8F-3 105 Chang An West Road
Taipei, Taiwan
Attn: Edmund Wu / Melody Hsiao

Banaras Beads Limited
A-1 Industrial Estate
Varanasi-221 106 India
Attn: Siddarth Gupta

Bureau Veritas
Consumer Products Services, Inc.
14624 Collection Center Drive
Chicago, IL 60693
Attn: Teresa Keller

Bureau Veritas Hong Kong Ltd
14630 Collection Center Drive
Chicago, IL 60693
Attn: Effie Lu

CSA Canadian Sales Agency Inc.
#1 Valleybrook Drive
Toronto, ON M3B 2S7
Attn: Michelle Callahan


Dumont Promotional Images Inc.
12947 Chadron Avenue
Hawthorne, CA 90250
Attn: Lisa Machado
     Brad Storms

Edwards Properties
PO Box 1549
Springdale, AR 72765
Attn:  Joe Edwards

Grant Thornton, LLP
PO Box 51552
Los Angeles, CA 90051-5852
Attn: Daryl Ohland

Kelly Lowry & Kelley LLP
6320 Canoga Ave #1650
Woodland Hills, CA 91367
Attn: John Kelly

Kwan Hing Fareast Prod Fty Ltd
Stg2 Blk A 6thF
Wah Fung Id Bldg Ct
Kwai Chung, Hong Kong
Attn: Michelle-Kwan Hing

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*                                                                    **F 9013-3.1.PROOF.SERVICE**

Miller Starr & Regalia
Dept 05115 POB 39000
San Francisco, CA 94139-5115
Attn: Lance Anderson

Nord Race Paper Intl Ltd
Unit 12 15/F Wah Wai Centre
38-40 Au Pui Wan St
New Territories, Hong Kong
Attn: Peter Pang

Silverwings Unique, Inc.
451 North Oak Street
Inglewood, CA 90302
Attn: Albert Chen

Tin Hung Products Factory HK
223 G/F, Yu Chau Street
Sham Shui Po, Hong Kong
Attn: Tin Fu-Lap Yeung Yuk

Tru-Blu Industries LLC
PO Box 793
Niles, MI 49120
Attn: Bob Demmet
Attn: Jerry French

VIF Valencia Gateway, LLC
c/o CB Richard Ellis
500 Citadel Drive
Commerce, CA 90040
Attn: Dee Eckman

Miller Starr & Regalia
300 Hamilton Avenue, Third Floor
Palo Alto, CA 94301
Attn: Lance Anderson

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*                                                    **F 9013-3.1.PROOF.SERVICE**