DAVID M. POITRAS P.C. (CA Bar No. 141309)
ALEXIS M. McGINNESS (CA Bar No. 241449)
JEFFER MANGELS BUTLER & MITCHELL LLP
1900 Avenue of the Stars, Seventh Floor
Los Angeles, California 90067-4308
Telephone:    (310) 203-8080
Facsimile:    (310) 712-8571
Email:    dpoitras@jmbm.com

Counsel for Westrim, Inc.,
Debtor and Debtor-in-Possession

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
### SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re | CASE NO.    1:11-bk-15313-GM |
| WESTRIM, INC. dba WESTRIM CRAFTS, a Delaware corporation. | Chapter 11 |
| Debtor. | **DEBTOR'S MOTION FOR ORDER AUTHORIZING:** |
| | **(A) SALE OF CERTAIN ASSETS OF THE ESTATE, FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS AND** |
| | **(B) DISPOSAL OF CERTAIN ENVIRONMENTAL AND CONSUMER NON-COMPLIANT PRODUCTS; AND** |
| | **(C) ABANDONMENT OF CERTAIN PERSONAL PROPERTY** |
| | **MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF RONALD B. COOPER IN SUPPORT THEREOF** |
| | Hearing: |
| | Date:    TBD |
| | Time:    TBD |
| | Place:    Courtroom 303 |
| | 21041 Burbank Blvd. |
| | Woodland Hills, CA 91367 |
| | Judge:    Hon. Geraldine Mund |

JMBM | Jeffer Mangels Butler & Mitchell LLP

PRINTED ON
RECYCLED PAPER
7849986v2

JMBM | Jeffer Mangels
Butler & Mitchell LLP

Westrim Inc. dba Westrim Crafts, a Delaware corporation, debtor and debtor-in-possession in this chapter 11 case (hereinafter "Westrim" or "Debtor"), hereby moves this Court, pursuant to section 363(b) and 554(a) of title 11 of the United States Code (the "Bankruptcy Code"), for an Order Granting Debtor's Motion for Order Authorizing (A) Sale of Certain Assets of the Estate, Free and Clear of all Liens, Encumbrances and Interests; (B) Disposal of Certain Environmental and Consumer Non-Compliant Products; and (c) Abandonment of Certain Personal Property (the "Liquidation Sale Motion" or "Motion") for authority to:

(1) Sell certain (though not substantially all) Remaining Assets[1] (as defined in the Motion), consisting of generally Non-Bead Inventory, Bead Inventory and other Fixed Assets as follows:

(a) The Remaining Assets shall be sold free and clear of liens, claims, interests and encumbrances, pursuant to 11 U.S.C. § 363(f). Pursuant to 11 U.S.C. § 363(e), the liens asserted by Newstar and the Bridge Lenders in the Remaining Assets to be sold will attach to the net proceeds of sale, in the same order and priority as said interest(s) existed on the date the sale is approved or consummated. At Closing, the net sale proceeds will be paid over to Newstar up to the amount of and on account of its claim secured by its senior lien against such Remaining Assets;

(b) Debtor intends to proceed to liquidate the Remaining Assets by selling these obsolete products to certain liquidation specialists or the highest bidder, as described in the attached Motion;

(c) There are no contingencies to the liquidation sale. The sales must be completed by the TSA Expiration Date;

(d) No commissions or fees shall be received or paid by the estate;

[1] A full schedule of the Non-Bead Inventory, Bead Inventory and Fixed Assets (as defined in the attached Motion) is attached as Exhibits A-C to the Declaration of Ronald B. Cooper.

PRINTED ON RECYCLED PAPER

1    (e) Debtor is unaware of any estimated or possible tax consequences to the estate;

2    (f) As set forth in the Motion, Debtor anticipates receiving approximately 15% -

3    20% recovery of the standard cost for the Non-Bead and Bead Inventory.

4    The Debtor anticipates a return of approximately $50,000.00 for all the Fixed

5    Assets.

6    (2) dispose of certain products in guidance with applicable law that do not comply

7    with certain environmental and consumer standards; and

8    (3) abandon certain personal property after the expiration of the TSA which is

9    located at the Van Nuys Warehouse located at 7855 Hayvenhurst Avenue, Van Nuys, California

10    91406-1712 because such personal property is burdensome to the estate, especially given Debtor's

11    necessity to vacate the Van Nuys Warehouse upon concluding Debtor's obligations under the

12    Transition Services Agreement.

13

14    **I.    FACTS AND PROCEDURAL HISTORY**

15        **A.    Debtor's Business Operations**

16        1.    Westrim is a Delaware corporation and a wholly owned subsidiary of Creativity

17    Craft, Inc., and is based in Van Nuys, California. Debtor evolved into a basic crafts business in the

18    1960s wholesaling products to hobby stores and sewing retailers.  Design of product was done in

19    Southern California but virtually all production has been done in Asia since the 1970s, with the

20    product being distributed nationwide from Debtor's Southern California distribution facility.

21        2.    By the early 2000s, the independent hobby and sewing stores had been replaced by

22    the national chains of hobby and mass merchandise stores such as Michaels, JoAnn Stores, A.C.

23    Moore, Wal-Mart and Target.  The Company grew to meet the needs of these large chains with

24    evolving consumer trends and increasing volume.  Scrapbooking became very popular and Debtor

25    moved its focus toward that sector, retaining the basic crafts business.  The costume jewelry making

26    business became increasingly popular and in 2002, Westrim acquired Blue Moon Beads.

27        3.    Debtor acquired several craft companies between 2000 and 2006, with the intent of

28    leveraging a common "back office" infrastructure (warehousing, accounting, IT, HR) to provide

PRINTED ON
RECYCLED PAPER

JMBM | Jeffer Mangels Butler & Mitchell LLP

1  cost leverage and strengthen its relationships with key retail customers, including Michaels, JoAnn's

2  and Wal-Mart.  Unfortunately, several factors in the mid-2000s adversely affected Debtor's ability

3  to sell the business as a whole and the overall business operations.

4      4.    The popularity of scrapbooking began to wane in the mid-2000s, negatively

5  impacting the company's largest and most profitable division.    Significant losses in product

6  placement due to changes in retailer strategy and increased competition results in a decline in

7  revenue from approximately $125 million in 2005 to $30 million in 2010.  As of the Petition Date,

8  Debtor's revenue and margins were not sufficient to pay its infrastructure costs on an ongoing basis.

9      5.    In May 2010, Debtor sold the assets of its scrapbooking, paper crafting, wall décor,

10  craft storage and general crafts business to ANW Crestwood.

11      6.    Since May 2010, in its ordinary course of business, Debtor has continued to liquidate

12  its remaining non-bead inventory (i.e. general crafts and scrapbooking inventory not sold to ANW

13  Crestwood) (the "Non-Bead Inventory").

14      7.    In 2010, sales of the remaining Non-Bead Inventory were $190,094.  The standard

15  costs of the product sold was $1,422,270 for a 13.4% recovery of standard costs.  For the period

16  January 1, 2011 through April 29, 2011, sales were $135,132 with a cost basis of $1,782,922 for a

17  recovery rate of 17.3%.  Debtor anticipates a lower recovery rate, given that the most valuable

18  remaining Non-Bead Inventory has generally been sold off and the remaining Non-Bead Inventory

19  now consists of the less desirable remaining products.

20  **B.**    **Chapter 11 Bankruptcy Proceedings**

21      8.    On April 29, 2011 (the "Petition Date"), Debtor filed a voluntary petition for relief

22  under chapter 11 of title 11 of the Bankruptcy Code.

23      9.    On May 4, 2011, Debtor filed its *Motion for Order Authorizing (A) Sale of Certain*

24  *Assets of the Estate, Free and Clear of All Liens, Claims, Encumbrances and Interests; (B)*

25  *Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (C) Other*

26  *Relief* [Docket No. 22] (the "BMB Sale Motion"), requesting authorization for the Debtor to sell

27  substantially all of its assets.

28

JMBM | Jeffer Mangels
Butler & Mitchell LLP

10.    On June 6, 2011, the Court entered an Order Granting Debtor's BMB Sale Motion (the "BMB Sale Order"). The BMB Sale closed on June 7, 2011.

11.    As part of the BMB Sale Motion, Debtor entered into a Transition Services Agreement ("TSA"), which provides in part, that Debtor will provide continuing on-going transition services for a limited period of time to allow the efficient transition of the assets sold pursuant to the BMB Sale Order. The TSA expires July 15, 2011, with the option of an extension to July 31, 2011 (the "TSA Expiration Date").[2]

### C.    Van Nuys Warehouse

Debtor is currently occupying its distribution facilities located at 7855 Hayvenhurst Avenue, Van Nuys, California (the "Van Nuys Warehouse"). Debtor filed a Motion to Reject the Van Nuys Lease on May 31, 2011, prior to consummation of the BMB Sale. Debtor jointly filed a stipulation requesting a continuance on the hearing until July 12, 2011 and is conducting negotiations with the landlord and DCWC Acquisition Corporation, the assignee to Blue Moon Beads Acquisition Corp. ("BMB Acquisition Corp.").

### D.    Remaining Personal Property Subject to this Liquidation Sale Motion

Debtor's remaining personal property consists of (i) non-bead inventory, such as general crafts and scrapbooking material, discussed above (the "Non-Bead Inventory"); (ii) bead inventory not subject the BMB Sale Order (the "Bead Inventory") and (iii) other fixed assets such as forklifts, racking, office furniture, personal computers, IT equipment and vehicles (the "Fixed Assets"). A full and complete list of this property is attached hereto as Exhibits A - B, respectively. Collectively, the Non-Bead Inventory, Bead Inventory and Fixed Asserts are hereinafter referenced as the "Remaining Assets."

Debtor also has certain Non-Bead Inventory and Bead Inventory that is no longer compliant with environmental and other consumer product standards (the "Non-Compliant Products"). For example, certain remaining inventory contains levels of lead that are too high to sell and/or donate

---

[2] BMB Acquisitions Corp. must provide notice of such extension on or prior to July 1, 2011.

7849986v2

1   to consumers.    Similarly, certain 'Mighty Mountz' products are packaged in non-compliant

2   packaging and therefore cannot be resold or donated.

3       **E.**    **Claims Against Debtor's Assets**

4          **1.**    **Secured Creditors**

5        Newstar Business Credit LLC ("Newstar") is Debtor's senior secured lender.    Debtor has

6   investigated and believes that Newstar has a perfected and unavoidable security interest in all of the

7   Remaining Assets subject to the Liquidating Sale Motion.    See Declaration of Ronald B. Cooper

8   (the "Cooper Declaration").    The debt owed to Newstar is secured by all assets of both Debtor and

9   Creativity, Inc., a wholly owned subsidiary of Debtor.    Debtor is hopeful that the Newstar debt will

10   be paid in full through a combination of the cash paid as part of the BMB Sale (including any Earn

11   Out payments), the collection of Debtor's remaining accounts receivable and the sale of the

12   Remaining Assets contemplated by the sale described herein.

13        As of the Petition Date, a group of fourteen individuals/entities (the "Bridge Lenders")

14   assert a claim against Debtor in the amount of approximately $1,025,000 plus accrued interest and

15   costs (the "Bridge Loan").    The Bridge Lenders are comprised of a group of shareholders of

16   Creativity Crafts, Inc., Debtor's parent company.    The Bridge Lenders provided the Bridge Loan to

17   Debtor in June 2010 to fund certain operating shortfalls and to otherwise get Debtor to the "finish

18   line" to complete a out-of-court going concern sale of Debtor's then assets.    At that point in time,

19   Debtor and the Bridge Lenders reasonably believed that the value of the company in a sale would be

20   sufficient to pay creditors in full and provide a return to equity.    The Bridge Lenders' debt is

21   secured by a junior security interest in substantially all of Debtor's assets.    The Bridge Loan is

22   subordinate to the Newstar loan.    See Cooper Declaration.

23        Newstar and the Bridge Lenders are the only parties that Debtor is aware of that

24   assert a perfected security interest in the Remaining Assets that are the subject of this Motion.    See

25   Cooper Declaration.

26       **F.**    **Unsecured Claims**

27        In addition to the secured claims described above, there are general unsecured trade claims

28   of approximately $9.5 million in this case, including projected landlord claims.

JMBM | Jeffer Mangels
Butler & Mitchell LLP

PRINTED ON
RECYCLED PAPER

7849986v2

## II.    SALE PROCEDURES FOR REMAINING ASSETS

Debtor has established relationships with consumers, consisting of craft and mass retail chain stores, discount chain stores as well as liquidation specialists for the sale of its previous product lines and operating equipment as well as other liquidators interested in Debtor's other fixed assets.  The following section provides Debtor's proposed procedure for the sale of its Remaining Assets.

### A.    Non-Bead Inventory

In May 2010, Debtor sold the assets of its scrapbooking, paper crafting, wall décor, craft storage and general crafts business to ANW Crestwood.  Since that time, in its ordinary course of business, Debtor has continued to sell the remaining inventory from these lines of business to different craft and mass chain stores, then to discounts chains such as Ross and Big Lots and finally to liquidation specialists, including MDM Distributors, Leon Korol Co., Joe Loo and Craven Closeouts[3].  See Cooper Declaration.

Debtor estimates that its remaining Non-Bead Inventory has an approximate standard cost value of approximately $600,000 which amount includes certain Non-Compliant Products.  Based upon the previous rates of liquidation of the Non-Bead Inventory, Debtor estimates that through this final liquidation, it can recover approximately $22,000.00.  Debtor will continued to solicit offers for the remaining Non-Bead Inventory from  the liquidation specialists to maximize the value received. See Cooper Declaration.

### B.    Bead Inventory

Pursuant to the BMB Sale Order, Debtor sold the assets of its Blue Moon Beads to BMB Acquisition Corp. on June 7, 2011.  Certain of the inventory related to the beads business was not acquired by BMB Acquisition Corp., including some Non-Compliant Products.  Debtor estimates the remaining Bead Inventory has an approximate standard cost value of $1.3 million.  See Cooper Declaration.

Debtor believes that BMB Acquisition Corp. has interest in acquiring some of this

---

[3] Debtor will serve these entities with a copy of this Motion.

PRINTED ON
RECYCLED PAPER

JMBM | Jeffer Mangels Butler & Mitchell LLP

7849986v2

1  remaining Bead Inventory. Debtor anticipates that by mid-July, BMB Acquisition Corp. will have

2  identified any additional Bead Inventory that it will seek to acquire. Debtor anticipates a higher

3  recovery value for this more desirable remaining Bead Inventory than it could otherwise obtain

4  from other buyers. See Cooper Declaration.

5       Exclusive of the Bead Inventory that BMB Acquisition Corp. seeks to acquire upon Court

6  approval herein, Debtor will solicit offers from potential buyers for the purchase of the remaining

7  Bead Inventory from similar customers as those of the Non-Bead Inventory. Debtor also has an

8  agreement with Fire Mountain Gems & Beads to acquire the remaining Bead Inventory at a price

9  that represents approximately 20% of the standard costs of the items purchased. This agreement

10  was reaffirmed on June 7, 2011. Debtor will solicit other entities for a higher recovery price and is

11  open to unsolicited overbid offers. See Cooper Declaration; **Exhibit C** thereto.

12       **C.**    **Fixed Assets and Other Personal Property**

13       Since the sale of a significant portion of its assets to ANW Crestwood in May 2010,

14  Debtor has significantly downsized its operations, including vacating several warehouses and

15  offices. As a result, Debtor, in its ordinary course of business, sold certain fixed assets to

16  companies and individuals that expressed interest in such personal property. See Cooper

17  Declaration. Consistent with its current winding down of operations, Debtor has certain fixed assets

18  and other personal property, including forklifts, racking, office cubical furniture, computers, IT

19  equipment and vehicles (the "Fixed Assets") that it seeks to sell, which are located in the Van Nuys

20  Warehouse. See Cooper Declaration, **Exhibit B**.

21       BMB Acquisition Corp. has expressed interest in acquiring some of the Fixed Assets upon

22  further court approval. Debtor anticipates that by mid-July, BMB Acquisition Corp. will have

23  identified any Fixed Assets that it will seek to acquire. Debtor anticipates a higher recovery value

24  for these Fixed Assets from BMB Acquisition Corp. than Debtor could otherwise obtain from other

25  buyers. See Cooper Declaration.

26       Exclusive of the Fixed Assets that BMB Acquisition Corp. seeks to acquire upon court

27  approval, Debtor will solicit offers from those companies and individuals that Debtor has a

28

JMBM | Jeffer Mangels
Butler & Mitchell LLP

PRINTED ON
RECYCLED PAPER

7849986v2

- 8 -

1  relationship[4] for their purchase of the remaining Fixed Assets and is open to unsolicited overbid

2  offers. See Cooper Declaration.

3       **1.    Truck**

4       As disclosed in Debtor's Statement of Financial Affairs, title of a 2002 Ford F150

5  Pickup (VIN #1FTRW07L42KD88959) (the "Truck") is titled in the name of Victor Chevalier

6  ("Chevalier"), an employee of Debtor.  Debtor inadvertently did not transfer title to itself after

7  reimbursing Chevalier for the purchase price in 2002.  Chevalier holds title despite Debtor paying

8  all insurance and license fees since 2002.  The Truck was used for work purposes and is in fair

9  condition.  As part of its liquidation, Debtor seeks authorization to sell the Truck to Chevalier or

10 some other party at the Kelley's Blue Book fair market value, which is $3,190.  See Cooper

11 Declaration; **Exhibit D** thereto.

12      **D.    Overbidding**

13      The Debtor intends to solicit parties it has knowledge are interested in acquiring the

14 Remaining Assets. By this Motion, Debtor provides notice to any other interested party that Debtor

15 is amenable to offers for the purchase of the Remaining Assets (which are identified specifically in

16 Exhibits A - B) that exceed the estimated sale value set forth herein.

17      **E.    Compliance with Rule 6004 and LBR 6004**

18      In accordance with Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary

19 course of business may be by private sale or by public auction. Debtor shall file an itemized

20 statement of the property sold, the name of the purchaser and the  purchase price no later than 21

21 days after the liquidating sale has been completed, pursuant to LBR 6004-1(g).

22      **F.    No Intent to Hire Auctioneer, Liquidator or Broker**

23      Debtor believes that it is in the best interest of its creditors for Debtor to conduct the

24 liquidation itself, rather than employing an auctioneer.  Debtor believes it is in the creditor's best

25 interest to maximize the value of the assets, and dispose of the remaining assets expeditiously while

26

27 _____

   [4] Including, but not limited to, American Warehouse Equipment, Inc. and Accessory One.
28 Both of these entities will be served a copy of this Motion.

PRINTED ON

RECYCLED PAPER

1    Debtor still has access to the remaining Inventory and Fixed Assets located in the Van Nuys

2    Warehouse, which such access shall terminate on the TSA Expiration Date when Debtor must

3    vacate the premises upon completion of the Transition Services Agreement.

4          Debtor believes that it is well suited to conduct such liquidation.  Debtor has significant

5    relationships with buyers of the products that it seeks to sell and will be able to maximize the

6    benefit of these sales for the creditors by reducing administrative costs associated with the fees

7    associated with employing a broker or auctioneer.  In addition, due to the time constraints of

8    vacating the Van Nuys Warehouse, Debtor can expeditiously complete these contemplated

9    transactions.

10   **III.    THE SALE OF THE ASSETS IS IN THE BEST INTEREST OF THE ESTATES AND**

11   **THERE IS A SOUND BUSINESS JUSTIFICATION FOR THE SALE BEING**

12   **PRESENTED TO THIS COURT**

13         The Ninth Circuit has ruled in cases under the Bankruptcy Code that a sale of a debtor's

14   property outside the ordinary course of business should be approved if it is in the best interests of

15   the estate and its creditors.  *In re The Huntington Ltd.*, 654 F.2d 578, 589 (9th Cir. 1981); *In re*

16   *Equity Funding Corp.*, 492 F.2d 793, 794 (9th Cir. 1974).  Whether a sale is in the best interests of

17   the estate and of the creditors of the estate continues to be one of the significant factors under the

18   Bankruptcy Code.  See, *In re the Canyon Partnership*, 55 B.R. 520 (Bankr. S.D. Cal. 1985).

19         In addition to the requirement that the sale be in the best interests of the estate and the

20   creditors of the estate, the Bankruptcy Appellate Panel of the Ninth Circuit as well as the Second

21   Circuit and the Fifth Circuit Court of Appeals have held that in order for a debtor-in-possession or

22   trustee to satisfy its fiduciary duty to the debtor, creditors and equity security holders, a motion to

23   sell assets of the estate outside of the ordinary course of business must articulate a sound business

24   justification for the use, sale or lease of the property outside the ordinary course of business.  *In re*

25   *Walter*, 83 B.R. 14 (Bankr. 9th Cir. 1988); see also, *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d

26   Cir. 1983); *In re Continental Airlines, Inc.*, 780 F.2d 1223 (5th Cir. 1986) and *In re Wilde Horse*

27   *Enterprises, Inc.*, 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991).

28         In the present case, the relief requested is in the best interests of creditors and the estate

1    because Debtor has practically ceased operations, other than performing the Transition Services

2    Agreement, and the value of the Remaining Assets will necessarily be lost and dissipated absent a

3    prompt sale. The protection of the value of a debtor's assets is a valid business justification for the

4    sale of assets under § 363(b). See, *In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1992) (approving

5    the sale of substantially all of the assets of one of the debtor's subsidiaries over the objections of the

6    creditors' committee. The court upheld the lower court's finding that further delay would create a

7    risk that the assets would be sold later, and for less). Moreover, based upon the evidence presented,

8    Debtor believes that it is clear that the estate is receiving fair and adequate value for the Remaining

9    Assets.

### A.    The Statutory Standard

11        The power of the bankruptcy court to authorize sales of estate property free and clear of

12    liens has long been recognized. *Van Huffel v. Harkelrode*, 284 U.S. 225, 52 S.Ct. 115 (1931).

13    Section 363(f) provides that a debtor-in-possession may sell property of the estate pursuant to §§

14    363(b) and (c)), free and clear of any such interest in such property of an entity other than the estate,

15    if any one of the five requirements of § 363(f) are met.[5] *In the Matter of Circus Time, Inc.*, 5 B.R. 1

16    (Bankr.D.Me. 1979).

17        Newstar and the Bridge Lenders consent to the sale proposed in this Motion free and clear of

18    liens, claims, encumbrances and other interests. Debtor is not aware of any other party that asserts a

19    perfected security interest in the Remaining Assets to be sold pursuant to the procedures set forth

20    herein. See Cooper Declaration. Therefore, Debtor has satisfied § 363(f)(2) and Debtor is entitled

21    to the relief requested as a matter of law.

22

---

23    [5] 11 U.S.C. §363(f) provides that: the trustee may sell property under subsection (b) or (c) of
this section free and clear of any interest in such property of an entity other than the estate, only if -

24    
        (1) applicable non-bankruptcy law permits sale of such property free and clear of such
25    interest;
        (2) such entity consents;
26        (3) such interest is a lien and the price at which such property is to be sold is greater than the
aggregate value of all liens on such property;
27        (4) such interest is in bona fide dispute; or
        (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money
28    satisfaction of such interest.

JMBM | Jeffer Mangels
Butler & Mitchell LLP

1    **B.    Debtor Has Provided Adequate Protection to Those Parties Which**

2    **Assert an Interest in the Assets of The Estate Which Are to be Sold Free**

3    **and Clear of Liens**

4        11 U.S.C. § 363(e) provides that sales of property under § 363 are predicated upon the

5    estate providing the entity with an interest in the Remaining Assets to be sold with adequate

6    protection for said interest. By the Motion, the liens asserted by Newstar and the Bridge Lenders in

7    the Remaining Assets to be sold will attach to the net proceeds of sale, in the same order and

8    priority as said interest(s) existed on the date the sale is approved or consummated. At Closing, the

9    net sale proceeds will be paid over to Newstar up to the amount of and on account of its claim

10    secured by its senior lien against such Remaining Assets by depositing the sales proceeds in the

11    trust account established at Union Bank where the BMB Sale proceeds are held.

12    **IV.    DISPOSAL OF NON-COMPLIANT PRODUCT**

13        Debtor has knowledge that a portion of the Remaining Assets consist of products that cannot

14    be resold and/or donated because such product does not satisfy certain environmental and/or

15    consumer protection standards. For example, certain of the older, unsold Non-Bead and Bead

16    Inventory consists of products that exceed permitted levels of lead. As a result, the property is

17    burdensome to the Debtor's estate but should not merely be abandoned due to the environmental

18    concerns associated with these products. See Cooper Declaration. Debtor intends to use the

19    services of Crown Disposal, who Debtor has previously used for such services, and estimates that

20    the cost of disposal could be between $2,000 - $4,000. See Cooper Declaration. These Non-

21    Compliant Product are, however, secured collateral of Debtor's secured creditors. Therefore,

22    Debtor seeks authorization to properly dispose of such Non-Compliant Products.

23    **V.    ABANDONMENT OF CERTAIN PERSONAL PROPERTY**

24        As the Court is aware, Debtor filed its Motion to Reject the Van Nuys Lease, and the motion

25    has been continued to July 12, 2011. Debtor also believes that BMB Acquisition Corp. has reached

26    an agreement with the Van Nuys Warehouse landlord for BMB Acquisition Corp. to occupy the

27    premises through at least July 31, 2011. BMB Acquisition Corp. has also agreed to allow Debtor to

28    continue use of the Van Nuys Warehouse, without cost, so that Debtor can perform the Transition

JMBM | Jeffer Mangels
Butler & Mitchell LLP

PRINTED ON
RECYCLED PAPER

7849986v2

1    Services Agreement (which, even upon an extension expires on July 31, 2011) and is permitting

2    Debtor to simultaneously wind down its other operations. Debtor also filed its motion to reject

3    certain leases effective July 31, 2011[6]. Thus, Debtor seeks this Court's authorization to abandon the

4    Remaining Assets that it is unable to otherwise liquidate as of the expiration of the TSA (the

5    "Unsold Assets"). Debtor believes that there is no equity in the Unsold Assets because their

6    realizable value is less than the legal expenses, closing costs and other expenses (including the

7    monthly Van Nuys Warehouse rent of approximately $167,000 per month) associated with a sale of

8    the Unsold Assets after the expiration of the TSA. Any sale after the expiration of the TSA will not

9    likely result in any significant return to the Debtor's bankruptcy estate.

10    Based on the foregoing circumstances, the Debtor's interest in the Unsold Assets after the

11    expiration of the TSA is inconsequential value for the benefit of the estate, and is burdensome to the

12    estate, and as such, the Debtor requests that any Unsold Assets be abandoned.

13    Section 544 of the Bankruptcy Code provides that "after a notice and a hearing, the debtor

14    may abandon any property of the estate that is burdensome to the estate or that is of inconsequential

15    value and benefit to the estate." 11 U.S.C. § 544.

16    **VI.    CONCLUSION**

17    For all of the foregoing reasons, Debtor believes that the proposed sale and sale procedures

18    outlined herein, in addition to the disposal and abandonment of other personal property, are in the

19    best interests of the creditors and the bankruptcy estate. Debtor respectfully requests the Court

20    approve this Motion.

21

22

23

24

25

26

27    [6] Debtor's motion to reject unexpired leases also requests the Court's authorization to abandon certain leased equipment to lessors.

28

PRINTED ON
RECYCLED PAPER

7849986v2

1

Respectfully Submitted,

2    DATED:  June 22, 2011

JEFFER MANGELS BUTLER & MITCHELL LLP

3

4

By:  /s/ Alexis M. McGinness
Alexis M. McGinness
5
Attorneys for Debtor and Debtor-in-Possession
WESTRIM INC. dba WESTRIM CRAFTS
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JMBM | Jeffer Mangels
Butler & Mitchell LLP

PRINTED ON
RECYCLED PAPER

7849986v2

- 14 -

## DECLARATION OF RONALD B. COOPER

I, Ronald B. Cooper, do hereby declare as follows:

1.      I am the President and Chief Executive Officer of Debtor. I am authorized to make this declaration on behalf of Westrim, Inc. dba Westrim Crafts, debtor and debtor in possession in the above entitled bankruptcy case ("Westrim" or "Debtor").

2.      Certain of the facts set forth in this declaration are based upon Debtor's business records. The documents and papers which comprise the business records of Debtor are maintained by persons whose duty it is to keep such records accurately and correctly. Said records are created by employees of Debtor by making a written record of each transaction or occurrence which relates to such events at or shortly after the time of such transaction or occurrence. I have reviewed certain of Debtor's records prior to making this declaration.

3.      Each of the facts set forth herein are true and correct, to the best of my actual knowledge, information and belief. If called as a witness, I could and would competently testify with respect to the matters set forth herein.

4.      This declaration is made in support of *Debtor's Motion for Order Authorizing (A) Sale of Certain Assets of the Estate, Free and Clear of all Liens, Encumbrances and Interests; (B) Disposal of Certain Environmental and Consumer Non-Compliant Products; and (c) Abandonment of Certain Personal Property* (the "Liquidation Sale Motion" or "Motion").

5.      Capitalized terms used in this declaration and not specifically defined herein shall have the meaning assigned to such terms in the Motion.

**Debtor's Business**

6.      Westrim is a Delaware corporation and a wholly owned subsidiary of Creativity Craft, Inc., and is based in Van Nuys, California. Debtor evolved into a basic crafts business in the 1960s, wholesaling products to hobby stores and sewing retailers. Design of product was done in Southern California but virtually all production has been done in Asia since the 1970s, with the product being distributed nationwide from Debtor's Southern California distribution facility.

7.      By the early 2000s, the independent hobby and sewing stores had been replaced by the national chains of hobby and mass merchandise stores such as Michaels, JoAnn Stores, A.C.

JMBM | Jeffer Mangels
Butler & Mitchell LLP

PRINTED ON
RECYCLED PAPER

7862403v2

1   Moore, Wal-Mart and Target. The Company grew to meet the needs of these large chains with

2   evolving consumer trends and increasing volume. Scrapbooking became very popular and Debtor

3   moved its focus toward that sector, retaining the basic crafts business. The costume jewelry making

4   business became increasingly popular and in 2002, Westrim acquired Blue Moon Beads.

5       8.      Debtor acquired several craft companies between 2000 and 2006, with the intent of

6   leveraging a common "back office" infrastructure (warehousing, accounting, IT, HR) to provide

7   cost leverage and strengthen its relationships with key retail customers, including Michaels, JoAnn's

8   and Wal-Mart. Unfortunately, several factors in the mid-2000s adversely affected Debtor's ability

9   to sell the business as a whole and the overall business operations.

10      9.      The popularity of scrapbooking began to wane in the mid-2000s, negatively

11  impacting the company's largest and most profitable division. Significant losses in product

12  placement due to changes in retailer strategy and increased competition results in a decline in

13  revenue from approximately $125 million in 2005 to $30 million in 2010. Debtor's current revenue

14  and margins are not sufficient to pay its infrastructure costs on an ongoing basis.

15      10.     Newstar Business Credit LLC ("Newstar") is Debtor's senior secured lender. Debtor

16  has investigated and believes that Newstar has a perfected and unavoidable security interest in all of

17  the Remaining Assets subject to the Liquidating Sale Motion and substantially all of Debtor's other

18  assets.

19      11.     The debt owed to Newstar is secured by all assets of both Debtor and Creativity,

20  Inc., a wholly owned subsidiary of Debtor. Debtor is hopeful that the Newstar debt will be paid in

21  full through a combination of the cash paid as part of the BMB Sale (including any Earn Out), the

22  collection of Debtor's remaining accounts receivable and the sale of Remaining Assets

23  contemplated by the sale described herein.

24      12.     As of the Petition Date, a group of fourteen individuals/entities (the "Bridge

25  Lenders") assert a claim against Debtor in the amount of approximately $1,025,000 plus accrued

26  interest and costs (the "Bridge Loan"). The Bridge Lenders are comprised of a group of

27  shareholders of Creativity Crafts, Inc., Debtor's parent company. I am one of the Bridge Lenders.

28  The Bridge Lenders provided the Bridge Loan to Debtor in June 2010 to fund certain operating

JMBM | Jeffer Mangels
Butler & Mitchell LLP

PRINTED ON
RECYCLED PAPER

7862403v2

1    shortfalls and to otherwise get Debtor to the "finish line" to complete a out-of-court going concern

2    sale of Debtor's then assets.  At that point in time, Debtor and the Bridge Lenders reasonably

3    believed that the value of the company in a sale would be sufficient to pay creditors in full and

4    provide a return to equity.  The Bridge Lenders' debt is secured by a junior security interest in

5    substantially all of Debtor's assets.  The Bridge Loan is subordinate to the Newstar loan.

6        13.    Newstar and the Bridge Lenders are the only parties that Debtor is aware of that

7    assert a perfected security interest in the Remaining Assets that are the subject of this Motion.

8        14.    In addition to the secured claims described above, there are general unsecured trade

9    claims of approximately $9.5 million in this case, including projected landlord claims.

10        15.    On April 29, 2011 (the "Petition Date"), Debtor filed a voluntary petition for relief

11    under chapter 11 of title 11 of the Bankruptcy Code.

12        16.    On May 4, 2011, Debtor filed its Motion for Order Authorizing (A) Sale of Certain

13    Assets  of the Estate, Free and Clear of All Liens, Claims, Encumbrances and Interests; (B)

14    Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (C) Other

15    Relief [Docket No. 22] (the "BMB Sale Motion"), requesting authorization for the Debtor to sell

16    substantially all of its assets.

17        17.    On June 6, 2011, the Court entered an Order Granting Debtor's  BMB Sale Motion

18    (the "BMB Sale Order").

19        18.    As part of the BMB Sale Motion, Debtor entered into a Transition Services

20    Agreement ("TSA"), which provides in part, that Debtor will provide continuing on-going transition

21    services for a limited period of time to allow the efficient transition of the assets sold pursuant to the

22    BMB Sale Order.  The TSA expires July 15, 2011, with the option of an extension to July 31, 2011

23    (the "TSA Expiration Date").  BMB Acquisitions Corp. must provide notice of such extension on or

24    prior to July 1, 2011.

25        19.    Debtor is currently occupying its distribution facilities located at 7855 Hayvenhurst

26    Avenue, Van Nuys, California (the "Van Nuys Warehouse").  Debtor filed a Motion to Reject the

27    Van Nuys Lease on May 31, 2011, prior to consummation of the BMB Sale.

28

JMBM | Jeffer Mangels
Butler & Mitchell LLP

PRINTED ON
RECYCLED PAPER

7862403v2

1    20.    Debtor's remaining personal property consists of (i) non-bead inventory, such as

2    general crafts and scrapbooking material, discussed above (the "Non-Bead Inventory"); (ii) bead

3    inventory not subject the BMB Sale Order (the "Bead Inventory") and (iii) other fixed assets such as

4    forklifts, racking, office furniture, personal computers, IT equipment and vehicles (the "Fixed

5    Assets").    A full and complete list of this inventory is attached hereto as Exhibits A - B.

6    Collectively, the Non-Bead Inventory, Bead Inventory and Fixed Asserts are hereinafter referenced

7    as the "Remaining Assets."

8    **Bead Inventory**

9    21.    Pursuant to the BMB Sale Order, Debtor sold the assets of Blue Moon Beads to

10    BMB Acquisition Corp. on June 7, 2011.

11    22.    Certain of the inventory related to the beads business was not acquired by BMB

12    Acquisition Corp., including some Non-Compliant Products (the "Bead Inventory").    Debtor

13    estimates the remaining Bead Inventory has an approximate standard cost value of $1.3 million. A

14    schedule of the preliminary list of Bead Inventory is attached hereto as part of **Exhibit A**.

15    23.    It is my understanding and belief, after discussions with BMB Acquisition Corp.'s

16    principal Michael Hill, that BMB Acquisition Corp. is interested in acquiring some of this

17    remaining Bead Inventory.    Based on my experience, I believe that Debtor will reap a higher

18    recovery value for this desirable Bead Inventory from BMB Acquisitions Corp. than it could

19    otherwise obtain from other buyers.

20    24.    I have been informed and believe, that BMB Acquisition Corp. will have identified

21    any additional Bead Inventory that it will seek to acquire by mid-July.    Exclusive of the Bead

22    Inventory that BMB seeks to acquire upon court approval herein, I will solicit offers from potential

23    buyers for the purchase of the remaining Bead Inventory from similar customers as those of the

24    Non-Bead Inventory.

25    25.    Debtor has an agreement with Fire Mountain Gems to acquire the remaining Bead

26    Inventory at a price that represents approximately 20% of the standard costs of the items purchased.

27    This agreement was reaffirmed on June 7, 2011. Attached hereto as **Exhibit C** is a true and correct

28    copy of email correspondence from Chuck Wolfmueller of Fire Mountain Gems & Beads,

JMBM | Jeffer Mangels Butler & Mitchell LLP

PRINTED ON
RECYCLED PAPER

7862403v2

1    confirming its interest in purchasing the excess Bead Inventory.  The email has been redacted to

2    exclude attorney-client communications.

3    **Non-Bead Inventory**

4        26.    In May 2010, Debtor sold the assets of its scrapbooking, paper crafting, wall décor,

5    craft storage and general crafts business to ANW Crestwood.  Certain of the inventory related to

6    these businesses was not acquired by ANW Crestwood, including some Non-Compliant Products

7    (the "Non-Bead Inventory").

8        27.    Since May 2010, in its ordinary course of business, Debtor has continued to liquidate

9    its remaining Non-Bead Inventory to craft and mass chain stores, then to discounts chains such as

10   Ross and Big Lots and finally to liquidation specialists, including MDM Distributors, Leon Korol

11   Co., Joe Loo, and Craven Closeouts.

12       28.    In 2010, sales of the remaining Non-Bead Inventory were $2.7 million.  The standard

13   costs of the product sold was approximately $4.8 million, for a recovery rate of 56 percent of

14   standard cost.  In 2011, sales of the remaining Non-Bead Inventory were  approximately $200,000.

15   The standard costs of the product sold was approximately $1.4 million, for a recovery rate of 13

16   percent of standard cost.

17       29.    Debtor estimates that its remaining Non-Bead Inventory has an approximate standard

18   cost value of approximately $600,000.00, which amount includes certain Non-Compliant Products.

19   Debtor anticipates a lower recovery rate on the remaining products, given that the most valuable

20   Non-Bead Inventory has already been sold off and the remaining Non-Bead Inventory now consists

21   of the less desirable remaining products.  Based upon the previous rates of liquidation of the Non-

22   Bead Inventory, Debtor estimates that through this final liquidation, it can recover approximately

23   $22,000.00.

24   **Fixed Assets**

25       30.    Due to the decline in sales and the sale of a significant portion of its assets to ANW

26   Crestwood in May 2010, Debtor has significantly downsized its operations, including vacating

27   several warehouses and offices.

28

PRINTED ON
RECYCLED PAPER

JMBM | Jeffer Mangels
      | Butler & Mitchell LLP

7862403v2

31.   As a result of the downsizing, Debtor, in its ordinary course of business, has sold certain fixed assets, including warehouse equipment, racking, office cubicles, furniture and personal computers to companies and individuals that expressed interest in such personal property.

32.   Consistent with its current winding down of operations, Debtor has certain remaining fixed assets and other personal property that it seeks to sell, including forklifts, racking, office cubicle furniture, computers, IT equipment and vehicles.  All of these assets are located in the Van Nuys Warehouse.  A copy of the preliminary list of Fixed Assets that Debtor seeks to sell are identified on **Exhibit B** attached hereto.  Debtor is currently conducting a physical audit of these items to confirm the accuracy of this list.

33.   As disclosed in Debtor's Statement of Financial Affairs, title of a 2002 Ford F150 Pickup (VIN #1FTRW07L42KD88959) (the "Truck") is titled in the name of Victor Chevalier ("Chevalier"), an employee of Debtor.  Debtor inadvertently did not transfer title to itself after reimbursing Chevalier for the purchase price in 2002.  Chevalier holds title despite Debtor paying all insurance and license fees since 2002.  The Truck was used for work purposes and is in poor condition.  As part of its liquidation, Debtor seeks authorization to sell the Truck to Chevalier or some other party at the Kelley's Blue Book fair market value, which is $3,190.  Attached hereto as **Exhibit D** is a true and correct copy of the print out from the Kelley Blue Book website setting forth the fair market value.

34.   BMB Acquisition Corp. has indicated an interest in acquiring some of the remaining Fixed Assets upon further court approval.  Debtor anticipates a higher recovery value for these Fixed Assets from BMB Acquisition Corp. than Debtor could otherwise obtain from other buyers.  Debtor anticipates that by mid-July, BMB Acquisition Corp. will have identified any Fixed Assets that it will seek to acquire.

35.   Exclusive of the Fixed Assets that BMB Acquisition Corp. seeks to acquire upon court approval, Debtor will solicit offers from companies and individuals for the purchase of the remaining Fixed Assets.

36.    Debtor will continued to solicit offers for the remaining Non-Bead Inventory and Bead Inventory from the liquidation specialists to maximize the value received. Debtor is amenable to unsolicited offers for its Non Bead and Bead Inventory.

37.    Debtor also has certain Non-Bead Inventory and Bead Inventory that is not compliant with current consumer product standards (the "Non-Complaint Products"). For example, certain remaining inventory contains levels of lead that are too high to sell and/or donate to consumers. Similarly, a line of 'Mighty Mountz' wall décor products are packaged in non-compliant packaging. Debtor will sell (if possible) or dispose of these products in such a manner as to prevent future product liability claims. Debtor intends to use the services of Crown Disposal, whom it has previously used to conduct similar disposal. Debtor estimates that the costs for such disposal will be in the range of $2,000 - $4,000.

38.    Debtor believes that it is in the best interest of its creditors for Debtor to conduct the liquidation itself, rather than employing an auctioneer. I believe that Debtor is well suited to conduct such liquidation. Debtor has significant relationships with buyers of the products that it seeks to sell and will be able to maximize the benefit of these sales for the creditors by reducing administrative costs associated with the fees associated with employing a broker or auctioneer. In addition, due to the time constraints of vacating the Van Nuys Warehouse, Debtor can expeditiously complete these contemplated transactions.

39.    I am informed that Newstar and the Bridge Lenders each consent to the sale proposed in this Motion is free and clear of liens, claims, encumbrances and other interests.

40.    Debtor is not aware of any other party that asserts a perfected security interest in the Remaining Assets to be sold pursuant to the procedures set forth herein.

41.    Debtor also seeks to abandon the Unsold Assets (as defined in the Motion) as of the TSA Expiration Date. Debtor believes that there is no equity in the Unsold Assets because their realizable value is less than the legal expenses, closing costs and other expenses (including the monthly Van Nuys Warehouse rent of approximately $167,000 per month) associated with a sale of the Unsold Assets.

JMBM | Jeffer Mangels
Butler & Mitchell LLP

PRINTED ON
RECYCLED PAPER

7862403v2

1      I declare under penalty of perjury under the laws of the United States of America that the

2 foregoing is true and correct. This declaration is executed this 22nd day of June, 2011 in Windsor,

3 California.

4

5

6      RONALD B. COOPER

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28